**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------  x
In re:                                                  :  Chapter 11
                                                        :
GREEN FIELD ENERGY SERVICES, INC., et                   :  Case No. 13-12783 (_____)
al.,                                                    :
                                                        :  Joint Administration Requested
                          Debtors.¹                     :
------------------------------------------------------  x
```

**DECLARATION OF EARL J. BLACKWELL IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Under 28 U.S.C. § 1746, Earl J. Blackwell declares as follows under the penalty of

perjury:

1.      I am the Chief Financial Officer of Green Field Energy Services, Inc.

("**GFES**"), a corporation organized under the laws of the state of Delaware, and the Secretary of

Hub City Tools, Inc. and Proppant One, Inc., the wholly-owned subsidiaries of GFES

(collectively, the "**Debtors**"), in the above-captioned chapter 11 cases (collectively, the

"**Chapter 11 Cases**").  I am authorized to submit this declaration (the "**First Day Declaration**")

on behalf of the Debtors.

2.      As Chief Financial Officer of GFES I am responsible for overseeing the

financial activities of the Debtors, including but not limited to, monitoring cash flow, and tax and

financial planning.  As a result of my tenure with the Debtors, my review of public and non-

public documents, and my discussions with other members of the Debtors' management team, I

---

¹       The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax
or organizational identification number, are: Green Field Energy Services, Inc. (2539); Hub City Tools, Inc. (2827);
and Proppant One, Inc. (6035).  The above-captioned Debtors' mailing address is 4023 Ambassador Caffery
Parkway, Suite #200, Lafayette, LA 70503.

am familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities.[2] I am authorized by each of the Debtors to submit this First Day Declaration. References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On the date hereof, (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtors will continue to operate their business and manage their properties as debtors-in-possession.

4.      I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "**Bankruptcy Code**") and (b) "first-day" motions, which are being filed concurrently herewith (collectively, the "**First Day Motions**").[3] The Debtors seek the relief set forth in the First Day Motions with the goal of minimizing the adverse effects of the commencement of the Chapter 11 Cases on their business.

---

[2]      With respect to the statements relating to Turbine Generation Services, LLC, my knowledge relating to such matters has been gained from discussions with employees of Turbine Generation Services, LLC.

[3]      Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the applicable First Day Motions.

I have reviewed the Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to successfully maximize value of the Debtors' estates.

5.      Part I of this First Day Declaration provides an overview of the Debtors' business, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings.  Part II sets forth the relevant facts in support of the First Day Motions.

## PART I

### I.    BUSINESS OVERVIEW

6.      The Debtors are an independent oilfield services company that provides a wide range of services to oil and natural gas exploration and production companies to help develop and enhance the production of hydrocarbons.  The Debtors' services include, among other things, hydraulic fracturing, as well as cementing, coiled tubing, pressure pumping, acidizing, and other pumping services.

7.      The pressure pumping industry provides hydraulic fracturing and other well stimulation services to oil and natural gas companies.  Hydraulic fracturing involves pumping a fluid down a perforated well casing or tubing under high pressure to cause the underground formation to fracture, thereby allowing the oil or natural gas to flow more freely.  A propping agent is suspended in the fracturing fluid and props open the cracks created by the hydraulic fracturing process in the underground formation.  Proppants generally consist of sand, bauxite, resin-coated sand, or ceramic particles.

01:14282707.3

3

HN\1067525.12

8.    The Debtors' hydraulic fracturing operations utilize turbine-powered hydraulic fracturing pumping equipment that provides several advantages over the diesel-powered pumping equipment that is typically used by others in the Debtors' industry.  These advantages include lower emissions, a smaller operating footprint, lower operating costs when burning natural gas, and greater fuel flexibility – including the ability to operate on natural gas provided at a well head.

9.    Each of the Debtors' turbine-powered hydraulic fracturing units consist primarily of a high pressure hydraulic pump, a turbine engine, a gear box, electrical and hydraulic assemblies, and skids (collectively, a "**TFP**") and various hoses, valves, tanks, and other supporting equipment that are typically mounted to a flat-bed trailer.  The group of hydraulic fracturing units, other equipment and vehicles necessary to perform a typical fracturing job is referred to as a hydraulic fracturing "spread" and the Debtors' spreads are collectively referred to as the Debtors' hydraulic fracturing "fleet."  The Debtors assemble the Debtors' own turbine-powered hydraulic fracturing units and then generally use trailers to haul the units to their customers' well locations.

## A.    Company History

10.    The Debtors were formed in 1969.  GFES was formerly a Louisiana limited liability company called Hub City Industries, L.L.C.  In September 2011, Hub City Industries, L.L.C. changed its name to Green Field Energy Services, LLC and, in October 2011, was converted into a Delaware corporation.[4]  Until 2010, the Debtors primarily focused their

---

[4]    GFES has also previously been named Green Field Energy Services, LLC and Green Field Energy Services, Inc., a Louisiana corporation.

operations on traditional well-related services.  The Debtors first started providing hydraulic fracturing services in December 2010, and in recent years have focused on expanding their hydraulic fracturing operations.

11.     As of December 31, 2011, the Debtors had over 30,000 HHP[5] available for hydraulic fracturing, of which 19,000 HHP was turbine powered.  By December 31, 2012, the Debtors had 137,250 HHP available for hydraulic fracturing, of which 128,250 was turbine-powered.  As of the Petition Date, the Debtors had a total of 65 TFPs for a total of 146,250 hydraulic HHP high pressure pumping capacity in the Debtors' fleet.

12.     Organizationally, GFES is the direct parent of each subsidiary in the Debtors' corporate structure, and is the main operating entity.  A corporate organization chart is attached hereto as Exhibit A.  Hub City Tools, Inc. and Proppant One, Inc. are currently non-operating companies.  Proppant One, Inc. was formed in 2011 primarily to market the Debtors' sand operations at such time, and Hub City Tools, Inc. is a legacy entity from the Debtors' earlier operations.

13.     GFES also holds a 50% equity interest in Turbine Powered Technology, L.L.C., a Louisiana limited liability company ("**TPT**").  TPT is a joint venture between GFES and MTT Properties, LLC ("**MTT**"), the operations of which are further described below.

---

[5]     "HHP" as used herein means the maximum hydraulic horsepower rating on the applicable pump(s).

B.      **GFES Ownership Summary**

14.      In May 2011, the Debtors entered into agreements with certain of the Debtors' members to repurchase all of their equity interests in GFES for cash and contingent consideration in the form of an earnout.  These redemption agreements required upfront payments to be made to certain parties as well as earnout payments to be made to all parties over time based on the gross revenues of the Debtors' turbine driven equipment ("**TDEs**").

15.      As of September 30, 2011, payment of the repurchase obligations with respect to the equity interests of two members, Moody Moreno & Rucks, L.L.C. ("**MMR**") and Egle Ventures, L.L.C. ("**Egle**"), remained outstanding and were classified as debt on the Debtors' balance sheet as of that date.  On October 13, 2011, the Debtors and MMR, an entity in which the Debtors' Chief Executive Officer indirectly holds a 33.3% equity interest, agreed to rescind the redemption agreement applicable to the equity interests previously held by MMR, thereby eliminating the associated approximate $27.9 million debt obligation reflected on the Debtors' balance sheet.  On October 14, 2011, the Debtors paid $0.7 million of its outstanding obligation to Egle, and MOR MGH Holdings, L.L.C. ("**MMH**") assumed the remainder of that obligation, in the amount of $3.0 million, thereby eliminating the associated approximate $3.7 million debt obligation reflected on the Debtors' balance sheet.  Egle is owned by the Debtors' prior Chief Executive Officer, John Eglé.  Following these redemptions and repurchases, as of October 17, 2011, MMH owned, on a undiluted basis, 88.9% of GFES's common stock and MMR owned, on an undiluted basis, the remaining 11.1%.  This series of transactions resulted in a change of control of the Debtors, which required a new basis of accounting be established as of the date of the change in control.

16.    In November 2011, GFES amended its certificate of incorporation to, among other things, effect a stock split on a 1,400 for 1 basis. The stock split was effected simultaneously for all of the Debtors' then-issued and outstanding common stock and the exchange ratio was the same for each share of issued and outstanding common stock. The stock split affected all of the Debtors' stockholders uniformly and did not affect any stockholder's percentage ownership interest. Shares of common stock issued pursuant to the stock split are fully paid and nonassessable.

17.    On November 15, 2011, as part of the 2016 Senior Secured Note Indenture (as defined below), GFES issued 250,000 warrants for the purchase of GFES common stock. Each warrant entitles the registered holder to receive from GFES 0.988235 fully paid and nonassessable shares of common stock at the initial exercise price of $0.01 per share, subject to adjustment upon the occurrence of certain events set forth in the Warrant Agreement. As of the Petition Date, no warrants have been exercised.

18.    In April 2013, 124,446 shares of common stock were awarded to GFES President Enrique Fontova as part of a management incentive plan. Following this award, and as of the Petition Date, the ownership of GFES, on an undiluted basis, is as follows:

| Entity | Common Shares Held | Percent Ownership |
|---|---|---|
| *MOR MGH Holdings, LLC* | 1,244,460 | 81.63% |
| *Moody Moreno & Rucks, LLC* | 155,540 | 10.20% |
| *Enrique Fontova* | 124,446 | 8.16% |

C.      **Business Operations and Sales**[6]

19.     While the Debtors are headquartered in Lafayette, Louisiana, the Debtors have, as of October 18, 2013, approximately 335 active employees, located in 14 facilities in Louisiana and Texas.

20.     The Debtors' consolidated total revenue was approximately $18,689,000 in 2007, $24,067,000 in 2008, $18,140,000 in 2009, $28,362,000 in 2010, $33,071,000 in 2011, $144,783,000 in 2012, and is $183,047,000 through August 31, 2013.  However, the Debtors experienced net losses in the two most recent years, experiencing a total net loss of $2,454,000 million in 2007, net loss of $1,634,000 million in 2008, net loss of $3,280,000 million in 2009, a net gain of approximately $1,533,000 in 2010, net loss of $26,032,000 million in 2011, net loss of $74,596,000 in 2012, and net loss of $81,395,000 million through August 31, 2013.

21.     The Debtors' business consists of two primary service lines: (i) hydraulic fracturing services and (ii) well services.

22.     Hydraulic Fracturing Services – The Debtors' customers utilize the Debtors' hydraulic fracturing services to enhance the production of oil and natural gas from formations with restricted natural flow of hydrocarbons.  The fracturing process consists of pumping a fluid into a perforated well casing or tubing at a sufficient pressure and rate to cause the underground formation to fracture, thereby allowing the oil or natural gas to flow more

---

[6]      As noted below, due to tightening liquidity and a reduction in customer base, prior to the Petition Date the Debtors substantially scaled down their operations in an effort to preserve funds and the value of the Debtors as a going concern.

freely.  Sand, bauxite, resin-coated sand, or ceramic particles, each referred to as a proppant or

propping agent, are suspended in the fracturing fluid and prop open the cracks created by the

hydraulic fracturing process in the underground formation.  The extremely high pressure

required to stimulate wells in many of the regions in which the Debtors operate presents a

challenging environment for achieving a successfully fractured horizontal well.

      23.     The Debtors' TFPs are powered by remanufactured turbine engines

previously used in United States military applications.  These turbine engines have a reputation

for reliability and durability. The Debtors' TFPs are more cost effective to operate on natural gas

and maintain than conventional diesel-powered equipment.  Prior field tests regarding operation

of the Debtors' current TFPs have demonstrated compliance with respect to emissions of

nitrogen oxides and carbon monoxide under the United States Environmental Protection Agency

("**EPA**") Clean Air Nonroad Diesel Tier 4 standards that regulate emissions from certain off-

road diesel engines.  Further emission controls may be required with respect to other emissions

regulated by Tier 4 standards, including particulate matter.

      24.     The Debtors provide hydraulic fracturing and other services to their

customers through long-term agreements and spot market agreements.

      25.     Raw fracturing sand is an essential element of the proppant used in the

hydraulic fracturing process.  The Debtors have entered into a long-term lease arrangement for

two sand mines in Mississippi and Louisiana to secure access to sand for use in the Debtors'

hydraulic fracturing operations as well as to market and sell to other providers of hydraulic

fracturing services.  The Debtors have also made arrangements to acquire 300,000 tons of sand

annually for three years to partially meet hydraulic fracturing service obligations pursuant to current and future arrangements.

26.    <u>Well Services</u> – The Debtors' well services include (i) cementing, (ii) coiled tubing, (iii) pressure pumping, (iv) acidizing, and (v) nitrogen and other pumping services. The Debtors have provided well services since 1969.  Although these service revenues are expected to be a relatively small component of total revenues as the Debtors expand their hydraulic fracturing fleet, due to the Debtors' established customer base for well services, the Debtors expect to continue to provide these services.

27.    "Cementing" involves the use of pressure pumping equipment to deliver a slurry of liquid cement that is pumped down a well between the casing and the borehole to isolate fluid zones and to minimize potential damage to hydrocarbon bearing and surrounding formations.  In addition, the cement provides structural integrity for the casing by securing it to the earth.  Cementing is also done when recompleting wells, where one zone is plugged and another is opened.

28.    "Coiled Tubing" involves the insertion of a flexible steel pipe into wells to perform various well servicing operations.  Coiled tubing typically has a diameter of less than three inches and is manufactured in continuous lengths of thousands of feet.  Due to its small diameter, coiled tubing can be inserted into existing production tubing and used to perform a variety of services to enhance the flow of oil or natural gas without using a larger, more costly workover rig.  The principal advantages of using coiled tubing in a workover include the ability to (i) continue production from the well without interruption, (ii) move continuous coiled tubing in and out of a well significantly faster than conventional pipe, (iii) direct fluids into a wellbore

with more precision, (iv) provide a source of energy to power a down-hole motor or manipulate down-hole tools, and (v) enhance access to remote fields due to the smaller size and mobility of a coiled tubing unit.

29.    "Pressure Pumping" involves the use of pressure pumping equipment for well injection, cased-hole testing, workover pumping, mud displacement, and wireline pumpdowns.

30.    "Acidizing" involves the injection of highly reactive, low pH solutions (such as hydrochloric acid) into the area where hydrocarbons enter the wellbore. Acidizing is the most common means of reducing near-wellbore damage, as it dissolves and dilutes contaminants that have accumulated and may restrict the flow of hydrocarbons from a reservoir toward the wellbore, thus increasing well productivity.

31.    "Nitrogen & Other Pumping" typically involves the use of nitrogen, an inert gas, in various pressure pumping operations. When provided as a stand-alone service, nitrogen pumping is used to displace fluids in various oilfield applications.

32.    In 2011, the Debtors had three (3) cementing units, four (4) coiled tubing units, five (5) pressure pumping units, ten (10) acidizing units, and eight (8) nitrogen and other pumping units. In 2012, the Debtors had three (3) cementing units, five (5) coiled tubing units, four (4) pressure pumping units, eight (8) acidizing units, and eight (8) nitrogen and other pumping units. By comparison, in 2011 the Debtors had eight (8) hydraulic fracturing units but in 2012 that number had increased to fifty-five (55).

**D.**     **Joint Venture with MTT**

33.     In September 2011, the Debtors formed TPT as a joint venture with MTT. TPT purchases the turbine engines used in the Debtors' TFPs and assembles the TFPs. Under the joint venture arrangements, the Debtors have the exclusive right to purchase turbines and accessory equipment from TPT for use in hydraulic fracturing until October 2016. The Debtors do not have the right to the technology for other purposes. The Debtors' royalty-free perpetual license to use purchased equipment will survive the termination of the exclusivity period. Following the termination of the exclusivity period, the Debtors will also have a perpetual right of first offer on all TFPs sold by TPT.

34.     Along with the equipment purchase arrangements, the Debtors have entered into installation and maintenance agreements with TPT. Under these agreements, TPT provides all labor and professional supervisory and managerial personnel as are required for installation of turbine engines on trailers or into skids and maintains and repairs all turbine-powered equipment, accessory equipment, and all gearboxes and accessory gearboxes that the Debtors purchase. Under such agreements, the Debtors pay costs plus agreed upon markups to TPT. As of the Petition Date, the Debtors owe TPT approximately $8,679,668 on account of products and services.

35.     In addition, the Debtors currently have an exclusive, royalty-free license from TPT under its technology for the use of its intellectual property relating to the Frac Stack Pack™ to make and commercialize their TFPs for use in hydraulic fracturing or well services and use the Frac Stack Pack™ trademark. Ted McIntyre II, the Manager and Chief Executive Officer of TPT, filed a non-provisional patent application with the United States Patent and

Trademark Office on August 25, 2011 claiming certain aspects of the technology which he subsequently transferred to TPT. While the Debtors' right to make and use this technology is perpetual, their exclusivity will expire on October 22, 2016.

## E.    Turbine Generation Services, LLC

36.    On March 7, 2013, Turbine Generation Services, LLC ("**TGS**") was formed by its sole member, MOR DOH Holdings, L.L.C. MOR DOH Holdings, L.L.C. was, at the time, owned 100% by MBM 2011 DOH and TCM 2011 DOH, trusts owned and controlled by Mr. Moreno or family members of Mr. Moreno. Subsequently, in June 2013, Powermeister, LP, an entity unrelated to the Debtors or their equity holders, purchased a 9.6% equity interest in TGS.

37.    TGS was formed to develop, construct, sell, and rent turbine and gas-engine power generation ("**Power Generation**"). Pursuant to the Written Consent of the Shareholders and Directors of Green Field Energy Services, Inc. dated May 13, 2013, GFES determined to waive the opportunity to pursue Power Generation and agreed that Mr. Moreno, TGS and TPT could purse Power Generation outside of GFES.

38.    In order to fund the Power Generation operations, on May 13, 2013, TGS entered into a Senior Secured Promissory Note pursuant to which GE Oil & Gas, Inc. provided a $25,000,000 loan to TGS secured by substantially all of the assets of TGS. On June 21, 2013, TGS entered into a Turbine Driven Power Generation Equipment License Agreement with TPT pursuant to which TGS licensed certain technologies developed by TPT, and used in connection with the Debtors' operations, for use in Power Generation. Additionally, on June 21, 2013, the GFES, TGS and TPT entered into a three-party Agreement for the Manufacture and Sale of

Turbine Powered Generators pursuant to which (a) TPT agreed to provide turbine generators to TGS, (b) GFES agreed to act as contract manager, overseeing the production of the turbine generators for TGS, and (c) TGS agreed to remit funds to GFES as deposits which would, in turn, be remitted by GFES to TPT upon fulfillment of orders.

39.     During the period of March 29, 2013 through the Petition Date, TGS provided $27,994,171 to GFES as deposits.  As of the Petition Date, GFES had made the following payments out of such deposits, on behalf of TGS: (a) $11,337,218 to TPT, (b) $2,321,250 to third party vendors, and (c) $2,210,884 to TGS.  The remaining $12,124,820 has been commingled with GFES funds and remains an obligation owing by GFES to TGS.

40.     Additionally, TGS has purchased turbine engines from the Debtors.  TGS has paid the Debtors $23,091,245 for such engines, resulting in a profit margin of approximately 50% for GFES on such sales.  The Debtors subsequently repurchased two of such engines from TGS for $766,000, which amount remains due and owing as of the Petition Date.

41.     Finally, the Debtors also maintain an account (account no. ******5075) (the "**Contract Account**") in compliance with that certain Agreement for the Manufacture and Sale of Turbine Powered Generators, dated June 21, 2013, among TGS, TPT and GFES (the "**Turbine Agreement**").  Pursuant to this agreement, TPT designs, manufactures, maintains, and provides field support for turbine powered generators, and provides those services to TGS and GFES serves as contract manager for such services.  The Debtors maintain the Contract Account in compliance with the Turbine Agreement, which requires (i) TGS to wire payment into the Contract Account, which must remain separate and not be commingled with GFES' other accounts, (ii) GFES to hold the funds in the Contract Account in trust for the benefit of TPT, and

(iii) GFES to remit the funds to TPT in accordance with the Turbine Agreement. The Contract Account is used by the Debtors to comply with the Turbine Agreement (and the related contracts) and to keep the Debtors' books and records separate and distinct from the books and records of TPT. As of the Petition Date, the Debtors owed TGS approximately $12,124,820 on account of unapplied deposits received under the Turbine Agreement.

## F.    **Related Party Transactions**

42.    In addition to TPT and TGS, the Debtors have in the past, and continue to, obtain certain goods and services from companies affiliated with certain of the Debtors' equity holders. For example, in January 2012, GFES entered into an agreement with Alliance Consulting Group, LLC ("**Alliance**") pursuant to which Alliance was to build and operate a wet and dry processing plant that would perform the mining, processing, and transportation of raw fracturing sand from the above-referenced mines to support the Debtors' fracturing sand needs as well as demand from other consumers of fracturing and other types of sand. The Debtors' Chairman and Chief Executive Officer, and , directly or indirectly, controller of the majority of the Debtors' equity, Michael B. Moreno, has a controlling interest in Elle Investments, LLC, which in turn owns a 50% equity interest in Alliance.

43.    Similarly, in February 2012 the Debtors entered into an agreement to purchase chemicals from Chemrock Technologies, LLC ("**Chemrock**"), a chemical company in which one of the Debtors' equity holders, Moody, Moreno and Rucks, LLC, an entity that Mr. Moreno has an equity interest in, owned 50%. Moody, Moreno and Rucks, LLC subsequently sold its interest in Chemrock. However, the Debtors continue to acquire chemicals from Chemrock under an agreement entered into on February 28, 2013.

44.     Likewise, the Debtors are party to an agreement with Dynamic Industries, Inc. ("**Dynamic**") under which Dynamic provided the material and labor for producing TFP skids according to the Debtors' specifications.  Mr. Moreno owns a non-controlling interest in Dynamic.  In approximately December, 2012, the Debtors stopped purchasing material and labor from Dynamic because the Debtors were able to locate a lower cost provider.  Finally, the Debtors were party to two aircraft leases with entities controlled by Mr. Moreno.  Pursuant to these aircraft leases, the Debtors had access to two non-commercial aircraft that the Debtors utilized from time to time to transport personnel for business travel.  Certain of the Debtors' officers, including Mr. Moreno, used the aircraft from time-to-time for personal travel.  Prior to the Petition Date, in connection with reducing their operations, the Debtors terminated the aircraft leases and two affiliated management and pilot contracts, which, under their terms, were terminable by either party at any time with damages limited to the expenses already incurred and the costs of returning the aircraft to the lessor.

## G.     Customers

45.     The Debtors' customers primarily include independent oil and natural gas exploration and production companies.  For the year ended December 31, 2012, the Debtors' top five customers accounted for 88% of total revenues with Shell (as defined below) representing 79% of total revenues.  During the year ended December 31, 2011, the Debtors' top five customers accounted for 52% of total revenues with EXCO Resources, Navidad Resources, L.L.C. and Shell accounting for 17%, 12%, and 11% of total revenues, respectively.  During the year ended December 31, 2010, the Debtors' top five customers accounted for 38% of revenues with EXCO Resources and Chesapeake Operating, Inc. accounting for 11% and 11% of total revenues, respectively.  The Debtors have performed hydraulic fracturing services utilizing their

01:14282707.3

HN\1067525.12

TFPs for Shell, Navidad Resources, L.L.C. and Roywell Services, Inc.. among others. The Debtors are continually negotiating with and otherwise pursuing other major independent companies to expand their customer base.

## H.    **Competition**

46.    The competition for the Debtors' services includes multi-national oilfield service companies as well as regional competitors. The Debtors' major multi-national competitors include Halliburton Company, Schlumberger Ltd., and Baker Hughes. The Debtors' multi-national competitors typically have a more diverse product and service offerings than that of the Debtors. In addition, the Debtors compete against a number of smaller, regional operators, which offer products and services, other than products and services related to the Debtors' TFPs, similar to the products and services offered by the Debtors.

## II.    **OVERVIEW OF THE PREPETITION DEBT STRUCTURE**

47.    Prior to the Petition Date, the Debtors entered into various financing arrangements. Each of the financing facilities and the amounts owed thereunder is described below.

| Type of Prepetition Indebtedness | Approximate Amount of Outstanding Debt as of the Petition Date[7] |
| --- | --- |
| *Shell Credit Facility* | $80 million |
| *2016 Senior Secured Notes* | $255.9 million |
| *Trade Debt* | $98.6 million |

---

[7]    These amounts exclude interest, fees, and expenses.

01:14282707.3

HN\1067525.12

TFPs for Shell, Navidad Resources, L.L.C. and Roywell Services, Inc.. among others. The Debtors are continually negotiating with and otherwise pursuing other major independent companies to expand their customer base.

## H.    Competition

46.    The competition for the Debtors' services includes multi-national oilfield service companies as well as regional competitors. The Debtors' major multi-national competitors include Halliburton Company, Schlumberger Ltd., and Baker Hughes. The Debtors' multi-national competitors typically have a more diverse product and service offerings than that of the Debtors. In addition, the Debtors compete against a number of smaller, regional operators, which offer products and services, other than products and services related to the Debtors' TFPs, similar to the products and services offered by the Debtors.

## II.    OVERVIEW OF THE PREPETITION DEBT STRUCTURE

47.    Prior to the Petition Date, the Debtors entered into various financing arrangements. Each of the financing facilities and the amounts owed thereunder is described below.

| Type of Prepetition Indebtedness | Approximate Amount of Outstanding Debt as of the Petition Date[7] |
|---|---|
| *Shell Credit Facility* | $80 million |
| *2016 Senior Secured Notes* | $255.9 million |
| *Trade Debt* | $98.6 million |

---

[7]    These amounts exclude interest, fees, and expenses.

A.    **Amended and Restated Shell Credit Facility**

48.    Prior to the Petition Date, GFES entered into that certain Contract for High Pressure Fracturing Services dated as of September 2, 2011, an amended and restated credit facility (the "Shell Credit Facility") with SWEPI, Inc. (together with its affiliates and subsidiaries, "Shell") pursuant to which GFES agreed to furnish certain fracking spreads at Shell drilling sites and service such sites, and Shell agreed to provide up to an aggregate $100 million of senior secured term loans, which loans may not be reborrowed once repaid. As of the Petition Date, there was approximately $80 million in aggregate principal amount of term loans outstanding under the Shell Credit Facility.

49.    The Shell Credit Facility was intended to be secured by first priority lien security interests on certain of the Debtors' motor vehicles and equipment designated by Shell, which excludes the vehicles securing certain Ford Motor Credit Company LLC loans and certain capital leases with Nations Fund I, Inc.  Certificates of title of certain of the Debtors' motor vehicles identify Shell as a lienholder (the "**Shell Titled Assets**"), and the Debtors are investigating the validity of such liens.

50.    In connection with the Shell Credit Facility, Shell and the Indenture Trustee (as defined below) entered into an amended and restated intercreditor agreement (the "**Intercreditor Agreement**") setting forth the relative priority and interests with respect to the Debtors' motor vehicles and equipment as between Shell and the Indenture Trustee, on behalf of the 2016 Senior Secured Notes (as defined below).  The Intercreditor Agreement includes a "payment over" provision requiring that Indenture Trustee (as defined below) remit certain

recoveries related to Shared Collateral (as defined in the Intercreditor Agreement) to Shell in certain circumstances.

51.    On May 10, 2012, Shell filed an insufficient UCC financing statement (the "**Insufficient Financing Statement**").  Instead of specifically listing or identifying the specific collateral in which it was claiming an interest, Shell noted "(See Attached Sheets)," but failed to attach any documents, thus failing to perfect any security interest in the Debtors' assets.  Shell failed to file a valid UCC-1 financing statement in the jurisdiction in which the Debtors' are incorporated and, as a result, Shell does not have a properly perfected lien on the Debtors' equipment under the Insufficient Financing Statement.

52.    On October 8, 2013, Shell delivered a notice of default to GFES stating that the Debtors had (i) failed to pay outstanding indebtedness within 10 days after such indebtedness became due; and (ii) had defaulted on any credit, loan, prepayment, or other financial obligation, and thus had defaulted on the Shell Credit Facility.[8]  The notice of default formally demanded full payment of all indebtedness and procurement of the release of any liens attached to the assets falling under the purview of the Shell Credit Facility.

53.    On October 11, 2013, Shell filed a new UCC Financing Statement (the "**Preference Period Financing Statement**"), attaching a list of the Debtors' assets in which Shell asserted a security interest and seemingly perfecting Shell's interest in the collateral (the "**October 2013 Preferential Transfer**").  The list of collateral in the Preference Period Financing Statement includes:

---

[8]    The Debtors reserve all rights to dispute these asserted defaults.

All of debtor's equipment, tools, trucks, blenders, sanders, pumps, Frac Spreads (namely, a complement or spread of equipment required to perform hydraulic fracturing), and motor vehicles, including but not limited to those described on Appendix A [to the October 13 Preference Period Financing Statement].

**B.**    **2016 Senior Secured Notes**

54.    On November 15, 2011, GFES, Hub City Tools, Inc., as guarantor, and Wilmington Trust, National Association, as trustee and collateral agent, entered into that certain Indenture (as amended by the Supplemental Indenture dated as of October 23, 2012, the "**2016 Senior Secured Note Indenture**") pursuant to which GFES issued 250,000 units, each unit consisting of: (i) $1,000 principal amount, totaling $250,000,000 aggregate principal amount, of 13% Senior Secured Notes due 2016 (the "**2016 Senior Secured Notes**")[9]; and (ii) one warrant to purchase 0.988235 shares of common stock ("**Warrants**"). The holders of the units informed the trustee of the decision to separate the units on November 15, 2011, so that the 2016 Senior Secured Notes and the Warrants would be traded independently.

55.    The Notes mature on November 15, 2016 and bear interest at a fixed annual rate of 13%, to be payable semiannually on May 15 and November 15 of each year. The Notes are secured by security interests in substantially all of the Debtors' tangible and intangible assets subject to certain exceptions. The covenants under the 2016 Senior Secured Note Indenture allow the Debtors to enter into a senior credit facility in addition to the Shell Credit

---

[9]    The Debtors conducted a successful consent solicitation to modify the terms of the 2016 Senior Secured Indenture as set forth in the Supplemental Indenture dated as of October 23, 2012. Following these modifications, the Debtors were allowed to incur a one-time borrowing of up to $95 million in senior term loans under the Shell Credit Facility, and permitted debt and permitted liens that could be obtained and granted senior to the liens of the 2016 Senior Secured Notes in an amount up to $30 million. In addition, the Supplemental Indenture contained an agreement to pay the holders of the 2016 Senior Secured Notes a consent fee in the amount of 2.5% of the principal amount of the 2016 Senior Secured Notes that consented – which amount ultimately increased the principal amount due under the 2016 Senior Secured Note Indenture to $255,948,000.

Facility in an aggregate principal amount not exceeding the greater of $30 million and a specified percentage of the Debtors' tangible assets.

56.    The Debtors may redeem the 2016 Senior Secured Notes in whole or in part on or after November 15, 2014 at a redemption price of 109.75% of principal amount in 2014 and 100% of principal amount after November 15, 2015.  Prior to November 15, 2014, the Debtors may, at their option, redeem up to 35% of the aggregate principal amount of the 2016 Senior Secured Notes at a redemption price of 113% of principal amount with the proceeds of certain equity offerings.  Additionally, the Debtors may, at their option, redeem the 2016 Senior Secured Notes at any time prior to November 15, 2014 at a price equal to 100% of the principal amount of the 2016 Senior Secured Notes redeemed by paying a make whole premium.

57.    If the Debtors experience certain kinds of changes in control, the Debtors must offer to repurchase the 2016 Senior Secured Notes at a price equal to 101% of the principal amount plus accrued and unpaid interest.  Upon the sale of certain assets, the Debtors may be required to offer to use the net proceeds of the sale to repurchase some of the 2016 Senior Secured Notes at 100% of the principal amount plus accrued and unpaid interest.  Additionally, the Debtors must offer to repurchase some of the 2016 Senior Secured Notes at 108% of the principal amount after each of June 30 and December 31 of each year, commencing with June 30, 2013.  Upon such time as certain conditions are met, the repurchase price of the 2016 Senior Secured Notes in connection with the semi-annual repurchase will decrease to 103%.  The portion of the carrying value related to the June 30, 2013 offer, net of discount, is classified as current.

58.    Under the terms of the 2016 Senior Secured Note Indenture, the Debtors were required to prepare and file a registration statement with the Securities and Exchange Commission ("**SEC**") with respect to (a) an offer to exchange the unregistered 2016 Senior Secured Notes in a registered offering for new notes that would be identical in all material respects to the 2016 Senior Secured Notes, and (b) the resale of common stock issuable under exercise of the Warrants.  Pursuant to this agreement, the Debtors filed: (i) a registration statement on Form S-4 on May 11, 2012 with respect to the 2016 Senior Secured Notes; and (ii) a registration statement on Form S-1 on June 13, 2013 with respect to the underlying shares of common stock issuable under exercise of the Warrants.  Both filings contained an amendment staying the effective date of the filing until the Debtors filed an amendment specifically stating that the filings shall thereafter become effective.  The Debtors filed amended S-4 and S-1 registration statements on June 14, 2013, updating and supplementing the earlier filings to keep the information therein current and to respond to certain comments from the SEC, but did not make the filing effective at such time.  The Debtors have not yet resolved all of the SEC's comments to the registration statements and therefore have not yet requested the effectiveness of the registration statements.

59.    Under that certain Share Purchase Agreement, dated as of October 24, 2012, among the Debtors and certain shareholders (the "**Share Purchase Agreement**"), the Debtors' shareholders agreed to purchase shares of GFES' preferred stock on a quarterly basis in an amount equal to the equal to the amount by which $10.0 million exceeded the Debtors' cash balance on their consolidated balance sheet at the end of any fiscal quarter (the "**Cash Deficit**").  On March 31, 2013 and June 30, 2013, the Debtors had a Cash Deficit of $4,464,626 and $2,242,455, respectively. The Debtors' shareholders did not purchase, and the Debtors did not

issue, preferred stock to the GFES' shareholders when payment for such shares of preferred stock was due on May 15, 2013 and August 13, 2013, nor did the Debtors make arrangements for another form of capital contribution.

60.    On October 14, 2013, the Indenture Trustee delivered a notice of default to GFES stating that the Debtors had failed to (i) make a payment on the 2016 Senior Secured Notes; and (ii) make a semi-annual offer to repurchase, and thus had defaulted on the 2016 Senior Secured Note Indenture.[10]  The notice provided that the Indenture Trustee is continuing to forbear, on a day-to-day basis, from exercising its rights and remedies as a result of this default, but reserves all of the rights and remedies available to it under the 2016 Senior Secured Note Indenture.

## C.    Trade and Other Unsecured Debt

61.    The Debtors have certain trade debt due and owing to vendors, suppliers and other prepetition creditors.  As of the Petition Date, the total outstanding obligations due and owing to vendors, suppliers and other general unsecured creditors (other than the lenders under the financings discussed above) approximately $95.9 million.  Additionally, the Debtors estimate that, as of the Petition Date, approximately $2.7 million of obligations to vendors had accrued but not yet been invoiced to the Debtors.  Certain of the trade debt could potentially give rise to liens under applicable state law against either the property of the Debtors or the Debtors' customers, although it is unclear at this time whether any such liens would be valid.

---

[10]    The Debtors reserve all rights to dispute these asserted defaults.

### III.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

62.    Due to the competitive advantages of the turbine-powered hydraulic fracturing technology utilized by the Debtors, the Debtors greatly expanded their hydraulic fracturing operations and capabilities, increasing the number of TFPs in their fleet from eight (8) in 2011 to sixty-five (65) as of the Petition Date.  Unfortunately, market conditions changed for the worse shortly after the Debtors made this shift in focus.

63.    As a result, the Debtors' customer base became more and more concentrated.  In the last three years the Debtors' top five (5) customers accounted for 38% of revenues (2010), 52% of revenues (2011), and 88% of revenues (2012).  Additionally, in August 2013, Shell, by far the Debtors' largest customer, accounting for 79% of total revenues in 2012, informed GFES that Shell would not continue to utilize the Debtors' services.  This severely reduced the revenues generated by the Debtors' business and has resulted in a need for reorganization of the Debtors' debt structure.

64.    As a result of the foregoing, the Debtors began to explore operational modifications to save operating costs, as well as financing options.  On September 30, 2013, the Debtors retained Alvarez and Marsal North America, LLC ("**Alvarez**") to perform a variety of restructuring related services.  Additionally, in October 2013 the Debtors retained Carl Marks Advisory Group, LLC ("**Carl Marks**") to provide investment banking related services.  The Debtors and their advisors continued to evaluate operational changes that could result in decreased cost, while also negotiating with the lenders under their prepetition credit facilities.  These operational changes include the cessation of substantially all of the Debtors' hydraulic fracturing operations and significant reductions in force.  Moreover, the Debtors are shifting largely all of their assets into storage facilities during this reorganization period.

65.     Prior to filing these Chapter 11 Cases, the Debtors, with the assistance of Alvarez and Carl Marks, and in consultation with Latham & Watkins LLP, pursued a range of options to address the Debtors' concerns about their ability to service their debt and fund operations going forward, including new financing, refinancing, and the sale of certain or all of the Debtors' assets or business.

66.     The Boards of Directors of the Debtors determined that in connection with the filing of the bankruptcy it was advisable and in the best interests of the Debtors for their respective Boards to designate a special committee (the "**Special Committee**") in connection with the evaluation and implementation of Possible Restructuring Alternatives (defined below). The Boards of Directors determined that the Special Committee will have the power and authority (1) to review and evaluate a possible bankruptcy, sale, restructuring, financing or equity transaction, liquidation, or other strategic alternative involving the Debtors  (the "**Possible Restructuring Alternatives**"), including the terms, conditions and advisability thereof, (2) to discuss and negotiate the terms and conditions of Possible Restructuring Alternatives with any party the Special Committee deems appropriate, including, without limitation, the Debtors' creditors and equity holders and their respective agents and advisors, (3) to determine whether any Possible Restructuring Alternative is advisable and in the best interests of the Debtors and their stockholders and creditors and, if appropriate, approve a Possible Restructuring Alternative, (4) to assist with, review and evaluate, and make determinations with respect to, any other matter which presents an actual or potential conflict between the interests of the Debtors and any of their affiliates as determined in the reasonable judgment of the Board, and (5) to engage (and terminate the engagement of) a Chief Restructuring Officer, a Deputy Chief Restructuring Officer, and such Assistant Chief Restructuring Officers as the Special Committee may

01:14282707.3                                    25

HN\1067525.12

determine are necessary or appropriate in connection with the Possible Restructuring Alternatives (collectively, the "**Restructuring Officers**") who will report solely to the Special Committee.

67.     Accordingly, effective as of the Petition Date, Brent Kugman has been appointed as an independent director of each of the Boards of Directors of the Debtors and been designated the sole member of each of the Special Committees.  As noted below, certain employees of Alvarez will be appointed as Restructuring Officers of the Debtors as of the Petition Date, and such officers will report to, and take direction from, solely the Special Committee.

## IV.    OBJECTIVES OF THE CHAPTER 11 CASES

68.     In an attempt to maximize value for parties in interest, the Debtors are in the process of formulating and implementing a strategy which will greatly deleverage the Debtors' business and provide for continued operations following emergence from Chapter 11 and recommencing business operations.  The Debtors' ultimate goal in these Chapter 11 Cases is to restructure their capital structure by reducing debt and obtaining additional financing.  This will allow the Debtors to leverage their new capital structure to reposition themselves in order to accomplish the ultimate goal of maximizing the value of the Debtors' estates for the benefit of all the Debtors' creditors.

69.     Prior to the Petition Date the Debtors commenced comprehensive restructuring negotiations with their key constituents, including, but not limited to, Shell, certain holders of the 2016 Senior Secured Notes and the Indenture Trustee.  The Debtors and their key constituents will continue those discussions and hope to negotiate the terms of a comprehensive

restructuring that maximizes the value of the Debtors' estates for the benefit of their creditors following the Petition Date.

70.    In an attempt to maximize value for parties in interest, the Debtors have formulated and implemented a strategy which has resulted in the securing of a debtor-in-possession financing facility, the request for approval of which has been filed contemporaneously herewith.

## PART II

71.    In furtherance of the objective of successfully maximizing value for creditors, the Debtors have sought approval of the First Day Motions and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering the Proposed Order granting such First Day Motions.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Motions.

72.    I have reviewed each of the First Day Motions and Proposed Orders (including the exhibits thereto), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with a minimum of interruption or disruption to their business or loss of productivity or value and (b) constitutes a critical element in the Debtors' efforts to successfully maximize value for the benefit of the estate.

I.    **ADMINISTRATIVE AND PROCEDURAL MOTIONS**

A.    **Joint Administration Motion**

73.    The Debtors seek the joint administration of their Chapter 11 Cases, three in total, for procedural purposes only.  Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors.  Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

B.    **Retention Applications**

74.    I believe that the retention of chapter 11 professionals is essential to these Chapter 11 Cases.  Accordingly, during the filing of these Chapter 11 Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals: (a) Latham & Watkins LLP, as co-counsel; (b) Young Conaway Stargatt and Taylor, LLP, as co-counsel; (c) Carl Marks Advisory Group LLC, as investment banker; and (d) Prime Clerk, Inc., as claims, noticing, soliciting, and balloting agent.  Additionally, the Debtors intend to seek the Court's authorization and approval of the agreement with Alvarez pursuant to which Alvarez has agreed to provide Thomas E. Hill as Chief Restructuring Officer, Gary Barton as Deputy Chief Restructuring Officer, Diego Torres as Assistance Chief Restructuring Officer, and certain additional employees of Alvarez and/or its affiliates as required and to the extend reasonably acceptable to the Debtors.  I believe that the above professionals are well qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of these Chapter 11 Cases, and the professionals will coordinate their services to avoid

duplication of efforts.  I understand that the Debtors may find it necessary to seek retention of additional professionals as these Chapter 11 Cases progress.

## II.    BUSINESS OPERATION MOTIONS

### A.    Cash Management Motion

75.    In the Cash Management Motion, the Debtors seek entry of an order, pursuant to Bankruptcy Code Sections 105(a), 345, 363, and 364(i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system including maintenance of the Debtors' existing bank accounts, checks and business forms; (ii) granting the Debtors a waiver of certain bank account and related requirements of the United States Trustee to the extent that such requirements are inconsistent with (a) the Debtors' existing practices under the cash management system or (b) any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Cases; and (iii) authorizing, but not directing, the Debtors to continue certain ordinary course intercompany transactions.  The Debtors also request that the Court authorize and direct all banks with which the Debtors maintain accounts to continue to maintain, service and administer such accounts and authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtors.

76.    In the ordinary course of their business, the Debtors maintain a complex cash management system (the "**Cash Management System**") that includes operating accounts, accounts used for the administration of specific employee benefits, collateral accounts, accounts required pursuant to contract, and other accounts.  The Cash Management System is integral to the operation and administration of the Debtors' business.  In this regard, the Cash Management

System allows the Debtors to efficiently (a) identify the Debtors' cash requirements, (b) transfer cash as needed to respond to cash requirements, including the cash requirements of the Debtors' payroll and benefits structure,[11] (c) track transfers related to certain contractual obligations, (d) efficiently monitor and control all of the Debtors' cash receipts and disbursements, and (e) to transfer funds in certain zero-balance accounts into interest-bearing accounts to increase the interest earned by such accounts.  I believe that the Cash Management System is similar to those utilized by many other companies of comparable size and complexity to collect, transfer, and disburse funds in a cost-effective and efficient manner.

77.    The Cash Management System is managed by the financial personnel at the Debtors' headquarters in Lafayette, Louisiana.  The Debtors' administration of the various bank accounts to effect the collection, disbursement, and movement of cash facilitates accurate cash forecasting and reporting and enables the Debtors to, among other things, monitor the collection and disbursement of funds, maintain their payroll and benefits structure, and comply with critical contractual obligations.

78.    As of the Petition Date, the Debtors maintained approximately five (5) active bank accounts (collectively, the "**Bank Accounts**") at two (2) financial institutions.  A summary of the Cash Management System is attached as Attachment 2[12] to the Cash

---

[11]    The Debtors' payroll and benefits structure is described in detail in *Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 (i) Authorizing Payment of Certain Prepetition Employee Obligations, Including Compensation, Benefits, Expense Reimbursements and Related Obligations, (ii) Confirming Right to Continue Employee Programs on Postpetition Basis, (iii) Authorizing Payment of Withholding and Payroll-Related Taxes, (iv) Authorizing Payment of Prepetition Claims Owing to Administrators of, or Third Party Providers Under, Employee Programs and (v) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments*, filed contemporaneously herewith.

[12]    I believe, and have undertaken reasonable efforts to ensure, that Attachment 2 of the Cash Management Motion lists all of the Bank Accounts.  In the event that any Bank Account has been inadvertently

01:14282707.3

30

Management Motion. All of the active Bank Accounts are held in the name of Green Field Energy Services, Inc.. The Cash Management System is primarily organized in a way that respects the Debtors' payroll and benefits structure and operating needs. As further reflected in such schedule, such accounts are maintained at JP Morgan Chase Bank ("**Chase**") and Regions Bank ("**Regions**").

79.     The majority of the receipts from the operation of the Debtors' business flow into an operating account (account no. ******2183) maintained by Regions (the "**Operating Account**"). The Operating Account also serves as the primary disbursement account for accounts payable, including bi-weekly wires to Automatic Data Processing, Inc. ("**ADP**") for employee payroll.

80.     The Debtors maintain a zero-balance payroll account (account no. ******2248) with Regions (the "**Payroll Account**") which is used to (i) pay ADP's administrative fees, (ii) remit checks as necessary to correct any errors related to accounts payable, and (iii) pay certain expenses related to employee benefits. The Debtors also maintain a disbursement account (account no. ******2388) with Regions (the "**Benefits Account**") for the purpose of paying medical providers for their claims arising from medical expenses incurred by employees under various benefit plans. The Benefits Account also receives deposits from ADP on account of withholdings related to medical benefits. ADP remits such funds to the Benefits Account, which are then disbursed to the medical service providers in payment of claims.

---

omitted from <u>Attachment 2</u>, the Debtors request that the relief sought by the Cash Management Motion be deemed to apply to any such Bank Account.

81.     The Debtors also maintain an account (account no. ******5075) with Chase (the "**Contract Account**") in compliance with that certain Agreement for the Manufacture and Sale of Turbine Powered Generators, dated June 21, 2013, TGS, TPT and GFES (the "**Turbine Agreement**").  TPT designs, manufactures, maintains, and provides field support for turbine powered generators, and provides those services to TGS.  GFES owns half of TPT in a joint venture arrangement.  The Turbine Agreement is one of several agreements among GFES, TPT, and TGS that are critical to the Debtors' operations.   The Debtors maintain the Contract Account in compliance with the Turbine Agreement, which requires (i) TGS to wire payment into the Contract Account, which must remain separate and not be commingled with GFES's other accounts, (ii) GFES to hold the funds in the Contract Account in trust for the benefit of TPT, and (iii) GFES to remit the funds to TPT in accordance with the Turbine Agreement.  The Contract Account is used by the Debtors to comply with the Turbine Agreement (and the related contracts) and to keep GFES's books and records separate and distinct from the books and records of TPT, its partially-owned subsidiary.

82.     Finally, GFES maintains an account (account no. ******0595) with Chase (the "**Collateral Account**") containing $125,000.  The Collateral Account serves as collateral for the Debtors' obligations to Chase on account of credit cards used by employees for travel and other business expenses (the "**Chase Cards**").  As the Debtors' financial condition deteriorated, the Debtors were obligated to collateralize the credit card obligations by means of the Collateral Account and to make weekly payments to Chase in order to maintain their credit limit.

83.     I believe the Debtors should be authorized to continue to use their existing Cash Management system and bank accounts.  The Cash Management System is an ordinary course, customary and essential business practice, and is similar to Cash Management systems

employed by other similar businesses. The Cash Management System allows the Debtors to efficiently identify their cash requirements, transfer cash as needed to respond to those requirements (including with respect to payroll and benefits), and comply with the requirements of certain critical contracts.

84.    The continued use of the Cash Management System during the pendency of the Chapter 11 Cases is essential to the Debtors' business operations and their goal of maximizing value for the benefit of all parties in interest. Requiring the Debtors to adopt a new Cash Management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption. I believe any such disruption would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value for the benefit of creditors and other parties in interest. Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their Cash Management requirements and, to the best of the Debtors' knowledge, the Bank Accounts are in financially stable institutions that are insured by the Federal Deposit Insurance Corporation ("**FDIC**") (up to an applicable limit per Debtor per institution). In this regard, it warrants mention that Chase and Regions are approved depositories of the United States Trustee. Consequently, maintaining the existing Cash Management system without disruption is both essential to the Debtors' ongoing operations and in the best interests of the Debtors, their estates, and all interested parties.

85.    To ensure that the transition into Chapter 11 is as smooth as possible, the Debtors request in the Cash Management Motion authorization to (a) maintain and continue to use the Bank Accounts, including but not limited to those accounts that are listed on Attachment 2 of the Cash Management Motion, in the same manner and with the same account numbers,

styles and document forms as are currently employed, (b) deposit funds in and withdraw funds from the Bank Accounts by all usual means, including checks, wire transfers, ACH transfers, and electronic fund transfers or other items presented, issued or drawn on the Bank Accounts, (c) pay ordinary course bank fees in connection with the Bank Accounts, including prepetition fees, (d) perform their obligations under the documents and agreements governing the Bank Accounts, and (e) treat the Bank Accounts for all purposes as accounts of the Debtors in their capacities as debtors in possession.

86.    If the relief requested is granted, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court.  To prevent the possible inadvertent payment of prepetition claims, except those otherwise authorized by the Court, the Debtors will work closely with the banks at which the Bank Accounts are maintained (the "**Banks**") to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.  However, the Debtors request that no Bank that implements such handling procedures and then honors a prepetition check or other item drawn on any account that is the subject of the Cash Management Motion (a) at the direction of the Debtors to honor such prepetition check or item, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of a good faith error made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition.  I believe that such flexibility accorded the Banks is necessary to induce the Banks to continue providing Cash Management services to the Debtors.

87.     Additionally, for banks at which the Debtors hold accounts that are party to a Uniform Depository agreement with the United States Trustee, the Debtors will (a) contact each bank, (b) provide the Debtors' employer identification numbers, and (c) identify each of their accounts held at such banks as being held by a debtor in possession in a bankruptcy case. For banks at which the Debtors hold accounts that are not party to a Uniform Depository agreement with the United States Trustee, the Debtors will use their good-faith efforts to cause the bank to execute a Uniform Depository agreement in a form prescribed by the Office of the United States Trustee.

88.     In the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of these Chapter 11 Cases, the Debtors request that all Banks be authorized and directed to continue to administer, service, and maintain the Bank Accounts as such accounts were administered, serviced, and maintained prepetition, without interruption and in the ordinary course (including making deductions for bank fees), and to honor any and all checks, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts on account of a claim arising on or after the Petition Date.

89.     In the Cash Management Motion, the Debtors further request that they be authorized to implement such reasonable changes to the Cash Management System as the Debtors may deem necessary or appropriate, including, without limitation, closing any of the Bank Accounts or opening any additional Bank Accounts following the Petition Date (the "**New Accounts**"), wherever the Debtors deem that such accounts are needed or appropriate, and whether or not the banks in which the accounts are opened are designated depositories in the District of Delaware.  Notwithstanding the foregoing, any New Account that the Debtors open

will be (a) at one of the existing Banks or with a bank that is organized under the laws of the United States of America or any state therein, and that is insured by the FDIC or the Federal Savings and Loan Insurance Corporation and (b) designated a "Debtor in Possession" account by the relevant bank.

90.    To minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession; provided, however, that in the event the Debtors generate new checks during the pendency of these cases other than from their existing stock of checks, such checks will include a legend referring to the Debtors as "Debtors in Possession." The Debtors also seek authority to use all correspondence and other business forms (including, without limitation, letterhead, purchase orders and invoices) without reference to the Debtors' status as debtors in possession.

91.    Most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicity of these cases, the press releases issued by the Debtors and additional press coverage.  Moreover, the Debtors will provide notice of the commencement of the Chapter 11 Cases to creditors and other parties-in-interest.

92.    I believe that changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates. Further, such changes would be disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.  For these reasons, I request that the

Debtors be authorized to use their existing check stock, all correspondence, and other business forms without being required to place the label "Debtors in Possession" on any of the foregoing.

93.    I further believe the Debtors should be granted a waiver of certain requirements of the United States Trustee to the extent that such requirements are inconsistent with (a) the Debtors' existing practices under the Cash Management System or (b) any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Cases. As set forth above, the Debtors submit that they are able to work with their current Banks to ensure that the goal of separation between the prepetition and postpetition periods is observed and enforcing certain of these UST Requirements would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.

94.    As I noted previously, it will be onerous for the Debtors to meet the requirement of closing all existing bank accounts and opening new debtor in possession bank accounts. Indeed, not only would the Debtors be unnecessarily inconvenienced, but so would their customers (the majority of whom wire remittances and checks directly to the Operating Account).

95.    Further, requiring the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for tax payments (including payroll taxes) and to deposit to such specific tax accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll and other tax obligations would be unnecessarily burdensome. I believe that the Debtors can pay their tax obligations most efficiently from the existing disbursement and checking accounts maintained at Regions in accordance with their

existing practices, that the United States Trustee can adequately monitor the flow of funds into and out of such accounts, and that the creation of new debtor in possession accounts designated solely for tax obligations would be unnecessary and inefficient.

96.    I believe requiring the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for cash collateral will be unnecessary.  The Debtors have provided significant safeguards (negotiated in good faith with parties in interest) to ensure that those who have interests in the Debtors' cash collateral are adequately protected and such persons have been provided with notice of the proposed use of such cash collateral.

97.    Finally, for the reasons noted above, compliance with the UST Requirement that requires a debtor to obtain checks for all debtor in possession accounts which bear the designation "Debtor In Possession," the bankruptcy case number and the type of account is unnecessarily burdensome in these Chapter 11 Cases.

98.    I further believe that the Debtors should be authorized to maintain and continue ordinary course intercompany transactions.  As I described above, pursuant to the Turbine Agreement and related agreements, funds from TGS are moved through the Contract Account to GFES's non-debtor subsidiary, TPT.  At any given time, there may be intercompany claims owing by GFES to TPT on account of funds in the Contract Account that GFES is holding in trust for TPT.  As of the week before the Petition Date, GFES held no funds in the Contract Account in trust for payment to TPT pursuant to the terms of the Turbine Agreement.

99.    With respect to this intercompany transaction (the "**Intercompany Transactions**"), the Debtors maintain records of all fund transfers and can ascertain, trace and account for the Intercompany Transactions.  At the same time, however, if the Intercompany

Transactions were to be discontinued, the Cash Management System and the related administrative controls would be disrupted to the Debtors' detriment.

**B.     Employee Obligations Motion**

100.    In the Employee Obligations Motion, the Debtors seek entry of an order authorizing them, in their discretion, to pay, continue or otherwise honor various prepetition employee-related obligations (collectively, the "**Prepetition Employee Obligations**") to or for the benefit of their current, former, full-time, part-time, permanent and temporary employees (including the Independent Contractor (as defined below)) (collectively, the "**Employees**"), for compensation, benefits, and expense reimbursements under all plans, programs, and policies maintained or contributed to, and agreements entered into, by the Debtors prior to the Petition Date (as described below, the "**Employee Programs**").  In addition, the Debtors request that the Court confirm their right to continue each of the Employee Programs in the ordinary course of business during the pendency of these Chapter 11 Cases in the manner and to the extent that such Employee Programs were in effect immediately prior to the filing of such cases and to make payments in connection with expenses incurred in the postpetition administration of any Employee Program.[13]

101.    The Employee Programs under which the Prepetition Employee Obligations arise are described more fully in the Employee Obligations Motion and include, without limitation, plans, programs, policies and agreements providing for (a) wages, salaries,

---

[13]     By the Employee Obligation Motion, the Debtors do not seek to modify the terms of any Employee Program and do not seek to assume or reject any Employee Program to the extent that such Employee Program is deemed to be an executory contract within the meaning of Bankruptcy Code Section 365.  Moreover, the Debtors do not waive their right to modify or terminate any Employee Program to the extent that such right exists under the terms of the Employee Program or as may be required by applicable law.

bonuses, paid time off, sick pay and other accrued compensation; (b) reimbursement of business, travel, relocation and other reimbursable expenses and payment of business-related credit card obligations; and (c) benefits, with coverage as applicable for eligible spouses and dependents, in the form of medical, vision and dental coverage, coverage continuation under COBRA,[14] basic term life, supplemental life, accidental death and dismemberment, business travel accident insurance, short-term disability, long-term disability, employee assistance, savings, workers' compensation,[15] severance, and miscellaneous other benefits provided to the Employees in the ordinary course of business.[16] The Debtors also seek authorization to be permitted to pay any and all local, state, and federal withholding and payroll-related or similar taxes relating to the Prepetition Employee Obligations including, but not limited to, all withholding taxes, social security taxes and medicare taxes. In addition, the Debtors seek authorization to pay to third parties any and all amounts deducted from Employee paychecks for payments on behalf of Employees for garnishments, support payments, savings programs, benefit plans, insurance programs, and other similar programs.

102.    The Debtors also request that, with respect to any Employee Programs and Prepetition Employee Obligations that are administered, insured, or paid through a third-party

---

[14]    See 29 U.S.C. §§ 1161 et seq.

[15]    The Debtors' workers' compensation policy and payment arrangements are described in the *Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363, 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Debtors to Pay Prepetition Insurance Obligations and Maintain Postpetition Insurance Coverage; to Continue Honoring Surety Bond Obligations, Workers' Compensation Obligations, and an Insurance Premium Finance Agreement; and Continuing Grant of Security Interest to the Insurance Premium Financing Company,* filed contemporaneously herewith.

[16]    The Debtors may separately seek authorization to implement new postpetition retention, severance or similar employment protection programs designed to preserve employee morale, encourage continuing employment and otherwise ameliorate the effects on employees of these Chapter 11 Cases. Pending approval of any such postpetition programs, the prepetition programs will continue in the ordinary course, subject to the provisions of Bankruptcy Code Section 503(c)(2).

administrator or provider, the Debtors be expressly authorized, in their discretion, to pay any prepetition claims of such administrator and provider in the ordinary course of business to insure the uninterrupted delivery of payments or other benefits to the Employees.

103.    In support of the requested relief, the Debtors move the Court (a) to authorize and direct all banks to receive, process, honor and pay any and all checks drawn on the payroll and other bank accounts used by the Debtors to satisfy their Prepetition Employee Obligations whether presented before, on or after the Petition Date, upon receipt by each bank and institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and (b) to prohibit the Debtors' banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for such Prepetition Employee Obligations.  The Debtors additionally request that the Court authorize them to issue new postpetition checks to replace any checks that may nevertheless be dishonored and to reimburse any expenses that Employees may incur as a result of any bank's failure to honor a prepetition check.

104.    Each of the Debtors' Employees are employed by GFES.  As of the most recent payroll period on October 18, 2013, the Debtors' workforce consisted of approximately 335 Employees.[17]  Approximately 62 were employed by GFES in its corporate headquarters located in Lafayette, Louisiana (the "**Louisiana Headquarters**") and 17 were employed by GFES in its sales headquarters located in Houston, Texas (the "**Texas Headquarters**" and, together with the Louisiana Headquarters, the "**Headquarters**").  In addition, the Debtors had

---

[17]     The Debtors have been materially reducing the number of Employees over the past several months as their operating needs have changed (all such reductions in force, the "**RIF**").  Due to the RIF, which is ongoing, and Employee departures, the most accurate data regarding Employee numbers is as of the Debtors' last pay period on October 18, 2013.

approximately 89 salaried and hourly Employees working at the coil tubing and nitrogen facility

in Lafayette, Louisiana, and the stimulation and cementing facility in Carencro, Louisiana.

Certain of these Employees also performed coil tubing and other well services at wells in

Louisiana (the "**Louisiana Field Employees**").[18]  The Debtors also had approximately 101

salaried and hourly Employees working at the fracturing facility in Monessen, Pennsylvania, and

certain of these Employees also performed fracturing services at wells in the area (the

"**Pennsylvania Field Employees**" and, together with the Louisiana Field Employees, the "**Field**

**Employees**").  The Debtors have been in the process of winding down two operations facilities,

and maintained 11 Employees at the Pleasanton, Texas facility and 44 Employees at the

Midland, Texas facility to assist with the wind-down process.  GFES employed two (2)

Employees to monitor property owned by the Debtors in Marshall, Texas.  Finally, GFES had

nine (9) Employees at its fracturing assembly warehouse in Abbeville, Louisiana.

105.    Approximately 35% of the Debtors' total Employees are salaried

Employees and approximately 65% are hourly Employees.  As of the Petition Date, five (5) of

the hourly Employees are part-time and none of the salaried Employees are part-time.

Additionally, GFES employs one (1) temporary Employee at the Carencro, Louisiana facility.

GFES also employs one independent contractor (the "**Independent Contractor**") serving as a

fuel evaluation auditor to identify potential savings related to fuel costs.

---

[18]    Louisiana Field Employees are paid hourly and may average up 60 hours per week, except that supervisors are salaried.  Pennsylvania Field Employees are paid hourly and work for 14 days on a job followed by seven (7) days off.  During the 14 days on a job, these Employees are paid for 14 hours of work per day, and during their seven (7) days off, they are paid for seven (7) hours per day.  Pennsylvania Field Employees that are supervisors or that perform safety functions are salaried, and work 14 days on a job followed by 14 days off.

106.    The Debtors' ability to preserve their business and successfully reorganize is dependent on the expertise and continued enthusiasm and service of their Employees. Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, I believe that the morale and, thus, the performance of their Employees may be adversely affected.

107.    If the Debtors fail to pay the Prepetition Employee Obligations in the ordinary course, their Employees will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. Such a result would have a highly negative impact on workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates. In addition, the Debtors have determined that continuation of the Employee Programs is vital to preserving and rebuilding the morale of Employees during the pendency of these Chapter 11 Cases and to reducing the level of attrition that might otherwise occur.

1.    **Prepetition Employee Compensation**

   a.    <u>Payroll and Payroll Deductions</u>

108.    The Employees are paid bi-weekly (on Fridays, or on the preceding business day if a holiday falls on a Friday) with an average payroll each pay period of approximately $1.4 million.[19] All Employees are paid all compensation two weeks in arrears. Approximately two (2) business days before payroll, the Debtors fund their payroll obligations for the applicable payroll period to Automatic Data Processing, Inc. ("**ADP**" or the "**Payroll Administrator**"). Either one (1) or two (2) business days before payroll, the Debtors fund tax withholding obligations for the applicable payroll period to ADP. ADP handles payments to

---

[19]    The Debtors' monthly payroll has decreased materially over the past few payroll periods due to the RIF executed by the Debtors.

Employees on the date of payroll. As of October 16, 2013, the Debtors transferred the payroll amounts to ADP, and as of October 17, 2013, the Debtors transferred the tax withholding amount to ADP, for the payroll disbursement that occurred on October 18, 2013 for work performed during the period from September 30, 2013 through October 13, 2013.

109.    Further, as of the Petition Date, the Debtors made deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state, and local income, FICA and other taxes, as well as for garnishments, support payments, savings programs, benefit plans, insurance programs, and other similar programs (collectively, the "**Deductions**"). In 2013, the Debtors' average Deductions per payroll period for Employees aggregated approximately $470,000.

110.    Because Employees are owed certain prepetition compensation amounts as described above, the applicable Deductions have not yet been taken. Additionally, the Debtors may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions that have been withheld from Employee paychecks. The Debtors estimate that, as of the Petition Date, they are holding Deductions aggregating approximately $470,000, which the Debtors seek to pay to third parties in accordance with their prepetition practice.

111.    The Debtors pay the Independent Contractor directly for his services, in the aggregate amount of approximately $12,500 per month. As of the Petition Date, the Independent Contractor is owed approximately $12,500. In addition, the Debtors pay Advantage Staffing a fixed rate per hour for the services of the temporary Employee. The Debtors are behind on their payments to Advantage Staffing by approximately four months.

112.    GFES also pays the independent director appointed to each of the Debtors' boards of directors (the "**Independent Director**") $5,000 per month.  No amounts are due to the Independent Director as of the Petition Date.

113.    The Debtors estimate that, as of the Petition Date, accrued but unpaid wages and other compensation, including the Deductions, total approximately $1.5 million (comprised of $1.03 million owed to Employees (including the Independent Contractor) and $470,000 attributable to the Deductions).[20]

b.    Paid Time Off

114.    As part of their overall compensation, salaried and hourly Employees are also entitled to receive a certain number of paid time off ("**PTO**") days each year.  Employees earn up to 25 PTO days per year, depending upon their length of service and position with the Debtors, with those Employees who have been employed by the Debtors for a longer period of time being entitled to a greater number of PTO days than those Employees who have been with the Debtors for a shorter period of time.[21]

115.    Unused PTO days are not accrued or permitted to be carried over year to year.  Upon termination or retirement, Employees receive payments of any PTO days that accrued but were unused during that year.  This policy is consistent with the laws of most states, which provide that vacation benefits are vested and must be paid upon termination of

---

[20]    Due to the ongoing RIFs, the Debtors expect a decrease in payroll in the near term.  However, because many of the RIFs occurred recently and Employees are paid in arrears, the Debtors' next payrolls will approximate the size of recent payrolls.

[21]    By way of example, Employees who have been employed by the Debtors for (a) less than five (5) years are entitled to 15 PTO days; (b) five (5) years or more but less than 15 years are entitled to 20 PTO days; and (c) greater than 15 years are entitled to 25 PTO days.  Field Employees working 14 days on the job and seven (7) days off earn ten (10) PTO days per year.

employment.  The Debtors estimate that, as of October 4, 2013, total accrued but unpaid PTO liability is approximately $880,000.

116.    In addition to PTO days, all Employees are entitled to receive 11 paid holidays per year.  Unused holidays are not accrued or permitted to be carried over year to year and are forfeited upon the Employee's termination or retirement.  The Debtors pay in full Employees who are required to serve as jurors, and such time spent on a jury is not deducted from the Employee's PTO.  The Debtors also maintain a bereavement policy, pursuant to which an Employee may take three (3) paid days off in the event of a death in that Employee's immediate family, and such time is not deducted from the Employee's PTO.  Finally, the Debtors accommodate those Employees who serve in the military reserves by accommodating their reserve schedules and providing such Employees unpaid time off as needed for military service.

c.    Bonus Programs

117.    In the ordinary course of business, as an incentive to encourage and reward outstanding performance, the Debtors have historically offered certain of their Employees the opportunity to earn bonuses under several bonus programs, including (a) sales-based incentive plans (the "**Field Sales Incentive Plan**"), (b) productivity bonuses ("**Well Productivity Bonus**"), (c) day bonuses earned by certain Field Employees ("**Day Bonuses**"), and (d) an executive bonus plan ("**Executive Bonus Plan**" and together with the Field Sales Incentive Plan, the Well Productivity Bonus, the Day Bonus and the Executive Bonus Plan, the "**Bonus Programs**").  An Employee's eligibility to participate in a particular Bonus Program is based on the specific type of position the Employee holds (i.e., Field Employee, supervisor, executive, etc.), the Employee's specific employment level and the location at which the Employee works.  The Bonus Programs provide incentive awards to applicable Employees who

make a significant contribution towards the Debtors' achievement of financial and other goals in their respective area.

118.    The Debtors offer the Field Sales Incentive Plan, which gives certain Louisiana Field Employees responsible for sales the opportunity to earn incentive bonuses for meeting specific team and individual sales goals in connection with the sale of well services. The targeted bonus is 15% of the Employee's annual base salary (earned upon achieving 100% of the established sales goals) up to a maximum of 23% of the Employee's annual base salary (earned upon achieving 160% of the established goals).  Eligibility to participate in the Field Sales Incentive Plan is based upon nomination by the Employee's District Manager and approval of the Regional Operations Manager or the Vice President of Operations.  In connection with bonuses earned during 2012, participants were paid approximately $32,000 under the Field Sales Incentive Plan.  I believe that, due to the downturn of their business, no Employees will achieve the sales goals for 2013, and no amounts will be payable under the Field Sales Incentive Plan for 2013.  In addition, Louisiana Field Employees earn a Day Bonus for each day of work completed.  Day Bonuses are paid in connection with bi-weekly payroll.  As of the Petition Date, Day Bonuses have been earned by Louisiana Field Employees during the period from October 13, 2013 through the Petition Date and will be paid with the next payroll.

119.    The Debtors also offer those Pennsylvania Field Employees who are supervisors or engineers the opportunity to earn a Well Productivity Bonus based upon the production levels of those wells that receive fracturing services.  Well Productivity Bonuses are paid upon the completion of each stage of a fracturing job.  I believe that Pennsylvania Field Employee supervisors will earn Well Productivity Bonuses of approximately $9,500 in 2013.

120.    The Debtors also offer certain named executive officers the opportunity to

earn awards in the form of annual discretionary cash bonuses.[22]  Such bonuses are determined by

GFES's Chief Executive Officer and are based on an evaluation of the Debtors' performance, the

executive's contributions to the Debtors' performance and the executive's individual

performance.  No bonuses were awarded to any executives for 2012 and no amounts are

currently due under this bonus program.[23]

121.    I believe that, as of the Petition Date, approximately $2.4 million was

earned but remains unpaid with respect to the Employees (including the Independent Contractor)

on account of accrued prepetition wages, salaries, jury and/or holiday pay that have accrued

during the most recent payment period and other compensation (excluding Reimbursable

Expenses, incentive bonuses and sick and vacation pay) (collectively, the "**Unpaid**

**Compensation**").

2.    **Prepetition Employee Reimbursements**

a.    <u>Business Expenses</u>

122.    The Debtors, in the ordinary course of their business, reimburse

Employees for a variety of ordinary, necessary and reasonable business related expenses that

Employees incur.  These include expenses for travel, including airfare, lodging, automobile

rentals, meals, business-related entertainment expenses, internet charges when traveling, taxi,

mileage and incidental expenses such as parking and tolls.  Employees are reimbursed for their

expenses via a separate check or direct deposit issued by the Debtors immediately after the

---

[22]        Non-Employee directors did not receive any pay or compensation in 2012.

[23]        In the event the Debtors wish to award executive bonuses for 2013, they will separately request
authority to do so from this Court at a later date.

expense report is submitted and approved by the applicable manager and accounting staff. Because the Employees are not always prompt in entering expense reimbursement data into the software system, it is difficult for the Debtors to determine the exact amount outstanding at any particular time. I believe that, on average, Employees take four weeks to submit their expense data. Taking into account this four-week lag period, the Debtors estimate that, as of the Petition Date, their obligation to Employees for accrued, reimbursable expenses (submitted and unsubmitted) aggregate approximately $10,000, inclusive of amounts for travel, entertainment and other business-related expenses. The Debtors also offer per diem payments to certain Field Employees who travel to job sites in field locations. It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue reimbursing Employees for business expenses and providing per diem payments to Field Employees under certain circumstances.

123.    As an alternative to the expense reimbursement program described above, the Debtors offer certain of their Employees who live in Texas or Oklahoma but work in Pennsylvania the option to participate in a transportation assistance program (the "**Transportation Assistance Plan**"). Approximately 20 Employees have opted into the Transportation Assistance Plan, pursuant to which the Debtors pay such Employees $500 per month to cover airfare and other travel expenses in connection with their travel to Pennsylvania, but do not otherwise reimburse Employees for travel expenses, even if such Employee's travel expenses exceed $500 per month. The Debtors estimate that this program reduces the amount of travel expenses reimbursed by the Debtors by approximately $75,000 annually. Transportation Assistance Plan amounts are funded on the 27th day of each month to cover an Employee's travel in the following month. As of the Petition Date, the Debtors owe approximately $1,000 on

account of the Transportation Assistance Plan for October, 2013, and will owe approximately

$8,500 as of October 27, 2013 to fund Transportation Assistance Plan payments for November,

2013.

124.    Those Employees who frequently travel or who make purchases on behalf

of the Debtors in the ordinary course are issued a company credit card through Chase to be

utilized for travel, entertainment and other business-related expenses.  The Debtors pay Chase

directly for expenses charged by Employees to their Chase cards.  The Debtors are not seeking to

pay any prepetition amounts owed on the Chase cards.

125.    In addition, certain Employees are issued fuel cards through WEX

(formerly Wright Express Fleet & Universal).  The Debtors pay all charges incurred by

Employees on the WEX fuel cards directly to WEX on a daily basis, one day in arrears.  The

Debtors are not seeking to pay any prepetition amounts owed on the WEX fuel cards.

b.    Relocation Expenses

126.    Additionally, in order to attract and retain Employees, the Debtors from

time to time and in the ordinary course offer certain Employees relocation payments based upon

the Employee's particular relocation needs.  As of the Petition Date, one relocation agreement is

in place which provides for a relocation payment of $4,000.  As of the Petition Date, no amounts

are owed on account of relocation-related expenses incurred pursuant to these two agreements.

c.    Miscellaneous Reimbursements

127.    The Debtors also provide certain senior Employees with a vehicle

allowance (the "**Vehicle Allowance Plan**") to assist such Employees in carrying out their job

duties in the absence of a vehicle provided by the Debtors, or as part of an Employee's total

compensation package. Eligibility to participate in the Vehicle Allowance Plan is based upon nominations by an Employee's District or Department Manager. Vehicle allowances range from $600 to $1,500 per month, based upon the position held by each participating Employee. As of the Petition Date, the unpaid obligations on account of the Vehicle Allowance Plan were approximately $17,400.

128. With the addition of approximately $10,000 in estimated outstanding reimbursable expenses, $1,000 owed on account of the Transportation Assistance Plan and $17,400 in reimbursements associated with the Vehicle Allowance Plan, the total prepetition obligations in respect of reimbursements is estimated at $28,400 as of the Petition Date (the "**Reimbursement Obligations**").

### 3.    Employee Benefits

129. Prior to the Petition Date, the Debtors offered Employees and their eligible spouses and dependents various standard employee benefits, including, without limitation, (a) medical, dental and vision coverage, (b) coverage continuation under COBRA, (c) basic term life, supplemental life, accidental death and dismemberment ("**AD&D**"), supplemental AD&D and business travel accident insurance, (d) short-term and long-term disability insurance, (e) employee assistance, (f) retirement, savings and related types of benefits, (g) workers' compensation, (h) severance programs, and (i) miscellaneous other benefits provided to the Employees in the ordinary course of business (collectively, the "**Employee Benefits**"). As of the Petition Date, the Debtors were obligated to pay certain contributions to or provide benefits under such plans, programs, and policies.

a.    Medical Programs

130.    All full-time Employees are eligible to choose between and participate in one of two medical plans offered by the Debtors, each of which provides similar medical and prescription drug coverage. The first option is referred to as the "HSA" option, under which Employees and their family members own a tax-advantaged medical savings account to which the Debtors deposit funds for the purpose of paying qualified medical expenses.[24] The funds contributed to an Employee's HSA account are not subject to federal income tax at the time of deposit, and funds roll over and accumulate year to year if not spent. Approximately 20% of the Employees chose the HSA plan option. The second option is referred to as the "co-pay" option, under which Employees and their family members have the choice to use providers within the network or to use providers outside the network (the latter option being subject to higher costs). Approximately 80% of Employees chose the co-pay plan option. Both the co-pay and HSA plans are administered by GFES, but claims are administered by Southern Benefit Services, LLC ("**Southern Benefit**").

131.    Both medical plans have different associated premiums, deductibles and coverage benefits. Regardless of which plan is selected, Employees pay approximately 15-30% of the premium for their medical benefits coverage through pre-tax contributions from their paychecks (depending upon the level of coverage), and the Debtors incur the remaining 70-85% of the premium cost. Furthermore, both medical plans are self-funded.

---

[24]    The Employees' HSA accounts are managed by The Bancorp Bank ("**Bancorp**") under the "My Smart Saver" program. Bancorp charges a fee of $2.00 per month per account, which is paid by the participating Employees and deducted from their respective paychecks on a monthly basis.

132.    The obligations that the Debtors incur on behalf of the Employees on account of medical and prescription drug coverage under both of the offered medical plans approximates $309,799.21 per month, not including Southern Benefit's fees for claim administration services.  As of the Petition Date, the Debtors were over three months behind on payments to medical service providers on account of reconciled medical claims and owe approximately $1.14 million to medical service providers on account of medical expenses incurred by Employees.  It is critical that the Debtors be permitted to pay this amount, as the medical service providers will soon seek payment directly from those Employees who have incurred medical expenses if the providers are not paid by the Debtors in the near term.

133.    In the event that Employee medical claims are higher than anticipated, the Debtors have stop-loss insurance coverage (the "**ACE Stop Loss Policy**") from ACE American Insurance Company ("**ACE**") to pay for excess medical costs.  The ACE Stop Loss Policy covers any individual Employee's medical needs over $60,000 up to $5,000,000 per year.  The ACE Stop Loss Policy is in effect through December 31, 2013, and the Debtors request authority to renew this policy in the ordinary course.

b.    Dental, Vision, LTD, STD, Life and AD&D Insurance Coverage

134.    The Debtors also offer Employees coverage for dental, vision, long term disability, short term disability, life, and AD&D insurance through a group insurance plan (the "**Group Plan**") administered by Guardian Life Insurance Company of America ("**Guardian**").[25] The dental, vision, and short-term disability coverage provided under the Group Plan is self-

---

[25]    The Debtors offer a slightly different Group Plan to Employees who reside in Texas, but there is no material difference in the benefits afforded Employees or the cost to the Debtors for the Texas and non-Texas plans.

funded by the Debtors.  Employees pay approximately 30% of the premium for their dental

coverage and approximately 30% of the premium for their vision coverage through contributions

from their paychecks, and the Debtors incur the remaining premium cost.

135.    Employees are provided with short-term disability ("**STD**") coverage

under the Group Plan if the Employee is unable to work due to serious illness or injury.  The

STD benefit results in the continuation of the Employee's weekly earnings at 60% of such

earnings, up to a maximum weekly benefit of $2,500 for a period of up to 25 weeks.[26]  The

Debtors also provide Employees who have been disabled for at least 180 days with long-term

disability ("**LTD**") coverage under the Group Plan.  There is no minimum length of service that

is required for Employees to be eligible for this benefit.  The LTD coverage is equal to 60% of

the Employee's monthly earnings (offset by sources of income such as social security and other

disability benefits) up to a maximum monthly benefit of $8,000.  Such LTD benefits are

generally paid as long as the Employee remains disabled or up to age 67.[27]

136.    Basic life insurance is provided under the Group Plan in an amount equal

to the Employee's annual earnings, up to a maximum of $150,000 in case of accidental death.[28]

Additionally, in cases not involving the loss of life but the dismemberment of an Employee (such

---

[26]    Employees' STD benefits begin after an Employee has missed seven (7) days of work due to
disability or illness.

[27]    Employees over age 60 are eligible to receive LTD coverage for reduced periods of time.  For
example, an Employee aged 60 would be eligible for five (5) years of LTD benefits, and Employees over the age of
68 are eligible to receive one (1) year of LTD benefits.

[28]    Employees may purchase supplemental life insurance, at their own cost, for a minimum of
$25,000 and up to a maximum of $200,000.  In addition, Employees may purchase supplemental life insurance
coverage for their spouses (in amounts ranging from $1,000 up to 50% of such Employee's life insurance coverage,
not to exceed $100,000).  Employees may also purchase supplemental life insurance coverage for their children (in
amounts ranging from $1,000 to 10% of such Employee's life insurance coverage, not to exceed $10,000).

as the loss of a hand, a foot or the total loss of sight in an eye), an AD&D benefit equal to the Employee's annual earnings, up to a maximum of $150,000 is also payable.[29]

137.    The Debtors pay all premiums for Employees' life, AD&D, STD and LTD benefits under the Group Plan to Guardian.  Employees pay all premiums for voluntary life and AD&D coverage.

138.    Premiums under the Group Plan are paid in monthly installments.  As of the Petition Date, the average monthly premium for coverage under the self-funded portion of the Group Plan (dental, vision and STD) for all Employees is approximately $25,000, and the average monthly premium for coverage under the non-self-funded (LTD, life and AD&D) portion of the Group Plan for all Employees is $14,000, which I believe is a reasonable proxy of the amounts they owe as of the Petition Date.  The Debtors have not paid the October, 2013 installments which amounts are due and owing as of the Petition Date.

139.    The Debtors also offer Employees the option of purchasing additional insurance for accidental injuries, illness, life insurance, disability insurance and hospital services through AFLAC ("**AFLAC**").  Employees may elect to insure themselves, their spouses and dependents through this policy, and will receive a fixed amount of insurance benefit based upon the type of injury suffered according to a schedule.  Employees pay all premiums and administrative fees under this policy, but the premiums are deducted from their paychecks and remitted to AFLAC by the Debtors.  The Debtors request authority to continue to deduct premiums from the paychecks of participating Employees and pay those funds to AFLAC.

---

[29]    Employees may purchase supplemental AD&D insurance, at their own cost, for a minimum of $25,000 and up to a maximum of $200,000.

Approximately 140 Employees elect additional insurance coverage and the Debtors pass approximately $22,000 per month from the participating Employees' paychecks to AFLAC. As of the Petition Date, the Debtors are approximately one month behind in remitting funds to AFLAC.

     c.     <u>Travel-Related Insurance Benefits</u>

     140.     The Debtors also provide business travel and accident insurance to all Employees who are required to travel for business purposes through a plan administered by Reliance Standard Life Insurance Company ("**Reliance**"). The plan provides life insurance protection for accidental death equal up to a maximum benefit of (i) $100,000 for Employees who earn up to $100,000 per year, (ii) $250,000 for Employees who earn between $100,000 and $250,000 per year, and (iii) $500,000 for Employees earning more than $250,000 per year. Coverage is also provided for certain disabling injuries, such as loss of sight, speech, hearing or limb; or permanent and total disability. The annual premium for such travel-related insurance is $16,159, which amount was paid by the Debtors on January 1, 2013 for the 2013 calendar year policy period. There is, thus, no estimated outstanding liability due as of the Petition Date.

     d.     <u>Employee Assistance Program</u>

     141.     The Debtors additionally offer all Employees services to help resolve personal issues, as well as assistance with challenges (including, but not limited to drug abuse, marital difficulties, alcoholism or alcohol abuse, financial and legal pressures, concerns about children, depression, or divorce) that may arise in the Employees' lives (the "**Employee Assistance Program**"). The Debtors utilize Janus Associates, Inc. d/b/a Business Health Services ("**BHS**") to administer the Employee Assistance Program for all Employees. As of the

Petition Date, the unpaid obligations on account of the Employee Assistance Program were approximately $2,000.

e.    Savings and Retirement Plans

142.    The Debtors maintain a 401(k) profit sharing plan (the "**401(k) Plan**") for eligible Employees.  The 401(k) Plan is a tax-qualified 401(k) retirement savings plan.  Under the 401(k) Plan, an eligible Employee (which includes certain full-time Employees) may contribute a portion of his or her compensation on a pre-tax basis, through voluntary payroll deductions, to the 401(k) Plan.[30]  These contributions are deducted from the paychecks of participating Employees and contributed by the Debtors to the 401(k) Plan.  The total contributions made by any participating Employee for any payroll period must be no less than one percent (1%) of his or her eligible earnings for such period and must be contributed before-tax, provided that the total contribution for any payroll period cannot exceed the limit set by the Internal Revenue Service. Currently, approximately 85% of the Employees participate in the 401(k) Plan.  The Debtors do not make matching contributions to the 401(k) Plan.[31]

f.    COBRA Benefits

143.    The Debtors pay approximately $4,700 per month to a third-party administrator, Southern Benefit, for notification and administration of COBRA insurance, which provides continuing health benefits to the Employees in the event they lose their benefits for a variety of reasons, including termination (the "**COBRA Benefits**").  In the Employee Obligation

---

[30]    All full-time Employees are eligible to participate in the 401(k) Plan on the date he or she first completes an hour of service as an eligible Employee.  Temporary and part-time Employees are not eligible to participate in the 401(k) Plan.

[31]    The Debtors terminated their matching contribution policy shortly before filing these Chapter 11 Cases.

### 4.    Honoring of Prepetition Benefits

146.    As described above, certain of the Employee Benefits remained unpaid or unprovided as of the Petition Date because certain obligations of the Debtors under the applicable plan, program or policy accrued either in whole or in part prior to the commencement of these Chapter 11 Cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date.  The Debtors seek authority to pay or provide as they become due all prepetition Employee Benefits that have already accrued and that are described above.  The Debtors estimate that the aggregate amount of such prepetition Employee Benefits is approximately $1.54 million, including certain pass-through amounts related to additional voluntary insurance obtained by Employees.

### 5.    Continuation of Employee Programs Postpetition

147.    The Debtors also request confirmation of their right to continue to perform their obligations with respect to all Employee Programs, except as otherwise indicated in the Employee Obligations Motion.  The Employee Programs are essential to the Debtors' efforts to maintain Employee morale and minimize attrition.  I believe that the expenses associated with the Employee Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale, and loss of productivity that would occur if the Employee Benefits were discontinued.

148.    Notwithstanding the foregoing, the Debtors reserve the right to evaluate all Employee Programs and to make such modifications, including terminating any particular plan, program or policy, as may be necessary or appropriate during the pendency of these cases. The Debtors do not at this time intend to assume any plan, program, policy or related agreement under Bankruptcy Code Section 365(a) and reserve all rejection and termination rights.

6.      **Payments to Administrators**

149.    With respect to the Employee compensation and benefits described above, the Debtors contract with several vendors to administer and deliver payments or other benefits to their Employees (the "**Administrators**"). The Debtors pay these Administrators fees and expenses incurred in connection with providing such services. In certain cases, disbursements made in the ordinary course are paid by the Administrators, which, in turn, invoice the Debtors for reimbursement of payments made.

150.    For example, the Debtors, in the ordinary course of business, pay approximately $221,000 per month in connection with the WEX fuel cards, and a fee of $1.55 per Employee per month to BHS in connection with the Employee Assistance Program. Other administrative fees paid by the Debtors include those of Southern Benefit for the administration of the Employee's medical, prescription drug claims, and COBRA claims (as applicable), Guardian for the administration of the Group Plan, and Reliance for the administration of the business travel accident insurance, which administrative fees may be rolled into the overall monthly charges incurred by the Debtors for their respective services. Furthermore, as of the Petition Date, the Debtors owe ADP up to $10,000 for their payroll management services.

151.    In addition, in order to remain within their credit limit, the Debtors pay Chase on a weekly basis for expenses charged to the Chase Cards by Employees. Chase requires the Debtors to maintain a separate bank account containing $125,000 to serve as collateral for amounts owed on the Chase Cards.[33] The Debtors pay Chase an administrative renewal fee at

---

[33]     The Debtors request authority to maintain this account in the *Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105(a), 345, 363 and 364, Fed. R. Bankr. P. 6003 and Del. Bankr. L.R. 2015-2 (i) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks and Business Forms, and (ii) Authorizing Continuation of Intercompany Transactions.*

the beginning of each year to renew the Employees' Chase Cards. The Debtors request authority to pay this renewal fee in the ordinary course when due in 2014. The renewal fee was approximately $3,150 for 2013, and the Debtors anticipate the renewal fee for 2014 will be similar in amount.

152.    The Debtors pay premiums to ACE for the ACE Stop Loss Policy in monthly installments due on the first day of each month. As of the Petition Date, the Debtors have not yet paid the installment due on October 1, 2013 in the approximate amount of $57,000. The Debtors request authority to pay this prepetition amount, as well as authority to pay future premium installments on the ACE Stop Loss Policy when due. The Debtors estimate such installments to average approximately $57,000 per month.

153.    In conjunction with the Debtors' payment of Prepetition Employee Obligations and continued performance under Employee Programs, I believe that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary to ensure uninterrupted delivery of certain benefits to Employees. I believe that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred. A need to engage replacement Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Employees. Accordingly, the Debtors submit that the payment of claims owed to the Administrators is in the best interest of the Debtors' estates and Employees.

7.    **Honoring of Prepetition Checks**

154.    Prior to the Petition Date, the Debtors paid certain of their Prepetition Employee Obligations with checks that had not been presented for payment as of the Petition Date. In order to ensure the orderly payment of the Prepetition Employee Obligations, the Debtors request that the Court enter an order requiring the Debtors' banks to honor any such checks which are drawn on the Debtors' accounts, and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to the Employee Obligation Motion. To the extent that any such checks are nevertheless refused payment, the Debtors additionally request authority to issue replacement checks and to reimburse their Employees from any loss resulting from the dishonoring.

C.    **Tax Motion**

155.    Pursuant to the Tax Motion, the Debtors seek entry of an order under Sections 105(a), 363(b), 506(a), 507(a)(8), and 541 of Title 11 of the United States Code and Rule 6003 of the Federal Rules of Bankruptcy Procedure, authorizing them to pay, in their sole discretion, but subject to the terms and provisions of any cash collateral and/or postpetition financing agreement made by the Debtors or order entered by the Court, any prepetition tax and fee obligations including, without limitation, sales, use, and excise taxes; income or gross receipts taxes; franchise taxes; net worth taxes; real and personal property taxes; licensing fees, business license, registration, commercial activity, or other business, occupation or regulatory taxes or fees; any other types of taxes, fees, or charges; and any penalty, interest, or similar

charges (collectively, the "**Taxes and Fees**")[34] owing to those federal, state, and local governmental entities (the "**Governmental Units**"), listed on Exhibit A of the Tax Motion.

156.    For the avoidance of doubt, the requested authorization would be completely discretionary, and would allow the Debtors, among other things, to elect to pay Taxes and Fees as to which their officers and directors may have personal liability in the event of nonpayment by the Debtors, before other Taxes and Fees; would be without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds they deem appropriate; and would extend to the payment of Taxes and Fees relating to tax audits that have been completed, are in progress or arise from prepetition periods.

157.    In addition, the Debtors request in the Tax Motion that the Court authorize and direct the Debtors' banks to receive, process, honor and pay all prepetition and postpetition checks and fund transfers on account of the Taxes and Fees that had not been honored and paid as of the Petition Date, and authorize the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

---

[34]    The Debtors incur various taxes related to their employees and are separately required to withhold certain amounts from each employee's paycheck on account of things such as social security and FICA. Such payroll, withholding and other employee-related tax obligations are separately addressed in the *Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 (I) Authorizing Payment of Certain Prepetition Employee Obligations, Including Compensation, Benefits, Expense Reimbursements and Related Obligations, (II) Confirming Right to Continue Employee Programs on Postpetition Basis, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, (IV) Authorizing Payment of Prepetition Claims Owing to Administrators of, or Third Party Providers Under, Employee Programs, (V) Authorizing Payment of Independent Contractor Obligations, and (VI) Directing Banks to Honor Prepetition Checks and Fund Transfers For Authorized Payments* which is contemporaneously filed herewith.

158.    As set forth in the Tax Motion, the Taxes and Fees at issue are appropriate for payment to the extent that they are priority or secured claims that are payable in full or, alternatively, under the personal liability theory or the doctrine of necessity.  I believe that by paying the Taxes and Fees in the ordinary course of business, as and when due, the Debtors will avoid unnecessary disputes with Governmental Units -- and expenditures of time and money resulting from such disputes -- over myriad issues that are typically raised by such units as they attempt to enforce their rights to collect Taxes and Fees.

159.    Prior to the Petition Date, the Debtors incurred obligations to federal, state, and local governments.  As of the week before the Petition Date, the Debtors owed approximately $3.85 million on account of past-due Taxes and Fees.  In addition, certain Taxes and Fees attributable to the prepetition period were not yet due.  Certain prepetition Taxes and Fees will not be due until the applicable monthly, quarterly, or annual payment dates — in some cases immediately and in others not until next year.  The Debtors estimate that Taxes and Fees in the approximate amount of $243,000 will come due during the next 30 days and that approximately $5 million in Taxes and Fees will come due by the end of 2013.

160.    I believe that the continued payment of the Taxes and Fees on their normal due dates, as well as payment of overdue Taxes and Fees as soon as possible, will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful Chapter 11 process.  If such obligations are not paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Governmental Unit's applicable laws, including whether (a) the obligations are priority, secured or unsecured in nature, (b) they are proratable or fully prepetition or postpetition, and (c) penalties, interest, attorneys' fees, and

costs can continue to accrue on a postpetition basis, and, if so, whether such penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature.

161.    Nonpayment or delayed payment of Taxes and Fees may also subject the Debtors to efforts by certain Governmental Units, whether or not permissible under the Bankruptcy Code, to revoke the Debtors' licenses and other privileges either on a postpetition or postconfirmation basis.  Moreover, certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment.  In such events, collection efforts by the Governmental Units would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

162.    Certain of the Governmental Units have not been paid or have been sent checks and/or fund transfers for Taxes and Fees that may or may not have been presented or cleared as of the Petition Date.  Similarly, in other cases, Taxes and Fees have accrued or are accruing, or are subject to audit or review, but have not yet become due and payable and, thus, any checks or fund transfers will be issued on a postpetition basis.  Accordingly, the Debtors seek entry of an order authorizing and directing their banks and other financial institutions to receive, process, honor and pay all prepetition and postpetition checks and fund transfers issued by the Debtors to the Governmental Units in payment of Taxes and Fees that had not been honored and paid as of the Petition Date, and authorizing the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

D.    **Utilities Motion**

163.    In order to continue business operations through the reorganization process, I believe the Debtors must provide adequate assurance of payment to their utility service providers by way of an adequate assurance deposit. As of today, approximately fifteen (15) Utility Companies provide Utility Services to the Debtors at various locations through approximately forty-three (43) accounts. The Utility Companies service the Debtors' offices/facilities in Louisiana, Texas, Colorado and Mississippi. On average, the Debtors spent approximately $110,810.23 each month on utility costs and had a history of timely payment of utility costs.

III.    **CRITICAL VENDOR MOTION**

164.    The Debtors provide their customers with various material and services relating to hydraulic fracturing operations, as well as cementing, coiled tubing, pressure pumping, acidizing, and other pumping services. Specifically, the Debtors are a leading supplier of turbine-powered hydraulic fracturing services. I believe the Debtors' ongoing business is dependent upon their ability to fulfill their obligations to their customers which, in turn, is dependent upon access to various essential goods and services.

165.    I believe that many of the Debtors' vendors and service providers will continue to do business with them after the commencement of these cases. However, I anticipate that certain of the Debtors' Critical Vendors will: (a) refuse to deliver goods and services without payment of their prepetition claims; (b) refuse to deliver goods and services on reasonable price or credit terms absent payment of prepetition claims, thereby effectively refusing to do business with the Debtors; or (c) suffer significant financial hardship, such that the Debtors' non-payment

of prepetition claims would destroy a Critical Vendor's business and, therefore, its ability to supply the Debtors with goods and services. Furthermore, there exists the potential for the assertion of liens by many Critical Vendors against assets that are necessary for the continuation of the Debtors' operations. Further still, suppliers of proprietary materials and equipment may withhold future orders, causing the Debtors to either restart work already performed to ensure confirming materials were used throughout, or possibly reconfigure machinery and equipment to work with the new type of materials. I believe that payment of the Critical Vendor Claims is vital to the Debtors' ability to deliver their products and services and, thus, to their effort to preserve and maximize value for all stakeholders.

## IV.    CONCLUSION

166.    The Debtors' ultimate goal in these Chapter 11 Cases is to formulate and implement a strategy that maximizes the value of the Debtors' estates for the benefit of all the Debtors' creditors. In the near term, however, to minimize any loss of value of their business during these Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible and to preserve the value of the Debtors' business. I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives will be substantially enhanced.

167.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information, and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of October 2013.

Green Field Energy Services, Inc., et al.
Debtors and Debtors in Possession

*Earl J. Blackwell*

Earl J. Blackwell
Chief Financial Officer of Green Field
Energy Systems, Inc.

SIGNATURE PAGE TO DECLARATION OF EARL J. BLACKWELL IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

## EXHIBIT A

### Corporate Organization Chart

