## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x
In re:                                      :   Chapter 11
                                            :
GREEN FIELD ENERGY SERVICES, INC., et       :   Case No. 13-12783 (_____)
al.,                                        :
                                            :   Joint Administration Requested
              Debtors.¹                     x
------------------------------------------------------- 
```

### MOTION OF DEBTORS FOR ORDER UNDER
### 11 U.S.C. §§ 105(a), 363, 507(a), 541, 1107(a) AND 1108 AND
### FED. R. BANKR. P. 6003 (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION
### EMPLOYEE OBLIGATIONS, INCLUDING COMPENSATION, BENEFITS, EXPENSE
### REIMBURSEMENTS AND RELATED OBLIGATIONS, (II) CONFIRMING RIGHT
### TO CONTINUE EMPLOYEE PROGRAMS ON POSTPETITION BASIS,
### (III) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED
### TAXES, (IV) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO
### ADMINISTRATORS OF, OR THIRD PARTY PROVIDERS UNDER, EMPLOYEE
### PROGRAMS AND (V) DIRECTING BANKS TO HONOR PREPETITION CHECKS
### AND FUND TRANSFERS FOR AUTHORIZED PAYMENTS

The debtors and debtors in possession in the above-captioned cases (collectively,

the "**Debtors**") hereby move (the "**Motion**") for entry of interim and final orders, under Sections

105(a), 363, 507(a), 541, 1107(a) and 1108 of Title 11 of the United States Code (the

"**Bankruptcy Code**") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), (i) authorizing the Debtors to pay certain prepetition amounts owing to or

for the benefit of current and former employees for compensation, benefits and reimbursable

expenses; (ii) confirming the Debtors' right to continue postpetition, in the ordinary course of

business, the employee-related plans, programs and policies in effect immediately prior to the

filing of these cases; (iii) authorizing the Debtors to pay any and all local, state and federal

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax
or organizational identification number, are: Green Field Energy Services, Inc. (2539); Hub City Tools, Inc. (2827);
and Proppant One, Inc. (6035). The above-captioned Debtors' mailing address is 4023 Ambassador Caffery
Parkway, Suite #200, Lafayette, LA 70503.

withholding and payroll-related or similar taxes relating to prepetition periods; (iv) confirming the Debtors' right to continue to deduct and to transmit deductions from payroll checks as authorized by employees, as required under any employee-related plan, program or policy or as required by law; (v) authorizing the Debtors to pay any prepetition claims owing to the administrators of, or third party providers under, their employee-related plans, programs and policies as necessary to ensure the delivery of compensation, benefits and expense reimbursements to their employees; and (vi) authorizing and directing all banks to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers on account of any obligations authorized to be paid pursuant hereto. In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Earl Blackwell in Support of Chapter 11 Petitions and First Day Motions*, filed with the Court concurrently herewith (the "**Blackwell Declaration**"). In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code Sections 105(a), 363, 507(a), 541, 1107(a) and 1108. Such relief is warranted under Bankruptcy Rule 6003.

## BACKGROUND

2.      On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases for relief under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The factual background regarding the Debtors, including their business operations, their capital and debt structures and the events leading to the filing of the

Chapter 11 Cases, is set forth in detail in the Blackwell Declaration and fully incorporated herein by reference.

3.      The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1108.  No trustee or examiner has been requested in the Chapter 11 Cases and no committees have yet been appointed.

## RELIEF REQUESTED

4.      By this Motion, the Debtors seek entry of interim and final orders authorizing them, in their discretion, to pay, continue or otherwise honor various prepetition employee-related obligations (collectively, the "**Prepetition Employee Obligations**") to or for the benefit of their current, former, full-time, part-time, permanent and temporary employees (including the Independent Contractor (defined below)) (collectively, the "**Employees**"), for compensation, benefits and expense reimbursements under all plans, programs and policies maintained or contributed to, and agreements entered into, by the Debtors prior to the Petition Date (as described below, the "**Employee Programs**").  In addition, the Debtors request that the Court confirm their right to continue each of the Employee Programs in the ordinary course of business during the pendency of these Chapter 11 Cases in the manner and to the extent that such Employee Programs were in effect immediately prior to the filing of such cases and to make payments in connection with expenses incurred in the postpetition administration of any Employee Program.[2]

5.      The Employee Programs under which the Prepetition Employee Obligations arise are described more fully herein and include, without limitation, plans,

---

[2]      By this Motion, the Debtors do not seek to modify the terms of any Employee Program and do not seek to assume or reject any Employee Program to the extent that such Employee Program is deemed to be an executory contract within the meaning of Bankruptcy Code Section 365.  Moreover, the Debtors do not waive their right to modify or terminate any Employee Program to the extent that such right exists under the terms of the Employee Program or as may be required by applicable law.

programs, policies and agreements providing for (a) wages, salaries, bonuses, paid time off, sick pay and other accrued compensation; (b) reimbursement of business, travel, relocation and other reimbursable expenses and payment of business-related credit card obligations; and (c) benefits, with coverage as applicable for eligible spouses and dependents, in the form of medical, vision and dental coverage, coverage continuation under COBRA,[3] basic term life, supplemental life, accidental death and dismemberment and business travel accident insurance, short-term disability, long-term disability, employee assistance, savings, workers' compensation,[4] severance, and miscellaneous other benefits provided to the Employees in the ordinary course of business.[5]

6.    The Debtors also seek authorization to be permitted to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to the Prepetition Employee Obligations including, but not limited to, all withholding taxes, social security taxes and medicare taxes.  In addition, the Debtors seek authorization to pay to third parties any and all amounts deducted from Employee paychecks for payments on behalf of Employees for garnishments, support payments, savings programs, benefit plans, insurance programs, and other similar programs.

---

[3]    See 29 U.S.C. §§ 1161 et seq.

[4]    The Debtors' workers' compensation policy and payment arrangements are described in the *Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363, 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Debtors to Pay Prepetition Insurance  Obligations and Maintain Postpetition Insurance Coverage; to Continue Honoring Surety Bond Obligations, Workers' Compensation Obligations, and an Insurance Premium Finance Agreement; and Continuing Grant of Security Interest to the Insurance Premium Financing Company*, filed contemporaneously herewith.

[5]    The Debtors may separately seek authorization to implement new postpetition retention, severance or similar employment protection programs designed to preserve employee morale, encourage continuing employment and otherwise ameliorate the effects on employees of these Chapter 11 Cases.  Pending approval of any such postpetition programs, the prepetition programs will continue in the ordinary course, subject to the provisions of Bankruptcy Code Section 503(c)(2).

7.    The Debtors also request that, with respect to any Employee Programs and Prepetition Employee Obligations that are administered, insured or paid through a third-party administrator or provider, the Debtors be expressly authorized, in their discretion, to pay any prepetition claims of such administrator and provider in the ordinary course of business to insure the uninterrupted delivery of payments or other benefits to the Employees.

8.    In support of the requested relief, the Debtors move the Court (a) to authorize and direct all banks to receive, process, honor and pay any and all checks drawn on the payroll and other bank accounts used by the Debtors to satisfy their Prepetition Employee Obligations whether presented before, on or after the Petition Date, upon receipt by each bank and institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and (b) to prohibit the Debtors' banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for such Prepetition Employee Obligations.  The Debtors additionally request that the Court authorize them to issue new postpetition checks to replace any checks that may nevertheless be dishonored and to reimburse any expenses that Employees may incur as a result of any bank's failure to honor a prepetition check.

### BASIS FOR RELIEF

9.    Each of the Debtors' Employees are employed by Green Field Energy Services, Inc. ("**GFES**").  As of the most recent payroll period on October 18, 2013, the Debtors' workforce consisted of approximately 335 Employees.[6]  Approximately 62 were employed by GFES in its corporate headquarters located in Lafayette, Louisiana (the "**Louisiana**

---

[6]    The Debtors have been materially reducing the number of Employees over the past several months as their operating needs have changed (all such reductions in force, the "**RIF**").  Due to the RIF, which is ongoing, and Employee departures, the most accurate data regarding Employee numbers is as of the Debtors' last pay period on October 18, 2013.

**Headquarters**") and 17 were employed by GFES in its sales headquarters located in Houston, Texas (the "**Texas Headquarters**" and, together with the Louisiana Headquarters, the "**Headquarters**"). In addition, the Debtors had approximately 89 salaried and hourly Employees working at the coil tubing and nitrogen facility in Lafayette, Louisiana, and the stimulation and cementing facility in Carenco, Louisiana. Certain of these Employees also performed coil tubing and other well services at wells in Louisiana (the "**Louisiana Field Employees**").[7] The Debtors also had approximately 101 salaried and hourly Employees working at the fracturing facility in Monessen, Pennsylvania, and certain of these Employees also performed fracturing services at wells in the area (the "**Pennsylvania Field Employees**" and, together with the Louisiana Field Employees, the "**Field Employees**"). The Debtors have been in the process of winding down two operations facilities, and maintained 11 Employees at the Pleasanton, Texas facility and 44 Employees at the Midland, Texas facility to assist with the wind-down process. GFES employed two (2) Employees to monitor property owned by the Debtors in Marshall, Texas. Finally, GFES had nine (9) Employees at its fracturing assembly warehouse in Abbeville, Louisiana.

10. Approximately 43% of the Debtors' total Employees are salaried Employees and approximately 57% are hourly Employees. As of the Petition Date, five (5) of the hourly Employees are part-time and none of the salaried Employees are part-time. Additionally, GFES employs one (1) temporary Employee at the Carenco, Louisiana facility.

---

[7]    Louisiana Field Employees are paid hourly and may average up 60 hours per week, except that supervisors are salaried. Pennsylvania Field Employees are paid hourly and work for 14 days on a job followed by seven (7) days off. During the 14 days on a job, these Employees are paid for 14 hours of work per day, and during their seven (7) days off, they are paid for seven (7) hours per day. Pennsylvania Field Employees that are supervisors or that perform safety functions are salaried, and work 14 days on a job followed by 14 days off.

GFES also employs one independent contractor (the "**Independent Contractor**") serving as a fuel evaluation auditor to identify potential savings related to fuel costs.

11.    The Debtors' ability to preserve their business and successfully reorganize is dependent on the expertise and continued enthusiasm and service of their Employees.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the morale and, thus, the performance of their Employees may be adversely affected.

12.    If the Debtors fail to pay the Prepetition Employee Obligations in the ordinary course, their Employees will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  Such a result would have a highly negative impact on workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates.  In addition, the Debtors have determined that continuation of the Employee Programs is vital to preserving and rebuilding the morale of Employees during the pendency of these Chapter 11 Cases and to reducing the level of attrition that might otherwise occur.

A.    **Prepetition Employee Compensation**

i.    Payroll and Payroll Deductions

13.    The Employees are paid bi-weekly (on Fridays, or on the preceding business day if a holiday falls on a Friday) with an average payroll each pay period of approximately $1.4 million.[8]  All Employees are paid all compensation two weeks in arrears. Approximately two (2) business days before payroll, the Debtors fund their payroll obligations for the applicable payroll period to Automatic Data Processing, Inc. ("**ADP**" or the "**Payroll Administrator**").  Either one (1) or two (2) business days before payroll, the Debtors fund tax

---

[8]    The Debtors' monthly payroll has decreased materially over the past few payroll periods due to the RIF executed by the Debtors.

01:14282597.4

HN\1066559.19

withholding obligations for the applicable payroll period to ADP.  ADP handles payments to Employees on the date of payroll.  As of October 16, 2013, the Debtors transferred the payroll amounts to ADP, and as of October 17, 2013, the Debtors transferred the tax withholding amount to ADP, for the payroll disbursement that occurred on October 18, 2013 for work performed during the period from September 30, 2013 through October 13, 2013.

14.    Further, as of the Petition Date, the Debtors made deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state and local income, FICA and other taxes, as well as for garnishments, support payments, savings programs, benefit plans, insurance programs and other similar programs (collectively, the "**Deductions**").  In 2013, the Debtors' average Deductions per payroll period for Employees aggregated approximately $470,000.

15.    Because Employees are owed certain prepetition compensation amounts as described above, the applicable Deductions have not yet been taken.  Additionally, the Debtors may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions that have been withheld from Employee paychecks.  The Debtors estimate that, as of the Petition Date, they are holding Deductions aggregating approximately $470,000, which the Debtors seek to pay to third parties in accordance with their prepetition practice.

16.    The Debtors pay the Independent Contractor directly for his services, in the aggregate amount of approximately $12,500 per month.  As of the Petition Date, the Independent Contractor is owed approximately $12,500.  In addition, the Debtors pay Advantage Staffing a fixed rate per hour for the services of the temporary Employee.  The Debtors are behind on their payments to Advantage Staffing by approximately four months.

17.     GFES also pays the independent director appointed to each of the Debtors' boards of directors (the "**Independent Director**") $5,000 per month.  No amounts are due to the Independent Director as of the Petition Date.

18.     The Debtors estimate that, as of the Petition Date, accrued but unpaid wages and other compensation, including the Deductions, total approximately $1.5 million (comprised of $1.03 million owed to Employees (including the Independent Contractor) and $470,000 attributable to the Deductions).[9]

ii.     Paid Time Off

19.     As part of their overall compensation, salaried and hourly Employees are also entitled to receive a certain number of paid time off ("**PTO**") days each year.  Employees earn up to 25 PTO days per year, depending upon their length of service and position with the Debtors, with those Employees who have been employed by the Debtors for a longer period of time being entitled to a greater number of PTO days than those Employees who have been with the Debtors for a shorter period of time.[10]

20.     Unused PTO days are not accrued or permitted to be carried over year to year.  Upon termination or retirement, Employees receive payments of any PTO days that accrued but were unused during that year.  This policy is consistent with the laws of most states, which provide that vacation benefits are vested and must be paid upon termination of

---

[9]     Due to the ongoing RIFs, the Debtors expect a decrease in payroll in the near term.  However, because many of the RIFs occurred recently and Employees are paid in arrears, the Debtors' next payrolls will approximate the size of recent payrolls.

[10]     By way of example, Employees who have been employed by the Debtors for (a) less than five (5) years are entitled to 15 PTO days; (b) five (5) years or more but less than 15 years are entitled to 20 PTO days; and (c) greater than 15 years are entitled to 25 PTO days.  Field Employees working 14 days on the job and seven (7) days off earn ten (10) PTO days per year.

employment. The Debtors estimate that, as of October 4, 2013, total accrued but unpaid PTO liability is approximately $880,000.

21.    In addition to PTO days, all Employees are entitled to receive 11 paid holidays per year. Unused holidays are not accrued or permitted to be carried over year to year and are forfeited upon the Employee's termination or retirement. The Debtors pay in full Employees who are required to serve as jurors, and such time spent on a jury is not deducted from the Employee's PTO. The Debtors also maintain a bereavement policy, pursuant to which an Employee may take three (3) paid days off in the event of a death in that Employee's immediate family, and such time is not deducted from the Employee's PTO. Finally, the Debtors accommodate those Employees who serve in the military reserves by accommodating their reserve schedules and providing such Employees unpaid time off as needed for military service.

iii.    Bonus Programs

22.    In the ordinary course of business, as an incentive to encourage and reward outstanding performance, the Debtors have historically offered certain of their Employees the opportunity to earn bonuses under several bonus programs, including (a) sales-based incentive plans (the "**Field Sales Incentive Plan**"), (b) productivity bonuses ("**Well Productivity Bonus**"), (c) day bonuses earned by certain Field Employees ("**Day Bonuses**") and (d) an executive bonus plan ("**Executive Bonus Plan**" and together with the Field Sales Incentive Plan, the Well Productivity Bonus, the Day Bonus and the Executive Bonus Plan, the "**Bonus Programs**"). An Employee's eligibility to participate in a particular Bonus Program is based on the specific type of position the Employee holds (i.e., Field Employee, supervisor, executive, etc.), the Employee's specific employment level and the location at which the Employee works. The Bonus Programs provide incentive awards to applicable Employees who

make a significant contribution towards the Debtors' achievement of financial and other goals in their respective area.

23.      The Debtors offer the Field Sales Incentive Plan, which gives certain Louisiana Field Employees responsible for sales the opportunity to earn incentive bonuses for meeting specific team and individual sales goals in connection with the sale of well services. The targeted bonus is 15% of the Employee's annual base salary (earned upon achieving 100% of the established sales goals) up to a maximum of 23% of the Employee's annual base salary (earned upon achieving 160% of the established goals).  Eligibility to participate in the Field Sales Incentive Plan is based upon nomination by the Employee's District Manager and approval of the Regional Operations Manager or the Vice President of Operations.  In connection with bonuses earned during 2012, participants were paid approximately $32,000 under the Field Sales Incentive Plan.  The Debtors believe that, due to the downturn of their business, no Employees will achieve the sales goals for 2013, and no amounts will be payable under the Field Sales Incentive Plan for 2013.  In addition, Louisiana Field Employees earn a Day Bonus for each day of work completed.  Day Bonuses are paid in connection with bi-weekly payroll.  As of the Petition Date, Day Bonuses have been earned by Louisiana Field Employees during the period from October 13, 2013 through the Petition Date and will be paid with the next payroll.

24.      The Debtors also offer those Pennsylvania Field Employees who are supervisors or engineers the opportunity to earn a Well Productivity Bonus based upon the production levels of those wells that receive fracturing services.  Well Productivity Bonuses are paid upon the completion of each stage of a fracturing job.  The Debtors believe that Pennsylvania Field Employee supervisors will earn Well Productivity Bonuses of approximately $9,500 in 2013.

01:14282597.4

HN\1066559.19

11

25.     The Debtors also offer certain named executive officers the opportunity to earn awards in the form of annual discretionary cash bonuses.[11]  Such bonuses are determined by GFES's Chief Executive Officer and are based on an evaluation of the Debtors' performance, the executive's contributions to the Debtors' performance and the executive's individual performance.  No bonuses were awarded to any executives for 2012 and no amounts are currently due under this bonus program.[12]

26.     The Debtors believe that, as of the Petition Date, approximately $2.4 million was earned but remains unpaid with respect to the Employees (including the Independent Contractor) on account of accrued prepetition wages, salaries, jury and/or holiday pay that have accrued during the most recent payment period and other compensation (excluding Reimbursable Expenses, incentive bonuses and sick and vacation pay) (collectively, the "**Unpaid Compensation**").

**B.      Prepetition Employee Reimbursements**

i.      Business Expenses

27.     The Debtors, in the ordinary course of their business, reimburse Employees for a variety of ordinary, necessary and reasonable business related expenses that Employees incur.  These include expenses for travel, including airfare, lodging, automobile rentals, meals, business-related entertainment expenses, internet charges when traveling, taxi, mileage and incidental expenses such as parking and tolls.  Employees are reimbursed for their expenses via a separate check or direct deposit issued by the Debtors immediately after the expense report is submitted and approved by the applicable manager and accounting staff.

---

[11]     Non-Employee directors did not receive any pay or compensation in 2012.

[12]     In the event the Debtors wish to award executive bonuses for 2013, they will separately request authority to do so from this Court at a later date.

Because the Employees are not always prompt in entering expense reimbursement data into the software system, it is difficult for the Debtors to determine the exact amount outstanding at any particular time. The Debtors believe that, on average, Employees take four weeks to submit their expense data. The Debtors reimbursed Employees for all outstanding submitted expenses shortly before the Petition Date. Taking this into account period, the Debtors estimate that, as of the Petition Date, their obligation to Employees for accrued, reimbursable unsubmitted expenses aggregate approximately $10,000, inclusive of amounts for travel, entertainment and other business-related expenses. The Debtors also offer per diem payments to certain Field Employees who travel to job sites in field locations. It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue reimbursing Employees for business expenses and providing per diem payments to Field Employees under certain circumstances.

28.    As an alternative to the expense reimbursement program described above, the Debtors offer certain of their Employees who live in Texas or Oklahoma but work in Pennsylvania the option to participate in a transportation assistance program (the "**Transportation Assistance Plan**"). Approximately 20 Employees have opted into the Transportation Assistance Plan, pursuant to which the Debtors pay such Employees $500 per month to cover airfare and other travel expenses in connection with their travel to Pennsylvania, but do not otherwise reimburse Employees for travel expenses, even if such Employee's travel expenses exceed $500 per month. The Debtors estimate that this program reduces the amount of travel expenses reimbursed by the Debtors by approximately $75,000 annually. Transportation Assistance Plan amounts are funded on the 27th day of each month to cover an Employee's travel in the following month. As of the Petition Date, the Debtors owe approximately $1,000 on account of the Transportation Assistance Plan for October, 2013, and will owe approximately

01:14282597.4

$8,500 as of October 27, 2013 to fund Transportation Assistance Plan payments for November, 2013.

29.     Those Employees who frequently travel or who make purchases on behalf of the Debtors in the ordinary course are issued a company credit card through Chase to be utilized for travel, entertainment and other business-related expenses. The Debtors pay Chase directly for expenses charged by Employees to their Chase cards. The Debtors are not seeking to pay any prepetition amounts owed on the Chase cards.

30.     In addition, certain Employees are issued fuel cards through WEX (formerly Wright Express Fleet & Universal). The Debtors pay all charges incurred by Employees on the WEX fuel cards directly to WEX on a daily basis, one day in arrears. The Debtors are not seeking to pay any prepetition amounts owed on the WEX fuel cards.

ii.     <u>Relocation Expenses</u>

31.     Additionally, in order to attract and retain Employees, the Debtors from time to time and in the ordinary course offer certain Employees relocation payments based upon the Employee's particular relocation needs. As of the Petition Date, one relocation agreement is in place which provides for a relocation payment of $4,000. As of the Petition Date, no amounts are owed on account of relocation-related expenses incurred pursuant to these two agreements.

iii.     <u>Miscellaneous Reimbursements</u>

32.     The Debtors also provide certain senior Employees with a vehicle allowance (the "**Vehicle Allowance Plan**") to assist such Employees in carrying out their job duties in the absence of a vehicle provided by the Debtors, or as part of an Employee's total compensation package. Eligibility to participate in the Vehicle Allowance Plan is based upon nominations by an Employee's District or Department Manager. Vehicle allowances range from $600 to $1,500 per month, based upon the position held by each participating Employee. As of

01:14282597.4

the Petition Date, the unpaid obligations on account of the Vehicle Allowance Plan were approximately $17,400.

33.    With the addition of approximately $10,000 in estimated outstanding reimbursable expenses, $1,000 owed on account of the Transpiration Assistance Plan and $17,400 in reimbursements associated with the Vehicle Allowance Plan, the total prepetition obligations in respect of reimbursements is estimated at $28,400 as of the Petition Date (the "**Reimbursement Obligations**").

C.    **Employee Benefits**

34.    Prior to the Petition Date, the Debtors offered Employees and their eligible spouses and dependents various standard employee benefits, including, without limitation, (a) medical, dental and vision coverage, (b) coverage continuation under COBRA, (c) basic term life, supplemental life, accidental death and dismemberment ("**AD&D**"), supplemental AD&D and business travel accident insurance, (d) short-term and long-term disability insurance, (e) employee assistance, (f) retirement, savings and related types of benefits, (g) workers' compensation, (h) severance programs, and (i) miscellaneous other benefits provided to the Employees in the ordinary course of business (collectively, the "**Employee Benefits**"). As of the Petition Date, the Debtors were obligated to pay certain contributions to or provide benefits under such plans, programs and policies.

i.    Medical Programs

35.    All full-time Employees are eligible to choose between and participate in one of two medical plans offered by the Debtors, each of which provides similar medical and prescription drug coverage. The first option is referred to as the "HSA" option, under which Employees and their family members own a tax-advantaged medical savings account to which

the Debtors deposit funds for the purpose of paying qualified medical expenses.[13] The funds

contributed to an Employee's HSA account are not subject to federal income tax at the time of

deposit, and funds roll over and accumulate year to year if not spent. Approximately 20% of the

Employees chose the HSA plan option. The second option is referred to as the "co-pay" option,

under which Employees and their family members have the choice to use providers within the

network or to use providers outside the network (the latter option being subject to higher costs).

Approximately 80% of Employees chose the co-pay plan option. Both the co-pay and HSA

plans are administered by GFES, but claims are administered by Southern Benefit Services, LLC

("**Southern Benefit**").

36.    Both medical plans have different associated premiums, deductibles and

coverage benefits. Regardless of which plan is selected, Employees pay approximately 15-30%

of the premium for their medical benefits coverage through pre-tax contributions from their

paychecks (depending upon the level of coverage), and the Debtors incur the remaining 70-85%

of the premium cost. Furthermore, both medical plans are self-funded.

37.    The obligations that the Debtors incur on behalf of the Employees on

account of medical and prescription drug coverage under both of the offered medical plans

approximates $309,799.21 per month, not including Southern Benefit's fees for claim

administration services. As of the Petition Date, the Debtors were over three months behind on

payments to medical service providers on account of reconciled medical claims and owe

approximately $1.14 million to medical service providers on account of medical expenses

incurred by Employees. It is critical that the Debtors be permitted to pay this amount, as the

---

[13]       The Employees' HSA accounts are managed by The Bancorp Bank ("**Bancorp**") under the "My Smart Saver" program. Bancorp charges a fee of $2.00 per month per account, which is paid by the participating Employees and deducted from their respective paychecks on a monthly basis.

medical service providers will soon seek payment directly from those Employees who have incurred medical expenses if the providers are not paid by the Debtors in the near term.[14]

38.      In the event that Employee medical claims are higher than anticipated, the Debtors have stop-loss insurance coverage (the "**ACE Stop Loss Policy**") from ACE American Insurance Company ("**ACE**") to pay for excess medical costs. The ACE Stop Loss Policy covers any individual Employee's medical needs over $60,000 up to $5,000,000 per year. The ACE Stop Loss Policy is in effect through December 31, 2013, and the Debtors request authority to renew this policy in the ordinary course.

    ii.    <u>Dental, Vision, LTD, STD, Life and AD&D Insurance Coverage</u>

39.      The Debtors also offer Employees coverage for dental, vision, long term disability, short term disability, life and AD&D insurance through a group insurance plan (the "**Group Plan**") administered by Guardian Life Insurance Company of America ("**Guardian**").[15] The dental, vision and short-term disability coverage provided under the Group Plan is self-funded by the Debtors. Employees pay approximately 30% of the premium for their dental coverage and approximately 30% of the premium for their vision coverage through contributions from their paychecks, and the Debtors incur the remaining premium cost.

40.      Employees are provided with short-term disability ("**STD**") coverage under the Group Plan if the Employee is unable to work due to serious illness or injury. The STD benefit results in the continuation of the Employee's weekly earnings at 60% of such

---

[14]      Certain medical benefits are offered to Employees on a pre-tax basis through Infinisource, Inc.

[15]      The Debtors offer a slightly different Group Plan to Employees who reside in Texas, but there is no material difference in the benefits afforded Employees or the cost to the Debtors for the Texas and non-Texas plans.

earnings, up to a maximum weekly benefit of $2,500 for a period of up to 25 weeks.[16] The Debtors also provide Employees who have been disabled for at least 180 days with long-term disability ("**LTD**") coverage under the Group Plan.  There is no minimum length of service that is required for Employees to be eligible for this benefit.  The LTD coverage is equal to 60% of the Employee's monthly earnings (offset by sources of income such as social security and other disability benefits) up to a maximum monthly benefit of $8,000.  Such LTD benefits are generally paid as long as the Employee remains disabled or up to age 67.[17]

41.      Basic life insurance is provided under the Group Plan in an amount equal to the Employee's annual earnings, up to a maximum of $150,000 in case of accidental death.[18] Additionally, in cases not involving the loss of life but the dismemberment of an Employee (such as the loss of a hand, a foot or the total loss of sight in an eye), an AD&D benefit equal to the Employee's annual earnings, up to a maximum of $150,000 is also payable.[19]

42.      The Debtors pay all premiums for Employees' life, AD&D, STD and LTD benefits under the Group Plan to Guardian.  Employees pay all premiums for voluntary life and AD&D coverage.

---

[16]      Employees' STD benefits begin after an Employee has missed seven (7) days of work due to disability or illness.

[17]      Employees over age 60 are eligible to receive LTD coverage for reduced periods of time.  For example, an Employee aged 60 would be eligible for five (5) years of LTD benefits, and Employees over the age of 68 are eligible to receive one (1) year of LTD benefits.

[18]      Employees may purchase supplemental life insurance, at their own cost, for a minimum of $25,000 and up to a maximum of $200,000.  In addition, Employees may purchase supplemental life insurance coverage for their spouses (in amounts ranging from $1,000 up to 50% of such Employee's life insurance coverage, not to exceed $100,000).  Employees may also purchase supplemental life insurance coverage for their children (in amounts ranging from $1,000 to 10% of such Employee's life insurance coverage, not to exceed $10,000).

[19]      Employees may purchase supplemental AD&D insurance, at their own cost, for a minimum of $25,000 and up to a maximum of $200,000.

43.     Premiums under the Group Plan are paid in monthly installments.  As of the Petition Date, the average monthly premium for coverage under the self-funded portion of the Group Plan (dental, vision and STD) for all Employees is approximately $7,000,[20] and the average monthly premium for coverage under the non-self-funded (LTD, life and AD&D) portion of the Group Plan for all Employees is $14,000, which the Debtors believe is a reasonable proxy of the amounts they owe as of the Petition Date.  The Debtors have not paid the October, 2013 installments which amounts are due and owing as of the Petition Date.

44.     The Debtors also offer Employees the option of purchasing additional insurance for accidental injuries, illness, life insurance, disability insurance and hospital services through AFLAC ("**AFLAC**").  Employees may elect to insure themselves, their spouses and dependents through this policy, and will receive a fixed amount of insurance benefit based upon the type of injury suffered according to a schedule.  Employees pay all premiums and administrative fees under this policy, but the premiums are deducted from their paychecks and remitted to AFLAC by the Debtors.  The Debtors request authority to continue to deduct premiums from the paychecks of participating Employees and pay those funds to AFLAC.  Approximately 140 Employees elect additional insurance coverage and the Debtors pass approximately $22,000 per month from the participating Employees' paychecks to AFLAC.  As of the Petition Date, the Debtors are approximately one month behind in remitting funds to AFLAC.

iii.     Travel-Related Insurance Benefits

45.     The Debtors also provide business travel and accident insurance to all Employees who are required to travel for business purposes through a plan administered by

---

[20]     Monthly claims under the dental and vision plans amount to approximately $25,000 .

01:14282597.4

HN\1066559.19

Reliance Standard Life Insurance Company ("**Reliance**"). The plan provides life insurance protection for accidental death equal up to a maximum benefit of (i) $100,000 for Employees who earn up to $100,000 per year, (ii) $250,000 for Employees who earn between $100,000 and $250,000 per year, and (iii) $500,000 for Employees earning more than $250,000 per year. Coverage is also provided for certain disabling injuries, such as loss of sight, speech, hearing or limb; or permanent and total disability. The annual premium for such travel-related insurance is $16,159, which amount was paid by the Debtors on January 1, 2013 for the 2013 calendar year policy period. There is, thus, no estimated outstanding liability due as of the Petition Date.

      iv.     Employee Assistance Program

      46.     The Debtors additionally offer all Employees services to help resolve personal issues, as well as assistance with challenges (including, but not limited to drug abuse, marital difficulties, alcoholism or alcohol abuse, financial and legal pressures, concerns about children, depression or divorce) that may arise in the Employees' lives (the "**Employee Assistance Program**"). The Debtors utilize Janus Associates, Inc. d/b/a Business Health Services ("**BHS**") to administer the Employee Assistance Program for all Employees. As of the Petition Date, the unpaid obligations on account of the Employee Assistance Program were approximately $2,000.

      v.     Savings and Retirement Plans

      47.     The Debtors maintain a 401(k) profit sharing plan (the "**401(k) Plan**") for eligible Employees. The 401(k) Plan is a tax-qualified 401(k) retirement savings plan. Under the 401(k) Plan, an eligible Employee (which includes certain full-time Employees) may contribute a portion of his or her compensation on a pre-tax basis, through voluntary payroll

deductions, to the 401(k) Plan.[21]  These contributions are deducted from the paychecks of

participating Employees and contributed by the Debtors to the 401(k) Plan.  The total

contributions made by any participating Employee for any payroll period must be no less than

one percent (1%) of his or her eligible earnings for such period and must be contributed before-

tax; provided that the total contribution for any payroll period cannot exceed the limit set by the

Internal Revenue Service. Currently, approximately 85% of the Employees participate in the

401(k) Plan.  The Debtors do not make matching contributions to the 401(k) Plan.[22]

      vi.    <u>COBRA Benefits</u>

          48.      The Debtors pay approximately $4,700 per month to a third-party

administrator, Southern Benefit, for notification and administration of COBRA insurance, which

provides continuing health benefits to the Employees in the event they lose their benefits for a

variety of reasons, including termination (the "**COBRA Benefits**").  By this Motion, the Debtors

seek authority, in their discretion, to (a) continue to maintain the COBRA Benefits, (b) modify

their prepetition policies relating to the COBRA Benefits as they deem appropriate and (c) pay

any amounts relating to the COBRA Benefits that (i) accrued prepetition and (ii) accrued

postpetition but relate to the prepetition period.

      vii.    <u>Severance</u>

          49.      Approximately 20 senior Employees are parties to Employment

Agreements which provide for, among other things, severance payments in certain

circumstances, including the death or disability of the Employee, the sale of the Debtors'

---

[21]      All full-time Employees are eligible to participate in the 401(k) Plan on the date he or she first
completes an hour of service as an eligible Employee.  Temporary and part-time Employees are not eligible to
participate in the 401(k) Plan.

[22]      The Debtors terminated their matching contribution policy shortly before filing these Chapter 11
Cases.

business, cessation of the Debtors' business, or termination of the Employee without cause. Severance payment amounts range from four to twelve months of the applicable Employee's salary, with some Employees entitled to an additional amount to cover COBRA expenses for up to one year. As of the Petition Date, the Debtors have no outstanding severance obligations.

50.    The Debtors seek authorization to continue to provide ordinary course severance benefits under the Employment Agreements to applicable Employees who may be subject to postpetition terminations during the pendency of these cases, subject to the limitations in Bankruptcy Code Section 503(c)(2) with respect to insiders.[23]

## D.    Honoring of Prepetition Benefits

51.    As described above, certain of the Employee Benefits remained unpaid or unprovided as of the Petition Date because certain obligations of the Debtors under the applicable plan, program or policy accrued either in whole or in part prior to the commencement of these Chapter 11 Cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date. The Debtors seek authority to pay or provide as they become due all prepetition Employee Benefits that have already accrued and that are described above. The Debtors estimate that the aggregate amount of such prepetition Employee Benefits is approximately $1.54 million, including certain pass-through amounts related to additional voluntary insurance obtained by Employees.

## E.    Continuation of Employee Programs Postpetition

52.    The Debtors also request confirmation of their right to continue to perform their obligations with respect to all Employee Programs, except as otherwise indicated herein.

---

[23]    Certain Employees subject to Employment Agreements are corporate officers, who are insiders, and would be entitled to receive severance benefits as described above. In view of the provisions of Bankruptcy Code Section 503(c)(2), the Debtors do not now seek authority to make any severance payments under the Employment Agreements to such insiders in excess of the amounts that would be permitted under the Bankruptcy Code.

The Employee Programs are essential to the Debtors' efforts to maintain Employee morale and minimize attrition. The Debtors believe that the expenses associated with the Employee Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale, and loss of productivity that would occur if the Employee Benefits were discontinued.

53.     Notwithstanding the foregoing, the Debtors reserve the right to evaluate all Employee Programs and to make such modifications, including terminating any particular plan, program or policy, as may be necessary or appropriate during the pendency of these cases. The Debtors do not at this time intend to assume any plan, program, policy or related agreement under Bankruptcy Code Section 365(a) and reserve all rejection and termination rights.

**F.      Payments to Administrators**

54.     With respect to the Employee compensation and benefits described above, the Debtors contract with several vendors to administer and deliver payments or other benefits to their Employees (the "**Administrators**"). The Debtors pay these Administrators fees and expenses incurred in connection with providing such services. In certain cases, disbursements made in the ordinary course are paid by the Administrators, which, in turn, invoice the Debtors for reimbursement of payments made.

55.     For example, the Debtors, in the ordinary course of business, pay approximately $221,000 per month in connection with the WEX fuel cards, and a fee of $1.55 per Employee per month to BHS in connection with the Employee Assistance Program. Other administrative fees paid by the Debtors include those of Southern Benefit for the administration of the Employee's medical, prescription drug claims and COBRA claims (as applicable), Guardian for the administration of the Group Plan, and Reliance for the administration of the business travel accident insurance, which administrative fees may be rolled into the overall

01:14282597.4

HN\1066559.19

monthly charges incurred by the Debtors for their respective services. Furthermore, as of the Petition Date, the Debtors owe ADP up to $6,000 for their payroll management services.

56.    In addition, in order to remain within their credit limit, the Debtors pay Chase on a weekly basis for expenses charged to the Chase Cards by Employees. Chase requires the Debtors to maintain a separate bank account containing $125,000 to serve as collateral for amounts owed on the Chase cards.[24] The Debtors pay Chase an administrative renewal fee at the beginning of each year to renew the Employees' Chase Cards. The Debtors request authority to pay this renewal fee in the ordinary course when due in 2014. The renewal fee was approximately $3,150 for 2013, but the Debtors anticipate the renewal fee for 2014 will be de minimis due to significantly fewer Employees using Chase Cards going forward.

57.    The Debtors pay premiums to ACE for the ACE Stop Loss Policy in monthly installments due on the first day of each month. As of the Petition Date, the Debtors have not yet paid the installment due on October 1, 2013 in the approximate amount of $57,000. The Debtors request authority to pay this prepetition amount, as well as authority to pay future premium installments on the ACE Stop Loss Policy when due. The Debtors estimate such installments to average approximately $57,000 per month.

58.    In conjunction with the Debtors' payment of Prepetition Employee Obligations and continued performance under Employee Programs, the Debtors believe that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary to ensure uninterrupted

---

[24]    The Debtors request authority to maintain this account in the *Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105(a), 345, 363 and 364, Fed. R. Bankr. P. 6003 and Del. Bankr. L.R. 2015-2 (i) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks and Business Forms, (ii) Authorizing Continuation of Intercompany Transactions and (iii) Granting Superpriority Status to Postpetition Intercompany Claims,* filed contemporaneously herewith.

delivery of certain benefits to Employees. The Debtors believe that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred. A need to engage replacement Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Employees. Accordingly, the Debtors submit that the payment of claims owed to the Administrators is in the best interest of the Debtors' estates and Employees.

**G.      Honoring of Prepetition Checks**

59.      Prior to the Petition Date, the Debtors paid certain of their Prepetition Employee Obligations with checks that had not been presented for payment as of the Petition Date. In order to ensure the orderly payment of the Prepetition Employee Obligations, the Debtors request that the Court enter an order requiring the Debtors' banks to honor any such checks which are drawn on the Debtors' accounts, and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to this Motion. To the extent that any such checks are nevertheless refused payment, the Debtors additionally request authority to issue replacement checks and to reimburse their Employees from any loss resulting from the dishonoring.

### APPLICABLE AUTHORITY

**A.      Payment Of The Priority Portion Of Prepetition Employee Obligations Should Be Authorized Under Bankruptcy Code Section 507(A)**

60.      Bankruptcy Code Sections 507(a)(4) and 507(a)(5) require that certain claims for prepetition wages, salaries, commissions, vacation, sick leave, sales commissions and employee benefit contributions be accorded priority in payment in an amount not to exceed $12,475 for each individual.

01:14282597.4

HN\1066559.19

61.    Because of the number of Employees working for the Debtors, and because some Employee benefit amounts are unknown pending submission of claims, the Debtors do not know the exact amount due each Employee for the prepetition period. However, the Debtors believe that the vast majority of their Employees and Independent Contractors are owed amounts under the $12,475 cap of Bankruptcy Sections 507(a)(4) and 507(a)(5), to the extent such cap is applicable. As to wages and salaries only, as of the Petition Date only two (2) Employees and the Independent Contractor are owed more than $12,475.

62.    In Chapter 11, priority claims must be paid in full. Accordingly, granting the relief requested with respect to the priority portion of the Prepetition Employee Obligations will not adversely affect the Debtors' other unsecured creditors.

63.    To the extent that Employees are owed aggregate amounts in excess of the priority cap, or amounts that are otherwise not entitled to priority status, the Debtors submit that payment of the Prepetition Employee Obligations in such higher amounts or otherwise non-priority amounts is nonetheless justified under the authority discussed below.

**B.    The Proposed Payments Are Appropriate Under Bankruptcy Code Section 363**

64.    Under Bankruptcy Code Section 363, a bankruptcy court is empowered to authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business. See 11 U.S.C. § 363. In order to obtain approval for the use of estate assets outside the ordinary course of business, the debtor must articulate a valid business justification for the requested use. See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). To the extent the payment of prepetition wage, salary and benefit claims were deemed to be outside the ordinary course of business, the preservation and protection of a debtor's business, the retention of a debtor's currently working employees and the maintenance of positive employee morale provide a sufficient business justification for such payment. See id.

01:14282597.4

HN\1066559.19

65.     Accordingly, this Court should grant the requested relief under Bankruptcy Code Section 363.

## C.   Payment Of Certain Of The Prepetition Employee Obligations Is Appropriate Under Bankruptcy Code Section 541

66.     The payment of the Employee contribution component of the payment of garnished wages, voluntary insurance or other Deductions will not prejudice the Debtors' estates because such withholdings are derived from Employee funds and held in trust for the benefit of the related payees and, thus, do not constitute property of the Debtors' estates under Bankruptcy Code Section 541.  See Begier v. IRS, 496 U.S. 53, 58-59 (1990).  See also In re Columbia Gas Sys., Inc., 997 F.2d 1039, 1059 (3d Cir. 1993) (concluding that property which debtor holds in trust – either express or constructive – for another does not become property of the estate when the debtor files for bankruptcy, and stating that "Congress clearly intended the exclusion by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust."); EBS Pension L.L.C. v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.), 243 B.R. 231 (Bankr. D. Del. 2000) (same).  Moreover, payments which are critical to the retention and morale of the Debtors' workforce actually add value to the estates because an unplanned reduction in Employee retention or productivity could have disastrous effects on any potential recoveries to unsecured creditors.

## D.   Payment Of The Prepetition Employee Obligations Is Authorized Under Bankruptcy Code Sections 1107(A) And 1108

67.     The Debtors, operating their business as debtors in possession under Bankruptcy Code Sections 1107(a) and 1108, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the

duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." Id.

68.    According to the CoServ court, there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." See id. The CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." Id. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id. at 498.

69.    Payment of the Prepetition Employee Obligations meets each element of the CoServ court's standard. Any failure by the Debtors to pay the Prepetition Employee Obligations would have a severe negative impact on the morale of the Debtors' Employees at a critical time for the Debtors and their business. Moreover, as described above, the Employees likely maintain priority claims against the Debtors for the majority of the Prepetition Employee Obligations.

70.    Second, the potential harm and economic disadvantage that would stem from the failure to pay the Prepetition Employee Obligations is grossly disproportionate to the amount of any prepetition claim that may be paid. Absent payment of the Prepetition Employee Obligations, Employee morale would decrease dramatically, likely leading to the loss of key

Employees, lower production and sales, and other severe business disruptions costing far in excess of the amount of such obligations.

71.    Third, the Debtors have examined other options short of payment of the Prepetition Employee Obligations and have determined that to avoid significant disruption of the Debtors' business operations there exists no practical or legal alternative to payment of such obligations.

72.    Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under Bankruptcy Code Sections 1107(a) and 1108 by payment of the Prepetition Employee Obligations.

**E.    Bankruptcy Code Section 105 And The Doctrine Of Necessity Support Payment Of The Prepetition Employee Obligations**

73.    The proposed payments of the Prepetition Employee Obligations should be authorized pursuant to Bankruptcy Code Section 105 and under the "doctrine of necessity."

74.    Bankruptcy Code Section 105 authorizes this Court "to issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105. For the reasons set forth herein, and in light of the critical need for the Debtors to preserve the going concern value of their business in order to effect a successful reorganization through, among other things, preservation of the Debtors' workforce and its morale and productivity, payment of the Prepetition Employee Obligations as requested herein is proper in accordance with Bankruptcy Code Section 105.

75.    Payment of the Prepetition Employee Obligations is further supported by the doctrine of necessity.  The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the reorganization.  See

01:14282597.4

29

<u>In re Just for Feet, Inc.</u>, 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment);[25] <u>see also</u> <u>In re NVR L.P.</u>, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); <u>In re Eagle-Picher Indus., Inc.</u>, 124 B.R. 1021, 1023 (Bankr. S. D. Ohio 1991) ("[T]o justify payment of a pre-petition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the Chapter 11 process.").

76.      The doctrine of necessity is a widely accepted component of modern bankruptcy jurisprudence. <u>See</u> <u>Just For Feet</u>, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season); <u>In re Payless Cashways, Inc.</u>, 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agree to provide postpetition trade credit); <u>see also</u> <u>In re Columbia Gas Sys., Inc.</u>, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994); <u>Ionosphere Clubs</u>, 98 B.R. at 175-76.

77.      For the reasons discussed herein, it is evident that payment of the Prepetition Employee Obligations is necessary to the achievement of the Debtors' chapter 11 objectives. In particular, without payment of the Prepetition Employee Obligations the Debtors'

---

[25]      The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The United States Supreme Court first articulated the doctrine of necessity over a century ago, in <u>Miltenberger v. Logansport C & Sw. Ry. Co.</u>, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. <u>See id.</u> at 309-14. The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in <u>Miltenberger</u>. <u>See</u> <u>In re Lehigh & New Eng. Ry.</u>, 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious jeopardy.")

01:14282597.4

HN\1066559.19

business and operations will be detrimentally impacted through the reduction in Employee morale and the potential loss of key Employees during a critical time for the Debtors and their business. Hence, this Court should exercise its equitable powers to grant the relief requested in this Motion.

**F.    Precedent Cases Support The Requested Relief**

78.    Numerous courts, including this Court, have permitted the payment of prepetition compensation, benefits and reimbursable expenses on the first day or in the early stages of chapter 11 bankruptcy cases. See, e.g., In re Exide Technologies, Case No. 13-11482 (KJC) (Bankr. D. Del. Jun. 10, 2013); In re A123 Sys., Inc., Case No. 12-82159 (KJC) (Bankr D. Del. Oct. 18, 2012); In re Graceway Pharmaceuticals, LLC, Case No. 11-13036 (PJW) (Bankr. D. Del. Oct. 19, 2011); In re Jackson Hewitt Tax Service Inc., Case No. 11-11587 (MFW) (Bankr. D. Del. May 25, 2011); In re Appleseed's Intermediate Holdings LLC, Case No. 11-10160 (KG) (Bankr. D. Del. Feb. 18, 2011); In re Freedom Communications Holdings, Inc., Case No. 09-13046 (BLS) (Bankr. D. Del. Sept. 2, 2009); In re Sun-Times Media Group, Inc., Case No. 09-11092 (CSS) (Bankr. D. Del. Apr. 1, 2009); In re Sportsman's Warehouse, Inc., Case No. 09-10990 (CSS) (Bankr. D. Del. Mar. 23, 2009); In re Journal Register Co., Case No. 09-10769 (ALG) (Bankr. S.D.N.Y. Feb. 24, 2009); In re Star Tribune Holdings Corp., Case No. 09-10244 (RDD) (Bankr. S.D.N.Y. Feb. 6, 2009).

**G.    Bankruptcy Rule 6003 Has Been Satisfied And Bankruptcy Rule 6004 Should Be Waived**

79.    Certain aspects of the relief requested herein are subject to Bankruptcy Rule 6003. Pursuant to Bankruptcy Rule 6003, a court may grant such relief on an expedited basis if it is necessary to avoid immediate and irreparable harm. The Debtors submit that the

facts set forth herein demonstrate that the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and, thus, Bankruptcy Rule 6003 has been satisfied.

80.     Additionally, with respect to any aspect of the relief sought herein that constitutes a use of property under Bankruptcy Code Section 363(b), the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is immediately necessary in order for the Debtors to be able to continue to operate their business and preserve the value of their estates.  The Debtors thus submit that the requested waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is here appropriate.

## NOTICE OF MOTION AND INTERIM ORDER

81.     Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware; (b) counsel to the Debtors' postpetition secured lender; (c) counsel to Shell Western Exploration and Production, Inc., the Debtors' prepetition lender; (d) counsel to the Indenture Trustee under the 2016 Senior Secured Notes (as defined in the Blackwell Declaration); (e) the Securities and Exchange Commission; (f) counsel to the Environmental Protection Agency; (g) counsel to the ad hoc group of holders of 2016 Senior Secured Notes; (h) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (i) the United States Attorney General for the District of Delaware; and (j) the Attorneys General for the states in which the Debtors conduct business (collectively, the "**Initial Notice Parties**").  The Debtors submit that, under the circumstances, no other or further notice is required.

82.     A copy of the Motion is available on the Court's website: www.deb.uscourts.gov.  Additional copies of the Motion are available for free on the website of the Debtors' proposed claims and noticing agent, Prime Clerk LLC, at

01:14282597.4

HN\1066559.19

32

http://cases.primeclerk.com/gfes, or can be requested by calling (855) 410-7359 from within the United States or +1 (646) 795-6960 if calling from outside the United States.

83.     In the event the Court enters an interim order granting this Motion (the "**Interim Order**"), within five (5) business days thereafter, the Debtors propose to serve notice of such entry on the Initial Notice Parties and all parties that have filed prior to such service date requests for notice pursuant to Bankruptcy Rule 2002.  The notice will provide that any objections to the relief granted in the Interim Order must be filed with the Court and served upon counsel for the Debtors no later than seven days prior to the final hearing to be held on the Motion (the "**Objection Deadline**").  If an objection is timely filed and served prior to the Objection Deadline, such objection will be heard at the final hearing on the Motion.  If no objections are timely filed and served, the Debtors' counsel will file a certification of counsel to that effect attaching a final form of order.

**WHEREFORE**, the Debtors respectfully request that the Court enter interim and final orders, substantially in the forms attached hereto as Exhibits A and B, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:  October 27, 2013
Wilmington, Delaware

Respectfully Submitted,

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

Josef S. Athanas
Caroline A. Reckler
Sarah E. Barr
Matthew L. Warren
LATHAM & WATKINS LLP
Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

Proposed Counsel for Debtors and Debtors in Possession

01:14282597.4

HN\1066559.19