**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------ x

In re:                                                    :    Chapter 11

                                                           :

GREEN FIELD ENERGY SERVICES, INC., et    :    Case No. 13-12783 (_____)

al.,                                                          :

                                                           :    Joint Administration Requested

          Debtors.[1]                                :

------------------------------------------------------------ x

**MOTION OF DEBTORS FOR ORDER UNDER 11 U.S.C. §§ 105, 363, 1107 AND 1108 AND FED. R. BANKR. P. 6003 AUTHORIZING DEBTORS TO PAY PREPETITION INSURANCE OBLIGATIONS AND MAINTAIN POSTPETITION INSURANCE COVERAGE; TO CONTINUE HONORING SURETY BOND OBLIGATIONS, WORKERS' COMPENSATION OBLIGATIONS, AND AN INSURANCE PREMIUM FINANCE AGREEMENT; AND CONTINUING GRANT OF SECURITY INTEREST TO THE INSURANCE PREMIUM FINANCING COMPANY**

The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**") hereby move (the "**Motion**") for entry of an order, under Sections 105, 363, 1107, and 1108 of Title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizing the Debtors (i) to pay all prepetition premiums, taxes, charges, fees and other obligations, including broker's commissions, owed under or with respect to their existing insurance policies; (ii) to maintain necessary insurance coverage by honoring their postpetition obligations under such existing policies and obtaining renewal coverage or new insurance arrangements; (iii) to continue honoring their surety bond obligations under applicable law; (iv) to continue honoring their obligations pursuant to their workers' compensation policies and programs as required by applicable law; (v) to continue honoring their obligations under a prepetition insurance premium

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax or organizational identification number, are: Green Field Energy Services, Inc. (2539); Hub City Tools, Inc. (2827); and Proppant One, Inc. (6035). The above-captioned Debtors' mailing address is 4023 Ambassador Caffery Parkway, Suite #200, Lafayette, LA 70503.

finance agreement entered into with TMC Bank (as defined below) for the purpose of financing the purchase of certain insurance coverage; and (vi) to continue to grant a security interest to TMC Bank in certain of the Debtors' assets as security for the Debtors' performance of their obligations under such insurance premium finance agreement.  In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Earl J. Blackwell in Support of Chapter 11 Petitions and First Day Motions*, filed with the Court concurrently herewith (the "**Blackwell Declaration**").  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code Sections 105, 363, 1107, and 1108.  Such relief is warranted under Bankruptcy Rule 6003.

## BACKGROUND

2.      On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases for relief under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The factual background regarding the Debtors, including their business operations, their capital and debt structures and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the Blackwell Declaration and fully incorporated herein by reference.

01:14282611.5

HN\1066603.12

3.     The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Cases and no committees have yet been appointed.

## RELIEF REQUESTED

4.     By this Motion, the Debtors seek entry of an order, pursuant to Bankruptcy Code Sections 105, 363, 1107 and 1108, authorizing but not requiring the Debtors (a) to pay all prepetition premiums, taxes, charges, fees and other obligations, including certain broker's commissions (the "**Insurance Obligations**"), owed under or with respect to their existing insurance policies (collectively, the "**Insurance Policies**"), and (b) to maintain necessary insurance coverage by honoring their postpetition obligations under the Insurance Policies and obtaining renewal coverage or new insurance arrangements as and when required.[2]

5.     The Debtors also seek authority to (i) continue honoring surety bond obligations under applicable law, whether through a prepetition letter of credit, entering into new letters of credit, or cash deposits provided to the State of Pennsylvania; (ii) continue honoring any obligations related to the Debtors' workers' compensation programs as required by applicable law; (iii) continue honoring obligations pursuant to the Finance Agreement (as defined below) entered into with TMC Bank for the purpose of financing the purchase of certain forms of insurance coverage; and (iv) continue the grant of a security interest to TMC Bank in certain of the Debtors' assets as security for the Debtors' performance of their obligations under the Finance Agreement.

---

[2]     To the extent that the Insurance Policies or related agreements may be deemed executory contracts within the meaning of Bankruptcy Code Section 365, the Debtors do not at this time seek authority to assume such contracts.

01:14282611.5

3

HN\1066603.12

6.      In addition, the Debtors request that the Court authorize and direct the Debtors' banks and financial institutions to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Insurance Obligations, and authorize the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of the Insurance Obligations, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

## BASIS FOR RELIEF

7.      In connection with the operation of their business and management of their properties, each of the Debtors is covered under one or more of the Insurance Policies, which have been obtained through several third-party insurance carriers (collectively, the "**Insurance Carriers**").[3]

8.      As set forth on Exhibit A hereto, the Insurance Policies include coverage for workers' compensation and excess workers' compensation, business automobile, uninsured/underinsured motorists bodily injury coverage, commercial property, general liability, umbrella liability, directors' and officers' liability, maritime employers liability coverage, and pollution liability.  The Insurance Policies provide coverage that is typical in scope and amount for business operations within the Debtors' industry.

**A.      Payment of Insurance Premiums and Broker's Commissions**

9.      Maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation of the Debtors' business and is required under the United States Trustee's Operating Guidelines for Chapter 11 Cases (the "**Operating Guidelines**"), laws

---

[3]      Certain of the Insurance Policies cover all of the Debtors while others only cover specific Debtors.

and regulations applicable to the Debtors' business, the laws of the various states in which the

Debtors operate, and the Debtors' various contractual commitments. Thus, the Debtors submit

that they should be authorized to continue to pay premiums, taxes, charges, fees, and other

obligations owed under or with respect to the Insurance Policies as such obligations come due in

the ordinary course of the Debtors' business.

10.    To the extent that the Insurance Obligations may be attributed to

prepetition insurance coverage, the Debtors believe that payment of such obligations is necessary

to ensure continued coverage under the Insurance Policies, and to maintain good relationships

with the Insurance Carriers. The Debtors' maintenance of their relationships with the Insurance

Carriers is critical to ensuring the continued availability of insurance coverage and reasonable

pricing of such coverage for future policy periods.

11.    The total annual premium obligations associated with all of the Insurance

Policies approximates $4.5 million. The Debtors finance the premiums owed on the majority of

their Insurance Policies through the Finance Agreement (defined and described below) with

TMC/MidSouth Bank N.A. ("**TMC Bank**"), an insurance premium finance company.

Accordingly, as of the date hereof, the premium payments to the majority of the Insurance

Carriers have been paid in full through this financing arrangement and the Debtors are not aware

of any pending requests for payment of other obligations owed directly to the Insurance Carriers

under the Insurance Policies.

12.    For those Insurance Policies that are not financed, the Debtors pay annual

premiums to certain Insurance Carriers directly. As of the Petition Date, no amounts were due to

the Insurance Carriers; however, requests for payment of amounts attributable to the period prior

to the Petition Date may be received from the Insurance Carriers from time to time hereafter, in accordance with the terms of the Insurance Policies.

13.     Landry Harris & Co, LLC ("**Landry Harris**") serves as the Debtors' insurance agent/broker, and also manages the Debtors' relationships with the Insurance Carriers, under the majority of the Insurance Policies. Among other things, Landry Harris represents the Debtors in various ongoing negotiations with the majority of the Debtors' Insurance Carriers. The employment of Landry Harris as broker has allowed the Debtors to obtain the insurance coverage necessary to operate their business in a reasonable and prudent manner and to realize savings in the procurement of such policies. Landry Harris receives an eight percent (8%) commission on each Insurance Policy secured for the Debtors as compensation for its services.

14.     The Debtors believe that it is in the best interests of their creditors and estates to continue their business relationship with Landry Harris. Accordingly, the Debtors seek the Court's authorization to continue their prepetition practice of compensating Landry Harris in the form of commissions on those Insurance Policies obtained by Landry Harris.

B.      **Maintenance of Insurance Coverage**

15.     The Insurance Policies maintained by the Debtors will all eventually expire under their annual terms, beginning with a policy due to expire on February 28, 2014. The majority of the Debtors' Insurance Policies will expire on July 1, 2014. Renewal of the Insurance Policies or entry into new insurance arrangements is necessary to comply with the Operating Guidelines, various applicable federal and state laws, contractual commitments and prudent business practices. Therefore, in an abundance of caution, the Debtors request authorization to continue their prepetition practice of renewing the Insurance Policies or entering

into new insurance arrangements in the ordinary course of business as the annual terms of the

Insurance Policies expire.  In addition, the Debtors request authorization to pay commissions to

Landry Harris on any new or renewed Insurance Policies to ensure the continuation of the

valuable services received from Landry Harris.

### C.    **Workers' Compensation and Other Obligations**

16.    Under the laws of the various jurisdictions in which they operate, the

Debtors are required to maintain workers' compensation policies and programs and to provide

Employees with workers' compensation coverage for claims arising from or related to their

employment with the Debtors.  Accordingly, the Debtors maintain workers' compensation

programs in all states in which they operate pursuant to the applicable requirements of local law.

17.    The Debtors fully insure their workers' compensation, auto, pollution and

general liability policies through Wildcat Energy Insurance, Ltd. ("**Wildcat**").  Wildcat is a

reinsurance entity that is owned by, and provides insurance to, a group of companies in the oil

and gas industry.  The Debtors own one share of Wildcat's equity.[4]  The Debtors pay premiums

of approximately $950,825 per annum to Wildcat, which are financed by the Finance Agreement

described below.  The majority of those premiums are used to self-fund the Debtors' workers'

compensation, auto, pollution and general liability obligations up to $300,000 in the aggregate.

If the Debtors' liabilities exceed $300,000 in the aggregate, the excess liabilities are paid from

Wildcat's general funds.

---

[4]    To the extent that the workers' compensation, auto, pollution and general liability claims were
lower than anticipated in a given year, the Debtors are entitled to a dividend from Wildcat for any amounts
overpaid by the Debtors.  Dividends are paid five (5) years after the year in which the refund was earned.  To date,
the Debtors have not received any dividends from Wildcat, but they expect to receive a dividend payment in 2014
for overpayments made in 2009.

01:14282611.5

HN\1066603.12

18.    Claims for workers' compensation, auto, pollution and general liability are administered by Zurich American Insurance Company ("**Zurich**").  Wildcat is managed and operated by Kensington Management Group Ltd. ("**Kensington**") and Captive Resources, LLC ("**Captive Resources**").  The services of Zurich, Kensington and Captive Resources are paid out of the annual premiums paid to Wildcat.  The Debtors request authority to continue paying for the services of these administrators in the ordinary course through their Wildcat premiums.

19.    In order to participate in the Wildcat program, the Debtors are required to provide security in the form of a cash deposit or a letter of credit.  The Debtors owe $975,619 as security on account of the July 1, 2013 renewals of their workers' compensation, auto, pollution and general liability policies (the "**Wildcat Security Deposit**"), which was due August 1, 2013.  Wildcat is entitled to discontinue insurance to its shareholders for a number of reasons including failure to make timely payments.  If the Debtors fail to pay the required collateral, it is highly likely that Wildcat will discontinue some or all of the Debtors' insurance coverage and the Debtors would be forced to find replacement insurance on an emergency basis under much less favorable terms.

20.    Participation in the Wildcat program is critical to the Debtors' financial well-being.  The Debtors' workers' compensation, pollution, auto, and general insurance coverage is significantly less expensive through Wildcat than similar coverage would be on the open market, and the Debtors are protected from the price fluctuations that exist in the open insurance market.  By this Motion, the Debtors seek authority, but not direction, to pay any and all amounts related to the Wildcat program that arose prior to the Petition Date as they become due, and to continue honoring all workers' compensation, auto and general obligations as

required by applicable law in the ordinary course of business.

**D.      Prepetition Insurance Premium Finance Agreement**

21.      The Debtors maintain an insurance premium finance agreement (the

"**Finance Agreement**") with TMC Bank to finance the premiums of the majority of the

Insurance Policies.  On July 1, 2013, the Debtors entered into an agreement with TMC Bank to

finance the payment of insurance premiums paid to Wildcat for the general liability, workers'

compensation, pollution, business auto, and uninsured/underinsured motorist bodily injury

policies (the "**July Financing**").  Pursuant to the Finance Agreement, TMC Bank agreed to pay

the insurance premiums owed to Wildcat, as set forth on Exhibit C, in exchange for a down

payment of $840,445.50 and ten monthly installment payments of $321,556.38, for a total of

$4,056,009.00 in payments from the Debtors.  The Debtors have not yet made the down payment

of $840,445.50 (the "**July Financing Down-Payment**") and owe that amount to Landry Harris

for payment to TMC Bank pursuant to the terms of the Finance Agreement.

22.      On September 23, 2013, Debtors supplemented the Finance Agreement to

finance the payment of insurance premiums for policies related to property, maritime employers

liability, and inland marine equipment coverage (the "**September Financing**").  Pursuant to the

agreement, TMC Bank agreed to pay the insurance premiums due under certain Insurance

Policies, set forth on Exhibit C, in exchange for a down payment of $152,237.89 and eight

monthly installment payments of $42,974.59, for a total of $496,035.00 in payments from the

Debtors.  As of the Petition Date, the Debtors are current on their payments under the September

Financing.

23.      As of the Petition Date, the Debtors' remaining future obligations under

the Finance Agreements total approximately $3.4 million (inclusive of the July Financing Down-Payment). The Debtors' obligations to pay TMC Bank under the Finance Agreements are secured by the grant to TMC Bank of a security interest in any and all unearned premiums and dividends that may become payable under the covered Insurance Policies, as well as loss payments that reduce the unearned premiums (such security interest, the "**TMC Security Interest**").

24.     The Insurance Policies subject to the Finance Agreement, set forth on Exhibit C, are essential to the preservation of the Debtors' business, properties, and assets. In the Debtors' business judgment, the terms of the Finance Agreement represent the best possible terms for financing the premiums of the Insurance Policies. The Debtors' estates will benefit by maintaining this low-cost financing from TMC Bank. Moreover, any interruption of payments might adversely affect the Debtors' ability to obtain financing for future policies on favorable terms. In some cases, the coverage is required by regulations, laws, and/or contracts that govern the Debtors' business obligations. Thus, the Debtors request the authority to continue honoring their obligations pursuant to the Finance Agreement and to continue the grant of the TMC Security Interest, in each case, subject to the terms and conditions of any order approving the Debtors' obtaining post-petition financing.

## APPLICABLE AUTHORITY

A.     **Payment of the Insurance Obligations and Renewal of the Insurance Policies is Necessary to Comply with United States Trustee Requirements**

25.     Maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation of the Debtors' business and is required under the Operating Guidelines, the federal laws and regulations applicable to the Debtors' business, the laws of the

various states in which the Debtors operate, and the Debtors' various contractual commitments.

<u>See</u> Operating Guidelines Sec. 3 (requiring maintenance of appropriate insurance coverage).

26.    The Debtors believe that the ordinary course maintenance of their necessary insurance coverage, including paying all Insurance Obligations, satisfying all postpetition commitments to the Insurance Carriers, renewing the Insurance Policies, or entering into new insurance arrangements, without further order of the Court, is necessary and essential to the Debtors' achievement of their chapter 11 objectives, especially where, as here, the Debtors' failure to take all actions necessary to honor their obligations to and preserve their relationships with the Insurance Carriers could have disastrous consequences for the Debtors' estates.

27.    The Debtors are not seeking to pay any amounts to Landry Harris as of the Petition Date.  Nevertheless, insofar as the employment of Landry Harris is necessary for the ordinary course maintenance of the Insurance Policies in the most efficient, cost-effective manner (and has the additional benefit of positioning the Debtors to obtain the most competitive rates and high quality service from Landry Harris in connection with any renewals of the Insurance Policies), the Debtors believe that, out of an abundance of caution, they should be authorized to continue to pay commissions to Landry Harris in the ordinary course.

**B.    Payment of the Insurance Obligations is Authorized under Bankruptcy Code Sections 1107(a) and 1108**

28.    The Debtors, operating their business as debtors in possession under Bankruptcy Code Sections 1107(a) and 1108, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." <u>In re CoServ, L.L.C.</u>, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate,

including an operating business's going-concern value." Id.

29.    The CoServ court has noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." See id. The CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." Id. That court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id. at 498.

30.    Payment of all Insurance Obligations meets each element of the CoServ court's standard. First, as described above, insurance coverage is required by the Operating Guidelines. Moreover, as a fiduciary for the bankruptcy estates, the Debtors could be violating their duties if they permitted any of the Insurance Policies to lapse.

31.    Second, as described above, nonpayment of the Insurance Obligations could result in cancellation of the Insurance Policies, in which case the Debtors would not only be in violation of the Operating Guidelines, the laws of various states in which the Debtors operate, and various financial agreements, but also, the Debtors may be unable to find alternative insurance coverage, or could find such alternatives only at a much higher cost than Debtors currently incur. Additionally, nonpayment of the Insurance Obligations could render the Debtors

unable to renew the Insurance Policies or obtain replacements therefor for future periods. Therefore, the potential harm and economic disadvantage that would stem from the failure to honor the Insurance Obligations are grossly disproportionate to the amount of the Insurance Obligations.

32.     Accordingly, to meet their fiduciary duties as debtors in possession under Bankruptcy Code Sections 1107(a) and 1108, the Debtors must be authorized to pay all Insurance Obligations, if doing so is necessary in the Debtors' judgment in order to avoid cancellation or interruption of insurance coverage or brokerage services.

### C.     Bankruptcy Code Section 105 and the Doctrine of Necessity Support Payment of the Insurance Obligations

33.     The proposed payments of the Insurance Obligations should also be authorized pursuant to Bankruptcy Code Section 105 and under the "doctrine of necessity."

34.     Bankruptcy Code Section 105 authorizes this Court "to issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105. For the reasons set forth herein, and in light of the unique risks applicable to the Debtors' operations and the critical need for the Debtors to protect their assets and recoverable value from such risks through, among other things, maintenance of legally-mandated insurance coverage and good relationships with the Insurance Carriers and Landry Harris, payment of the Insurance Obligations as requested herein is proper in accordance with Bankruptcy Code Section 105.

35.     Payment of the Insurance Obligations is further supported by the doctrine of necessity.  The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the reorganization

01:14282611.5

HN\1066603.12

process where the payment of such claims is necessary to the reorganization. See In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment);[5] see also In re NVR L.P., 147 B.R. 126, 127 (Bankr. E. D. Va. 1992) ("[T]he court can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a prepetition unsecured creditor, a debtor must show the payment is necessary to avert a serious threat to the Chapter 11 process.").

36.    Here, for the reasons discussed herein, it is evident that payment of the Insurance Obligations is necessary to the Debtors' achievement of their chapter 11 objectives. In particular, the Debtors believe that payment of the Insurance Obligations is necessary to maintain insurance coverage as well as to maintain good relationships with the Debtors' Insurance Carriers and Landry Harris, thereby ensuring the continued availability of insurance coverage and reasonable pricing of such coverage.

**D.    Bankruptcy Code Section 363 Supports Payment of the Insurance Obligations**

37.    To the extent that payment of any of the Insurance Obligations sought to be paid under this Motion would be deemed to constitute a use of property outside the ordinary

---

[5]    The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The United States Supreme Court first articulated the doctrine of necessity over a century ago, in Miltenberger v. Loqansport, C. & Sw. Ry. Co., 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. See id. at 309-14. The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in Miltenberger. See In re Lehigh & New Eng. Ry., 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious jeopardy.").

course of business, a basis for authorizing payment of the amounts associated with such obligations is found under Bankruptcy Code Section 363(b). Bankruptcy Code Section 363(b)(1) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under this section, a court may authorize a debtor to pay certain prepetition claims. See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). To do so, "the debtor must articulate some business justification, other than mere appeasement of major creditors[.]" Ionosphere Clubs, 98 B.R. at 175; see also In re NVR L.P., 147 B.R. 126, 128 (Bankr. E.D. Va. 1992).

38.     Although the Debtors have routinely paid premiums, taxes, charges, fees, and other obligations and, thus, view the payment of such obligations as ordinary course payments, in the event the Court (or any party in interest) believes that this Court's express authorization under Bankruptcy Code Section 363(b) is necessary to honor the Insurance Obligations, it is the Debtors' business judgment that the failure to pay all Insurance Obligations could result in (a) the cancellation of Insurance Policies and/or the Debtors' inability to obtain renewal of the Insurance Policies on terms that are as competitive and (b) the violation of the Operating Guidelines and the fiduciary duties of debtors in possession. Accordingly, the Debtors submit that they have satisfied the requisite standard applied to requests under Bankruptcy Code Section 363(b) and this Court should authorize the payment of all Insurance Obligations on such basis.

E.      **Payment of Amounts Related to Workers' Compensation, Surety Bonds, Insurance Policies, and the Finance Agreement Is Appropriate Under Section 363 of the Bankruptcy Code**

39.     The Debtors believe that the ordinary course satisfaction of their workers'

compensation, surety bond, and other obligations under applicable law, including providing cash

deposits to Wildcat and the State of Pennsylvania, without further order of the Court, is

necessary and essential to the Debtors' operation of their business during the course of these

Chapter 11 Cases. Failure to satisfy such obligations, which are obligations under the laws of the

various states in which the Debtors operate, could result in significant and costly disruptions in

the Debtors' operations. Likewise, the Debtors believe that the ordinary course maintenance of

their insurance financing programs, including payment of all monthly obligations under the

Finance Agreement, and the renewal of or entry into new financing arrangements as may be

required as the annual terms of existing arrangements expire and consistent with prepetition

practice, without further order of the Court, is also necessary and essential to the Debtors'

operation of their business, especially where, as here, the Debtors' failure to pay their monthly

premium obligations to the Insurance Carriers and TMC Bank could have disastrous

consequences for the Debtors.

   40. Specifically, under the terms of the Finance Agreement, TMC Bank may

issue a delinquency charge upon a default of payment of any installments or may cancel the

Insurance Polices upon the Debtors' default. Because the Debtors are required to maintain

insurance coverage during these Chapter 11 Cases, the cancellation of these policies would be

particularly costly. See United States Trustee Manual 3-3.2.3 (Oct. 1998) (requiring

maintenance of appropriate insurance coverage). Even if TMC Bank did not immediately cancel

the insurance coverage upon the Debtors' default, the Debtors' failure to pay monthly premium

obligations would result in a depletion of the unearned premiums. See, e.g., Schwinn Plan

Comm. v. Transamerica Ins. Fin. Corp., 200 B.R. 980, 985-89 (Bankr. N.D. Ill. 1996); In re

Universal Motor Express, Inc., 72 B.R. 208, 210 (Bankr. W.D.N.C. 1987).

01:14282611.5

HN\1066603.12

41.    The use of estate assets to satisfy surety bond, workers' compensation, and other obligations under applicable law and to pay installments under the Insurance Policies and the Finance Agreement constitutes a use of estate property that should be authorized under Section 363(b) of the Bankruptcy Code because a sound business purpose exists for such use. See, e.g., Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991); In re Global Crossing Ltd., 295 B.R. 726, 742-43 (Bankr. S.D.N.Y. 2003); Ionosphere Clubs, 98 B.R. at 175. The Debtors have determined, in the exercise of their business judgment, that honoring their surety bond, workers' compensation, and other obligations under applicable law permits the Debtors to operate their business in compliance with applicable state laws. The Debtors have further determined, in the exercise of their business judgment, that financing the premiums, pursuant to the terms of the Finance Agreement discussed herein, enables the Debtors to maintain critical insurance coverage at the best possible price. Doing so is in the best interests of the Debtors' estates and their creditors, and these actions should be approved.

**F.    Payment of Amounts Related to Prepetition Premium Finance Agreement is Appropriate Under Section 361 of the Bankruptcy Code**

42.    Security interests created by premium finance agreements, such as the Finance Agreement, are generally recognized as secured claims in bankruptcy to the extent of the amount of unearned premiums financed pursuant to such agreements. Bankruptcy Code Section 361 specifically contemplates providing adequate protection to the extent of the diminution in value of a secured creditor's collateral, and such security interests under the Finance Agreement warrant adequate protection in the form of periodic payments pursuant to the Finance Agreement's terms. See, e.g., In re Waverly Textile Processing, Inc., 214 B.R. 476 (Bankr. E.D. Va. 1997); In re Megamarket of Lexington, Inc., 207 B.R. 527 (Bankr. E.D. Ky. 1997); TIFCO, Inc. v. U.S. Repeating Arms Co., 67 B.R. 990 (Bankr. D. Conn. 1986); In re Krimbrell Trucking

Co., Inc., 3 B.R. 4 (Bankr. W.D. Wash. 1979).

43.    The Debtors' continued use of the Finance Agreement decreases the value

of the unearned premiums that serve as the collateral for TMC Bank.  This loss in value is

replaced through the Debtors' payment of the installment payments due under the Finance

Agreement.  Accordingly, TMC Bank is entitled to continued payment of these amounts as

adequate protection under Section 361 of the Bankruptcy Code as a condition to the Debtors'

continued ability to finance the financed Insurance Policies.

G.    **Bankruptcy Code Section 363 Supports the Debtors' Request to Maintain
Postpetition Insurance Coverage and Enter into New Coverage as Needed**

44.    With respect to that aspect of the Motion that seeks authorization to satisfy

all of the Debtors' postpetition commitments to the Insurance Carriers, renew the Insurance

Policies or enter into new insurance arrangements, the Debtors submit that Bankruptcy Code

Section 363(c) authorizes such actions.  In pertinent part, Bankruptcy Code Section 363(c)(1)

provides that ". . . unless the court orders otherwise, the trustee may enter into transactions,

including the sale or lease of property of the estate, in the ordinary course of business, without

notice or a hearing, and may use property of the estate in the ordinary course of business without

notice or a hearing." 11 U.S.C. § 363(c)(1).  The maintenance of the Insurance Policies and

honoring of postpetition obligations arising thereunder, including undertaking renewals of the

Insurance Policies as they expire or entering into new insurance arrangements, would appear to

fit squarely within the foregoing provision.  To the extent, however, that this Court believes that

any such actions are not properly characterized as transactions in the ordinary course of the

Debtors' business, the Debtors respectfully request that this Court authorize the Debtors to take

such actions pursuant to Bankruptcy Code Section 363(b) as reasonable exercise of their

business judgment.

**H.    Bankruptcy Rule 6003 has Been Satisfied and Bankruptcy Rule 6004 Should be Waived**

45.    The request for authorization to pay the Insurance Obligations is subject to Bankruptcy Rule 6003, which provides for authorization to be obtained within twenty-one (21) days after the Petition Date if necessary to avoid immediate and irreparable harm.  The Debtors submit that standard is satisfied here.  The Debtors believe that if the Insurance Obligations are not authorized for payment as soon as possible and on an expedited basis, the Insurance Carriers may seek to terminate the Debtors' Insurance Policies.  Specifically, the effect of potential cancellation of the Insurance Policies – or even litigation regarding the same – would be devastating to the Debtors' estates, particularly at these early stages of the Chapter 11 Cases.  Moreover, cancellation of the Insurance Policies would render the Debtors in violation of the Operating Guidelines, the laws of the various states in which the Debtors operate, and the Debtors' various contractual commitments.  Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rule 6003.

46.    In addition, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is immediately necessary in order for the Debtors to be able to continue to operate their business and preserve the value of their estates.  The Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**I.    Precedent Cases Support the Granting of the Requested Relief**

47.    This Court and other Courts have granted the same or similar relief in

other large chapter 11 cases.  See, e.g., In re LCI Holding Company, Inc., Case No. 12-13319

(KG) (Bankr. D. Del. Dec. 13, 2012); In re WP Steel Venture LLC, Case No. 12-11661 (KJC)

(Bankr. D. Del. Jun. 1, 2012); In re AFA Inv. Inc., Case No. 12-11127 (MFW) (Bankr. D. Del.

Apr. 3, 2012); In re Pemco World Air Servs., Inc., Case No. 12-10799 (MFW) (Bankr. D. Del.

Mar. 6, 2012); In re Graceway Pharmaceuticals, LLC, Case No. 11-13036 (MFW) (Bankr. D.

Del. Sept. 30, 2011); In re Appleseed's Intermediate Holdings LLC, Case No. 11-10160 (KG)

(Bankr. D. Del. Feb. 17, 2011); In re Freedom Commc'ns Holdings, Inc., Case No. 09-13046

(BLS) (Bankr. D. Del. Sept. 2, 2009);  In re Sportsman's Warehouse, Inc., Case No. 09-10990

(CSS) (Bankr. D. Del. Mar. 24, 2009); In re Circuit City Stores, Inc., 08-35653 (KRH) (Bankr.

E.D. Va. Nov. 12, 2008); In re Goody's Family Clothing, Inc., Case No. 08-11133 (CSS) (Bankr

D. Del. June 10, 2008); and In re Tweeter Home Entm't Group, Inc., Case No. 07-10787 (PJW)

(Bankr. D. Del. June 13, 2007).

## NOTICE

48.    Notice of this Motion will be given to: (a) the United States Trustee for the

District of Delaware; (b) counsel to the Debtors' postpetition secured lender; (c) counsel to Shell

Western Exploration and Production, Inc., the Debtors' prepetition lender; (d) counsel to the

Indenture Trustee under the 2016 Senior Secured Notes (as defined in the Blackwell Declaration);

(e) the Securities and Exchange Commission; (f) counsel to the Environmental Protection

Agency; (g) counsel to the ad hoc group of holders of 2016 Senior Secured Notes; (h) the parties

included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (i) the United

States Attorney General for the District of Delaware; and (j) the Attorneys General for the states

in which the Debtors conduct business (collectively, the "**Initial Notice Parties**").  The Debtors

submit that, under the circumstances, no other or further notice is required.

49.    A    copy    of    the    Motion    is    available    on    the    Court's    website:
www.deb.uscourts.gov.  Additional copies of the Motion are available for free on the website of
the    Debtors'    proposed    claims    and    noticing    agent,    Prime    Clerk    LLC,    at
http://cases.primeclerk.com/gfes, or can be requested by calling (855) 410-7359 from within the
United States or +1 (646) 795-6960 if calling from outside the United States.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit B, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:  October 27, 2013
Wilmington, Delaware

Respectfully Submitted,

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

Josef S. Athanas
Caroline A. Reckler
Sarah E. Barr
Matthew L. Warren
LATHAM & WATKINS LLP
Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 876-7700
Facsimile:   (312) 993-9767

Proposed Counsel for Debtors and Debtors in Possession

01:14282611.5

HN\1066603.12