## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                                          :    Chapter 11

                                                :

GREEN FIELD ENERGY SERVICES, INC., et    :    Case No. 13-12783 (_____)

al.,                                            :

                                                :    Joint Administration Requested

                     Debtors.[1]                :

------------------------------------------------------------ x

## MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) UNDER
## 11 U.S.C. §§ 105(a), 363(b), 364, 1107(a) AND 1108 AND FED.
## R. BANKR. P. 6003 AUTHORIZING PAYMENT OF PREPETITION
## CLAIMS OF CERTAIN CRITICAL VENDORS AND SERVICE PROVIDERS AND (II)
## UNDER 11 U.S.C. §§ 105(a), 363(c) AND 503(b)(1)(A) AND FED.
## R. BANKR. P. 6003 CONFIRMING ADMINISTRATIVE
## EXPENSE PRIORITY STATUS OF DEBTORS' UNDISPUTED
## OBLIGATIONS FOR POSTPETITION DELIVERY OF GOODS AND SERVICES

The debtors and debtors in possession in the above-captioned cases (collectively,

the "**Debtors**") hereby move (the "**Motion**") for entry of interim and final orders, (i) under

Sections 105(a), 363(b), 364, 1107(a) and 1108 of Title 11 of the United States Code (the

"**Bankruptcy Code**") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), authorizing, but not directing, the Debtors to pay the prepetition fixed,

liquidated and undisputed claims of certain critical vendors and service providers, subject to the

conditions described herein, (ii) under Bankruptcy Code Sections 105, 363(c) and 503(b)(1)(A),

confirming the administrative expense priority status and authorizing payment of the Debtors'

undisputed obligations for the postpetition delivery of goods and provision of services, and (iii)

granting certain related relief.  In support of the Motion, the Debtors rely upon and incorporate

by reference the *Declaration of Earl J. Blackwell in Support of Chapter 11 Petitions and First*

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax or organizational identification number, are: Green Field Energy Services, Inc. (2539); Hub City Tools, Inc. (2827); and Proppant One, Inc. (6035).  The above-captioned Debtors' mailing address is 4023 Ambassador Caffery Parkway, Suite #200, Lafayette, LA 70503.

*Day Motions*, filed with the Court concurrently herewith (the "**Blackwell Declaration**").  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief requested herein are Bankruptcy Code Sections 105(a), 363(b), 363(c), 364, 503(b)(1)(A), 1107(a) and 1108.  Such relief is warranted under Bankruptcy Rule 6003.

## BACKGROUND

2.      On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases for relief under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the Blackwell Declaration and fully incorporated herein by reference.

3.      The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1108.  No trustee or examiner has been requested in the Chapter 11 Cases and no committees have yet been appointed.

4.      The Debtors are an independent oilfield services company that provides a wide range of services to oil and natural gas drilling and production companies to help develop

and enhance the production of hydrocarbons. Many of the Debtors' vendors supply highly specialized goods or goods that are ordered in such high quantities that it would be difficult to find immediate replacements. Furthermore, the Debtors provide services that must be performed timely in conjunction with larger well operations. Additionally, because some of the Debtors' service providers have such specialized knowledge about the Debtors' operations, they are impossible to replace. Many of the Debtors' suppliers provide proprietary materials and supplies, the loss of which would force the Debtors to redo work already performed and possibly reconfigure their own machinery and tools to work with the new type of materials. Finally, there exists the potential for the assertion of liens against assets that are necessary for the continuation of the Debtors' operations.

## RELIEF REQUESTED

5.      By this Motion, the Debtors seek entry of an order granting them authority to pay the prepetition fixed, liquidated and undisputed claims (the "**Critical Vendor Claims**") of certain critical suppliers of goods and services, with whom the Debtors continue to do business and whose goods and services are essential to the Debtors' operations (the "**Critical Vendors**"), as more particularly described and on the terms set forth below. As set forth below, and to the extent possible, the Debtors propose to condition the payment of individual Critical Vendor Claims on the agreement of the Critical Vendor to continue supplying goods and/or services to the Debtors on the same trade terms that, or better trade terms than, such Critical Vendors offered the Debtors immediately prior to the Petition Date or, if more favorable, within the 180 day period prior to the Petition Date, or pursuant to such other trade practices and programs that are favorable to the Debtors. The Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim. The Debtors further

propose to limit the aggregate amount of payments to be made on account of Critical Vendor Claims to $1 million unless further authorization is obtained from this Court.

6.      Additionally, as of the Petition Date, the Debtors had outstanding prepetition purchase orders (collectively, the "**Outstanding Orders**") with certain suppliers (collectively, the "**Suppliers**") for ordinary course goods and services that had not yet been delivered as of the Petition Date and which the Debtors believe are integral to the Debtors' ongoing business operations. Accordingly, the Debtors seek entry of an order confirming that the Debtors' undisputed obligations to the Suppliers under Outstanding Orders for (a) shipments of goods delivered to and accepted by the Debtors on and after the Petition Date and (b) the provision of services to the Debtors on and after the Petition Date at the Debtors' request will be entitled to administrative expense priority status. Notwithstanding the foregoing, the Debtors do not seek authority in this Motion to pay any obligations to the Suppliers where title to the underlying goods was transferred to the Debtors prior to the Petition Date pursuant to the express terms of the legal documents governing a particular postpetition shipment unless such Suppliers are otherwise Critical Vendors.

7.      In addition, the Debtors request that the Court authorize and direct the Debtors' banks and financial institutions to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of obligations owed to (a) the Critical Vendors and (b) the Suppliers on account of the Outstanding Orders, and authorize the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of such obligations, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

## BASIS FOR RELIEF REGARDING CRITICAL VENDORS

**A.    Payment of Critical Vendor Claims is Essential to the Debtors' Continued Operations during the Chapter 11 Cases**

8.    As more particularly described in the Blackwell Declaration, the Debtors provide their customers with various material and services relating to hydraulic fracturing operations, as well as cementing, coiled tubing, pressure pumping, acidizing, and other pumping services.

9.    The Debtors' ongoing business is dependent upon their ability to fulfill their obligations to their customers which, in turn, is dependent upon access to various essential goods and services. The Debtors believe that payment of the Critical Vendor Claims is vital to the Debtors' ability to deliver their products and services and, thus, to their effort to preserve and maximize value for all stakeholders.

10.    The Debtors believe that many of their vendors and service providers will continue to do business with them after commencement of these cases because doing so simply makes good business sense. In some cases, however, the Debtors anticipate that certain Critical Vendors will: (a) refuse to deliver goods and services without payment of their prepetition claims; (b) refuse to deliver goods and services on reasonable price or credit terms absent payment of prepetition claims, thereby effectively refusing to do business with the Debtors; or (c) suffer significant financial hardship, such that the Debtors' non-payment of prepetition claims would destroy a Critical Vendor's business and, therefore, its ability to supply the Debtors with goods and services. Furthermore, there exists the potential for the assertion of liens by many Critical Vendors against assets that are necessary for the continuation of the Debtors' operations. Further still, suppliers of proprietary materials and equipment may withhold future orders, causing the Debtors to either restart work already performed to ensure conforming materials were used throughout, or possibly reconfigure machinery and equipment to work with the new

type of materials. Accordingly, the Debtors request authorization to pay the Critical Vendor Claims of such vendors and service providers, subject to the criteria below, because payment of such claims is necessary to achieve their chapter 11 objectives and preserve value for their various constituencies.

**B.      Stringent Criteria will be Used to Identify Critical Vendors**

11.      To ensure that the Debtors identify as Critical Vendors only those vendors and service providers that are actually critical to the Debtors' business, and who will refuse to, or who will demand pricing or trade terms that constitute an effective refusal to, or be financially unable to, provide goods or services if not paid, certain of the Debtors' employees and professionals who are responsible for maintaining, and have intimate knowledge of, the Debtors' vendor and service provider relationships, have conducted, and will continue to conduct, an extensive analysis and review of the Debtors' immediate needs for goods and services.

12.      As part of such analysis and review, the Debtors have used, and will continue to use, the following criteria to determine which of the Debtors' vendors and service providers are Critical Vendors: (a) whether the vendor or service provider is a sole-source provider; (b) whether the Debtors receive advantageous pricing or other terms from a vendor or service provider such that a postpetition replacement would result in significantly higher costs; (c) whether quality requirements, geographic constraints, customizations, proprietary materials, or other specifications prevent the Debtors from obtaining the necessary goods or services from alternative sources within a reasonable timeframe and without unnecessary and burdensome costs; (d) whether, if the vendor is not a sole source provider, the Debtors have insufficient inventory of goods or in-house capabilities to continue operations while a replacement is found and put into place; (e) whether a vendor or service provider is contractually obligated to continue to provide goods and services but the Debtors cannot afford the time and expense of an

enforcement action if the vendor or service provider wrongfully refuses to perform, and in fact refuses to perform; (f) whether a vendor or service provider has possession of goods, products or other deliverables as to which they are able to claim a possessory lien and, thus, to decline to deliver such items to the Debtors without payment, or if there exists the potential for assertion of liens against assets currently in the Debtors' possession; (g) whether a vendor or service provider is in control of systems or data used in the daily operation of the business and can easily shutdown or refuse access to such systems or data; (h) whether a vendors' prepetition claim is entitled to administrative expense status under Bankruptcy Code Section 503(b)(9); and (i) whether a vendor or service provider meeting any of the aforementioned standards in (a) through (h) refuses to, demands pricing or trade terms that constitute an effective refusal to, or is financially unable to, provide goods or services to the Debtors on a postpetition basis if the prepetition balances are not paid.  The Debtors are confident that this process has appropriately identified, and will continue to appropriately identify, only those vendors and service providers that are critical to the estates.[2]

C.    **Types of Goods and Services Giving Rise to Critical Vendor Claims Evidences Necessity for Payment**

13.    The Debtors services include cementing, coiled tubing, pressure pumping, acidizing, and other pumping services.  Among the types of Critical Vendors identified by the Debtors are certain suppliers of sand, chemicals, fuels, and other equipment that is critical to the Debtors' operations at the worksite located in Pennsylvania.  Such equipment includes heaters, gear boxes, frac heads, and pump valves that are utilized by the Debtors in their well service and

---

[2]    As the Debtors believe that keeping the identity of Critical Vendors confidential may assist them in reducing the number of prepetition claims that they must pay in order to continue receiving critical goods and services, a schedule of Critical Vendors has not been filed with this Motion and will not be made publicly available. If requested, a copy of the schedule will be provided on a confidential basis to (a) the United States Trustee for the District of Delaware, (b) counsel to the agent for the Debtors' postpetition secured lender, (c) counsel for any official committee of unsecured creditors, provided that such counsel not share the list with any member of the committee, and (d) the chambers of the United States Bankruptcy Judge assigned to these cases.

fracturing operations. Furthermore, many of the Critical Vendors identified by the Debtors are suppliers of cement, pumping parts, specialty chemicals, and tubing that are critical to the Debtors' provision of well services.

14.    Vendors and service providers of the nature described above, and others that satisfy the criteria described above, fall under the rubric of Critical Vendors. Any refusal by Critical Vendors to provide essential goods or perform key services would have immediate and severe adverse repercussions, including, but not limited to, jeopardizing or impairing the value of the Debtors' business. For even in those instances in which an actual replacement vendor exists, the Debtors have determined that the time and other factors involved in replacing such Critical Vendors would be disruptive, cost-prohibitive and, in certain instances, impossible given the Debtors' efforts to maximize value for their estates.

15.    The Debtors estimate that there are approximately ten (10) Critical Vendors.

**D.    Proposed Terms and Conditions for Payment of Critical Vendor Claims**

16.    The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying goods or services to the Debtors on trade terms that are the same or better than the trade terms that existed immediately prior to the Petition Date or, if more favorable, within the 180 day period prior to the Petition Date (the "**Customary Trade Terms**"). The Debtors reserve the right to negotiate new trade terms (the "**Minimum Credit Terms**") with any Critical Vendor as a condition to payment of any Critical Vendor Claim, in the Debtors' discretion.

17.    To ensure that the Critical Vendors deal with the Debtors on either Customary Trade Terms or Minimum Credit Terms, the Debtors propose that a letter agreement

(a "**Trade Agreement**")³ substantially in the form attached hereto as Exhibit A be sent to the

Critical Vendors for execution, together with a copy of the Order granting this Motion.

                18.     The Debtors propose that each Trade Agreement include, without

limitation:

- the amount of the relevant Critical Vendor's estimated Critical Vendor Claims, accounting for any setoffs, other credits and discounts thereto; provided, however, such amount shall be used only for the purposes of determining such Critical Vendor's claim under the Order and shall not be deemed a claim allowed by the Court, and the rights of all interested persons to object to such claim shall be fully preserved until further order of this Court;

- the Customary Trade Terms or Minimum Credit Terms applicable to such Critical Vendor, or such other terms as the Critical Vendor and the Debtors may agree, and the Critical Vendor's agreement to provide goods or services to the Debtors under such terms for the duration of the Chapter 11 Cases unless the Debtors fail to make timely payments under the agreed-upon trade terms;

- the Critical Vendor's agreement not to file or otherwise assert against any or all of the Debtors, their estates, the Debtors' customers or any other person or entity or any of their respective assets or property (real or personal) any lien (a "**Lien**"), a claim for reclamation (a "**Reclamation Claim**") or a claim under Bankruptcy Code Section 503(b)(9) (a "**503(b)(9) Claim**"), regardless of the statute or other legal authority upon which such Lien, Reclamation Claim or 503(b)(9) Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date; and, to the extent the Critical Vendor has already obtained or otherwise asserted such a Lien, Reclamation Claim or 503(b)(9) Claim, the Critical Vendor shall take (at such vendor's own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim or 503(b)(9) Claim;

- the Critical Vendor's agreement not to file a motion to compel assumption or rejection of any contract under which the Critical Vendor Claim arises; and

- the Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the Order sought hereby and is bound thereby.

                19.     By this Motion, the Debtors seek only the authority to enter into Trade

Agreements when the Debtors determine, in their sole discretion, that payment of such Critical

---

³       The Debtors' entry into a Trade Agreement will not change the nature or priority of the underlying Critical Vendor Claims and will not constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and a Critical Vendor.

Vendor Claims is necessary to enable the Debtors to realize their chapter 11 objectives and that

such agreements are advisable. The Debtors also hereby seek authority to make payments on

account of Critical Vendor Claims in the absence of a Trade Agreement if the Debtors determine,

in their business judgment, that failure to pay such Critical Vendor Claims will result in harm to

the Debtors' business operations and there is no reasonable likelihood that the Debtors will

negotiate an acceptable Trade Agreement with the applicable vendors and/or service providers.[4]

20.     By agreeing to provide Customary Trade Terms or Minimum Credit

Terms under a Trade Agreement, the Critical Vendors are extending unsecured postpetition

credit to the Debtors for the benefit of all creditors. Such Customary Trade Terms or Minimum

Credit Terms maintain the credit terms that the Debtors had prior to the Petition Date, or provide

other acceptable credit terms, and may provide the Debtors with more favorable terms for

unsecured credit than currently provided by the Critical Vendors or available elsewhere.

Accordingly, the treatment of the valid Critical Vendor Claims set forth herein in exchange for

Customary Trade Terms or Minimum Credit Terms is in the best interests of the Debtors and

their estates and should be approved in accordance with Bankruptcy Code Section 364(b).

21.     In the event that a Critical Vendor under a Trade Agreement refuses to

supply goods and/or services to the Debtors on Customary Trade Terms or Minimum Credit

Terms (or such other terms as are agreed by the parties) following receipt of payment on its

Critical Vendor Claim, or otherwise fails to comply with its Trade Agreement with the Debtors,

the Debtors seek authority to return the parties to the positions they held immediately prior to

entry of the Order approving this Motion with respect to all prepetition claims. Further, the

Debtors seek authority, in their sole discretion and without further order of the Court (a) to

---

[4]     Nothing in this Motion should be construed as a waiver by any of the Debtors of their rights to contest any claim of a Critical Vendor under applicable non-bankruptcy law.

declare that any Trade Agreement between the Debtors and such Critical Vendor is terminated; (b) to declare that payments made to such Critical Vendor on account of its Critical Vendor Claims be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of such Critical Vendor without further order of the Court or action by any person or entity; and (c) to recover or seek disgorgement of any payment made to such Critical Vendor on account of its Critical Vendor Claims to the extent that such payments exceed the postpetition claims of such Critical Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense. In addition, the Debtors reserve the right to seek damages or other appropriate remedies against any breaching Critical Vendor.

22.    The Debtors further propose that any Trade Agreement terminated as a result of a Critical Vendor's refusal to comply with the terms thereof may be reinstated if the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor of such a default; or the Debtors, in their discretion, reach a favorable alternative agreement with the Critical Vendor.

**E.    Applicable Authority Regarding Critical Vendors**

23.    The relief requested in this Motion is supported by several provisions of the Bankruptcy Code that authorize a debtor to honor prepetition obligations in certain circumstances. Courts have recognized each of these statutory provisions as valid authority for such payments.

i.    The Court May Rely on the "Necessity of Payment" Doctrine and its General Equitable Powers to Grant the Motion

24.    The Debtors' proposed payment of Critical Vendor Claims should be authorized under Bankruptcy Code Section 105(a) and the "doctrine of necessity."

25.     Under Bankruptcy Code Section 105 this Court "may issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a).  For the reasons set forth above, and in light of the need for the Debtors to preserve the going concern value of their businesses, the relief requested herein is proper and should be granted.

26.     The relief sought is further supported by the doctrine of necessity.  The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the chapter 11 case where the payment of such claims is necessary to the restructuring efforts.  See In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (payment of creditors' claims authorized under "necessity of payment" doctrine); In re Penn Central Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or materials essential to the conduct of the business until their pre-reorganization claims have been paid"); see In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment);[5] In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-192 (Bankr. D. Del. 1994) (noting that the debtors "may pay pre-petition claims that are essential to continued operation of business"); see also In

---

[5]     The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The United States Supreme Court first articulated the doctrine of necessity over a century ago, in Miltenberger v. Logansport, C. & S.W. R. Co., 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. See id. at 309-14. The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in Miltenberger. See In re Lehigh & New Eng. Ry., 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious jeopardy.").

re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan

payment of a pre-petition obligation when essential to the continued operation of the debtor.").

27.    The doctrine of necessity is a widely accepted component of modern

bankruptcy jurisprudence.  See Just For Feet, 242 B.R. at 826 (approving payment of key

inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by

refusing to deliver new inventory on eve of debtor's key sales season); In re Payless Cashways,

Inc., 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition

suppliers' claims when such suppliers agree to provide postpetition trade credit); In re

Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).

28.    As stated above, payment of the Critical Vendor Claims is essential to the

Debtors' ability to achieve their chapter 11 objectives and to maximize value for the benefit of

all of the Debtors' stakeholders.  Hence, this Court should exercise its equitable powers to grant

the relief requested in this Motion.

ii.    This Court May Authorize Payment of the Critical Vendor Claims Under Bankruptcy
       Code Sections 363 and 364

29.    Additional authorization for the payment of the Critical Vendor Claims

may be found through reliance on Bankruptcy Code Sections 363 and 364.  With respect to the

former, Bankruptcy Code Section 363(b)(1) authorizes the trustee to use property of the estate

other than in the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1).

Courts in this and other jurisdictions have relied on such subsection to authorize the payment of

prepetition claims held by vendors. See, e.g., In re MPC Computers, LLC, Case No. 08-12667

(PJW) (Bankr. D. Del. Nov. 10, 2008) (authorizing, pursuant to § 363, the payment of prepetition

claims of some suppliers); In re Conseco, Inc., Case No. 02-49672 (CAD) (Bankr. N.D. Ill. Jan.

14, 2003); Armstrong World Indus., Inc. v. James A. Phillips, Inc., 29 B.R. 391, 397 (S.D.N.Y.

1983) (district court affirmed bankruptcy court's decision under Section 363 authorizing

contractor to pay prepetition claims of some suppliers who were potential lien claimants).

Similarly, where, as here, the relief at issue involves a request impacting the trade terms among

the Debtors and the vendor, the relief may, where the appropriate showing has been made, be

approved pursuant to Bankruptcy Code Section 364.  See In re UAL Corp., Case No. 02-48191

(Bankr. N.D. Ill. Dec. 11, 2002) (essential trade motion relying upon Bankruptcy Code Section

363 is "completely consistent with the Bankruptcy Code;" payments to critical trade vendors

have further support when debtor seeks "the extension of credit under section 364 on different

than usual terms, terms that might include the payment of a prepetition obligation").

      30.     The relief requested in this Motion contemplates payments to be made to

Critical Vendors who agree to provide goods or services on Customary Trade Terms or

Minimum Credit Terms, to the extent possible.  As a result, the payment of such Critical Vendor

Claims is consistent with and appropriate under Bankruptcy Code Sections 363 and 364.  As

detailed above, the goods and services provided by the Critical Vendors are vital to the Debtors'

continuing business operations.

    iii.     The Court Should Authorize Payment of the Critical Vendor Claims as a Valid
            Exercise of the Debtors' Fiduciary Duties

      31.     Authority for such payments also may be found in Bankruptcy Code

Sections 1107(a) and 1108.  The Debtors, operating their businesses as debtors in possession

under Bankruptcy Code Sections 1107(a) and 1108, are fiduciaries "holding the bankruptcy

estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value

justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the

estate, including an operating business's going-concern value." Id.

      32.     The CoServ court has noted that there are instances in which a debtor in

possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition

claim." Id. That court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," Id., and also when the payment was to "sole suppliers of a given product." Id. at 498. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.
> Second, unless it deals with the claimant, the debtor risks the
> probability of harm, or, alternatively, loss of economic advantage
> to the estate or the debtor's going concern value, which is
> disproportionate to the amount of the claimant's prepetition claim.
> Third, there is no practical or legal alternative by which the debtor
> can deal with the claimant other than by payment of the claim.

Id.

33.    Payment of the Critical Vendor Claims meets each element of the CoServ court's standard. As described above, the Debtors have narrowly tailored the Critical Vendor Claims to encompass only those vendors and service providers that satisfy the specific criteria described above and that refuse to, demand pricing or trade terms that constitute an effective refusal to, or are financially unable to provide goods or services to the Debtors on a postpetition basis if their prepetition balances are not paid. The shutdown of the Debtors' operations would cost the Debtors' estates lost revenue, which could negatively impact the Debtors' ability to achieve their chapter 11 objectives, and severely harm the going concern value of the Debtors' business. The potential harm and economic disadvantage that would stem from the failure of any of the Critical Vendors to perform is grossly disproportionate to the amount of any prepetition claim that may be paid. Finally, with respect to each Critical Vendor, the Debtors have examined other options short of payment of Critical Vendor Claims and have determined that, to avoid significant disruption of the Debtors' business operations, there exists no practical or legal

alternative to payment of the Critical Vendor Claims. Therefore, the Debtors can only meet their

fiduciary duties as debtors in possession under Bankruptcy Code Sections 1107(a) and 1108 by

payment of the Critical Vendor Claims.

      iv.    <u>Payment of Certain of the Critical Vendor Claims is Justified Under Bankruptcy Code Section 506(b) and 1129(b)(2)</u>

      34.    The Debtors believe that their failure to pay certain of the Critical Vendor

Claims may result in the assertion of possessory liens by such Critical Vendors under applicable

state law with respect to any goods in their possession (collectively, the "**Liens**"). Moreover, to

protect any asserted Lien rights, the Critical Vendors may refuse to release goods or property in

their possession unless and until their prepetition claims have been satisfied. Therefore,

notwithstanding the automatic stay imposed by Bankruptcy Code Section 362, many of these

parties: (a) may be entitled to assert and perfect Liens against the Debtors' property, which

would entitle them to payment ahead of other general unsecured creditors in any event; and (b)

may hold the property subject to the asserted Liens pending payment, to the direct detriment of

the Debtors and their estates.

      35.    Moreover, since the amount of these Critical Vendor Claims is likely less

than the value of any property securing those claims, any such party holding a Lien arguably is a

fully secured creditor. For those Critical Vendor Claims that are deemed secured claims,

Bankruptcy Code Section 1129(b)(2)(A) requires that they be satisfied through deferred cash

payments totaling at least the allowed amount of each such claim, of a value as of the effective

date of the plan equal to the value of the collateral securing the claim, with a continuation of the

Liens against the collateral; or if the collateral is to be sold, that the Lien securing the claim

attach to the proceeds of sale; or that the holder realize the indubitable equivalent of the claim.

11 U.S.C. § 1129 (b)(2)(A). Additionally, under Bankruptcy Code Section 506(b), fully secured

creditors are entitled to receive postpetition interest accruing on their claims to the extent that

such claims are oversecured.  Consequently, payment of those of the Critical Vendor Claims that are subject to valid Liens should give the Critical Vendors no more than that to which they otherwise would be entitled under a plan; and save the Debtors the interest costs that otherwise may accrue on the Claims during these Chapter 11 Cases.

>    v.    Payment of Certain of the Critical Vendor Claims is Justified Under Bankruptcy Code Section 503(b)(9)

36.    Certain of the Critical Vendors have claims for goods delivered to and received by the Debtors within twenty (20) days before the Petition Date (the "**20-Day Goods**"). Pursuant to Bankruptcy Code Section 503(b)(9), any claims arising from the sale of 20-Day Goods will be administrative expenses at the end of these cases.  Bankruptcy Code Section 503(b)(9) provides that:

> After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –
>
> * * *
>
> (9) the value of goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

11 U.S.C. § 503(b)(9);  See In re GWLS Holdings, Inc., No. 08-12430 (PJW) (Bankr. D. Del. Oct. 22, 2008) (order granting payment of vendors' administrative expense claims with priority under Bankruptcy Code Section 503(b)(9)); In re Werner Holding Co. (DE), Inc., No. 06-10578 (Bankr. D. Del. June 13, 2006) (order granting vendors' administrative expense claims with priority under Bankruptcy Code Sections 503(b) and 507(a)(2)); see also In re Pliant Corp., No. 06-10001 (Bankr. D. Del. Jan. 4, 2006) (same); In re Dana Corp., No 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 3, 2006) (order authorizing payment of administrative priority claims under Section 503(b)(9)).  See also In re Rio Valley Motors Co., LLC, Case No. 11-06-11866-SS, 2008 WL 824271, at *1-2 (Bankr. D.N.M. Mar. 24, 2008) (holding Bankruptcy Code Section

503(b)(9) gave administrative priority to prepetition claim for value of vehicle delivered to debtor within 20 days of chapter 11 bankruptcy filing); In re WETCO Rest. Group, LLC, Case No. 07-51169 (RS), 2008 WL 1848779, at *2 (Bankr. W.D. La. Apr. 23, 2008) (finding no Section 503(b)(9) claim for goods delivered within 20 days of petition, where creditor was prepaid for such goods).

37.    Additionally, bankruptcy courts have held that the timing of the payment of administrative expenses allowed under Bankruptcy Code Section 503(b)(9) is within the discretion of the court. See In re Tubular Techs., LLC, 372 B.R. 820, 824 & n.4 (Bankr. D.S.C. 2007) (bankruptcy court may determine when Section 503(b)(9) claim is paid); In re Bookbinders' Rest., Inc., 2006 Bankr. LEXIS 3749, at *2 (Bankr. E.D. Pa. Dec. 28, 2006) (timing of the payment of Section 503(b)(9) claim "is within the discretion of the bankruptcy court"). Thus, the Debtors submit that, under the circumstances, it would be appropriate for the Court to exercise its discretion to allow Critical Vendor Claims for 20-Day Goods to be paid in the ordinary course.

vi.    Precedent Cases Support the Requested Relief

38.    This Court and other courts have granted similar critical vendor or essential supplier relief in other cases. See, e.g., In re A123 Sys., Inc., Case No. 12-12859 (KJC) (Bankr. D. Del. Nov. 8, 2012) (authorizing debtor to pay approximately 15% of total prepetition trade claims and additionally pay section 503(b)(9) claims); In re S. Air Holdings, Inc., Case No. 12-12690 (CSS) (Bankr. D. Del. Sept. 28, 2012); In re Digital Domain Media Grp., Inc., Case No. 12-12568 (BLS) (Bankr. D. Del. Sept. 12, 2012); In re WP Steel Venture, LLC, Case No. 12-11661 (KJC) (Bankr. D. Del. June 1, 2012); The Great Atlantic & Pacific Tea Co., Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2011); In re Constar Int'l Inc., Case No. 11-10109 (CSS) (Bankr. D. Del. Feb. 1, 2011); In re Appleseed's Intermediate Holdings LLC, Case No.

11-10160 (KG) (Bankr. D. Del. Feb. 23, 2011); In re DSI Holdings, Inc., Case No. 11-11941

(KJC) (Bankr. D. Del. July 21, 2011); In re NewPage Corp., Case No. 11-12804 (KG) (Bankr. D.

Del. Sept. 8, 2011); In re Sun-Times Media Group, Inc., Case No. 09-11092 (CSS) (Bankr. D.

Del. Apr. 28, 2009); In re Journal Register Co., Case No. 09-10769 (ALG) (Bankr. S.D.N.Y.

March 17, 2009); In re Star Tribune Holdings Corp., Case No. 09-10244 (RDD) (Bankr.

S.D.N.Y. Feb. 16, 2009); In re Tribune Co., Case No. 08-13141 (KJC) (Bankr. D. Del. Dec. 10,

2008).

    vii.    <u>Bankruptcy Rule 6003 has been Satisfied and Bankruptcy Rule 6004 Should be Waived</u>

        39.    The request for authorization to pay the Critical Vendor Claims is subject

to Bankruptcy Rule 6003, which provides for authorization to be obtained within twenty-one

(21) days after the Petition Date if necessary to avoid immediate and irreparable harm. The

Debtors submit that standard is satisfied here for all the reasons described above. Accordingly,

the relief requested herein is appropriate under the circumstances and under Bankruptcy Rule

6003.

        40.    In addition, the Debtors seek a waiver of the fourteen-day stay under

Bankruptcy Rule 6004(h). As described above, the relief that the Debtors seek in this Motion is

immediately necessary in order for the Debtors to be able to preserve the value of their estates.

The Debtors respectfully request that the Court waive the fourteen-day stay imposed by

Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate

relief.

### BASIS FOR RELIEF REGARDING
### POSTPETITION DELIVERY OF GOODS AND SERVICES

        41.    As noted above, the Debtors, by this Motion, seek additional relief with

respect to amounts owed to Suppliers for Outstanding Orders on account of (a) shipments of

goods delivered to and accepted by the Debtors on and after the Petition Date and (b) the

provision of services to the Debtors on and after the Petition Date.  Accordingly, the Debtors

seek entry of an order confirming that the Debtors' undisputed obligations to the Suppliers for

such Outstanding Orders will be entitled to administrative expense priority status.

42.    As a result of the commencement of these Chapter 11 Cases, the Debtors

believe that the Suppliers may perceive a risk that they will be treated as prepetition general

unsecured creditors for the cost of any shipments made or services provided after the Petition

Date pursuant to the Outstanding Orders.  As a result, the Suppliers may refuse to deliver such

goods to the Debtors or provide such services to the Debtors unless the Debtors issue substitute

postpetition purchase orders or provide other assurances of payment.

43.    Issuing substitute purchase orders on a postpetition basis would be

administratively burdensome, time-consuming and counterproductive to the Debtors' ability to

realize their chapter 11 objectives.  Such a requirement imposed by Suppliers – or other requests

for assurance of payment – inevitably will lead to delays in the Debtors' receipt of goods and

services, ultimately (a) resulting in the disruption of established schedules and (b) hindering the

Debtors' ability to continue their operations uninterrupted and to minimize the impact of these

Chapter 11 Cases on their parties in interest.

44.    Under these circumstances, the Debtors believe that the requested relief is

necessary to permit the Debtors to obtain the timely delivery of goods and uninterrupted

provision of services from the Suppliers pursuant to the Outstanding Orders.  Further, the

Debtors submit that the relief sought herein is noncontroversial and entirely consistent with the

applicable provisions of the Bankruptcy Code.  Obligations arising out of the postpetition

delivery of such goods and provision of such services to the Debtors generally are expenses

incurred for the benefit of the Debtors' estates and assist in preserving the value of the Debtors'

business. As such, these costs generally are accorded administrative expense priority status

pursuant to Bankruptcy Code Section 503(b)(1)(A). The requested relief merely confirms the

treatment of such postpetition obligations under the Bankruptcy Code, providing necessary

assurances of payment to the Suppliers and ensuring the Debtors' ongoing and uninterrupted

receipt of essential goods and services.

        45.     Under Bankruptcy Code Section 105, the Court has broad discretion to

issue orders necessary to "carry out the provisions of this title." 11 U.S.C. § 105(a). For all of

the reasons described above, the Debtors submit that the relief sought herein will facilitate the

Debtors' ability to realize their chapter 11 objectives and, therefore, is appropriate under Section

105 of the Bankruptcy Code.

        46.     Similar relief to that requested herein has been granted in other chapter 11

cases in this District. See, e.g., In re Harry & David Holdings, Inc., Case No. 11-10884 (MFW)

(Bankr. D. Del. March 29, 2011) (authorizing, among other things, administrative expense

priority status for postpetition deliveries of suppliers and vendors and the payment of undisputed

obligations arising therefrom in the ordinary course of business); In re The Fairchild Corp., Case

No. 09-10899 (CSS) (Bankr. D. Del. March 20, 2009) (same); In re Boscov's, Inc., Case No. 08-

11637 (KG) (Bankr. D. Del. Aug. 5, 2008) (same); In re Linens Holding Co., Case No. 08-1832

(CSS) (Bankr. D. Del. May 28, 2008) (same); In re Sharper Image Corp., Case No. 08-10322

(KG) (Bankr. D. Del. Feb. 20, 2008) (same); In re Buffets Holdings, Inc., Case No. 08-10141

(MFW) (Bankr. D. Del. Feb. 13, 2008) (same).

## RESERVATION OF RIGHTS

        47.     Nothing contained herein is or should be construed as: (a) an admission as

to the validity of any claim against the Debtors or the existence of any lien against the Debtors'

properties; (b) a waiver of the Debtors' rights to dispute any claim or lien on any grounds; (c) a

promise to pay any claim; (d) an implication or admission that any particular claim would constitute a Critical Vendor Claim; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code Section 365; or (f) otherwise affecting the Debtors' rights under Bankruptcy Code Section 365 to assume or reject any executory contract with any party subject to the proposed Order once entered.  Further, none of the Debtors or their officers, directors, attorneys or agents will have any liability on account of any decision by the Debtors not to pay a Critical Vendor Claim, and nothing contained in this order shall be deemed to increase, reclassify, elevate to an administrative expense status or otherwise affect the Critical Vendor Claims to the extent they are not paid.

48.     Additionally, nothing in this Motion is intended to modify or waive any of the Debtors' rights with respect to goods and services requested or received from the Critical Vendors or Suppliers, including the Debtors' rights to (a) cancel a purchase order (including any Outstanding Order); (b) decline the acceptance of goods and services; (c) return any defective, nonconforming or unacceptable goods; or (d) contest the amount of any invoice or claims on any grounds.

**NOTICE OF MOTION AND INTERIM ORDER**

49.     Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware; (b) counsel to the Debtors' postpetition secured lender; (c) counsel to Shell Western Exploration and Production, Inc., the Debtors' prepetition lender; (d) counsel to the Indenture Trustee under the 2016 Senior Secured Notes (as defined in the Blackwell Declaration); (e) the Securities and Exchange Commission; (f) counsel to the Environmental Protection Agency; (g) counsel to the ad hoc group of holders of 2016 Senior Secured Notes; (h) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (i) the United States Attorney General for the District of Delaware; and (j) the Attorneys General for the states

in which the Debtors conduct business (collectively, the "**Initial Notice Parties**"). The Debtors submit that, under the circumstances, no other or further notice is required.

50.    A copy of the Motion is available on the Court's website: www.deb.uscourts.gov. Additional copies of the Motion are available for free on the website of the Debtors' proposed claims and noticing agent, Prime Clerk LLC, at http://cases.primeclerk.com/gfes, or can be requested by calling (855) 410-7359 from within the United States or +1 (646) 795-6960 if calling from outside the United States.

51.    In the event the Court enters an interim order granting this Motion (the "**Interim Order**"), within five (5) business days thereafter, the Debtors propose to serve notice of such entry on the Initial Notice Parties and all parties that have filed prior to such service date requests for notice pursuant to Bankruptcy Rule 2002. The notice will provide that any objections to the relief granted in the Interim Order must be filed with the Court and served upon counsel for the Debtors no later than seven days prior to the final hearing to be held on the Motion (the "**Objection Deadline**"). If an objection is timely filed and served prior to the Objection Deadline, such objection will be heard at the final hearing on the Motion. If no objections are timely filed and served, the Debtors' counsel will file a certification of counsel to that effect attaching a final form of order.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: October 27, 2013
Wilmington, Delaware

Respectfully Submitted,

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

Josef S. Athanas
Caroline A. Reckler
Sarah E. Barr
Matthew L. Warren
LATHAM & WATKINS LLP
Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

Proposed Counsel for Debtors and Debtors in Possession