# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x
In re:                                                  :   Chapter 11
                                                        :
GREEN FIELD ENERGY SERVICES, INC., et                   :   Case No. 13-12783 (_____)
al.,                                                    :
                                                        :   Joint Administration Requested
                    Debtors.¹                           :
------------------------------------------------------- x
```

**MOTION OF THE DEBTORS FOR ENTRY OF (A) INTERIM ORDER (I)
AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364 AND 507(B), AND (II) SCHEDULING
A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(B) AND (C),
AND (B) A FINAL ORDER APPROVING AND
<u>AUTHORIZING THE FOREGOING SUBSTANTIVE RELIEF</u>**

Green Field Energy Services, Inc. (the "**Borrower**"), and certain of its affiliates, each

as a debtor-in-possession in the above captioned cases (collectively, the "**Borrowers**" or

"**Debtors**") file this motion (the "**Motion**"), pursuant to Sections 105, 361, 362, 364 and 507(b)

of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002 and 4001 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-2 of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "**Local Rules**"), for entry of an interim order, substantially in the form

attached hereto as <u>Exhibit A</u> (the "**Interim Order**"), and a final order (the "**Final Order**"² and

together with the Interim Order, the "**DIP Orders**"), (a) authorizing the Debtors to obtain

postpetition financing on a senior secured, priming, superpriority basis, to grant liens and claims

in support of such financing, and to execute necessary documentation attendant to the obtaining

of such financing; (b) vacating and modifying the automatic stay afforded by Bankruptcy Code

---

¹      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax or organizational identification number, are: Green Field Energy Services, Inc. (2539); Hub City Tools, Inc. (2827); and Proppant One, Inc. (6035). The above-captioned Debtors' mailing address is 4023 Ambassador Caffery Parkway, Suite #200, Lafayette, LA 70503.

²      A copy of the proposed Final Order shall be filed under separate cover prior to the Final Hearing (as defined below).

Section 362 to permit actions necessary to implement, effectuate and enforce the postpetition

financing; and (c) scheduling a final hearing to consider entry of the Final Order.

The facts and circumstances supporting this Motion are set forth in the *Declaration of*

*Earl J. Blackwell in Support of Chapter 11 Petitions and First Day Motions*, filed with the Court

concurrently herewith (the "**Blackwell Declaration**").  In further support of this Motion, the

Debtors respectfully state as follows:

## JURISDICTION

1.        This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference from the United States District Court*

*for the District of Delaware* dated as of February 29, 2012.  This is a core proceeding under

28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United

States Constitution.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

The predicates for the relief requested herein are Bankruptcy Code Sections 105(a), 361, 362,

364, and 507(b).  Such relief is warranted under Bankruptcy Rule 4001-2 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware.

## BACKGROUND

A.        **Introduction**

2.        On the date hereof (the "**Petition Date**"), each of the Debtors filed a

voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").

The Debtors are operating their business and managing their properties as debtors-in-possession

pursuant to Bankruptcy Code Sections 1107(a) and 1108.  No trustee or examiner has been

requested and no statutory committee has yet been appointed in these Chapter 11 Cases.  For a

detailed description of the Debtors and their operations, the Debtors respectfully refer the Court

and parties-in-interest to the Blackwell Declaration.

HN\1100136.2

**B.**    **Summary of the Debtors' Prepetition Secured Obligations**[3]

3.    On September 2, 2011, Green Field Energy Services, Inc. ("**GFES**")
entered into an amended and restated credit facility (as amended, restated, supplemented or
otherwise modified on or prior to the Petition Date, the "**Shell Credit Facility**") with SWEPI,
Inc. (together with its affiliates and subsidiaries, "**Shell**") pursuant to which Shell agreed to
provide up to an aggregate $94 million of senior secured term loans. As of the Petition Date,
there was approximately $80 million outstanding under the Shell Credit Facility. The Shell
Credit Facility was intended to be secured by a first priority lien on all of the Debtors' motor
vehicles and equipment except for the vehicles securing certain third party loans and capital
leases. As discussed below, Shell failed to properly perfect certain of such security interests
outside the preference period prior to the filing of these Chapter 11 Cases.

4.    On November 15, 2011, GFES, Hub City Tools, Inc., as guarantor, and
Wilmington Trust, National Association, as trustee and collateral agent, entered into that certain
Indenture, a copy of which is attached hereto as Exhibit B (as supplemented by the Supplemental
Indenture dated October 23, 2012 (the "**Supplemental Indenture**"), the "**2016 Senior Secured
Note Indenture**") pursuant to which GFES issued 250,000 units, each unit consisting of:
(i) $1,000 principal amount, totaling $250,000,000 aggregate principal amount, of 13% Senior
Secured Notes due 2016 (the "**2016 Senior Secured Notes**")[4]; and (ii) one warrant to purchase
0.988235 shares of common stock ("**Warrants**").

---

[3]    The below summary of the Debtors' Prepetition Collateral structure is intended for informational purposes
only and shall not constitute a finding as to the validity of any indebtedness of the Debtors nor prohibit any party,
including, without limitation, the Debtors, from challenging any aspect of such financing.

[4]    The Debtors conducted a successful consent solicitation to modify the terms of the 2016 Senior Secured
Indenture as set forth in the Supplemental Indenture dated as of October 23, 2012. Following these modifications,
the Debtors were allowed to incur a one-time borrowing of up to $95.0 million in senior term loans under the Shell
Credit Facility, permitted debt and permitted liens that could be obtained and granted senior to the liens of the 2016
Senior Secured Notes in an amount up to $30 million. In addition, the Supplemental Indenture contained an
agreement to pay the holders of the 2016 Senior Secured Notes a consent fee in the amount of 2.5% of the principal
amount of the 2016 Senior Secured Notes that consented – which amount ultimately increased the principal amount
due under the 2016 Senior Secured Note Indenture to $255,948,000.

HN\1100136.2

(i)    <u>Summary of First Lien Prepetition Credit Agreement and Nature and Amount of Obligations Arising Thereunder</u>

5.    As noted above, pursuant to the Shell Credit Facility, Shell agreed to provide GFES with an aggregate $95.0 million of senior secured term loans, of which there was approximately $80 million outstanding as of the Petition Date. The Shell Credit Facility was intended to be secured by a first priority lien on all of the Debtors' motor vehicles and equipment except for the vehicles securing certain Ford Motor Credit Company LLC loans and certain capital leases with Nations Fund I, Inc.

6.    On May 10, 2012, Shell filed an insufficient UCC financing statement (the "**Insufficient Financing Statement**"). Instead of specifically listing or identifying the specific collateral in which it was claiming an interest, Shell wrote "(See Attached Sheets)" but failed to attach any documents, thus failing to perfect any security interest in the Debtors' assets. Because Shell failed to file a valid UCC-1 financing statement in the district in which the Debtors are incorporated, Shell does not have a properly perfected lien on the Debtors' equipment under the Insufficient Financing Statement.

7.    On October 8, 2013, Shell delivered a notice of default to GFES stating that the Debtors had (i) failed to pay outstanding indebtedness within 10 days after such indebtedness became due; and (ii) had defaulted on any credit, loan, prepayment, or other financial obligation, and thus had defaulted on the Shell Credit Facility.[5] The notice of default formally demanded full payment of all indebtedness and procurement of the release of any liens attached to the assets falling under the purview of the Shell Credit Facility.

8.    On October 11, 2013, Shell filed a new UCC Financing Statement (the "**Preference Period Financing Statement**"), attaching a list of the Debtors' assets in which Shell asserted a security interest and perfecting Shell's interest in the collateral (the "**October**

---

[5]    The Debtors reserve all rights to dispute these asserted defaults.

**2013 Preferential Transfer**"). The list of collateral in the Preference Period Financing Statement includes:

> All of debtor's equipment, tools, trucks, blenders, sanders, pumps, Frac Spreads (namely, a complement or spread of equipment required to perform hydraulic fracturing), and motor vehicles, including but not limited to those described on Appendix A [to the October 13 Preference Period Financing Statement].

(ii)    Summary of the 2016 Senior Secured Note Indenture and Nature and Amount of Obligations Arising Thereunder

9.      As described above, on November 15, 2011, GFES, Hub City Tools, Inc., as guarantor, and Wilmington Trust, National Association, as trustee and collateral agent (the "**Indenture Trustee**"), entered into the 2016 Senior Secured Note Indenture. The holders of the units informed the trustee of the decision to separate the units on November 15, 2011, so that the 2016 Senior Secured Notes and the Warrants would be traded independently.

10.     The Notes mature on November 15, 2016 and bear interest at a fixed annual rate of 13%, to be payable semiannually on May 15 and November 15 of each year. The Notes are secured by a security interest on substantially all of the Debtors' tangible and intangible assets subject to certain exceptions, including, without limitation, certain motor vehicles and certain real property (the "**Prepetition Collateral**").

11.     The 2016 Senior Secured Note Indenture expressly allows for certain Liens (defined therein as "Permitted Liens") to take priority over those liens securing the Notes, pursuant to the terms of the Intercreditor Agreement. These "Permitted Liens" may only secure "Permitted Debt."

12.     The first form of Permitted Debt set forth in the 2016 Senior Secured Note Indenture is the incurrence of debt by the Company under a "Senior Credit Facility" in an aggregate principal amount not exceeding the greater of:

> (x) $30.0 million and (y) following the first date on which the Company's Pro Forma Consolidated Leverage Ratio is less than 3.00 to 1.00, 10% of Consolidated Tangible Asset of the Company as of the most recently

HN\1100136.2

ended fiscal quarter for which internal financial statements are available at the time of such occurrence[.]

A "Senior Credit Facility" means "one or more revolving credit facilities, commercial paper facilities, term loan facilities, receivables financings and/or notes or bond financings, as amended, restated, modified, renewed, refunded, replaced."

13.    A separate form of Permitted Debt under the 2016 Senior Secured Note Indenture, relating to the Shell Credit Facility, is "the incurrence by the Company of Indebtedness in the form of term loans bearing interest at 0% per annum (which, for the avoidance of doubt, may not be reborrowed once repaid) under the Shell Credit Agreement not to exceed $95.0 million in aggregate principal amount."

14.    On October 14, 2013, the Indenture Trustee delivered a notice of default to GFES stating that the Debtors had failed to make (i) a payment on the 2016 Senior Secured Notes; and (ii) a semi-annual offer to repurchase, and thus had defaulted on the 2016 Senior Secured Note Indenture.[6]  The notice provided that the Indenture Trustee is continuing to forbear, on a day-to-day basis, from exercising its rights and remedies as a result of this default, but reserves all of the rights and remedies available to it under the 2016 Senior Secured Note Indenture.

(iii)    <u>Summary of Intercreditor Agreement</u>

15.    In connection with the Shell Credit Facility, Shell and the Indenture Trustee entered into an amended and restated intercreditor agreement (the "**Intercreditor Agreement**")[7] setting forth the relative priority and interests with respect to the Debtors' motor vehicles and equipment as between Shell and the Indenture Trustee, on behalf of the 2016 Senior Secured Notes.  Under the Intercreditor Agreement, Shell's security interest in the specific collateral took priority over the security interest held by the Indenture Trustee.  Further, under

---

[6]    The Debtors reserve all rights to dispute these asserted defaults.

[7]    A copy of the Intercreditor Agreement is attached hereto as <u>Exhibit C</u>.

the Intercreditor Agreement, Borrower agreed not to grant any further liens on the collateral

upon which Shell's security interest rested until Shell was paid in full.

      16.    The Intercreditor Agreement includes a "payment over" provision

requiring the Indenture Trustee to remit certain recoveries to Shell in certain circumstances.

Specifically, Sections 4.02 and 4.03 of the Intercreditor Agreement provide for remittance of:

> i.    any Shared Collateral or any proceeds thereof knowingly received by any Second Priority Secured Party in connection with any Disposition of, or collection on, such Shared Collateral upon the enforcement or the exercise of any right or remedy (including any right of setoff) with respect to the Shared Collateral, or in connection with any insurance policy claim or any condemnation award (or deed in lieu of condemnation) and,

> ii.    if a determination is made in any Insolvency or Liquidation Proceeding that any Lien encumbering any Shared Collateral is not enforceable for any reason, any distribution or recovery with respect to, or allocable to, the value of the assets constituting Shared Collateral subject to an enforceable Lien in favor of the Second Priority Secured Parties or any proceeds thereof[.]

      17.    The Intercreditor Agreement also states that, until Shell is paid in full, the

Indenture Trustee and the 2016 Senior Secured Notes "will not oppose or object to the use of

Shared Collateral constituting cash collateral" unless Shell opposes such use.

## RELIEF REQUESTED

      18.    By this Motion, the Debtors request entry of the DIP Orders which, among

other things, provide the Debtors with the following relief:

> DIP Facility: authorizing the Borrower to obtain, for working capital and other general corporate purposes, a senior secured, superpriority, priming debtor-in-possession term loan facility (the "**DIP Facility**") totaling $30 million. Upon entry of the Interim Order, $15 million of the DIP Facility will be made available to the Borrower, the remainder of which shall be made available upon entry of the Final Order (each as defined below).

> DIP Documents: authorizing the Debtors to execute and enter into that certain Bridge Note (the "**Bridge Note**"),[8] and all documents, notes, instruments and agreements to be negotiated and executed in connection with the term facility (collectively, the "**Term Facility**, the

---

[8]    A copy of the Bridge Note is attached hereto as Exhibit D.

Term Facility and the Bridge Note together, the "**DIP Documents**"),[9] and to perform such other and further acts as may be required in connection with the DIP Documents, including the payment of costs and expenses in connection with the DIP Documents and these Chapter 11 Cases;

DIP Liens and Claims: granting to the Co-Administrative Agents (defined below) for their benefit and for the benefit of the DIP Lenders (as defined below) (a) superpriority claims payable from, and having recourse to, all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, subject only to the Carve Out (defined below) and the Pre-Petition Permitted Encumbrances, and (b) certain liens and security interests (more fully described below); provided that such liens and claims shall not attach to or be payable from any chapter 5 claims or the proceeds thereof;

Automatic Stay: modifying the automatic stay of Bankruptcy Code Section 362 to the extent necessary to allow the Co-Administrative Agents to enforce their liens, security interests and the terms and conditions of the DIP Documents upon or after the occurrence of any Events of Default, upon the giving of 4 business days' prior written notice to counsel to the Borrowers, the U.S. Trustee and counsel for any committee of creditors; and

Final Hearing: scheduling a final hearing (the "**Final Hearing**") to consider approving on a final basis the relief requested in this Motion.

## BANKRUPTCY RULE 4001 CONCISE STATEMENT[10]

19.    Pursuant to Bankruptcy Rules 4001(c) and (d)[11] and Local Rule 4001-2(a)(i)[12], the following table summarizes the proposed material terms of the DIP Documents and DIP Orders.

---

[9]    If, within twenty-one days after the entry of the Interim Order, the DIP Lenders and the Debtors come to an agreement on the documentation as to the Term Facility, the Term Facility will be filed, and approval of the Term Facility will be heard at the Final Hearing or at such other time as the parties request and the Court is available.

[10]    The summary of the Bridge Note and Interim Order is qualified in all respects by reference to the Interim Order, and to the extent of any inconsistency between the Motion and the Interim Order, the Interim Order shall govern. Additionally, capitalized terms used in this table have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable, unless otherwise defined herein.

[11]    Certain provisions referenced in Bankruptcy Rule 4001 are not applicable here: (i) the providing of adequate protection or priority for a claim that arose prior to the commencement of the case, Bankruptcy Rule 4001(c)(1)(B)(ii); (ii) a determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, Bankruptcy Rules 4001(c)(1)(B)(iii); (iii) the establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation or entry of a confirmation order, Bankruptcy Rule 4001(c)(1)(B)(vi); (iv) waiver or modification of authority to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, Bankruptcy Rule 4001(c)(i)(B)(v); (v) a release, waiver, or limitation on claim or other cause of action belonging to the estate or the trustee, Bankruptcy

HN\1100136.2

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| **Bridge Note Parties**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Borrowers: Green Field Energy Services, Inc., Hub City Tools, Inc. and Proppant One, Inc.<br><br>DIP Lenders: GB Credit Partners, LLC (together with its successor and assigns, "**GB**"), ICON Capital, LLC (together with its successors and assigns, "**ICON**", and together with GB, the "**Co-Administrative Agents**"), and certain other financial institutions and other entities selected by GB and ICON from time to time (each, a "**DIP Lender**", and collectively the "**DIP Lenders**") | *Interim Order ¶ Preamble* |
| **DIP Commitments**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Bridge Loan:** $15 million (or such lesser amount approved by the Court)<br><br>**DIP Facility:** $30 million (or such lesser amount approved by the Court) | *Interim Order ¶ Preamble* |
| **Purpose**<br><br>*Fed. R. Bankr. P. 4001(c)(1)B)* | The DIP Facility will be used for all purposes permitted by the Bridge Loan and the Interim Order, including, without limitation, to provide for ongoing working capital for the Debtors and their subsidiaries and other operational needs and to pay fees and expenses in accordance with the Bridge Loan and the Interim Order. | *Interim Order ¶ Preamble* |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Interest shall be determined for periods ("**Interest Periods**") of one month and shall be at an annual rate equal to the 30 day London Interbank Offered Rate ("**LIBOR**") for the corresponding deposits of U.S. dollars plus 10.00%.  LIBOR shall be determined by the Co-Administrative Agents at the start of each Interest Period and shall be fixed through such period. Interest shall be paid at the end of each Interest Period, and shall be calculated on the basis of the actual number of days elapsed in a year of 360 days.  LIBOR shall be adjusted for maximum statutory reserve requirements (if any).  Notwithstanding the foregoing, in the event the Co-Administrative Agents determines that LIBOR is less than 1.00% for any Interest Period, then interest shall be equal to 11.00% for such Interest Period. | *Bridge Note at 1-2* |
| **Maturity Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Maturity Date for the Bridge Note is December 13, 2013.  The contemplated Maturity Date for the Term Facility is the date which is nine months following the Closing Date of the Bridge Note, subject to final documentation. | *Bridge Note at 1* |
| **Termination Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The earliest to occur of (i) the Maturity Date and (ii) the date on which the DIP Facility is terminated following the occurrence of an event of default (described below). | *Bridge Note at 1, 7* |
| **Funding Conditions**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Debtors are required to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements and financing statements), and to pay all fees required or necessary for the Debtors' performance of their obligations under the Bridge Loan, including, without limitation: | *Interim Order ¶ 6(b)* |

Rule 4001(c)(1)(B)(viii); and (vi) the granting of a lien on any claim or cause of action arising under Bankruptcy Code Sections 544, 545, 547, 548, 549, 553(b), 723(a) or 724(a), Bankruptcy Rule 4001(c)(i)(B)(xi).

[12]    Certain provisions referenced in Local Rule 4001-2 are not applicable here:  (i) grant of cross-collateralization protection, Local Rule 4001-2(a)(i)(A); (ii) findings or stipulations confirming the validity, perfection or amount of a prepetition secured lender's claims, Local Rule 4001-2(a)(i)(B); (iii) grant of liens in chapter 5 causes of actions, Local Rule 4001-2(a)(i)(D); (iv) roll-up provisions, Local Rule 4001-2(a)(i)(E); and (iv) an equities of the case waiver, Local Rule 4001-2(a)(i)(H).

HN\1100136.2

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | a) the execution, delivery and performance of the documents evidencing and governing the Bridge Loan and any exhibits attached thereto; | |
| | b) the execution, delivery and performance of one or more amendments to or waivers of the requirements of the Bridge Loan for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the DIP Facility among the DIP Lenders, in each case in such form as the Debtors and the DIP Lenders may agree (it being understood that no further approval of the Court shall be required for amendments to the Bridge Loan that do not shorten the maturity of the extensions of credit thereunder, increase the commitments, the rate of interest thereunder or make any other material modification to the Bridge Note); provided, however, that the Debtors shall provide notice of any such amendment to the U.S. Trustee, and lead counsel to the Committee as soon as reasonably practicable; | |
| | c) the non-refundable and indefeasible payment to the DIP Lenders of the fees and any amounts due (or that may become due) (a) in respect of the indemnification obligations referred to in the Bridge Loan; (b) any and all fees and expenses of the DIP Lenders' professionals referenced in the Budget incurred prior to and in connection with closing the Bridge Loan;  (c) costs and expenses as may be due from time to time, including, without limitation, any and all fees and expenses of the DIP Lenders' professionals referenced in the Budget; and (d) the Term Fee (defined below), each without the need to file retention motions or fee applications, or to provide notice to any party other than as set forth in the Interim Order; and | |
| | d) the performance of all other acts required under or in connection with the Bridge Loan. | |
| **Fees**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | (a) In lieu of providing an advance work fee for such preparation, negotiation and facilitation, the parties have agreed, and the Court hereby orders, that all fees, costs and expenses incurred by the DIP Lenders with respect to negotiating, preparing, and drafting the documents evidencing and governing the Bridge Loan, shall be paid by the Debtors' estates, and as such shall be given the same level such claim, and secured by the same Collateral of the same priority, as the Bridge Loan and shall comprise part of the DIP Obligations (the "**Term Fee**").  The Term Fee shall be paid on the earlier of (i) the closing of the Term Loan, and (ii) ten days after written request made by a DIP Lender; provided, however, that solely with respect to (ii), the review provisions provided in paragraph 26 of the Interim Order shall apply and such payment will be made consistent therewith.<br><br>(b) The total fees and original issue discount for the Bridge Note are $600,000 and the total fees and original issue discount for the Term Facility are contemplated to be $600,000.  Finally, there is (a) a $25,000 monthly administration fee, (b) in the event that the Borrowers refinance the DIP Obligations with funds from any person other than the DIP Lenders, for the ratable account of the DIP Lenders, a make whole fee in an amount equal to 2.50% of the outstanding Obligations owed with respect to the DIP Obligations on the effective date of such refinancing, which fee shall be due and payable in full on such effective date, and (c) a contemplated extension fee in connection with the extension of | *Interim Order ¶ 7(b); Fee Letter* |

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | the Maturity Date. | |
| **DIP Liens and Priorities**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i), (ii)* | As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lenders of, or over, any Collateral (as defined below), the following security interests and liens are hereby granted to the Co-Administrative Agents for the benefit of the DIP Lenders and any of their affiliates, as applicable (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "**Collateral**"), subject to the payment of the Carve Out as provided for herein (all such liens and security interests granted to the DIP Lenders pursuant to this Interim Order and the Bridge Loan, the "**DIP Liens**"):<br><br>    a)  Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, perfected first-priority liens on and security interests in all of the Debtors' assets, including, without limitation, all goods, investment property, as-extracted-collateral, inventory, accounts, deposit accounts, securities accounts, chattel paper, documents, instruments, letter-of-credit rights, supporting obligations, intellectual property, contract rights, general intangibles, equipment, real property, commercial tort claims, the Prepetition Segregated Funds (defined below), Post-Petition Segregated Funds (defined below), Unencumbered Segregated Funds (defined below), tax refunds and similar tax payments of the Debtors, whether now owned or hereafter acquired or coming into existence, and wherever located, and all accessions, products and proceeds thereof (including, without limitation, insurance proceeds, claims, damages and proceeds of suit) of the foregoing (other than chapter 5 avoidance actions and the proceeds thereof) that are not subject to the Pre-Petition Permitted Encumbrances (as defined below);<br><br>    b)  Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, perfected junior liens on and security interests in the Debtors' assets that are subject to valid, enforceable, properly perfected, non-avoidable security interests or liens in existence as of the Petition Date, including the Pre-Petition Segregated Funds and Post-Petition Segregated Funds (which liens shall not include the Indenture Liens, the Valid Pre-Petition Shell Credit Facility Liens or the Shell Invalid Liens and which assets shall not include the Indenture Collateral, the Valid Pre-Petition Shell Credit Collateral or the Shell Invalid Collateral) (the "**Pre-Petition Permitted Encumbrances**");<br><br>    c)  Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, perfected first-priority priming liens on and security interests in (i) the Valid Pre-Petition Shell Credit Collateral and the Shell Invalid Collateral, (ii) the Indenture Collateral, and (iii) the Prepetition Segregated Funds and Post-Petition Segregated Funds (any security interests, liens, and encumbrances in or on the Debtors' assets described in the immediately preceding clauses (i), (ii) and (iii), the "**Primed Liens**");<br><br>    d)  All such security interests provided in this Interim Order shall be created and perfected automatically pursuant to the Interim Order | *Interim Order ¶ 9* |

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | and the Bridge Loan; | |
| | e) Notwithstanding the foregoing, the Collateral shall exclude those assets as to which the DIP Lenders determine in their sole discretion that the granting of a security interest in such assets would be prohibited by contract or applicable law unless such prohibition is not effective under applicable law; | |
| | f) Any terms (whether capitalized or lower case) used herein that are defined in the Uniform Commercial Code (the "**UCC**") shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided that to the extent that the UCC is used to define any term used herein and if such term is defined differently in different articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern. | |
| | All such security interests provided in the Interim Order shall be created and perfected automatically pursuant to the Interim Order and Bridge Note. | |
| | Notwithstanding the foregoing, the Collateral shall exclude those assets as to which the Co-Administrative Agents determine that the granting of a security interest in such assets would be prohibited by contract or applicable law unless such prohibition is not effective under applicable law. | |
| **Carve Out** | The "**Carve-Out**" shall mean, after the first business day following the delivery by the DIP Lenders of a Carve-Out Trigger Notice (the earlier of the such business day following such delivery and the Maturity Date, the "**Carve-Out Date**"), (1) with respect to each estate professional, all fees or expenses incurred prior to the delivery of the Carve-Out Trigger Notice, and ultimately allowed by the Bankruptcy Court, for each such professional, up to the cumulative amount specified for such professional set forth in the Professional Fee Budget for all months through and including the month in which the Carve-Out Trigger Notice is delivered plus (2) (A) amounts not exceeding (i) $750,000, which amount may be used, subject to the terms of the Interim Order, to pay any allowed fees or expenses incurred following the delivery by the Co-Administrative Agents of a Carve-Out Trigger Notice by Latham & Watkins, LLP, co-counsel to the Debtors, plus (ii) $150,000, which amount may be used, subject to the terms of the Interim Order, to pay any allowed fees or expenses incurred following the delivery by the Co-Administrative Agents of a Carve-Out Trigger Notice by Young Conaway Stargatt & Taylor, LLP, co-counsel to the Debtors, plus (iii) $100,000, which amount may be used, subject to the terms of the Interim Order, to pay any allowed fees or expenses incurred following the delivery by the Co-Administrative Agents of a Carve-Out Trigger Notice by Carl Marks Advisory Group LLC, investment banker to the Debtors, plus (iv) $250,000, which amount may be used, subject to the terms of the Interim Order, to pay any allowed fees or expenses incurred following the delivery by the Co-Administrative Agents of a Carve-Out Trigger Notice by Alvarez & Marsal North America, LLC, restructuring consultant to the Debtors, plus (v) $40,000, which amount may be used, subject to the terms of the Interim Order, to pay any allowed fees or expenses incurred following the delivery by the Co-Administrative Agents of a Carve-Out Trigger Notice by Prime Consulting LLC, solicitation agent to the Debtors, plus (vi) $100,000, which amount may be used subject to the terms of the Interim Order, to pay any allowed fees or expenses incurred following the delivery by the Co-Administrative Agents of a Carve-Out Trigger Notice by the Committee (if any), plus (B) any | *Interim Order ¶ 8(b),(c)* |

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | unpaid fees due to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a).<br><br>Notwithstanding the foregoing, (a) the applicable dollar limitations on fees and expenses for each of the foregoing professionals set forth above shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses incurred, awarded or paid to such professional on or prior to the business day following the delivery by the Co-Administrative Agents of a Carve-Out Trigger Notice in respect of which the Carve-Out is invoked (so long as any such fees and expenses do not exceed the cumulative amount specified for such professional in the Professional Fee Budget), and (b) nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described above.<br><br>The term "**Carve-Out Trigger Notice**" shall mean a written notice delivered by Co-Administrative Agents to the Borrower's lead counsel, the U.S. Trustee, and lead counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Documents.<br><br>Notwithstanding the foregoing, so long as the Carve-Out Trigger Notice has not been delivered, the Borrower shall be permitted to pay fees and expenses payable under 11 U.S.C. § 330 and § 331 and approved by order of the Bankruptcy Court, as the same may become due and payable, but subject to the other terms and conditions of the Term Sheet (such fees and expenses, "**Allowed Fees and Expenses**"), including, without limitation, Committee's Professional Fees; provided that the Allowed Fees and Expenses of each estate professional shall not exceed the cumulative fees and expenses set forth in the Budget for such professional, and such Allowed Fees and Expenses shall not reduce the Carve-Out amount designated to such professional in clause (2)(A) of the first paragraph of this Section. | |
| **Covenants**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Documents shall contain customary covenants for a transaction of this size and nature and such others as may be reasonably requested by the Co-Administrative Agents and agreed to by the Debtors, including that the Debtors are permitted a maximum aggregate variance of 10% from any line item within Budget, as reflected on a Variance Report, first measured on the fourth Tuesday after the Petition Date, and on every Tuesday thereafter during the term of the Interim Order. Variance testing shall be conducted upon delivery of a Variance Report by the Debtors and shall be based on Variance Report data applicable to the then-ended trailing four-week period, excluding professional fees, on a cumulative basis. | *Interim Order ¶ 15(d)* |
| **Limitations on Use of DIP Facility Proceeds and Collateral** | Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, Collateral or the Carve Out may be used, in the Case or any other proceeding of any kind, or in any jurisdiction, to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the Bridge Loan or the liens or claims granted under the Interim Order, (b) investigate, assert or prosecute any claims and defenses or causes of action against the DIP Lenders or their respective agents, affiliates, representatives, attorneys or advisors, (c) prevent the DIP Lenders' assertion, enforcement or realization on the Collateral in accordance with the DIP Documents or the Interim Order, (d) seek to modify any of the rights granted to the Co-Administrative Agents, DIP Lenders or under the Bridge Loan, in each of the foregoing cases without such applicable party's prior written consent, or (e) pay any amount on account of any claims arising prior to the Petition | *Interim Order ¶ 17* |

HN\1100136.2

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the Bridge Loan. | |
| **Events of Default**<br><br>*Fed R. Bankr. P. 4001(c)(1)(B)* | The occurrence or existence of the following events shall constitute an Event of Default hereunder, which, in addition to any and all defaults and Events of Default provided in the Bridge Loan shall be referred to herein as an "**Event of Default**":<br><br>a.  any Debtor fails to make any payment of principal, interest, professional and other fees or any other amounts payable under the Bridge Loan or hereunder when due;<br><br>b.  any Debtor fails to perform or is in default under (i) the financial covenant related to the variance set forth herein related to the Budget or (ii) any of the other covenants or obligations contained in the Bridge Note or in the Interim Order;<br><br>c.  the use, disbursement or transfer of any of the Prepetition Segregated Funds without the prior written consent of the Co-Administrative Agents;<br><br>d.  any change of control in the ownership or management of any Debtor shall occur;<br><br>e.  any event shall occur that results in the material impairment of any security interest of the Co-Administrative Agents in the Collateral;<br><br>f.  any material provision of the Bridge Note or the Interim Order shall for any reason cease to be valid, binding and enforceable with respect to any party hereto or thereto (other than the Co-Administrative Agents and the DIP Lenders) in accordance with its terms, or any such party shall challenge the enforceability hereof or thereof, or shall assert in writing, or take any action or fail to take any action based on the assertion that any provision hereof or thereof has ceased to be or is otherwise not valid, binding or enforceable in accordance with its terms, or any security interest provided for in the Bridge Loan or the Interim Order shall cease to be a valid and perfected first priority security interest in any of the Collateral purported to be subject thereto;<br><br>g.  any material loss with respect to the Collateral which is not covered by insurance, or any material Collateral is not covered by insurance;<br><br>h.  any Debtor dissolves or suspends or discontinues doing business (to the extent such Debtor was engaged in business prior to the Petition Date), or if any is enjoined, restrained or in any way prevented by any order from continuing to conduct all or any material part of its business, other than as permitted herein;<br><br>i.  the Bankruptcy Court shall enter any order(s) (i) amending, reversing, revoking, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order or any other order with respect to the Chapter 11 Cases affecting in any material respect the Bridge Loan, (ii) appointing a Chapter 11 trustee or an examiner in the Chapter 11 Cases with enlarged powers relating to the operation of the business of any Debtor pursuant to Section 1104 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, or (iv) granting relief from the automatic stay for lien or reclamation claims in the aggregate amount in excess of $250,000 on the | *Interim Order ¶ 18* |

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | assets of the Debtors to permit any foreclosure upon or the reclamation of any of the Collateral; | |
| | j. any order(s) is entered approving a motion filed in the Chapter 11 Cases approving any superpriority claims aggregating an amount in excess of $250,000 in the Chapter 11 Cases (other than the Carve Out) which are *pari passu* with or senior to the claims of any of the Co-Administrative Agents or the DIP Lenders against any of the Debtors unless after giving effect to the transactions contemplated by such motion, all of the DIP Obligations shall be paid in full in cash; or | |
| | k. any motion shall be filed by the Debtors in the Chapter 11 Cases (i) seeking to obtain additional financing under Section 364 of the Bankruptcy Code and to use cash collateral of the DIP Lenders under Section 363(c) of the Bankruptcy Code without the consent of the Co-Administrative Agents and the DIP Lenders that does not provide for the indefeasible repayment of the DIP Obligations in cash at the closing of such new financing, (ii) subject to the entry of the Final Order, to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (iii) to take any other action or actions adverse to the Co-Administrative Agents or the DIP Lenders rights and remedies under the Bridge Loan or the Interim Order. | |
| **Repayment** | (a) The Borrowers shall pay to the Co-Administrative Agents on the Maturity Date an amount sufficient to repay in full the Borrowers' indebtedness, liabilities and obligations hereunder, including without limitation, all unpaid principal, interest, fees, costs and expenses owing by Borrowers to the Co-Administrative Agents and the DIP Lenders and any other DIP Obligations. | *Bridge Note at 1, 4, 5; Interim Order ¶ 16* |
| | (b) Borrowers shall pay to the Co-Administrative Agents without demand any deficiency after any Collateral has been disposed of and the proceeds thereof have been applied to the DIP Obligations, and Co-Administrative Agents shall account to the Borrowers for any surplus remaining thereafter and shall pay such surplus to the Borrowers. | |
| | (c) All payments hereunder shall be in lawful money of the United States in immediately available funds, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any taxes or other payments. All payments shall be applied first to the payment of accrued interest, and the balance on account of outstanding principal; provided, however, that after an Event of Default, all payments will be applied to the DIP Obligations as the Co-Administrative Agents determine in their sole discretion. If any payment of principal or interest becomes due on a day on which the parties hereto are required or permitted by law to remain closed, such payment shall be made on the next succeeding day on which such parties are open, and such extensions shall be included in computing interest in connection with such payment. | |
| | (d) The Debtors shall make mandatory prepayments in an amount equal to (a) 100% of the net proceeds of casualty insurance relating to the Collateral, and (b) 100% of the net proceeds from the sale (or series of sales) of Collateral (subject to exceptions for dispositions of inventory and collections of accounts receivable for services rendered in the ordinary course of business, the reinvestment of proceeds of such sales, and other exceptions | |

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | mutually agreed upon by the Debtors and the DIP Lenders); provided that the Debtors are authorized to utilize the first $2.5 million of Unencumbered Segregated Funds to pay post-petition expenses subject to the Budget | |
| **Automatic Stay**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | The Interim order modifies the automatic stay of Bankruptcy Code Section 362 to the extent necessary to allow the Co-Administrative Agents to enforce their liens, security interests and the terms and conditions of the DIP Documents upon or after the occurrence of any Events of Default, upon the giving of 4 business days' prior written notice to counsel to the Borrowers, the U.S. Trustee and counsel for any committee of creditors. | *Interim Order ¶ 11(b)* |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(ix)* | The Borrowers shall indemnify the Co-Administrative Agents, each of the DIP Lenders and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including disbursements, settlement costs and other charges and reasonable attorneys' fees of counsel) relating to the DIP Facility or any transactions related thereto and the Borrowers' use of the loan proceeds or the commitments; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee or as a result of such indemnitee's material breach in bad faith of the DIP Documents. This indemnification shall survive and continue for the benefit of all such persons or entities. | *Bridge Note at 5-6* |

## SUMMARY OF PROVISIONS TO BE HIGHLIGHTED PURSUANT TO BANKRUPTCY RULE 4001(B) AND LOCAL RULE 4001-2

20.     Bankruptcy Rule 4001(b) and Local Rule 4001-2 require that certain provisions contained in the Interim Order be highlighted for the Court and parties-in-interest. The Debtors believe that the following provisions may be required to be identified in accordance with such rules and that such provisions are justified and necessary in the context and circumstances of these Chapter 11 Cases.

(a) Section 506(c) Waiver. The Interim Order acknowledges that the Debtors will, at the Final Hearing, seek a waiver of rights under Bankruptcy Code Section 506(c). The proposed waiver of the estate's rights will, however, be effective only after notice to parties in interest and entry of the Final Order granting such relief. Thus, the Debtors believe that parties-in-interest will have sufficient notice of this provision prior to the Final Hearing, and the Debtors are simply disclosing such provision out of an abundance of caution.

(b) Certain Aspects of Carve Out. As noted above, the Carve Out provides for, among other things, (1) with respect to each estate professional, all fees or expenses incurred prior to the Carve-Out Date, and ultimately allowed by the Bankruptcy Court, for each such professional, up to the cumulative amount specified for such professional set forth in the Professional Fee Budget for all calendar months through and including the calendar month in

which the Carve-Out Date occurs, plus (2) (A) amounts not exceeding (i) $750,000, which amount may be used, subject to the terms of the Interim Order, to pay any allowed fees or expenses incurred following the Carve-Out Date by Latham & Watkins, LLP, co-counsel to the Debtors, plus (ii) $150,000, which amount may be used, subject to the terms of the Interim Order, to pay any allowed fees or expenses incurred following the Carve-Out Date by Young Conaway Stargatt & Taylor, LLP, co-counsel to the Debtors, plus (iii) $100,000, which amount may be used, subject to the terms of the Interim Order, to pay any allowed fees or expenses incurred following the Carve-Out Date by Carl Marks Advisory Group LLC, investment banker to the Debtors, plus (iv) $250,000, which amount may be used, subject to the terms of the Interim Order, to pay any allowed fees or expenses incurred following the Carve-Out Date by Alvarez & Marsal North America, LLC, restructuring consultant to the Debtors, plus (v) $40,000, which amount may be used, subject to the terms of the Interim Order, to pay any allowed fees or expenses incurred following the Carve-Out Date by Prime Consulting LLC, solicitation agent to the Debtors, plus (vi) $100,000, which amount may be used subject to the terms of the Interim Order, to pay any allowed fees or expenses incurred following the Carve-Out Date by the Committee (if any), plus (B) any unpaid fees due to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a). Notwithstanding the foregoing, (1) the applicable dollar limitations on fees and expenses for each of the foregoing professionals set forth above shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses incurred, awarded or paid to such professional for the period concluding on the Carve-Out Date (so long as any such fees and expenses do not exceed the cumulative amount specified for such professional in the Professional Fee Budget), and (2) nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described above.

## CERTIFICATION OF BUDGET PURSUANT TO LOCAL RULE 4001-2(H)

21.    As set forth more fully in the DIP Documents, the Debtors' use of funds under the DIP Facility will be pursuant to the Budget and subject to the variance specified in the DIP Documents. The Debtors believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the DIP Facility and the Budget.

## DEBTORS' PROPOSED DIP FACILITY

**A.    <u>Need for Postpetition Financing</u>**

22.    As described more fully in the First Day Declaration, the Debtors have faced a number of challenges which, taken together, have had a negative impact on their overall financial performance. Recently, the Debtors have been challenged by declining revenues, the general economic environment and a high level of debt, among other things. Moreover, the Debtors are shifting largely all of their assets into storage facilities during this reorganization

HN\1100136.2

period.  This severely reduced the revenues generated by the Debtors' business and has resulted in a need for reorganization of the Debtors' debt structure.

23.      To continue to operate their business in the ordinary course while in chapter 11, the Debtors determined, with the assistance of their advisors, Alvarez and Marsal North America, LLC and Carl Marks Advisory Group, LLC ("**Carl Marks**"), that they require postpetition financing as described herein.

**B.      Background of the DIP Facility**

24.      In October, 2013, Carl Marks contacted various financial institutions who are active in the debtor-in-possession financing industry to outline the Debtors' financing needs and ascertain these parties' interest in providing a debtor-in-possession loan to the Debtors. After negotiating with multiple parties, the Debtors determined that the DIP Lenders provided the best offer for debtor-in-possession financing to the Debtors.

25.      Several factors contributed to the Debtors' decision to pursue financing with DIP Lenders, including (a) the pricing and amount of the available financing, (b) the short window of time that the Debtors could continue to operate on current financing, severely limiting any diligence period, and (c) the required lien priming and related issues.

**C.      Implementation of the DIP Facility**

26.      These extensive, good faith, arm's length negotiations culminated in the DIP Facility.  Significantly, the DIP Facility allows the Debtors to draw on a $15 million commitment from the DIP Lenders, and, pending this Court's entry of the Final Order and negotiation and execution of certain documents, notes, instruments and agreements, up to $30 million in the aggregate.

27.      The Debtors have determined that entering into the DIP Facility with the DIP Lenders is appropriate and is necessary under the circumstances, to among other things, permit the preservation of the value of the Debtors' assets, make payroll, make capital

HN\1100136.2

expenditures and satisfy other working capital and operational needs. Indeed, the access of the Debtors to sufficient working capital and liquidity through the incurrence of new indebtedness are vital to the preservation and maintenance of the going concern value of the Debtors and to a successful reorganization of the Debtors and thus, should be approved.

## BASIS FOR RELIEF

A.    **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents**

28.    For the reasons set forth in greater detail below, the Court should authorize the Debtors to enter into the DIP Documents, and obtain access to the DIP Facility as an exercise of the Debtors' sound business judgment.

i.    Approval of the DIP Facility is Necessary for the Success of These Chapter 11 Cases

29.    Approval of the DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to pay vendors, make payroll, make capital expenditures and satisfy other working capital and operational needs. Unless these expenditures are made, the Debtors could be forced to cease operations entirely, which could result in substantial going concern value being destroyed and jeopardize the Debtors' ability to reorganize. Finally, the implementation of the DIP Facility will be viewed favorably by the Debtors' employees, thereby promoting a successful reorganization. Accordingly, the timely approval of the relief requested herein is imperative. For each of the foregoing reasons, the credit provided under the DIP Facility will thus preserve and enhance the value of their estates for the benefit of all parties-in-interest.

30.    Bankruptcy Code Section 364(c) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code Section 503(b)(1), the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in Bankruptcy Code

19

Section 503(b) or 507(b), (b) secured by a lien on property of the estate that is not otherwise

subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  Bankruptcy Code Section 364(d) allows a debtor to obtain credit secured by

a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor

is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of

the holder of the lien on the property of the estate on which such senior or equal lien is proposed

to be granted.  11 U.S. C. § 364(d).  Additionally, such credit is appropriate under section 364(d)

if the secured parties to be primed consent.  See In re Xerium Techs., Inc., 2010 Bankr. LEXIS

5878 (Bankr. D. Del. Apr. 28, 2010).  The Debtors propose to obtain the financing set forth in

the DIP Facility by providing, inter alia, superpriority claims, priming security interests and liens

pursuant to Bankruptcy Code Sections 364(c)(1) – (3) and 364(d).

      31.    The Debtors' liquidity needs can be satisfied only if the Debtors are

immediately authorized to borrow up to $15 million on an interim basis under the DIP Facility

and to use such proceeds to fund their operations and these Chapter 11 Cases.  Despite their best

efforts, the Debtors have been unable to procure sufficient financing (a) in the form of unsecured

credit allowable under Bankruptcy Code Section 503(b)(1), (b) as an administrative expense

under Bankruptcy Code Section 364(a) or (b), (c) in exchange for the grant of a superpriority

administrative expense claim pursuant to Bankruptcy Code Section 364(c)(1), or (d) without

granting priming liens pursuant to Bankruptcy Code Section 364(d).  Further, the Debtors have

not been able to obtain postpetition financing or other financial accommodations from any

alternative prospective lender or group of lenders on more favorable terms and conditions taken

as a whole than those for which approval is sought herein.

      32.    Having determined that financing is available only under Bankruptcy

Code Sections 364(c) and (d), the Debtors negotiated with the DIP Lenders extensively, in good

faith and at arm's length.  Provided that a debtor's business judgment does not run afoul of the

provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable

deference in acting in accordance therewith. See In re Ames Dep't Stores, Inc., 115 B.R. 34, 40

(Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section

364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long

as the financing agreement does not contain terms that leverage the bankruptcy process and

powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.");

see also A&K Endowment, Inc. v. Gen. Growth Props., Inc. (In re Gen. Growth Props., Inc.),

423 B.R. 716, 725 (S.D.N.Y. 2010) (upholding the bankruptcy court's decision to approve

debtor-in-possession financing where the bankruptcy court found such financing reflected the

exercise of the debtors' business judgment); Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re

Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).

      ii.    The Consensual Priming Liens Securing the DIP Facility Should be Approved

      33.    Bankruptcy Code Section 364(d) does not require that a debtor seek

alternative financing from every possible lender; rather, the debtor simply must demonstrate

sufficient efforts to obtain financing without the need to grant a senior lien. In re Snowshoe Co.,

789 F.2d at 1088 (trustee demonstrated that credit was unavailable absent the senior lien by

establishment of unsuccessful contact with other financial institutions in the geographic area and

court observed that "[t]he statute imposes no duty to seek credit from every possible lender

before concluding that such credit is unavailable"); In re YL West 87th Holdings I LLC, 423

B.R. 421, 442 n.44 (Bankr. S.D.N.Y. 2010) ("Generally, courts require only a showing of

reasonable effort; debtors are not required to seek an alternative financing from every possible

lender."); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor

testified to numerous failed attempts to procure financing from various sources, explaining that

"most banks lend money only in return for a senior secured position").

HN\1100136.2

34.     A large majority of the Debtors' assets are encumbered and the Debtors have been unable to procure the required funding absent the proposed superpriority claims and liens.  Further, it is noteworthy that the proposed priming only impacts the liens of Shell and the holders of the 2016 Senior Secured Notes but does not impact the liens of any other party that might have a secured prepetition interest that is senior to Shell and the holders of the 2016 Senior Secured Notes.

35.     Shell has consented to the priming liens securing the DIP Facility. Additionally, as noted above, the covenants under the 2016 Senior Secured Note Indenture allow the Debtors to enter into a senior credit facility in an aggregate principal amount of up to $30 million secured by liens senior in priority to those securing the 2016 Senior Secured Notes.  As a result, the holders of the 2016 Senior Secured Notes should be viewed as consenting to the priming liens securing the DIP Facility as such liens are expressly contractually permitted under the 2016 Senior Secured Note Indenture.

36.     Because both parties with loans subject to priming under the DIP Facility have consented to priming, the priming liens securing the DIP Facility are appropriate under Section 364(d).  See In re Xerium Techs., Inc., 2010 Bankr. LEXIS 5878 ("The DIP Liens . . . are appropriate under section 364(d) of the Bankruptcy Code because, among other things . . . the holders of such valid, perfected, prepetition security interests and Liens have consented to the security interests and priming Liens.").

**B.      The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders**

37.     As described above, the Debtors have agreed, subject to Court approval of this Motion, to pay certain fees to the DIP Lenders in exchange for their providing the DIP Facility.  Specifically, the Debtors will pay to the DIP Lenders certain commitment fees, monthly administrative fees and an original issuance discount in favor of the DIP Lenders and certain fees associated with any extension of the Maturity Date and make whole fees in

connection with any refinancing of the Bridge Facility.  In addition, as described above, the Debtors have agreed, subject to Court approval, to pay certain expenses incurred by the Co-Administrative Agents, including those of internal and third-party auditors, appraisers, advisors and consultants.

38.     The fees the Debtors have agreed to pay to the DIP Lenders, together with the other provisions of the DIP Facility, represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make the DIP Facility available.  The Debtors considered the fees described above when determining in their sound business judgment that the DIP Documents constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute their chapter 11 cases, and paying these fees in order to obtain access to the DIP Facility is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

39.     Courts routinely authorize Debtors to pay fees similar to those the Debtors propose to pay where the associated financing is, in such debtors' business judgment, beneficial to the Debtors' estates.  See, e.g., In re EnviroSolutions of New York, LLC, Case No. 10-11236 (SMB) (Bankr. S.D.N.Y. Apr. 15, 2010) (approving 1.00% exit fee); In re Tronox Inc., Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Jan. 13, 2009) (approving an upfront 3% facility fee); In re Dura Auto. Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Jan. 30, 2008) (approving a 2.5% fee related to refinancing and extending a postpetition financing facility); In re DJK Residential, Inc., Case No. 08-10375 (JMP) (Bankr. S.D.N.Y. Feb. 29, 2008) (approving 3% fee in connection with postpetition financing).  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents.

C.     **The DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e)**

40.     Bankruptcy Code Section 364(e) protects a good faith lender's right to collect on loans extended to a debtor, and its rights in any lien securing those loans, even if the

HN\1100136.2

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

       41.    As explained in detail herein and in the First Day Declaration, the DIP Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length, good faith negotiations between the Debtors and the Co-Administrative Agents. The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Documents other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of Bankruptcy Code Section 364(e), and are entitled to all of the protections afforded by that section.

**D.**    <u>**The Automatic Stay Should Be Modified on a Limited Basis**</u>

       42.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to (a) implement the postpetition financing and grant the security interests, liens and superpriority claims described above, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, (b) permit the DIP Lenders to exercise, upon the occurrence of an Event of Default (as defined in the Interim Order), all rights and remedies under the DIP Facility, and (c) implement the terms of the proposed DIP Orders.

24

43.    Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.  See, e.g., In re EnviroSolutions of New York, LLC, Case No. 10-11236 (SMB) (Bankr. S.D.N.Y. Apr. 15, 2010); In re Uno Rest. Holdings Corp., Case No. 10-10209 (MG) (Bankr. S.D.N.Y. Feb. 18, 2010); In re Reader's Digest Assoc., Inc., Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009); In re Lear Corp., Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009); In re Gen. Growth Props. Inc., Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009); In re Tronox Inc., Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Feb. 6, 2009); In re Chemtura Corp., Case No. 09-11233 (REG) (Bankr. S.D.N.Y. Apr. 29, 2009).

### E.    The Debtors Require Immediate Access to the DIP Facility

44.    Pursuant to Bankruptcy Rule 4001, the Court may grant interim relief in respect of a motion filed pursuant to Bankruptcy Code Section 363(c) or 364 where, as here, interim relief is "necessary to avoid immediate irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under Bankruptcy Rule 4001, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. See Ames Dep't Stores, 115 B.R. at 36.

45.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors  to borrow up to $15 million under the DIP Facility, is not granted promptly after the Petition Date.  The credit provided under the DIP Facility will help restore the confidence of the Debtors' vendors, customers and key constituents which, in turn, should encourage them to resume ongoing relationships with the Debtors and enhance the value of the Debtors' estates.  In contrast, without the financing provided under the Proposed DIP Facility, the Debtors could be forced to curtail or even terminate all or a portion of their business operations, to the material detriment of all parties

in interest.  Accordingly, the Debtors need to ensure that working capital is available immediately.

46.     Therefore, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).  Further, for these same reasons, the Debtors seek a waiver, to the extent applicable, of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

**F.    Request for a Final Hearing**

47.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no later than forty-five (45) days after the Petition Date, to hold a hearing to consider entry of the Final Order and the permanent approval of the relief requested in this Motion and the Term Facility.  The Debtors intend to file the documentation relating to the Term Facility as well as a proposed Final Order prior to the Final Hearing.  The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to entry of the Final Order, upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

## MOTION PRACTICE

48.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion.  Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

HN\1100136.2

## NOTICE OF MOTION AND INTERIM ORDER

49.    Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware, (b) counsel to the Debtors' postpetition secured lender, (c) counsel to Shell Western Exploration and Production, Inc., the Debtors' prepetition lender, (d) counsel to the Indenture Trustee under the Debtors' prepetition 2016 Senior Secured Notes (as defined in the Blackwell Declaration); (e) the Securities and Exchange Commission; (f) counsel to the Environmental Protection Agency; (g) counsel to the ad hoc group of holders of 13% Senior Secured Notes Due 2016; (h) the Internal Revenue Service; (i) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (j) the United States Attorney General for the District of Delaware; and (k) the Attorneys General for the states in which the Debtors conduct business (collectively, the "**Initial Notice Parties**"). The Debtors submit that, under the circumstances, no other or further notice is required.

50.    A copy of the Motion is available on the Court's website: www.deb.uscourts.gov. Additional copies of the Motion are available for free on the website of the Debtors' proposed claims and noticing agent, Prime Clerk LLC, at http://cases.primeclerk.com/gfes, or can be requested by calling (855) 410-7359 from within the United States or +1 (646) 795-6960 if calling from outside the United States.

51.    In the event the Court enters the Interim Order, within five (5) business days thereafter, the Debtors propose to serve notice of such entry on the Initial Notice Parties and all parties that have filed prior to such service date requests for notice pursuant to Bankruptcy Rule 2002. The notice will provide that any objections to the relief granted in the Interim Order must be filed with the Court and served upon counsel for the Debtors no later than seven days prior to the final hearing to be held on the Motion (the "**Objection Deadline**"). If an objection is timely filed and served prior to the Objection Deadline, such objection will be heard at the final

HN\1100136.2

hearing on the Motion.  If no objections are timely filed and served, the Debtors' counsel will file a certification of counsel to that effect attaching a final form of order.

**NO PRIOR REQUEST**

52.      No prior motion for the relief requested herein has been made to this Court or any other court.

HN\1100136.2

WHEREFORE, the Debtors respectfully request that the Court enter the Interim

Order and the Final Order granting the relief requested herein and such other further relief as the

Court deems appropriate.

Dated:  October 27, 2013                         Respectfully Submitted,
Wilmington, Delaware

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

          -and-

Josef S. Athanas
Caroline A. Reckler
Sarah E. Barr
Matthew L. Warren
LATHAM & WATKINS LLP
Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

Proposed Counsel for Debtors and Debtors in Possession

HN\1100136.2