## Exhibit A

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
In re:                                    :   Chapter 11
                                          :
GREEN FIELD ENERGY SERVICES, INC., et     :   Case No. 13-12783 (_____)
al.,                                      :
                                          :   Jointly Administered
                      Debtors.1           x
------------------------------------------------------------
```

### INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364 AND 507(b), AND (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b) AND (c)

Upon the motion (the "**Motion**"),[2] dated October 27, 2013, of Green Field Energy Services, Inc. ("**GFES**" or the "**Borrower**") and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**" or the "**Borrowers**") in the above-captioned chapter 11 cases (the "**Cases**"), pursuant to sections 105, 361, 362, 364 and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), seeking, among other things:

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax or organizational identification number, are: Green Field Energy Services, Inc. (2539); Hub City Tools, Inc. (2827); and Proppant One, Inc. (6035).  The above-captioned Debtors' mailing address is 4023 Ambassador Caffery Parkway, Suite #200, Lafayette, LA 70503.

[2]    All capitalized terms used herein but not otherwise defined have the meanings given to them in the Motion.

(1)      authorization for the Debtors to obtain post-petition financing, provided by GB

Credit Partners, LLC (together with its successor and assigns, "**GB**"), ICON Capital, LLC

(together with its successors and assigns, "**ICON**", and together with GB, the "**Co-**

**Administrative Agents**"), and certain other financial institutions and other entities selected by

GB and ICON from time to time (each, a "**DIP Lender**", and collectively, the "**DIP Lenders**"),

consisting of (a) a superpriority, secured term loan in the principal amount of $15,000,000,

consisting of and evidenced by (i) this Interim Order, (ii) that certain Bridge Note executed by

the Debtors in favor of the Co-Administrative Agents maturing forty-five (45) days after the

Petition Date in the form attached to the Motion as Exhibit C (the "**Bridge Note**"), and (iii) the

Fee Letter executed by the Debtors in favor of Co-Administrative Agents (the "**Fee Letter**",

together with the Bridge Note, and the Interim Order, the "**Bridge Loan**"), and (b) a

superpriority, secured term note in the principal amount of $30,000,000 (all documents, notes,

instruments and agreements to be negotiated and executed in connection therewith, the "**Term**

**Facility**");

(2)      authorization for the Debtors to execute and enter into the Bridge Note and the

Fee Letter and to execute, enter into and perform all such other and further acts as may be

required in connection with the Bridge Loan and this Interim Order;

(3)      authorization for the granting of liens and security interest in substantially all the

Debtors' assets pursuant to (a) section 364(c)(2), (b) section 364(c)(3), and (c) as described more

fully below, on a priming and senior basis pursuant to section 364(d), as to: (i) the lenders (the

"**Pre-Petition Shell Lenders**") pursuant to that certain Contract for High Pressure Fracturing

Services, dated as of September 2, 2011 (as amended, together with any and all other agreements

2

between any of the Debtors and the Pre-Petition Shell Lenders, the "**Pre-Petition Shell Credit Agreement**"), with Shell Western Exploration and Production, Inc. (predecessor-in-interest to SWEPI LP, "**Shell**" and the credit facility evidenced thereby, the "**Pre-Petition Shell Credit Facility**"), and as to (ii) the holders (the "**Noteholders**", and together with Shell, the "**Pre-Petition Secured Lenders**") of those certain 13% Senior Secured Notes due 2016 in the aggregate principal amount of $255,948,000 (together with any and all other agreements between the Noteholders and any of the Debtors, the "**Pre-Petition Senior Secured Notes**"), subject to that certain Indenture dated November 15, 2011 (as amended or supplemented, the "**Indenture**", and together with the Pre-Petition Senior Secured Notes and the Pre-Petition Shell Credit Agreements, the "**Pre-Petition Credit Agreements**"), among Green Field Energy Services, Inc., as Issuer, Hub City Tools, Inc. as guarantor, and Wilmington Trust, National Association, as Trustee and Collateral Agent (the "**Indenture Trustee**"), whose liens and security interests are being primed by the financing provided in this Interim Order;

(4)    the granting of superpriority claims under section 364(c)(1) of the Bankruptcy Code to the DIP Lenders payable from, and having recourse to, all pre-petition and post-petition property of the Debtors' estates and all proceeds thereof, subject to the Carve Out;

(5)    subject only to and effective upon entry of the Final Order, the limitation of the Debtor's right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code;

(6)    pursuant to Bankruptcy Rule 4001, that an interim hearing (the "**Interim Hearing**") on the Motion be held before this Court to consider entry of this Interim Order: (a) authorizing the Debtors to forthwith borrow the aggregate face amount not to exceed $15,000,000 under the Bridge Loan for (i) the payment of fees and expenses incurred in

3

connection with these Chapter 11 Cases, and (ii) for ongoing working capital and for other general corporate purposes of the Debtors; and (b) granting the liens, claims and other protections to the Co-Administrative Agents and the DIP Lenders as described herein; and

(7)    that this Court schedule a final hearing (the "**Final Hearing**") to be held within forty-five (45) days of the entry of this Interim Order to consider entry of a final order (the "**Final Order**") approving on a final basis the relief granted herein, and to approve the Debtors' entry into the Term Loan Facility.

Due and appropriate notice of the Motion, the relief requested therein and the Interim Hearing having been served by the Debtors on the: (a) the United States Trustee for the District of Delaware, (b) counsel to the DIP Lenders, (c) counsel to Shell Western Exploration and Production, Inc., (d) counsel to the Indenture Trustee; (e) the Securities and Exchange Commission; (f) counsel to the Environmental Protection Agency; (g) the Internal Revenue Service; (h) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (i) any party asserting an interest in the Debtors' assets of which the Debtors are aware, (j) the attorney general in each state in which the Debtors operate and (k) counsel to the ad hoc group of holders of Noteholders.

The Interim Hearing having been held by this Court on October 29, 2013.

Upon the record made by the Debtors in the Motion, the *Declaration of Earl J. Blackwell, the Chief Financial Officer of Green Field Energy Services, Inc. in Support of Chapter 11 Petition and First Day Pleadings*, and at the Interim Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Disposition.*  The Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.    *Jurisdiction.*  This Court has core jurisdiction over the Case, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    *Notice.*  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, on October 27, 2013, to certain parties in interest, including: (a) the United States Trustee for the District of Delaware, (b) counsel to the DIP Lenders, (c) counsel to Shell Western Exploration and Production, Inc., (d) counsel to the Indenture Trustee; (e) the Securities and Exchange Commission; (f) counsel to the Environmental Protection Agency; (g) the Internal Revenue Service; (h) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (i) any party asserting an interest in the Debtors' assets of which the Debtors are aware, (j) the attorney general in each state in which the Debtors operate and (k) counsel to the ad hoc group of holders of Noteholders.  Under the circumstances, such notice of the Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules.

4.    *Pre-Petition Collateral Structure*[3]

(a)    GFES's obligations to repay "Indebtedness" under and as defined in the Pre-Petition Shell Credit Agreement (the "**Pre-Petition Shell Credit Obligations**") were to be secured by security interests in and liens on certain of GFES's equipment and motor vehicles (the "**Shell Collateral**").    Although certain of the Pre-Petition Shell Credit Obligations may be secured by valid liens on and security interests in certain of the Shell Collateral (such Shell Collateral, the "**Valid Pre-Petition Shell Credit Collateral**" and, such liens and security interests, the "**Valid Pre-Petition Shell Credit Facility Liens**"), the Debtors contend that certain of such security interests and liens are invalid due to Shell's failure to properly perfect such liens and security interests outside the preference period (such Shell Collateral, the "**Shell Invalid Collateral**" and, such liens and security interests, the "**Shell Invalid Liens**").

(b)    To the extent there exist Valid Pre-Petition Shell Credit Facility Liens, they are entitled to priority of payment over the Indenture Liens (as defined below) from the proceeds of the Valid Pre-Petition Shell Credit Collateral pursuant to the terms of the Intercreditor Agreement (as defined below).

(c)    All obligations under the Indenture payable under the Notes and documents related thereto are allegedly secured by first-priority liens on and security interests (the "**Indenture Liens**") in substantially all of the assets of GFES and Hub City (collectively, the "**Indenture Collateral**"), subject to the terms of the Intercreditor Agreement and the Pre-Petition Permitted Encumbrances (as defined below).

---

3    The below summary of the Debtors' prepetition collateral structure is intended for informational purposes only and shall not constitute a finding as to the validity of any indebtedness of the Debtors nor prohibit any party, including, without limitation, the Debtors, from challenging any aspect of such financing.

(d)     Shell and the Indenture Trustee are party to that certain Amended and Restated Intercreditor Agreement, dated October 24, 2012 (as amended, the "**Intercreditor Agreement**"). Under the terms of the Intercreditor Agreement, the Indenture Trustee is deemed to consent to the transactions, liens, security interests and other relief requested in the Motion and provided in this Order to the extent consented to by Shell.

(e)     Shell has consented to the transactions, liens, security interests and other relief requested in the Motion and provided in this Order. The Indenture Trustee and Noteholders are deemed to have consented to the transactions, liens, security interests and other relief requested in the Motion and provided in this Order pursuant to the terms of the Indenture and the Intercreditor Agreement.

5.     *Findings Regarding the Bridge Loan.*

(a)     Good cause has been shown for the entry of this Interim Order.

(b)     The Debtors have an immediate need to obtain the Bridge Loan in order to provide, among other things, working capital and for the orderly continuation of the operation of their business, to maintain business relationships with vendors, suppliers and customers, to make payroll and to satisfy other working capital and other operational needs.  The access of the Debtors to sufficient working capital and liquidity, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtors and to a successful reorganization of the Debtors.

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the Bridge Loan and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.

The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the DIP Lenders, subject to the Carve Out as provided for herein, the DIP Liens and the Superpriority Claims (as defined below) under the terms and conditions set forth in this Interim Order and in the Bridge Loan.

(d)      The terms of the Bridge Loan appear to be fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)      The Bridge Loan has been negotiated in good faith and at arm's length among the Debtors and the DIP Lenders, and all of the Debtors' indebtedness and obligations, including the priority thereof, arising under, in respect of or in connection with the Bridge Loan, including, without limitation: (i) the Bridge Note; (ii) the Fee Letter; (iii) the obligations of the Debtors to DIP Lenders under the Bridge Loan, including any obligation to indemnify the DIP Lenders, to pay the DIP Lenders' fees and expenses, including but not limited to professional fees, and the Term Fee (all of the foregoing in clauses (i), (ii) and (iii) collectively, the "**DIP Obligations**"); and (iv) any liens and security interests and the priority thereof granted by this Interim Order, shall be deemed to have been extended by the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364 of the Bankruptcy Code, and the DIP Lenders (and the successors and assigns of each) shall be entitled to the full protection of section 364 of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  This finding of good faith and protection provided by

8

section 364(e) of the Bankruptcy Code with respect to the Bridge Loan and DIP Obligations shall not be in any way impacted or affected by the DIP Lenders' determination of whether or not to enter into the Term Facility with the Debtors.

(f)     The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2.  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the Bridge Loan in accordance with this Interim Order and other governing documents is therefore in the best interests of the Debtors' estates.

6.     *Authorization of the Bridge Loan and Conditions Precedent*

(a)     The Court hereby approves and authorizes the Debtors to enter into and perform all obligations under the Bridge Loan and hereunder.  The Debtors are hereby authorized to borrow money up to an aggregate face amount of $15,000,000 pursuant to the terms and conditions governing the Bridge Loan (in each case plus interest, fees, and other expenses and amounts provided by the Bridge Loan and this Interim Order), which borrowings shall be used for all purposes permitted by the Bridge Loan and this Interim Order, including, without limitation, to provide for ongoing working capital for the Debtors and their subsidiaries and other operational needs and to pay fees and expenses in accordance with the Bridge Loan and this Interim Order.

(b)     In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of

security agreements and financing statements), and to pay all fees required or necessary for the Debtors' performance of their obligations under the Bridge Loan, including, without limitation:

   (i) the execution, delivery and performance of the documents evidencing and governing the Bridge Loan and any exhibits attached thereto;

   (ii) the execution, delivery and performance of one or more amendments to or waivers of the requirements of the Bridge Loan for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the DIP Loan among the DIP Lenders, in each case in such form as the Debtors and the DIP Lenders may agree (it being understood that no further approval of the Court shall be required for amendments to the Bridge Loan that do not shorten the maturity of the extensions of credit thereunder, increase the commitments, the rate of interest thereunder or make any other material modification to the Bridge Note); provided, however, that the Debtors shall provide notice of any such amendment to the U.S. Trustee, and lead counsel to the Committee as soon as reasonably practicable;

   (iii) the non-refundable and indefeasible payment to the DIP Lenders of the fees and any amounts due (or that may become due) (a) in respect of the indemnification obligations referred to in the Bridge Loan; (b) any and all fees and expenses of the DIP Lenders' professionals referenced in the Budget incurred prior to and in connection with closing the Bridge Loan; (c) costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the DIP Lenders' professionals referenced in the Budget; and (d) the Term Fee (defined below), each without the need to file retention motions or fee applications,

or to provide notice to any party other than as set forth in this Order (provided, however, that paragraph 26 hereof shall not apply to subsections (b) or (d) of this subsection (iii)); and

      (iv)     the performance of all other acts required under or in connection with the Bridge Loan.

    (c)     Upon execution and delivery of the Bridge Loan, the Bridge Loan shall constitute valid, binding and unavoidable obligations of the Debtors, enforceable against the Debtors in accordance with the terms thereof and of this Interim Order. No obligation, payment, transfer or grant of security under the Bridge Loan or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, any claim or cause of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**") or under any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or other similar state statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim or counterclaim.

    7.     *Term Facility.*

    (a)     The Debtors have requested that the DIP Lenders negotiate the terms and conditions of the Term Facility. The Debtors have requested that the Term Facility provide for the refinancing of the indebtedness under the Bridge Loan and provide additional liquidity to the Debtors. If, within twenty-one days after the entry of this Interim Order, the DIP Lenders and the Debtors come to an agreement on the documentation as to the Term Facility, the Term

11

Facility will be filed, and approval of the Term Facility will be heard at the Final Hearing (defined below) or at such other time as the parties request and the Court is available.

(b)    In order to avoid delay, the Debtors have requested that the DIP Lenders begin work immediately on the documents evidencing and governing a potential Term Loan while simultaneously negotiating the documentation thereof.    Payment of the fees and expenses provided in this paragraph is essential for the parties to undertake the necessary tasks in time associated with the preparation, negotiation, and facilitation of the Term Loan and related documents.    In lieu of providing an advance work fee for such preparation, negotiation and facilitation, the parties have agreed, and the Court hereby orders, that all fees, costs and expenses incurred by the DIP Lenders with respect to negotiating, preparing, and drafting the documents evidencing and governing the Term Loan, shall be paid by the Debtors' estates, and as such shall be given the same level claim, and secured by the same Collateral of the same priority, as the Bridge Loan and shall comprise part of the DIP Obligations (the "**Term Fee**").    The Term Fee shall be paid on the earlier of (i) the closing of the Term Loan, and (ii) ten days after written request made by a DIP Lender; provided, however, that solely with respect to (ii), the review provisions provided in paragraph 26 of this Interim Order shall apply and such payment will be made consistent therewith.

(c)    Nothing in this Interim Order shall bind or require the DIP Lenders to extend any additional credit to the Debtors, including but not limited to the Term Facility.

8.    *Superpriority Claims for DIP Lenders.*

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative

expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "**Superpriority Claims**"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and their estates and all proceeds thereof, subject only to the Carve-Out.

(b)      For purposes hereof, the "**Carve-Out**" shall mean, after the first business day following the delivery by the DIP Lenders of a Carve-Out Trigger Notice (the earlier of the such business day following such delivery and the Maturity Date, the "**Carve-Out Date**"), (1) with respect to each estate professional, all fees or expenses incurred prior to the Carve-Out Date, and ultimately allowed by the Bankruptcy Court, for each such professional, up to the cumulative amount specified for such professional set forth in the Professional Fee Budget for all calendar months through and including the calendar month in which the Carve-Out Date occurs, plus (2) (A) amounts not exceeding (i) $750,000, which amount may be used, subject to the terms of this Interim Order, to pay any allowed fees or expenses incurred following the Carve-Out Date by Latham & Watkins, LLP, co-counsel to the Debtors, plus (ii) $150,000, which amount may be used, subject to the terms of this Interim Order, to pay any allowed fees or expenses incurred following the Carve-Out Date by Young Conaway Stargatt & Taylor, LLP, co-counsel to the Debtors, plus (iii) $100,000, which amount may be used, subject to the terms of this Interim

Order, to pay any allowed fees or expenses incurred following the Carve-Out Date by Carl

Marks Advisory Group LLC, investment banker to the Debtors, plus (iv) $250,000, which

amount may be used, subject to the terms of this Interim Order, to pay any allowed fees or

expenses incurred following the Carve-Out Date by Alvarez & Marsal North America, LLC,

restructuring consultant to the Debtors, plus (v) $40,000, which amount may be used, subject to

the terms of this Interim Order, to pay any allowed fees or expenses incurred following the

Carve-Out Date by Prime Consulting LLC, solicitation agent to the Debtors, plus (vi) $100,000,

which amount may be used subject to the terms of this Interim Order, to pay any allowed fees or

expenses incurred following the Carve-Out Date by the Committee (if any), plus (B) any unpaid

fees due to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a).  Notwithstanding the

foregoing, (1) the applicable dollar limitations on fees and expenses for each of the foregoing

professionals set forth above shall neither be reduced nor increased by the amount of any

compensation or reimbursement of expenses incurred, awarded or paid to such professional for

the period concluding on the Carve-Out Date (so long as any such fees and expenses do not

exceed the cumulative amount specified for such professional in the Professional Fee Budget),

and (2) nothing herein shall be construed to impair the ability of any party to object to the fees,

expenses, reimbursement or compensation described above.

    (c)    For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written

notice delivered by DIP Lenders to the Debtors' lead counsel, the U.S. Trustee, and lead counsel

to the Committee, which notice may be delivered following the occurrence and during the

continuation of an Event of Default under the Bridge Loan or this Interim Order.

Notwithstanding the foregoing, so long as the Carve-Out Trigger Notice has not been delivered,

the Debtors shall be permitted to pay fees and expenses payable under 11 U.S.C. § 330 and § 331 and approved by order of the Bankruptcy Court, as the same may become due and payable, but subject to the other terms and conditions of the Bridge Loan and this Interim Order (such fees and expenses, "**Allowed Fees and Expenses**"), including, without limitation, Committee's Professional Fees (as defined below); provided that the Allowed Fees and Expenses of each estate professional shall not exceed the cumulative fees and expenses set forth in the Professional Fee Budget through the Carve-Out Date for such professional, and such Allowed Fees and Expenses shall not reduce the Carve-Out amount designated to such professional in clause (2)(A) of paragraph 8(b) of this Order.

(d)      No portion of (i) the Carve-Out, (ii) any Bridge Loan proceeds, (iii) the Collateral, proceeds therefrom or other proceeds, or (iv) other property or assets of the Debtors may be used for the payment of the fees and reimbursement of expenses of any person that were incurred in (x) challenging (other than payment of the Debtors' professional fees incurred in opposing such challenge), or in relation to, among other things, the challenge of, any of the security interests, liens or claims of any or all of the DIP Lenders or (y) investigating, initiating, or prosecuting any claim or action against any or all of the DIP Lenders or any of their respective advisors, agents and sub-agents, including any claim under chapter 5 of the Bankruptcy Code, any claim under state or foreign law, the commencement or participation in formal discovery proceedings in anticipation of any such claim or action, or the threat or assertion of any other lender liability or other claim or cause of action against any of the DIP Lenders.

9.     *DIP Liens*.

As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lenders of, or over, any Collateral (as defined below), the following security interests and liens are hereby granted to the Co-Administrative Agents for the benefit of the DIP Lenders and any of their affiliates, as applicable (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "**Collateral**"), subject to the payment of the Carve Out as provided for herein (all such liens and security interests granted to the DIP Lenders pursuant to this Interim Order and the Bridge Loan, the "**DIP Liens**"):

(a)     *First Lien on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, perfected first-priority liens on and security interests in all of the Debtors' assets, including, without limitation, all goods, investment property, as-extracted-collateral, inventory, accounts, deposit accounts, securities accounts, chattel paper, documents, instruments, letter-of-credit rights, supporting obligations, intellectual property, contract rights, general intangibles, equipment, real property, commercial tort claims, the Prepetition Segregated Funds (defined below), Post-Petition Segregated Funds (defined below), Unencumbered Segregated Funds (defined below), tax refunds and similar tax payments of the Debtors, whether now owned or hereafter acquired or coming into existence, and wherever located, and all accessions, products and proceeds thereof (including, without limitation, insurance proceeds, claims, damages and proceeds of suit) of the foregoing (other than chapter 5 avoidance actions

and the proceeds thereof) that are not subject to the Pre-Petition Permitted Encumbrances (as defined below);

(b) *Priming Liens on Pre-Petition Collateral.*  Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, perfected junior liens on and security interests in the Debtors' assets that are subject to valid, enforceable, properly perfected, non-avoidable security interests or liens in existence as of the Petition Date, including the Pre-Petition Segregated Funds and Post-Petition Segregated Funds (which liens shall not include the Indenture Liens, the Valid Pre-Petition Shell Credit Facility Liens or the Shell Invalid Liens and which assets shall not include the Indenture Collateral, the Valid Pre-Petition Shell Credit Collateral or the Shell Invalid Collateral) (the "**Pre-Petition Permitted Encumbrances**");

(c) *Liens Senior to Certain Other Liens.*  Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, perfected first-priority priming liens on and security interests in (i) the Valid Pre-Petition Shell Credit Collateral and the Shell Invalid Collateral, (ii) the Indenture Collateral, and (iii) the Prepetition Segregated Funds and Post-Petition Segregated Funds (any security interests, liens, and encumbrances in or on the Debtors' assets described in the immediately preceding clauses (i), (ii) and (iii), the "**Primed Liens**");

(d) All such security interests provided in this Interim Order shall be created and perfected automatically pursuant to the Interim Order and the Bridge Loan;

(e) Notwithstanding the foregoing, the Collateral shall exclude those assets as to which the DIP Lenders determine in their sole discretion that the granting of a security interest in such assets would be prohibited by contract or applicable law unless such prohibition is not effective under applicable law.

17

(f)    Any terms (whether capitalized or lower case) used herein that are defined in the Uniform Commercial Code (the "**UCC**") shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided that to the extent that the UCC is used to define any term used herein and if such term is defined differently in different articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

10.    *Segregation of Certain Funds.* All cash in the Debtors' bank accounts as of entry of this Interim Order, and all proceeds of any of the Debtors' pre-petition accounts received on or after entry of this Interim Order, shall be deposited into a segregated bank account (the "**Pre-petition Segregated Funds**"). All proceeds of any of the Debtors' post-petition accounts received on or after entry of this Interim Order, solely to the extent relating to the Valid Pre-Petition Shell Credit Collateral, the Shell Invalid Collateral or the Indenture Collateral, shall be deposited into a segregated bank account (the "**Post-petition Segregated Funds**" and together with the Pre-petition Segregated Funds, the "**Segregated Funds**"). All proceeds of any sale of the Debtors' pre-petition unencumbered assets shall be deposited into a segregated bank account subject solely to the DIP Liens (the "**Unencumbered Segregated Funds**").

11.    *Protection of DIP Lenders' Rights.*

(a)    So long as there are any DIP Obligations outstanding, unless otherwise ordered by the Court, the Pre-Petition Secured Parties shall (i) have no right to and shall take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Pre-Petition Credit Agreements, or otherwise seek to exercise or exercise any enforcement rights or remedies against any Collateral, (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, Collateral, to the extent such transfer, disposition, sale or release is

18

authorized under the Bridge Loan and this Interim Order, (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action with respect to their security interests in the Collateral unless, solely as to this clause (iii) as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date and (iv) deliver or cause to be delivered, at the Debtors' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the Collateral subject to any sale or disposition.

(b)      The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Co-Administrative Agents and DIP Lenders to enforce all of their rights under the Bridge Loan and this Interim Order and to exercise all rights and remedies under the Bridge Loan and hereunder; provided that such rights and remedies that are exercisable only upon an Event of Default shall require the giving of four (4) business days' prior written notice to the Debtor, with a copy to counsel for the Pre-Petition Secured Lenders, to the United States Trustee, and to any committee appointed in this Case (the "**Default Notice Period**"). In any hearing regarding any exercise of rights or remedies under the Bridge Loan or hereunder (which hearing must take place within the Default Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors, the Pre-Petition Secured Lenders, any committee appointed in these bankruptcy cases and all other parties in interest hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of

the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights

and remedies of the Co-Administrative Agents or DIP Lenders set forth in this Interim Order or

the Bridge Loan.  Notwithstanding the foregoing, during the Default Notice Period, the Debtors

shall be permitted to use the DIP Obligations to fund (i) the then-accrued unpaid payroll

expenses and related taxes, (ii) other critical expenses necessary to preserve the Debtors' assets,

in each case in accordance with the Budget, and not to exceed an aggregate of $250,000, and (iii)

such other payments as are agreed to in writing by the Co-Administrative Agents.  In no event

shall the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine

with respect to the Collateral.

      12.   *Limitation on Charging Expenses Against Collateral.*  Subject only to and

effective upon entry of the Final Order, except to the extent of the Carve Out, no expenses of

administration of the Case or any future proceeding that may result therefrom, including

liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged

against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or

any similar principle of law, without the prior written consent of the DIP Lenders, and no such

consent shall be implied from any other action, inaction, or acquiescence by the DIP Lenders.

      13.   *Perfection of DIP Liens*

      (a)   The Co-Administrative Agents, on behalf of the DIP Lenders, are hereby

authorized, but not required, to file or record (and to execute in the name of the Debtors, as their

true and lawful attorney, with full power of substitution, to the maximum extent permitted by

law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or

similar instruments in any jurisdiction, or take possession of or control over assets, or take any

other action, in each case, in order to validate and perfect the liens and security interests granted to it hereunder. Whether or not the Co-Administrative Agents, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and date of the entry of this Interim Order. Upon the request of the Co-Administrative Agents, each of the Pre-Petition Secured Lenders, without any further consent of any party, is authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the Co-Administrative Agents to further validate, perfect, preserve and enforce the DIP Liens.

(b)    A certified copy of this Interim Order may, in the discretion of the Co-Administrative Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording. For the avoidance of doubt, the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Lenders to take all actions, as applicable, referenced in this subparagraph (b) and in the immediately preceding subparagraph (a).

(c)    Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for the Debtors to pledge, grant,

21

sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code and shall have no force and effect with respect to the grant of DIP Liens, in such leasehold interest or the proceeds of any assignment and/or sale thereof by the Debtors, in favor of the Co-Administrative Agents, on behalf of the DIP Lenders, in accordance with the terms of the Bridge Loan and of this Interim Order.    In addition, all governmental (domestic and foreign), shareholder, corporate, and third party consents have been obtained or are hereby overridden by the terms of this Interim Order.

14.    *Preservation of Rights Granted Under this Interim Order.*

(a)    No claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the Co-Administrative Agents or to the DIP Lenders shall be granted or allowed while any portion of the Bridge Loan or the DIP Obligations remains outstanding, and the DIP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)    Unless all DIP Obligations shall have been indefeasibly paid in full, the Debtors shall not seek, and in addition to the other Events of Default set forth below, it shall constitute an Event of Default hereunder if the Debtors seek, or if there is entered, (i) any modifications or extensions of this Interim Order without the prior written consent of the DIP Lenders, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lenders, or (ii) an order converting or dismissing the Case; (iii) an order appointing a chapter 11 trustee in

22

the Case; or (iv) an order appointing an examiner with enlarged powers in the Case.  In the event

of the entry of any order dismissing the Case under section 1112 of the Bankruptcy Code or

otherwise, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy

Code) that (i) the Superpriority Claims, priming liens, security interests and replacement security

interests granted to the Co-Administrative Agents, on behalf of the DIP Lenders, pursuant to this

Interim Order and the Bridge Loan, shall continue in full force and effect and shall maintain their

priorities as provided in this Interim Order until all DIP Obligations and shall have been paid and

satisfied in full (and that such Superpriority Claims, DIP Liens and replacement security

interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii)

this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing

the claims, liens and security interests referred to in clause (i) above.

(c)    If any or all of the provisions of this Interim Order are hereafter reversed,

modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the

validity of any DIP Obligations incurred prior to the actual receipt of written notice by the Co-

Administrative Agents and the DIP Lenders, as of the effective date of such reversal,

modification, vacation or stay or (ii) the validity or enforceability of any lien or priority

authorized or created hereby or pursuant to the Bridge Loan with respect to any DIP Obligations.

Notwithstanding any such reversal, modification, vacation or stay, of any DIP Obligations

incurred by the Debtors to the Co-Administrative Agents and DIP Lenders prior to the actual

receipt of written notice by the Co-Administrative Agents and DIP Lenders of the effective date

of such reversal, modification, vacation or stay shall be governed in all respects by the original

provisions of this Interim Order, and the DIP Lenders shall be entitled to all the rights, remedies,

23

privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the Bridge Loan with respect to the DIP Obligations.

(d)     Except as expressly provided in this Interim Order or in the Bridge Loan, the DIP Liens, the Superpriority Claims and all other rights and remedies of the Co-Administrative Agents and DIP Lenders granted by the provisions of this Interim Order and the Bridge Loan shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting the Case to a case under chapter 7, dismissing the Case, terminating the joint administration of this Case or by any other act or omission, (ii) the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the Bridge Loan and hereunder) or (iii) the entry of an order confirming a plan of reorganization in the Case and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations.   The terms and provisions of this Interim Order and the Bridge Loan shall continue in this Case, in any successor case, or in any superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Lenders granted by the provisions of this Interim Order and the Bridge Loan shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full unless otherwise consented to in writing in advance by the Co-Administrative Agents and DIP Lenders in their sole discretion.

15.     *Operations Pursuant to Approved Budget.*

(a)     During the term of this Interim Order, the Debtors shall operate pursuant to the budget attached to the Motion, which is hereby approved by the Court to the extent applicable to

the period of this Interim Order.   As used herein, "**Budget**" means, with respect to each of the Debtors, (i) the initial 13-week cash flow budget attached to the Motion and the monthly budget of professional fees (the "**Professional Fee Budget**"), which is attached hereto as Exhibit A, setting forth, for each of the Debtors, (x) projected cash receipts, (y) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Cases, capital expenditures, asset sales, and estimated fees and expenses of the Co-Administrative Agents and DIP Lenders (including only one restructuring counsel and one Delaware counsel) and any other fees and expenses relating to the Term Loan Facility) and (z) the unused availability under the Bridge Loan and unrestricted cash on hand (collectively, "**Aggregate Liquidity**"), and (ii) such updated "rolling" 13-week cash flow budgets, provided bi-weekly to supplement and replace the Budget then in effect.

(b)      The Budget shall include the aggregate budgeted disbursements for the fees, costs and disbursements of professionals for any statutory committee of unsecured creditors (if appointed) (the "**Committee**") (collectively, the "**Committee's Professional Fees**").

(c)      Commencing with the first Tuesday after the Petition Date and on every Tuesday thereafter during the term of this Interim Order, the Debtors shall provide to the Co-Administrative Agents a Budget variance report/reconciliation report certified by the Chief Financial Officer, Chief Restructuring Officer or Deputy Chief Restructuring Officer of the Debtors or their designee(s), in form acceptable to the Co-Administrative Agents, setting forth (i) the actual cash receipts, expenditures, disbursements and the Aggregate Liquidity for the trailing four weeks then ending and (ii) the variance in dollar amounts of the actual expenditures, disbursements and Aggregate Liquidity for such trailing four-week period from those budgeted

25

amounts for the corresponding period reflected in the Budget (each such report, a "**Variance Report**").

(d)     First measured on the fourth Tuesday after the Petition Date, and on every Tuesday thereafter during the term of this Interim Order, the Debtors are permitted a maximum aggregate variance of 10% from any line item within Budget, as reflected on a Variance Report. Variance testing shall be conducted upon delivery of a Variance Report by the Debtors and shall be based on Variance Report data applicable to the then-ended trailing four-week period, excluding professional fees, on a cumulative basis.

16.     *Mandatory Prepayments.* The Debtors shall make mandatory prepayments in an amount equal to (a) 100% of the net proceeds of casualty insurance relating to the Collateral, and (b) 100% of the net proceeds from the sale (or series of sales) of Collateral (subject to exceptions for dispositions of inventory and collections of accounts receivable for services rendered in the ordinary course of business, the reinvestment of proceeds of such sales, and other exceptions mutually agreed upon by the Debtors and the DIP Lenders); provided that the Debtors are hereby authorized to utilize the first $2.5 million of Unencumbered Segregated Funds to pay post-petition expenses subject to the Budget.

17.     *Limitation on Use of DIP Financing Proceeds and Collateral.* Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, Collateral or the Carve Out may be used, in the Case or any other proceeding of any kind, or in any jurisdiction, to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the Bridge Loan or the liens or claims granted under this Interim Order, (b) investigate, assert or prosecute any claims and defenses or causes of

26

action against the DIP Lenders or their respective agents, affiliates, representatives, attorneys or advisors, (c) prevent the DIP Lenders' assertion, enforcement or realization on the Collateral in accordance with the Bridge Documents or this Interim Order, (d) seek to modify any of the rights granted to the Co-Administrative Agents, DIP Lenders or under the Bridge Loan, in each of the foregoing cases without such applicable party's prior written consent, or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the Bridge Loan.

18.    *Events of Default*.  The occurrence or existence of the following events shall constitute an Event of Default hereunder, which, in addition to any and all defaults and Events of Default provided in the Bridge Loan shall be referred to herein as an "**Event of Default**":

(a)    any Debtor fails to make any payment of principal, interest, professional and other fees or any other amounts payable under the Bridge Loan or hereunder when due;

(b)    any Debtor fails to perform or is in default under (i) the financial covenant related to the variance set forth herein related to the Budget or (ii) any of the other covenants or obligations contained in the Bridge Note or in the Interim Order;

(c)    the use, disbursement or transfer of any of the Prepetition Segregated Funds without the prior written consent of the Co-Administrative Agents;

(d)    any change of control in the ownership or management of any Debtor shall occur;

(e)    any event shall occur that results in the material impairment of any security interest of the Co-Administrative Agents in the Collateral;

(f)    any material provision of the Bridge Note or this Interim Order shall for any reason cease to be valid, binding and enforceable with respect to any party hereto or thereto (other than

the Co-Administrative Agents and the DIP Lenders) in accordance with its terms, or any such

party shall challenge the enforceability hereof or thereof, or shall assert in writing, or take any

action or fail to take any action based on the assertion that any provision hereof or thereof has

ceased to be or is otherwise not valid, binding or enforceable in accordance with its terms, or any

security interest provided for in the Bridge Loan or this Interim Order shall cease to be a valid

and perfected first priority security interest in any of the Collateral purported to be subject

thereto;

  (g) any material loss with respect to the Collateral which is not covered by insurance,

or any material Collateral is not covered by insurance;

  (h) any Debtor dissolves or suspends or discontinues doing business (to the extent such

Debtor was engaged in business prior to the Petition Date), or if any is enjoined, restrained or in

any way prevented by any order from continuing to conduct all or any material part of its

business, other than as permitted herein;

  (i) the Bankruptcy Court shall enter any order(s) (i) amending, reversing, revoking,

supplementing, altering, staying, vacating, rescinding or otherwise modifying this Interim Order

or any other order with respect to the Chapter 11 Cases affecting in any material respect the

Bridge Loan, (ii) appointing a Chapter 11 trustee or an examiner in the Chapter 11 Cases with

enlarged powers relating to the operation of the business of any Debtor pursuant to Section 1104

of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases or converting any of the

Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, or (iv) granting relief from

the automatic stay for lien or reclamation claims in the aggregate amount in excess of $250,000

on the assets of the Debtors to permit any foreclosure upon or the reclamation of any of the Collateral;

(j)     any order(s) is entered approving a motion filed in the Chapter 11 Cases approving any superpriority claims aggregating an amount in excess of $250,000 in the Chapter 11 Cases (other than the Carve Out) which are *pari passu* with or senior to the claims of any of the Co-Administrative Agents or the DIP Lenders against any of the Debtors unless after giving effect to the transactions contemplated by such motion, all of the DIP Obligations shall be paid in full in cash; or

(k)    any motion shall be filed by the Debtors in the Chapter 11 Cases (i) seeking to obtain additional financing under Section 364 of the Bankruptcy Code and to use cash collateral of the DIP Lenders under Section 363(c) of the Bankruptcy Code without the consent of the Co-Administrative Agents and the DIP Lenders that does not provide for the indefeasible repayment of the DIP Obligations in cash at the closing of such new financing, (ii) subject to the entry of the Final Order, to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (iii) to take any other action or actions adverse to the Co-Administrative Agents or the DIP Lenders rights and remedies under the Bridge Loan or this Interim Order.

19.    *Remedies*

(a)     Upon the occurrence of an Event of Default and subject to compliance with section 11(b) hereof, all of the DIP Obligations shall become immediately due and payable, without any further demand, notice, further order of the Court or legal process of any kind.  In addition, subject to compliance with section 11(b) hereof, Co-Administrative Agents and DIP

Lenders shall be immediately entitled, without further order of the Court, to exercise any and all rights and remedies against the Debtors and/or the Collateral as provided herein, in the Bridge Loan, the UCC, and other applicable law, or otherwise, including their rights to take the following actions (all of which rights and remedies may be exercised without further notice to or consent by any of the Debtors):

      (i)    declare a termination, reduction or restriction on the ability of the Debtors to use any cash collateral derived from the proceeds of the Collateral;

      (ii)    with or without judicial process or the aid or assistance of others, enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or complete processing, manufacturing and repair of all or any portion of the Collateral;

      (iii)    require any Debtor, at the Co-Administrative Agents' and DIP Lenders' expense (such expense being a DIP Obligation), to assemble and make available to Co-Administrative Agents any part or all of the Collateral at any place and time designated by Co-Administrative Agents;

      (iv)    remove any or all of the Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose;

      (v)    collect, foreclose, receive, appropriate, setoff or realize upon any and all Collateral;

      (vi)    transfer any Collateral into the name of a Co-Administrative Agent or that of its nominee;

(vii)    sell, lease, transfer, assign, deliver or otherwise dispose of any of the Collateral at public or private sale at such prices or terms as Co-Administrative Agents may deem reasonable, for cash, upon credit or for future delivery, with the Co-Administrative Agents having the right to purchase the whole or any part of the Collateral at any such public sale, all of the foregoing being free from any right or equity of redemption of any Debtor, which right or equity of redemption is hereby expressly waived and released by Debtors;

(viii)    enforce the rights of any Debtor against any account debtor, secondary obligor or other obligor in respect of any accounts, including, without limitation, (a) notify any account debtor, secondary obligor or other obligor in respect thereof that the accounts have been assigned to Co-Administrative Agents and that Co-Administrative Agents have a security interest therein, (b) direct any account debtor, secondary obligor or other obligor to make payment of accounts directly to Co-Administrative Agents, (c) extend the time of payment of, compromise, settle or adjust for cash, credit, return of merchandise or otherwise, and upon any terms or conditions, any accounts or other obligations included in the Collateral and thereby discharge or release the account debtor, secondary obligor or other obligor in respect thereof without affecting any of the DIP Obligations, or (d) demand, collect or enforce payment of any accounts or other related obligations, but without any duty to do so, and Co-Administrative Agents and DIP Lenders shall not be liable for any failure to collect or enforce the payment thereof nor for the negligence of its agents or attorneys with respect thereto;

(ix)    file any action or proceeding which Co-Administrative Agents may deem necessary or appropriate to protect and preserve the right, title and interest of the Co-Administrative Agents and the DIP Lenders in the Collateral;

31

(x)       apply all sums received or collected from or on account of Collateral, including the proceeds of any sales thereof, to the payment of the costs and expenses incurred in preserving and enforcing rights of the Co-Administrative Agents and the DIP Lenders, including but not limited to reasonable attorneys' fees and legal expenses, and DIP Obligations secured by the Collateral in such order and manner as the Co-Administrative Agents in their sole discretion determine; and

(xi)      exercise any other rights or remedies available to Co-Administrative Agents and the DIP Lenders under the Interim Order, the UCC, the Bridge Loan, applicable law or otherwise.

(b)      All rights, remedies and powers granted to Co-Administrative Agents and the DIP Lenders hereunder, in the Bridge Loan, the UCC or other applicable law, are cumulative, not exclusive, and enforceable, in the discretion of Co-Administrative Agents, alternatively, successively, or concurrently on any one or more occasions, and shall include, without limitation, the right to apply to a court of equity for an injunction to restrain a breach or threatened breach by any Debtor of the Bridge Loan.

(c)      Debtors shall pay to the Co-Administrative Agents without demand any deficiency after any Collateral has been disposed of and the proceeds thereof have been applied to the Obligations, and Co-Administrative Agents shall account to the Debtors for any surplus remaining thereafter and shall pay such surplus to the Debtors.

(d)      If notice of disposition of Collateral is required by law, ten (10) days prior notice by Co-Administrative Agents to Debtors designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall

be deemed to be reasonable notice thereof and, subject to applicable law, Debtors waive any

other notice. To the extent that applicable law imposes duties on Co-Administrative Agents or

any DIP Lenders to exercise remedies in a commercially reasonable manner (which duties

cannot be waived under such law), each Debtor acknowledges and agrees that it is not

commercially unreasonable for Co-Administrative Agents or any DIP Lender (a) to fail to incur

expenses reasonably deemed significant by Co-Administrative Agents or any DIP Lender to

prepare Collateral for disposition or otherwise to complete raw material or work in process into

finished goods or other finished products for disposition, (b) to fail to obtain third party consents

for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to

obtain consents of any Governmental Authority or other third party for the collection or

disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies

against account debtors, secondary obligors or other persons obligated on Collateral or to remove

liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection

remedies against account debtors and other persons obligated on Collateral directly or through

the use of collection agencies and other collection specialists, (e) to advertise dispositions of

Collateral through publications or media of general circulation, whether or not the Collateral is

of a specialized nature, (f) to contact other persons, whether or not in the same business as any

Debtor, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one

or more professional auctioneers to assist in the disposition of Collateral, whether or not the

collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that

provide for the auction of assets of the types included in the Collateral or that have the

reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of

33

assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure Co-Administrative Agents or DIP Lenders against risks of loss, collection or disposition of Collateral or to provide to Co-Administrative Agents or DIP Lenders a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by Co-Administrative Agents, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Co-Administrative Agents in the collection or disposition of any of the Collateral. Each Debtor acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by Co-Administrative Agents or any DIP Lender would not be commercially unreasonable in the exercise by Co-Administrative Agents or any DIP Lender of remedies against the Collateral and that other actions or omissions by Co-Administrative Agents or any DIP Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section. Without limitation of the foregoing, nothing contained in this Section shall be construed to grant any rights to any Debtor or to impose any duties on Co-Administrative Agents or DIP Lenders that would not have been granted or imposed by the Bridge Loan, this Interim Order, or by applicable law in the absence of this Section.

20.    *Cash Management and Dominion.*  The Co-Administrative Agent, for the benefit of the DIP Lenders, shall have the right to a springing full dominion and control with respect to the Debtors' accounts described below (the "**Cash Dominion**") if an Event of Default has occurred and is continuing.  Within 45 days after entry of this Interim Order, all deposit, securities, investment, collection, clearing and/or concentration accounts of the Debtors (other than petty cash accounts, trust accounts, payroll accounts, employee benefit accounts and certain

other accounts to be agreed upon) shall be subject to deposit account control agreements or other appropriate control agreements and/or lockbox agreements or other satisfactory arrangements as the Co-Administrative Agents may reasonably require, in each case, in form and substance satisfactory to the Co-Administrative Agents.

21.     *Collateral Reporting, Appraisals and Field Exam.*  During the existence of an Event of Default, and without regarding to any notice period provided herein or in the Bridge Loan, the Co-Administrative Agents shall be permitted to conduct, field examinations and obtain appraisals with respect to Collateral as reasonably requested by Co-Administrative Agents.

22.     *Payments Held in Trust.*  Except as expressly permitted in this Interim Order or the Bridge Loan, in the event that any person or entity receives any payment on account of a security interest in Collateral, receives any proceeds of Collateral or receives any other payment with respect thereto from any other source prior to indefeasible satisfaction of all DIP Obligations, and termination of the DIP Lenders' obligations in accordance with the Bridge Loan, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of Collateral in trust for the benefit of the Co-Administrative Agents and DIP Lenders and shall immediately turn over such proceeds to the Co-Administrative Agents, or as otherwise instructed by this Court, for application in accordance with the Bridge Loan and this Interim Order.

23.     *Retention of Jurisdiction.*  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

24.     *Order Governs.*  In the event of any inconsistency between the provisions of this Interim Order and the Bridge Loan, the provisions of this Interim Order shall govern.

25.    *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in this Case, including, without limitation, the Co-Administrative Agents, the DIP Lenders, the Pre-Petition Secured Lenders, any committee appointed in this Case, and the Debtors and their subsidiaries, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtors) and shall inure to the benefit of the DIP Lenders, and the Debtors and their subsidiaries and their respective successors and assigns; provided, however, that the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estate of the Debtors.  In determining to make the Bridge Loan or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the Bridge Loan, the DIP Lenders shall not be deemed to be in control of the operations of or participating in the management of the Debtors or to be acting as a "**responsible person**" or "**owner or operator**" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

26.    *Notice of Professional Fees.*  As set forth above, professionals for the Co-Administrative Agents and the DIP Lenders shall not be required to comply with the United States Trustee fee guidelines or submit invoices to the Court, United States Trustee, the Committee or any other party-in-interest.  Except as otherwise set forth in this Interim Order, the Co-Administrative Agents, or their respective professionals, shall deliver their respective invoices to counsel for the Debtors, counsel to any committee appointed by the Court, and the

United States Trustee.  Such invoices need not contain detailed descriptions of the services provided, but may consist of a general description of the services provided during the period covered by the invoice.  If, with respect to any invoice for services performed following the Petition Date, the Debtors, the Office of the United States Trustee or any committee appointed by the Court notify a professional, in writing, by no later than the seventh (7th) business day following delivery of such invoice, of an objection to a particular invoice that it has delivered, and the objector and the professional whose fees are the subject of the objection are unable to resolve any dispute regarding the reasonableness of fees, costs and expenses in such invoice, the objector(s) may file with the Court and serve upon the professional a written objection to the reasonableness of such fees, costs and expenses.  If such an objection is filed, the Debtors shall still be obligated to timely make all payments required under this Interim Order and the Bridge Loan except to the extent of the portion subject to the objection which shall not be paid until the Court authorizes such payment and/or the objection is otherwise resolved by the parties.  The professionals' fees of the for Co-Administrative Agents and the DIP Lenders shall not be subject to the provisions of sections 327, 328, 329, 330 or 331 of the Bankruptcy Code.

27.     *Order Governs.*  In the event of any inconsistency between the provisions of this Order and Bridge Note, the provisions of this Order shall govern.

28.     *Final Hearing.*  The Final Hearing is scheduled for _____, 2013 at _____ .m. (ET) before this Court.  The Debtors shall promptly mail copies of this Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the

37

same shall have been appointed.  Any party in interest objecting to the relief sought at the Final

Hearing shall serve and file written objections; which objections shall be served no later than

_____, 2013 at 4:00 p.m. (ET) upon:  (a) the U.S. Trustee, c/o Tiiara Patton, the

United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35,

Wilmington, DE 19801; (b) the Debtors, c/o Earl Blackwell, 4023 Ambassador Caffery Parkway,

Suite #200, Lafayette, LA 40503; (c) counsel to the Debtors, c/o Caroline Reckler, 233 S.

Wacker Driver, Suite 5800, Chicago IL 60606; (d) counsel to the DIP Lenders, c/o David B.

Kurzweil, 3333 Piedmont Road, Suite 2500, Atlanta, Georgia 30305; (e) counsel to the Indenture

Trustee, Katten Muchin Rosenman LLP, 575 Madison Avenue, New York, NY 10022 (Attn:

Craig A. Barbarosh); (f) counsel to the Ad Hoc Noteholder Group, Jones Day, 222 East 41st

Street, New York, New York 10017 (Attn:  Paul Leake, Esq. and Michael Cohen, Esq.) (g)

counsel to Shell, First City Tower, 1001 Fannin Street, Suite 1800, Houston, Texas 77002; and

(h) counsel to any official committee then appointed in these Cases.


Dated:   Wilmington, Delaware

_____, 2013


_____

UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

Budget

# GREEN FIELD ENERGY SERVICES, INC

## 13 Week Cash Flow Projections

**Exhibit A**

| Week | 10/28/13 11/03/13 October 1 | 11/4/2013 11/10/13 November 2 | 11/11/13 11/17/13 November 3 | 11/18/13 11/24/13 November 4 | 11/25/13 12/01/13 November 5 | 12/02/13 12/08/13 December 6 | 12/09/13 12/15/13 December 7 | 12/16/13 12/22/13 December 8 | 12/23/13 12/29/13 December 9 | 12/30/13 01/05/14 December 10 | 01/06/12 01/12/14 January 11 | 01/13/14 01/19/14 January 12 | 01/20/14 01/26/14 January 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | | | | | | | | | | | | | | |
| Reserved Cash | 200,000 | | | | | | | | | | | | | |
| DIP Beginning Cash Balance | 200,000 | 2,925,954 | 2,339,374 | 1,015,707 | 641,123 | 3,044,318 | 2,674,844 | 1,692,716 | 1,264,272 | 281,226 | 3,831,490 | 3,290,576 | 2,716,546 | |
| **Cash Receipts:** | | | | | | | | | | | | | | |
| Collections from customers | | | | | | | | | | | 415,842 | 415,842 | 415,842 | 1,247,525 |
| Sale of Assets | | | | | | | | | | | | 1,250,000 | 1,250,000 | 2,500,000 |
| Total Cash Receipts | | | | | | | | | | | 415,842 | 1,665,842 | 1,665,842 | 3,747,525 |
| **Cash Disbursements:** | | | | | | | | | | | | | | |
| Employee, Payroll, Benefits and Other | 2,852,119 | 14,000 | 944,021 | 10,000 | 622,311 | 16,000 | 628,098 | 10,000 | 608,098 | 10,000 | 514,098 | 10,000 | 580,598 | 6,859,341 |
| Frac Storage Repair and Maintenance | 25,000 | 190,000 | 10,000 | 10,000 | 25,000 | 10,000 | 10,000 | 10,000 | 10,000 | 25,000 | 10,000 | 10,000 | 10,000 | 355,000 |
| Wells Service Products and Other | 174,067 | 174,067 | 174,067 | 174,067 | 174,067 | 168,452 | 168,452 | 168,452 | 168,452 | 168,452 | 168,452 | 168,452 | 168,452 | 2,217,946 |
| Rent, Utilities, Insurance, W/C and Taxes | 5,874,476 | 139,444 | 126,500 | 36,438 | 364,531 | 105,944 | 126,500 | 20,313 | 127,417 | 364,531 | 95,127 | 126,500 | 406,818 | 7,915,141 |
| Vehicle Financing, DIP and OID | 829,295 | | | | 841,818 | | | | | 512,675 | | | | 2,183,788 |
| 90 Day Interest Escrow | 500,000 | | | | 500,000 | | | | | 300,000 | | | | |
| Other and OCP Fees | 1,315,079 | 69,079 | 69,079 | 144,079 | 69,079 | 69,079 | 69,079 | 219,079 | 69,079 | 69,079 | 69,079 | 69,079 | 219,079 | 2,523,026 |
| Restructure Professional Fees | 700,000 | | | | | | | | | 300,000 | | 1,440,000 | | 2,940,000 |
| Total Cash Disbursements | 12,274,036 | 556,590 | 1,323,667 | 374,584 | 2,596,805 | 369,474 | 982,128 | 428,444 | 983,245 | 1,449,736 | 956,755 | 1,824,031 | 1,384,947 | 25,034,242 |
| **Ending Cash Balance** | 2,925,954 | 2,339,374 | 1,015,707 | 641,123 | 3,044,318 | 2,674,844 | 1,692,716 | 1,264,272 | 281,226 | 3,831,490 | 3,290,576 | 2,716,546 | 2,581,599 | |
| **DIP Balance** | | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | |
| DIP Draw | | 15,000,000 | | | 5,000,000 | | | | | 5,000,000 | | | | |
| DIP Total | | 15,000,000 | 15,000,000 | 15,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | |

*NOTE: This 13 week cash flow projection does not include amounts relates to any potential KEIP*

| Restructure Professional Fees | Name | Nov-13 | Dec-13 | Jan-14 |
|---|---|---|---|---|
| Debtor Counsel | Latham & Watkins LLP | 1,000,000 | 750,000 | 750,000 |
| Debtor Restructuring Advisor | Alvarez & Marsal | 250,000 | 400,000 | 250,000 |
| Debtor Delaware Counsel | Young Conaway Stargatt & Taylor, LLP | 125,000 | 125,000 | 125,000 |
| Debtor Investment Bank | Carl Marks & Co. Inc. | 175,000 | 85,000 | 85,000 |
| Debtor Claims Agent | Prime Clerk | 50,000 | 50,000 | 50,000 |
| Unsecured Creditor Counsel - FA | TBD | 200,000 | 200,000 | 200,000 |
| DIP Lender Counsel | Greenberg Traurig LLP | 650,000 | 450,000 | 250,000 * |
| DIP Lender Local Counsel | Reed Smith | 50,000 | 50,000 | 50,000 * |
| DIP Agent Administration Fee | G8 Credit Partners / ICON Capital Corp. | 25,000 | 25,000 | 25,000 |
| New Accrual | | 2,525,000 | 2,135,000 | 1,785,000 |

* No amount included for Financial Advisor