# EXHIBIT C

## Agreement

# INVESTMENT BANKING AGREEMENT

INVESTMENT BANKING AGREEMENT, dated as of October 14, 2013 (this Agreement"), by and between Green Field Energy Services Inc. with its principal place of business at 4023 Ambassador Caffery Parkway, Suite 200, Lafayette, LA 70503 ("Green Field" or the "Company") and Carl Marks Advisory Group LLC, with its principal place of business at 900 Third Avenue, New York, NY 10022 ("CMAG").

WHEREAS, Green Field desires to engage the investment banking services of CMAG, subject to and on the terms and conditions hereinafter set forth; and

WHEREAS, CMAG has agreed to provide such investment banking services subject to and on such terms and conditions.

NOW, THEREFORE, in consideration of the above premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Engagement**: Green Field engages CMAG, and CMAG hereby agrees to serve Green Field as its investment banker and to provide the services described in Section 2 hereof (the "Engagement"). Green Field understands and acknowledges that CMAG has and will continue to have other engagements during the term of this Agreement.

2. **Scope:** CMAG shall provide investment banking services to Green Field in connection with the Company's exploration of strategic alternatives available to it which could include a prospective financial restructuring, recapitalization, or reorganization of the Company including the possible sale, merger or disposition of its assets in one or more Transactions, whether conducted out-of-court or in-court in connection with a plan of reorganization or plan of liquidation (the "Plan") with any person or entity (each a "Transaction"). In that connection, CMAG shall perform the following activities, as necessary:
    - Source and/or initiate potential Transactions or other transactions, including, without limitation, any proposals for debtor-in-possession financing;
    - Review and analyze the business plans and 13-week cash flow forecasts of the Company;
    - Evaluate the Company's liquidity, including financing alternatives;

- Evaluate the Company's debt capacity in relation to projected cash flows and assist in determination of appropriate capital structure;
- Assist Company and its professionals in the review of and implementation of any proposed Transaction or other transaction, in responding thereto and, if directed evaluating potential alternatives for a Transaction;
- Assist and advise the Company in evaluating and analyzing a Transaction, including the value of the securities or debt instruments, if any, that may be issued in any such Transaction;
- Review, analyze and value any proposed third party Transactions or other transactions, including, without limitation, any proposals for debtor-in-possession financing;
- Determine a range of values for the Company and any securities that the Company offers or proposes to offer in connection with a Transaction
- Assist Company in review of risks and benefits of considering a Transaction;
- Advise the Company on Financing alternatives including refinancing existing credit, term and subordinated loans, notes or other debt instruments including, but not limited to, any exit financing related to any Bankruptcy Case (each a "Financing");
- Review and analyze any proposed third party Transactions
- Participate in negotiations with parties in interest, including, current or prospective creditors, holders of equity, or claimants against the Company and/or their respective representatives in connection with a Transaction;
- Advise Company on and attend meetings of the Board of Directors, creditor groups, official constituencies and other interested parties;
- In the event the Company determines to commence Chapter 11 cases, participate in hearings before the Bankruptcy Court and provide relevant testimony with respect to matters defined herein and issues arising in connection with any proposed plan; and
- Perform other such services related to this Engagement as are directed by Green Field and reasonably acceptable to CMAG.

As used herein the term Transaction shall mean any of the following, whether consummated through a court approved sale transaction under Section 363 of the Bankruptcy Code, or similar mechanism, and/or pursuant to one or more Plans: a transaction or series of related transactions whereby, directly or indirectly, control of or a material interest in the securities, assets or business of the Company is acquired by or

combined with any person or entity through the sale or exchange of capital stock, debt or assets, a conversion of debt to equity, a lease of assets with or without a purchase option, a merger or consolidation, a tender or exchange offer, a leveraged buy-out, a minority investment, the formation of a joint venture or partnership, or any other business combination or similar transaction.

To the extent that CMAG determines that any services under this Agreement involve an offering of securities, such services will be provided by Carl Marks Securities LLC, its broker dealer affiliate.

3. **Term**: The term of this Agreement (the "Term") shall commence as of the date of this Agreement and shall continue unless canceled with or without cause by either party on thirty (30) days prior written notice, in which event any compensation and expenses owing to CMAG pursuant to Sections 4 and 5 below shall be immediately due and payable. If at any time during the Residual Period (as defined below), Green Field completes a Transaction and/or Financing with any party introduced by CMAG or with whom CMAG has had discussions on behalf of Green Field, (defined as "Covered Parties" in Section 9), and the closing of such Transaction and/or Financing occurs within the Residual Period, Green Field shall pay CMAG the applicable compensation and expenses pursuant to Sections 4 and 5 below, payable within five (5) days following the closing of each Transaction and/or Financing. A residual period shall extend for twelve (12) months from the date of termination of this Agreement ("Residual Period").

4. **Compensation**: As compensation for providing the services to be rendered hereunder by CMAG, Green Field shall pay CMAG the following fees:

1) <u>Monthly Advisory Fee</u>: A fixed fee (a "Monthly Advisory Fee") at the rate of $85,000 per monthly period, payable via wire transfer in advance, commencing upon the execution of this Agreement and payable in advance at the beginning of each subsequent monthly period thereafter in which Investment Banking Services are to be provided. The Monthly Advisory Fee shall be prorated for any monthly period for which CMAG does not work the full month. The Monthly Advisory Fee for the seventh, eighth and ninth month of this Engagement shall be credited 100% against any Completion Fee (as defined below).

2) <u>Completion Fee</u>: If, during the period CMAG is retained by Green Field or within the Residual Period thereafter, Green Field closes one or more Transactions, a fee (a "Completion Fee") which will be paid in cash and earned in full and due upon the closing of any Transaction (which in the case of a sale of substantially all of the Company's assets shall be deemed to occur upon the closing of such sale and in the case of a Plan shall be deemed to occur upon the effective date of such Plan) with any party during the term of this Agreement or with any Covered Party within the Residual Period. Such fee will be in an amount equal to $750,000 subject to reduction for the Monthly Advisory Fee paid for the seventh, eighth and ninth month of this Engagement.

3) <u>New Capital Fee</u>: If, during the period CMAG is retained by Green Field or within the Residual Period thereafter, Green Field closes one or more Financings, a fee (a "New Capital Fee") which will be paid in cash and earned in full and due upon the closing of each Financing commitment. Such fee will be in an amount equal to: (i) 0.85% of the total commitment amount of any Financing from a provider who is not a current bondholder and not a "Designated Party" and/or (ii) 0.425% of the total commitment amount of any Financing in the case the provider of such Financing is a current bondholder of the Company as of the date of this Agreement or a Designated Party as previously identified and mutually agreed upon between Green Field and CMAG. A Designated Party shall mean any of the entities identified on Exhibit I hereof. Such New Capital Fee shall not be applicable and is understood to not include any fee payable in connection with Debtor-in-Possession financing.

CMAG shall also receive a retainer from Green Field of $100,000 upon the execution of this Agreement to be applied against unpaid fees and expenses, if any. Any unused portion of the retainer shall be returned to Green Field at the completion of CMAG's services under this Agreement. CMAG will submit investment banking service fee invoices for each payment due. It is agreed that all invoices will be paid promptly upon receipt.

5. **Expenses**: CMAG shall be entitled to reimbursement for all reasonable out of pocket expenses incurred by it in the performance of its duties (the "Expenses") upon presentation of appropriate documentation therefore. The Expenses shall include, but not be limited to, transportation of any of CMAG personnel, employees or associates on business related to the Engagement, cost of hotels, meals, etc. Such Expenses shall also

include, but not be limited to, all reasonable out of pocket legal fees incurred by CMAG in connection with the performance of the Engagement, provided that Green Field first consents to the retention of such counsel for such services. All Expenses will be reimbursed by Green Field upon receipt of invoices therefore, which shall be submitted promptly after the end of each month in which CMAG renders services.

6. **Indemnification**: Green Field will indemnify CMAG and hold it harmless for all acts or omissions, and all decisions made, by CMAG (other than as a result of CMAG's gross negligence or willful misconduct) while performing services for Green Field and agrees to pay directly, upon presentation thereof, all statements or invoices for all fees and expenses, including reasonable attorneys' fees actually and necessarily incurred by CMAG in connection with the defense of any such claims based on CMAG's alleged acts, omissions or decisions (other than made or taken through gross negligence or willful misconduct), including any suit or proceeding relating thereto and any appeal therefrom and the costs of any settlement thereof ("Claim"), provided that with respect to costs incurred in any appeal of a judgment, Green Field first consents to appealing such judgment (which consent shall not be unreasonably withheld or delayed), notwithstanding anything to the contrary in Section 5. CMAG shall have the sole right to select counsel of its choosing and control the defense of any such Claim, but Green Field shall have the right to accept or reject any settlement of any Claim for which indemnification is sought by CMAG hereunder (which acceptance or rejection shall not be unreasonably withheld or delayed). For purposes of this Section, "CMAG" includes its members, officers, directors, employees and/or agents, and CMAG's affiliates and each of their respective shareholders, members, officers, directors, employees and/or agents. The provisions of this Section 6 shall survive the term of this Agreement.

7. **Proprietary Work Product and Confidential Company Information:** Green Field acknowledges and agrees that any work product including, without limitation, any information, advice, recommendations or other content of any reports, presentations or other communications produced by CMAG is for the sole use of Green Field and is not intended for distribution to, or to be relied upon by, any third party.

In addition, CMAG acknowledges and agrees that as a result of the services to be provided hereunder, the persons performing such services may acquire knowledge and information of a secret and confidential nature. CMAG further acknowledges and agrees that this information constitutes valuable property of Green Field generally not being

disseminated or made known to persons or organizations outside Green Field at all, or if made known, being done so only under specific and restrictive conditions such as to ensure that it does not become readily available to the public, and also that confidential information of others may be received by Green Field with restrictions on its use and disclosure. Accordingly, CMAG agrees that:

(i) CMAG and any person performing any services for CMAG hereunder shall not, during the Term nor at any time thereafter, disclose to anyone outside Green Field any secret or confidential information of Green Field or its subsidiaries or affiliates, except as authorized by Green Field. Green Field information which is not readily available to the public shall be considered secret and confidential for the purpose of this Agreement and shall include, but not be limited to, information relating to Green Field and its subsidiaries and affiliates, customers, processes, products, apparatus, data, compounds, business studies, business and contracting plans, business procedures and finances;

(ii) CMAG and any person performing any services for CMAG hereunder shall not, during the Term nor at any time thereafter, disclose to any other person or use secret or confidential information of others, which, to the knowledge of CMAG, has been disclosed to Green Field with restriction on the use or disclosure thereof, in violation of those restrictions.

(iii) CMAG and any person performing any services for CMAG hereunder shall not, during the Term nor at any time thereafter, disclose to Green Field or induce Green Field to use, without prior permission of the owner, any secret or confidential information or material of others of which CMAG is or may become possessed; and

(iv) Notwithstanding the foregoing, CMAG and any person performing services for CMAG hereunder shall not be liable for the disclosure of information which may otherwise be deemed confidential hereunder:

(a) if the information is in, or becomes part of, the public domain, other than by CMAG's disclosure of the information; or
(b) if the information is furnished to a third party by Green Field without restriction on the third party's right to disseminate the information;

(c) if the information is already of record in CMAG's files at the time of disclosure, or is disclosed to CMAG by a third party as a matter of right;

(d) if the information is disclosed with Green Field's written approval; or

(e) if the information is compelled to be revealed via subpoena, civil investigative demand or other judicial or administrative process

The provisions of this Section 7 shall survive the termination of this Agreement.

8. **Client Cooperation; Reliance on Client's Information:** Green Field acknowledges and agrees that the ability of CMAG to perform the Engagement requires the full cooperation and assistance of Green Field and its personnel. Accordingly, Green Field covenants and agrees to furnish to CMAG all information, documents and other materials requested by CMAG and to make available to CMAG for meetings, conference calls and otherwise all personnel designated by CMAG to enable CMAG to receive on a timely basis, in writing and verbally, all information requested by CMAG related to the Engagement under this Agreement. Green Field acknowledges and agrees that CMAG, in performance of the Engagement, will be relying on the truth, completeness and accuracy of the written documentation delivered and the verbal communications made by Green Field and its representatives to CMAG in connection with all matters relating to the Engagement.

9. **Covered Party:** Within 30 days after the effective date of any termination or expiration, CMAG shall deliver to the Company, a list of all parties who CMAG has had discussions concerning the Transaction and/or Financing prior to receipt of the notice of termination. Each listed party shall be considered a "Covered Party" and collectively shall be considered the "Covered Parties" for purposes of Section 4.

10. **Conflicts of Interest:** Nothing contained in this Agreement or otherwise, shall diminish or impair the right of CMAG to accept engagements, directly or indirectly, from Green Field's lender(s) or other professionals or other third parties provided such engagements do not involve the relationship of the lender(s), other professionals or other third parties to Green Field.

11. **Limitation on CMAG Liability:** If CMAG fails to perform its obligations under or is otherwise in breach of or default under this Agreement, the maximum liability of

CMAG in respect thereof shall be limited to an amount equal to the aggregate of all fees paid to CMAG pursuant to this Agreement.

12. **Notices**: All notices, requests, demands and other communications provided for by this Agreement shall be in writing addressed to the parties at the address for such party first set forth above, and shall be transmitted by either facsimile (fax), personal or overnight courier delivery or by certified mail. All notices, etc. shall be deemed given when received by the party to whom it is addressed.

13. **Successors and Assigns**: This Agreement shall inure to the benefit of, and be binding upon, each of Green Field and CMAG and their respective successors and assigns. Neither party may assign its rights and/or obligations under this Agreement without the written consent of the other, which consent shall not be unreasonably withheld or delayed.

14. **Applicable Law**: This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to principles of conflicts of law.

15. **Amendments**: No amendment, modification, termination or waiver of any provision of this Agreement or consent to any departure by any party therefrom shall be effective unless in writing signed by the parties hereto, and, in any event, shall be effective only in the specific instance and for the specific purpose for which given.

16. **No Waiver; Cumulative Remedies**: No failure or delay on the part of any party in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude the exercise of any other right, power or remedy. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

17. **Headings**: Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

18. **Counterparts**: This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

19. **Waiver of Jury Trial:** Each of the parties to this Agreement hereby waives its right to a jury trial with respect to any claim, action, suit or proceeding made or brought by one of the parties against the others in connection with or arising from this Agreement.

20. **Publication:** Upon the consummation of a Transaction or with the prior written consent of Greenfield, CMAG may, at its expense, place an announcement in such newspapers, periodicals, electronic publications and other print as CMAG may choose stating that CMAG has acted as a investment banker for the Company in connection therewith.

21. **Independent Contractor Relationship:** CMAG shall serve as an independent contractor to Green Field pursuant to the terms and conditions of this Agreement and this Agreement does not create and shall not be construed to create a relationship of principal and agent, joint venturer, co-partners, employer and employee, master and servant or any similar relationship between CMAG and Green Field, and the parties hereto expressly deny the existence of any such relationship.

22. **Non-Solicitation:** For a period of two-years from the date of this Agreement, or one-year following its termination, whichever is later; Green Field, (or any of its Affiliates) will not (A) solicit or cause to be solicited any employee, agent or representative of CMAG with whom Green Field, (or any of its Affiliates) has had contact, or who became known to Green Field, (or any of its Affiliates) during CMAG's provision of services; or (B) hire or cause to be hired any employee, agent or representative of CMAG, with whom Green Field, (or any of its Affiliates) has had contact, or who became known to Green Field, (or any of its Affiliates) during CMAG's provision of services and who was, within twelve (12) months of such proposed hiring, an employee, agent or representative of CMAG. As used herein, the term "Affiliates" shall mean and include any person, firm, corporation or other entity directly or indirectly controlling, controlled by or under common control with Green Field.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**GREEN FIELD ENERGY SERVICES INC.**

By: _____
Michel B. Moreno
Chief Executive Officer

**CARL MARKS ADVISORY GROUP LLC**

By: _____
Christopher K. Wu
Partner

## Exhibit I

### List of Designated Parties

1. Icon Investments and any subsidiaries/affiliates thereof