**Exhibit A**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>GREEN FIELD ENERGY SERVICES, INC.,<br>et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 13-12783 (KG)<br><br>Jointly Administered<br><br>**Docket Ref. No.** |

### ORDER AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER A RESTRUCTURING SUPPORT AGREEMENT WITH THE MORENO ENTITIES, TURBINE POWERED TECHNOLOGY, LLC, SWEPI, LP, AND CONSENTING NOTEHOLDERS

Upon consideration of the motion (the "**Motion**")[2] by the above-captioned debtors and debtors-in-possession in these Chapter 11 Cases (collectively, the "**Debtors**"), seeking entry of an order pursuant to Sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"), and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizing the Debtors to enter into and perform their obligations under the RSA by and between the Debtors, the Moreno Entities, TPT, Shell, and the Consenting Noteholders; and the Court being satisfied based on the representations made in the Motion and the RSA; and it appearing that the RSA and the relief requested in the Motion are in the best interests of the Debtors, their creditors and estates; and it appearing that proper and adequate notice has been given and that no other or further notice is required; and upon the record herein; and after due deliberation thereon; and sufficient cause appearing therefore; it is hereby ORDERED that:

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax or organizational identification number, are: Green Field Energy Services, Inc. (2539); Hub City Tools, Inc. (2827); and Proppant One, Inc. (6035).  The above-captioned Debtors' mailing address is 4023 Ambassador Caffery Parkway, Suite #200, Lafayette, LA 70503.

[2]    Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion or the RSA, as applicable.

1.      The Motion is GRANTED.

2.      The Debtors are hereby authorized to enter into the RSA attached hereto as Exhibit 1, which is approved pursuant to Sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

3.      The Debtors are authorized to perform their obligations under the RSA, including the payment of professional fees as contemplated therein.

4.      This Order and the RSA shall be binding upon the RSA Parties.

5.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Order.

6.      The Debtors are authorized and empowered to take all steps necessary and appropriate to carry out and otherwise effectuate the terms, conditions, and provisions of the RSA.


Dated: _____, 2014        _____
                                    KEVIN GROSS
                                    CHIEF UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**RSA**

**EXECUTION COPY**

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (the "Agreement") is made and entered into as of December 31, 2013, by and among Green Field Energy Services, Inc. ("GFES") and its wholly owned subsidiaries Hub City Tools, Inc. and Proppant One, Inc. (collectively, together with GFES, the "Companies" or "Debtors"), Michel B. Moreno ("Moreno") and related trusts and other entities under Moreno's control (together with Moreno, the "Moreno Entities"), Turbine Powered Technology, LLC ("TPT"), SWEPI, LP (successor to Shell Western Exploration and Production, Inc., "Shell"), and holders of at least 66.7% of the aggregate amount of those certain 13% Senior Secured Notes Due 2016 issued in the original aggregate principal amount of $250,000,000 under that certain Indenture dated as of November 15, 2011 among GFES and Wilmington Trust, National Association, as trustee and collateral agent (the "Indenture Trustee," the Notes issued thereunder, the "Notes" and, the beneficial holders thereof, the "Noteholders" and the undersigned Noteholders to this Agreement, the "Consenting Noteholders"), as amended on October 23, 2012 and thereafter amended, modified, or supplemented from time to time (the "Indenture").  The Companies, the Moreno Entities, TPT, Shell and the Consenting Noteholders and any subsequent person that becomes a party hereto in accordance with the terms hereof are each referred to herein as a "Party" and collectively as the "Parties."  Capitalized terms used herein and not otherwise defined herein or in the Plan Term Sheet (as defined below) have the meanings assigned thereto in the Indenture. "Claim" or "Claims" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

## W I T N E S S E T H:

WHEREAS, each of the Companies commenced voluntary chapter 11 cases (the "Chapter 11 Cases") under title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on October 27, 2013 (the "Petition Date");

WHEREAS, GFES, as issuer, and the Indenture Trustee are parties to the Indenture pursuant to which the Notes are secured by liens on substantially all the assets of the Companies;

WHEREAS, as of the date of this Agreement, the Debtors are obligated for an aggregate principal amount of $255,948,000 and other amounts under the Indenture;

WHEREAS, GFES and Shell are parties to that certain Contract for High Pressure Fracturing Services dated as of September 2, 2011 (the "Shell Contract"), as amended, the obligations under which are secured by security interests in certain motor vehicles as the result of notations on their certificates of title and equipment and other assets as the result of a UCC-1 financing statement filed with the Delaware Secretary of State on October 11, 2013;

WHEREAS, as of the date of this Agreement, the Debtors are obligated for an aggregate principal amount of $80,000,000 under the Shell Contract;

WHEREAS, Shell contends that the Debtors are obligated to Shell in an additional amount of at least $15,000,000 under the Shell Contract with respect to liens that have been asserted on Shell's property as a result of the Debtor's failure to pay;

WHEREAS, Moreno guaranteed the amounts owed by the Debtors under the Shell Contract pursuant to that certain Guarantee dated as of October 22, 2012 (the "Moreno Guaranty");

WHEREAS, in connection with the Shell Contract, Shell and the Indenture Trustee entered into that certain Amended and Restated Intercreditor Agreement dated as of October 24, 2012;

WHEREAS, the Debtors believe they have various causes of action against Shell in connection with the Shell Contract and various causes of action against Shell arising under chapter 5 of the Bankruptcy Code;

WHEREAS, TPT is a joint venture owned 50% by MTT Properties, LLC and 50% owned by GFES;

WHEREAS, TPT licenses certain patent rights, copyrights, trademarks and trade secrets to the Debtors pursuant to that certain Turbine Driven Equipment License Agreement dated September 22, 2011;

WHEREAS, prior to the Petition Date, TPT sold equipment to the Debtors pursuant to that certain Equipment Purchase Agreement dated July 8, 2011 (as amended by that certain Amendment to Equipment Purchase Agreement dated September 22, 2011) and provided maintenance on the Debtors' equipment;

WHEREAS, as of the date of this Agreement, the Debtors are obligated to TPT for equipment sold and maintenance services provided in the aggregate amount of $8,730,749.97;

WHEREAS, the Debtors believe they have various causes of action against Moreno and various entities directly and indirectly owned or controlled by him or the other Moreno Entities;

WHEREAS, the Moreno Entities own approximately 90.40767% of the membership interests in MOR DOH Holdings, LLC ("MOR DOH"), which owns 100% of Turbine Generation Services, LLC ("TGS");

WHEREAS, the Parties have engaged in good faith negotiations with the objective of reaching an agreement regarding a financial and corporate restructuring of the Debtors, including the terms for the settlement of various claims and causes of action and the treatment of the Debtors' outstanding indebtedness, liabilities, and equity interests (the "Restructuring");

WHEREAS, the Restructuring is to be realized through a chapter 11 plan of reorganization that is consistent with the term sheet appended as Exhibit A hereto (the "Plan Term Sheet") and otherwise reasonably acceptable to the Debtors, the Moreno Entities, Shell, TPT and the Consenting Noteholders (such chapter 11 plan of reorganization, the "Chapter 11 Plan");

WHEREAS, the Companies intend, within the time frames set forth below, to (i) file and use commercially reasonable efforts to obtain approval by the Bankruptcy Court of a disclosure statement and related materials for the Chapter 11 Plan that is in form and substance reasonably satisfactory to the Debtors, the Moreno Entities, Shell, TPT and the Consenting Noteholders (the "Disclosure Statement"), and (ii) file and use commercially reasonable efforts to obtain confirmation by the Bankruptcy Court of the Chapter 11 Plan;

WHEREAS, each of the Moreno Entities, Shell, TPT and each of the Consenting Noteholders have reviewed, or have had the opportunity to review, the Plan Term Sheet and this Agreement with the assistance of legal and financial advisors of its own choosing;

WHEREAS, each Moreno Entity, TPT, Shell and each Consenting Noteholder desires to support and vote to accept the Chapter 11 Plan, and the Companies desire to obtain the commitment of the Moreno Entities, Shell, TPT and Consenting Noteholders to support and vote to accept the Chapter 11 Plan, in each case subject to the terms and conditions set forth herein;

WHEREAS, subject to execution of definitive documentation and appropriate approvals by the Bankruptcy Court of this Agreement, the Disclosure Statement and the Chapter 11 Plan, this Agreement sets forth the terms and conditions of the Parties' respective obligations hereunder; and

WHEREAS, consents and certain other actions hereunder may, in accordance with the terms of this Agreement, be effectuated on behalf of the Consenting Noteholders by holders of more than 50% of the aggregate principal amount of Claims held by the Consenting Noteholders, whether now or hereafter signatories hereto (the "Requisite Noteholders"), unless otherwise expressly provided herein.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

Section 1.    General.   Each of the Parties agrees and covenants that, subject to the conditions set forth on the Plan Term Sheet:

(a)    It will negotiate in good faith (i) the documentation regarding the Restructuring or otherwise contemplated by or required to effectuate the Plan Term Sheet, (ii) the Chapter 11 Plan, and (iii) the other documents contemplated hereby and thereby (such documents, the "Plan-Related Documents"); and

(b)    It will not (i) object to, delay, impede, commence any proceeding, or take any other action to interfere, directly or indirectly, in any material respect with the acceptance or implementation of the Chapter 11 Plan, (ii) encourage or support any person or entity to do any of the foregoing, or (iii) seek or solicit, propose, file, support, encourage, vote for, consent to, instruct, or engage in discussions with any person or entity concerning any restructuring, workout, plan of reorganization, dissolution, winding up, or liquidation of the Companies and their affiliates, other than the Chapter 11 Plan.

Section 2.        <u>Support for the Chapter 11 Plan</u>.

(a)        The Companies agree and covenant that they shall (A) use commercially reasonable efforts to file the Chapter 11 Plan prior to the applicable termination date set forth in Section 6(a) hereof, (B) use commercially reasonable efforts to file the Disclosure Statement within the time frame set forth in Section 6(b) hereof, (C) upon Bankruptcy Court approval of the Disclosure Statement, use commercially reasonable efforts to solicit acceptance to the Chapter 11 Plan, (D) take all necessary steps to obtain from the Bankruptcy Court an order confirming the Chapter 11 Plan (the "<u>Confirmation Order</u>") within the time frame set forth in Section 6(c) hereof, which Confirmation Order shall be in form and substance reasonably satisfactory to the Moreno Entities, TPT, Shell and the Consenting Noteholders, (E) take all other commercially reasonably necessary actions to support the Chapter 11 Plan and (F) take no actions inconsistent with the transactions contemplated by this Agreement, the Plan Term Sheet and the Chapter 11 Plan or the expeditious confirmation and consummation of the Chapter 11 Plan.

(b)        Each of the Consenting Noteholders, Shell, TPT, and each of the Moreno Entities (collectively, the "<u>Non-Debtor Parties</u>"), severally and not jointly, agrees and covenants that it shall:

(A)        use commercially reasonable efforts (including, with respect to the Consenting Noteholders, directing the Indenture Trustee, as necessary, but only so long any such direction does not require any of the Consenting Noteholders to indemnify the Indenture Trustee) to support the Debtors' efforts to obtain confirmation of, and consummate, the Chapter 11 Plan;

(B)        not directly or indirectly seek, solicit, support, or vote in favor of any sale, proposal, offer or plan of dissolution, winding up, liquidation, reorganization, merger, or restructuring of any of the Debtors other than the Chapter 11 Plan (each, an "<u>Alternative Plan</u>");

(C)        not, directly or indirectly, engage in, continue, or otherwise participate in any negotiations regarding any Alternative Plan; and

(D)        with respect to any Non-Debtor Parties that hold Claims, following receipt of solicitation materials approved by the Bankruptcy Court, cast all votes to which it is entitled to accept the Chapter 11 Plan in the Chapter 11 Cases (and will not withdraw or change such votes.

Each of the Non-Debtor Parties shall be bound by its agreements and covenants set forth herein only so long as this Agreement has not been validly terminated in accordance with Sections 6, 7 or 8 hereof.

(c)        For the avoidance of doubt, each of the Parties to this Agreement hereby agrees and covenants that it shall support the treatment set forth in this Agreement and the Plan Term Sheet for any and all Claims that it or any other Party may hold against the Debtors.

Section 3.    <u>Representations and Warranties</u>.

(a)    Each of the Parties severally represents and warrants to each of the other Parties that the following statements are true and correct as of the date of execution of this Agreement by such Party:

(1)    <u>Power and Authority</u>.  It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement subject, with respect to the Debtors, to approval of the Bankruptcy Court.

(2)    <u>Authorization</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part, subject, with respect to the Debtors, to approval of the Bankruptcy Court.

(3)    <u>No Conflicts</u>.  The execution, delivery, and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule, or regulation applicable to it or its certificate of incorporation or by-laws (or other organizational documents) or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party or under its certificate of incorporation or by-laws (or other organizational documents), except, with respect to any of the Companies, for any contractual obligation that would not have a material adverse effect on the business, assets, financial condition, or results of operations of the Companies and their affiliates, taken as a whole.

(4)    <u>Governmental Consents</u>.    The execution, delivery, and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any Federal, state, or other governmental authority or regulatory body, except: (i) such filings as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws; (ii) any filings in connection with the Chapter 11 Cases, including the approval of this Agreement, the Disclosure Statement and confirmation of the Chapter 11 Plan; and (iii) in the case of the Companies, (A) filings of amended articles of incorporation or formation or other organizational documents with applicable state authorities, and (B) other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the businesses of the Companies.

(5)    <u>Binding Obligation</u>.    Immediately upon execution of this Agreement, and without regard to whether any other Party has executed this Agreement at the time of such execution, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, subject, solely with respect to the Debtors, to approval of the Bankruptcy Court; provided that this Agreement shall only become effective as set forth in Section 11 below.

(6)    <u>Proceedings</u>.    No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

(b)    Each of the Consenting Noteholders represents and warrants, severally and not jointly, to each of the other Parties that the following statements are true, correct, and complete as of the date hereof:

(1)    <u>Ownership</u>.    It is: (i) the sole beneficial owner and/or the investment advisor or manager for the beneficial owners of the Claims set forth on its signature page attached hereto, having the power to vote and dispose of such Claims on behalf of such beneficial owners; and (ii) entitled (for its own account or for the account of other persons claiming through it) to all of the rights and economic benefits of such Claims.

(2)    <u>Transfers</u>.    It has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in the Claims that are subject to this Agreement.

(3)    <u>Laws</u>.    It is: (i) a sophisticated investor with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in securities similar to the Notes (including any securities that may be issued in connection with the Restructuring), making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement; and (ii) a "qualified institutional buyer" within the meaning of Rule 501 of the Securities Act of 1933, as amended.

(c)    Shell represents and warrants to each of the other Parties that the following statements are true, correct, and complete as of the date hereof:

(1)    <u>Ownership</u>.    It is: (i) the sole beneficial owner and/or the investment advisor or manager for the beneficial owners of the Claims set forth on its signature page attached hereto, having the power to vote and dispose of such Claims on behalf of such beneficial owners; and (ii) entitled (for its own account or for the account of other persons claiming through it) to all of the rights and economic benefits of such Claims.

(2)    <u>Transfers</u>.    It has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in the Claims that are subject to this Agreement.

(d)    TPT represents and warrants to each of the other Parties that the following statements are true, correct, and complete as of the date hereof:

(1)    <u>Ownership</u>.    It is: (i) the sole beneficial owner and/or the investment advisor or manager for the beneficial owners of the Claims set forth on its signature page attached hereto, having the power to vote and dispose of such Claims on behalf of such

beneficial owners; and (ii) entitled (for its own account or for the account of other persons claiming through it) to all of the rights and economic benefits of such Claims.

(2)    Transfers.  It has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in the Claims that are subject to this Agreement.

Section 4.    Covenants.  Each Consenting Noteholder, Shell and TPT individually covenants that, from the date hereof until the termination of this Agreement, such Party shall not, directly or indirectly, sell, pledge, hypothecate, or otherwise transfer any Claims, or any option, right to acquire, or voting, participation, or other interest therein, except to a purchaser or other entity who represents that it will execute and deliver to the Companies, Moreno Entities, Shell, TPT and other Consenting Noteholders within two business days of settlement of such trade or transfer an agreement in writing (in a form substantially similar to Exhibit B hereto) to assume and be bound by all the terms of this Agreement with respect to the relevant Claims or other interests being transferred to such purchaser (which agreement shall include the representations and warranties set forth in Section 3 hereof).  The Companies shall promptly acknowledge any such trade or transfer in writing and provide a copy of such acknowledgement to the transferor. By its acknowledgement of the relevant trade or transfer, the Companies shall be deemed to have acknowledged that their obligations to the Consenting Noteholder, Shell or TPT, as applicable, hereunder shall be deemed to constitute obligations in favor of the relevant purchaser.  This Agreement shall in no way be construed to preclude a Party from acquiring additional Claims or other interests in any Debtor; *provided, however*, that any such additional Claims or other interests in such Debtor shall automatically be deemed to be subject to all the terms of this Agreement.

Section 5.    No Waiver of Participation and Reservation of Rights.  This Agreement and the Chapter 11 Plan are part of a proposed settlement of disputes among the Parties.  Except as expressly provided in this Agreement, nothing herein is intended to, does, or shall be deemed in any manner to waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its respective rights, remedies and interests.  Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in the Chapter 11 Plan are not consummated, if a Termination Event occurs, or if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all rights, remedies and interests.

Section 6.    Termination.  This Agreement may be terminated by the Parties set forth below on the occurrence of the following events (each a "Counterparty Termination Event"), by delivering written notice of the occurrence of such event in accordance with Section 14 below to the other Parties:

(a)    Shell, any of the Moreno Entities, TPT or the Requisite Noteholders, if the Debtors shall not have filed a motion, in form and substance reasonably acceptable to each of the foregoing Parties, seeking Bankruptcy Court approval of this Agreement by December 31, 2013;

(b)     Shell or the Requisite Noteholders, if the Debtors shall not have filed the Chapter 11 Plan, the Disclosure Statement, and a motion, in form and substance reasonably acceptable to each of the foregoing Parties, seeking approval of the Disclosure Statement by February 7, 2014 (the "Chapter 11 Plan Filing Date");

(c)     Shell or the Requisite Noteholders, if the entry of an order by the Bankruptcy Court approving the Disclosure Statement in form and substance reasonably acceptable to each of the foregoing Parties, shall not have occurred by March 10, 2014;

(d)     Shell, any of the Moreno Entities, TPT or the Requisite Noteholders, if the entry of the Confirmation Order and the effective date of the Chapter 11 Plan shall not have occurred by April 30, 2014; provided, that, if such events have not occurred on or before June 30, 2014, then any Consenting Noteholder may withdraw from and no longer be bound by this Agreement by providing notice of such withdrawal in accordance with Section 14 below;

(e)     Shell, any of the Moreno Entities, TPT or the Requisite Noteholders, if the Chapter 11 Plan or any exhibits or supplements thereto do not conform in all material respects to the Plan Term Sheet with respect to the treatment of its Claims and its rights;

(f)     Shell, the Requisite Noteholders or TPT if the Bankruptcy Court enters an order invalidating, disallowing or limiting in any material respect, such Party's Claims;

(g)     Shell, any of the Moreno Entities, TPT or the Requisite Noteholders, if an order converting the Chapter 11 Case of any of the Debtors to a case under chapter 7 of the Bankruptcy Code is entered by the Bankruptcy Court without the prior consent of such Party, *provided* that it shall not constitute a Termination Event if the Requisite Noteholders, Shell, the Moreno Entities or TPT unreasonably withhold their consent to an order converting the Chapter 11 Case of one of the  subsidiaries of GFES;

(h)     Shell, any of the Moreno Entities, TPT or the Requisite Noteholders, if the Bankruptcy Court enters an order terminating or modifying the Debtors' exclusive right to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code without the prior written consent of such Party;

(i)     Shell, any of the Moreno Entities, TPT or the Requisite Noteholders, if any of the Companies shall materially breach its obligations under this Agreement or file or publicly announce its intention not to pursue the Restructuring or to file a chapter 11 plan other than the Chapter 11 Plan;

(j)     Shell, any of the Moreno Entities, TPT or the Requisite Noteholders, if the Bankruptcy Court enters an order under section 1106(b) of the Bankruptcy Code appointing an examiner with enlarged powers (powers beyond the ability to investigate and report as set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or the entry of an order by the Bankruptcy Court appointing a trustee under section 1104 of the Bankruptcy Code;

(k)     Shell, any of the Moreno Entities, TPT or the Requisite Noteholders, if the Bankruptcy Court enters an order dismissing one or more of the Debtors' Chapter 11 Cases without the prior consent of such Party;

(l)     The Requisite Noteholders if, on or before February 24, 2014, the Companies have not filed a motion to sell substantially all of their assets pursuant to Section 363 of the Bankruptcy Code (the "Sale") and establish certain bidding procedures relating thereto (the "Sale Motion") together with an executed purchase agreement from a stalking horse buyer that would result in the Debtors' receipt at closing of the Sale of at least REDACTED of cash proceeds (net of any funds escrowed or otherwise reserved for the benefit of the stalking horse buyer therein);

(m)     Shell, if, on or before February 24, 2014, the Companies have not filed the Sale Motion together with an executed purchase agreement from a stalking horse buyer that would result in the Debtors' receipt at closing of the Sale of at least REDACTEDof cash proceeds (net of any funds escrowed or otherwise reserved for the benefit of the stalking horse buyer therein);

(n)     Shell, any of the Moreno Entities, TPT or the Requisite Noteholders, if any other Party materially breaches this Agreement and such breach has not been cured within 5 days after notice thereof;

(o)     Shell or the Requisite Noteholders, if the Companies fail to satisfy any of the other Milestones set forth in the Plan Term Sheet;

(p)     Shell, any of the Moreno Entities, TPT or the Requisite Noteholders, if any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing or prohibiting the Restructuring in a manner that cannot reasonably be remedied by the Companies or any other Party hereto;

(q)     Shell, any of the Moreno Entities or the Requisite Noteholders, if the Chapter 11 Plan is amended or modified, or if the Debtors file a pleading seeking to amend or modify the Chapter 11 Plan, Disclosure Statement, any of the Plan Related Documents, or any documents related to the foregoing, including motions, notices, exhibits, appendices, and orders, in a manner not reasonably acceptable to Requisite Noteholders;

(r)     Shell, any of the Moreno Entities or the Requisite Noteholders, if the Debtors file any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement, Plan Term Sheet or the Chapter 11 Plan and such motion or pleading has not been withdrawn prior to three (3) business days of the Debtors receiving notice that such motion or pleading is inconsistent with this Agreement, the Chapter 11 Plan, or Plan Term Sheet;

(s)     Shell, in its sole discretion, may terminate this Agreement on or prior to January 10, 2014, by providing notice in accordance with Section 14 below stating that Shell will not release the Moreno Guaranty; or

(t)     The Requisite Noteholders, in their sole discretion, may terminate this Agreement on or prior to January 10, 2014, by providing notice in accordance with Section 14 below stating that they are not satisfied with the results of their TGS related diligence;

.

*provided, however* that no Consenting Noteholder, Shell, TPT, or Moreno Entity may seek to terminate this Agreement based upon a material breach or a failure of a condition in this Agreement arising out of its own actions or omission.

Section 7.    Termination by the Companies.

In the event of (i) a material breach of this Agreement by any of the Moreno Entities, Shell, TPT or Consenting Noteholders holding more than one-third in amount of the Claims of all Noteholders at the time of any such breach or (ii) the stalking horse bid set forth in the motion to sell substantially all of the assets of the Companies pursuant to Section 363 of the Bankruptcy Code and establish certain bidding procedures relating thereto would not result in the Debtors' receipt at closing of the Sale of at least REDACTED of cash proceeds (net of any funds escrowed or reserved for the benefit of the stalking horse buyer therein), then the Companies shall have the right to terminate this Agreement by giving written notice thereof to the other Parties in accordance with Section 9 below (a "Company Termination Event" and, together with a Counterparty Termination Event, a "Termination Event"); *provided, however,* that the Companies may not seek to terminate this Agreement based upon a material breach or a failure of a condition in this Agreement arising out of their own actions or omissions. For the avoidance of doubt, the filing of a Sale motion that includes a stalking horse bid that would not result in the Debtors' receipt at closing of the Sale of at least REDACTED of cash proceeds shall not constitute the failure of a condition arising out of the Companies' own actions or omissions.

Section 8.    Consensual Termination.  In addition to the Termination Events set forth in Sections 6 and 7 of this Agreement, this Agreement shall be terminable immediately upon written agreement of the Moreno Entities, the Companies, Shell, TPT and each Consenting Noteholder to terminate the Agreement; *provided, however,* that such termination of the Agreement shall not restrict the Parties' rights and remedies for any prior breach of the Agreement by any Party, including, but not limited to, the reservation of rights set forth in Section 5 hereof.  The Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder (the "Automatic Stay") in connection with giving any notice after the occurrence of a Termination Event as provided herein.  This Agreement shall terminate automatically without further required action or notice upon consummation of the Chapter 11 Plan

Section 9.    Effect of Termination and of Waiver of Termination Event; Survival.  On the delivery of the written notice referred to in Sections 6, 7 or 8 hereof in connection with the valid termination of this Agreement, the obligations of each of the Parties hereunder shall thereupon terminate and be of no further force and effect, *provided, however,* that prior to the delivery of such notice any Party who has the right to waive a Counterparty Termination Event and the Companies may waive the occurrence of a Company Termination Event, and *provided further* that any Party that gives notice of a Counterparty Termination Event may waive the occurrence of a Counterparty Termination Event within three days after delivery of written notice referred to in Section 6 hereof and the Companies may waive the occurrence of a Company Termination Event within three days after delivery of written notice referred to in Section 7 hereof.  No such waiver shall affect any subsequent Termination Event or impair any

right consequent thereon.  Upon termination of this Agreement, no Party (or any other party) shall have any continuing liability or obligation to the other Parties hereunder; _provided_, _however_, that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Notwithstanding the termination of this Agreement, the agreements and obligations of the Parties in Sections 17 through and including 20 hereof and Sections 23 through and including 32 hereof shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

Section 10.    Fiduciary Obligations.    Notwithstanding anything to the contrary contained in this Agreement (i) nothing herein requires the Debtors or their respective boards of directors to breach any fiduciary obligations they have under applicable law; and (ii) the Debtors may terminate this Agreement without incurring liability to any Party as a result of such termination in the event the independent director on the special committees of the Debtors' Boards of Directors reasonably determines, consistent with his fiduciary obligations and in consultation with the Debtors' legal advisors, (a) that the conditions to effectiveness of the Chapter 11 Plan cannot be satisfied or (b) if an unsolicited offer of an Alternative Plan or other alternative to the Chapter 11 Plan is received, that failure to negotiate such unsolicited offer would violate his fiduciary duties.

Section 11.    Effectiveness of the Agreement.    This Agreement shall become immediately effective upon all Parties other than the Companies upon execution of this Agreement by the Companies, the Moreno Entities, TPT, Shell and holders of at least 66.7% of the principal amount of the Notes.  The Agreement shall become effective upon the Companies upon approval of the Bankruptcy Court.  This Agreement will remain effective until terminated pursuant to Sections 6, 7 or 8 hereof.

Section 12.    Amendments.    This Agreement may not be modified, amended, or supplemented except in writing signed by the Companies, TPT, Shell, the Moreno Entities, and the Requisite Noteholders.

Section 13.    Governing Law; Jurisdiction.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of Delaware.  By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought in the Bankruptcy Court.  By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit, or proceeding.  Each of the Parties hereto hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.

Section 14.    Notices.  All demands, notices, requests, consents, and communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally or by courier service, messenger, facsimile, telecopy, electronic mail, or if duly deposited in the

mails, by certified or registered mail, postage prepaid-return receipt requested, and shall be deemed to have been duly given or made: (i) upon delivery, if delivered personally, by electronic mail or by courier service, or messenger, in each case with record of receipt; (ii) upon transmission with confirmed delivery, if sent by facsimile or telecopy; or (iii) two business days after being sent by certified or registered mail, postage pre-paid, return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

> If to the Debtors, to the addresses or telecopier numbers set forth below following the Companies' signature and to the following Debtors' Counsel:
>
> YOUNG CONAWAY STARGATT & TAYLOR, LLP
> Michael R. Nestor
> Kara Hammond Coyle
> Rodney Square
> 1000 North King Street
> Wilmington, Delaware 19801
> Telephone: (302) 571-6600
> Facsimile: (302) 571-1253
> Email: mnestor@ycst.com and kcoyle@ysct.com
>
>     -and-
>
> LATHAM & WATKINS LLP
> Josef S. Athanas
> Caroline A. Reckler
> Sarah E. Barr
> Matthew L. Warren
> Suite 5800
> 233 South Wacker Drive
> Chicago, IL 60606
> Telephone:  (312) 876-7700
> Facsimile:  (312) 993-9767
> Email: josef.athanas@lw.com, caroline.reckler@lw.com,
>       sarah.barr@lw.com and matthew.warren@lw.com
>
> If to a Moreno Entity or a transferee thereof, to the addresses or telecopier numbers set forth below following the Moreno Entity's signature (or as directed by any transferee thereof) and to the following:
>
> COLE SCHOTZ
> Norman L. Pernick
> Jordan A. Fisch
> 500 Delaware Avenue, Suite 1410
> Wilmington, DE 19801
> Telephone:  (302) 651-2000

Facsimile:  (302) 574-2100
Email: npernick@coleschotz.com and jfisch@coleschotz.com

If to a Consenting Noteholder or a transferee thereof, to the addresses or telecopier numbers set forth below following the Consenting Noteholder's signature (or as directed by any transferee thereof) and to the following counsel for the Ad Hoc Noteholder Group (as defined in Section 27 below):

JONES DAY
Paul D. Leake
Richard H. Engman
Michael J. Cohen
222 E. 41st Street
New York, NY 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Email: rengman@JonesDay.com, pdleake@JonesDay.com,
        mcohen@JonesDay.com

If to Shell or a transferee thereof, to the addresses or telecopier numbers set forth below following the Shell's signature (or as directed by any transferee thereof) and to the following:

LISKOW & LEWIS
Michael D. Rubenstein
1001 Fannin Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 651-2953
Facsimile: (713) 651-2952
Email: mdrubenstein@liskow.com

If to TPT or a transferee thereof, to the addresses or telecopier numbers set forth below following the TPT's signature (or as directed by any transferee thereof).

Section 15.    Entire Agreement.    This Agreement constitutes the full and entire understanding and agreement among the Parties with regard to the subject matter hereof, and supersedes all prior agreements with respect to the subject matter hereof.

Section 16.    Headings.    The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

Section 17.    Successors and Assigns.    This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors and assigns *provided*, *however*, that nothing contained in this paragraph shall be deemed to permit sales, assignments, or transfers other than in accordance with Section 4 hereof.

13

Section 18.  <u>Specific Performance</u>.  Each Party hereto recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement will cause the other Parties to sustain damages for which such Parties would not have an adequate remedy at law for money damages, and therefore each Party hereto agrees that in the event of any such breach, such other Parties shall be entitled to the remedy of specific performance of such covenants and agreements and injunctive and other equitable relief in addition to any other remedy to which such Parties may be entitled, at law or in equity.

Section 19.  <u>Several, Not Joint, Obligations</u>.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

Section 20.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

Section 21.  <u>No Waiver</u>.  The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such compliance.

Section 22.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an executed signature page of this Agreement by telecopier or email shall be as effective as delivery of a manually executed signature page of this Agreement.

Section 23.  <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 24.  <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

Section 25.  <u>Additional Parties</u>.  Without in any way limiting the provisions hereof, additional Noteholders may elect to become Parties by executing and delivering to the Companies a counterpart hereof.  Such additional Noteholder shall become a Party to this Agreement as a Consenting Noteholder in accordance with the terms of this Agreement.

Section 26.  <u>No Solicitation</u>.  This Agreement is not intended to be, and each signatory to this Agreement acknowledges that this Agreement is not, whether for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise, a solicitation for the acceptance or rejection of a plan of reorganization for any of the Debtors.  The Debtors will not solicit acceptances of the Chapter 11 Plan from Shell, TPT or the Consenting Noteholders until Shell, TPT and the

Consenting Noteholders have been sent copies of a Disclosure Statement approved by the Bankruptcy Court.

Section 27.    <u>Fees and Expenses</u>.  The Companies shall pay the reasonable accrued and ongoing prepetition and postpetition fees and expenses of Jones Day, Tudor, Pickering, Holt & Co., and Richards, Layton and Finger LLP, in their capacity as professionals retained by the Ad Hoc Noteholder Group (as defined in the *Final Order (I) Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364 and 507(b), and (II) Granting Adequate Protection to Certain Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Court* [Docket No. 191] (the "<u>Final DIP Order</u>"), within 15 days of receipt of invoices therefor, subject to (a) the Companies and the Ad Hoc Noteholder Group agreeing to a monthly budget for such fees and expenses and the DIP Lenders (as defined in the Final DIP Order) agreeing to amend the Budget (as defined in the Final DIP Order) to include such fees and expenses, and (b) compliance with paragraph 26 of the Final DIP Order.  The Companies shall also pay, upon the effective date of the Chapter 11 Plan, the reasonable fees and expenses of (i) attorneys and a financial advisor for the Moreno Entities, (ii) attorneys for the Indenture Trustee, (iii) attorneys for the proposed agent retained by certain Noteholders in connection with a postpetition financing proposal negotiated with the Companies (the "<u>Proposed Agent</u>") and (iv) Liskow & Lewis, FTI Consulting, Inc., and Potter Anderson & Corroon LLP as professionals retained by Shell, subject to the Companies and each of the Moreno Entities, the Indenture Trustee, the Proposed Agent and Shell agreeing to an aggregate budget for such respective fees and expenses.

Section 28.    <u>Settlement Discussions</u>.  This Agreement and the Restructuring are part of a proposed settlement of a dispute among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

Section 29.    <u>Consideration</u>.  It is hereby acknowledged by the Parties hereto that, other than the agreements, covenants, representations, and warranties set forth herein and in the Plan Term Sheet, no consideration shall be due or paid to the Noteholders, TPT or Shell for their agreement to vote to accept the Chapter 11 Plan in accordance with the terms and conditions of this Agreement.

Section 30.    <u>Receipt of Adequate Information; Representation by Counsel</u>.  Each Party acknowledges that it has received adequate information to enter into this Agreement and that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party shall have no application and is expressly waived.  The provisions of the Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties.

Section 31.    <u>Conflicts Between the Plan Term Sheet and this Agreement</u>.  In the event of any conflict among the terms and provisions in the Plan Term Sheet and this Agreement, the terms and provisions of the Plan Term Sheet shall control.

Section 32.    <u>Public Disclosure</u>.    The Consenting Noteholders hereby consent to the disclosure of the execution and contents of this Agreement by the Debtors in the Chapter 11 Plan, Disclosure Statement, the other Plan-Related Documents and any filings by the Debtors with the Bankruptcy Court; *provided, however*, that the Debtors shall not, without the applicable Consenting Noteholder's prior written consent, disclose (a) the name of any Consenting Noteholder or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives and agents or (b) the holdings of any Consenting Noteholder as set forth on any signature page to this Agreement or otherwise; provided that, the Company shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, the Claims held by the Consenting Noteholders as a group.    The Debtors, counsel for the Ad Hoc Noteholder Group and the Moreno Entities shall (a) consult with each other before issuing any press release or otherwise making any public statement with respect to the transactions contemplated by this Agreement, (b) provide to the other for review a copy of any such press release or public statement and (c) not issue any such press release or make any such public statement prior to such consultation and review and the receipt of the prior consent of the other Party; provided, that no Party need consult with any other Party with respect to any press release or public statement relating to the termination of this Agreement.

[**Signature Page Follows**]

**EXECUTION COPY**

IN WITNESS WHEREOF, the Companies have duly executed and delivered this Agreement as of the date first above written.

**GREEN FIELD ENERGY SERVICES, INC.**

By: _Thomas E. Hill_
Name: _Thomas E. Hill_
Title: _Chief Restructuring Officer_

**HUB CITY TOOLS, INC.**

By: _Thomas E. Hill_
Name: _Thomas E. Hill_
Title: _Chief Restructuring Officer_

**PROPPANT ONE, INC.**

By: _Thomas E. Hill_
Name: _Thomas E. Hill_
Title: _Chief Restructuring Officer_

Notice Address:

Green Field Energy Services, Inc.
4023 Ambassador Caffery Parkway, Suite #200,
Lafayette, LA 70503
ATTN: Thomas Hill, Rick Fontova and Earl Blackwell
Telephone: (337) 706-1700
Facsimile: (337) 706-1786
Email: thill@alvarezandmarsal.com;
      Rick.Fontova@gfes.com;
      Earl.Blackwell@gfes.com

IN WITNESS WHEREOF, the Moreno Entities have duly executed and delivered this Agreement as of the date first above written.

**MICHEL B. MORENO**

By: _____

**TCM 2011 DOH**

By: _____
Name: Michel B. Moreno
Title: Managing Member

**MBM 2011 DOH**

By: _____
Name: Michel B. Moreno
Title: Managing Member

Notice Address:
4023 Ambassador Caffery, Suite 200
Lafayette, LA 70503
Telephone: (337) 706-1700
Facsimile: (337) 706-1787
michel@morenoholdings.com

IN WITNESS WHEREOF, Shell has duly executed and delivered this Agreement as of the date first above written.

Shell holds $ 95,000,000.00     in principal amount of Claims.

**SWEPI, LP** (successor to Shell Western Exploration and Production, Inc.)

By: _F. Cade Kohoutek_

Name: F. Cade Kohoutek

Title: Vice President - Finance

Notice Address:
Liskow & Lewis
Attn: Michael D. Rubenstein
1001 Fannin Street, Suite 1800
Houston, Texas 77002
mdrubenstein@liskow.com

IN WITNESS WHEREOF, TPT has duly executed and delivered this Agreement as of the date first above written.

TPT holds $ _7,832,213.41_ in principal amount of Claims.

**TURBINE POWERED TECHNOLOGY, LLC**

By: _Ted Lee McIntyre II_

Name: Ted Lee McIntyre II

Title: C.E.O.

Notice Address:

Turbine Powered Technology, LLC
Attn Ted Lee McIntyre II
298 Louisiana Rd
Port of West St Mary
Franklin, LA 70538-7607
Email: ted.m@tptenergy.com

IN WITNESS WHEREOF,                REDACTED                agrees to this
Restructuring Support Agreement and to become a Consenting Noteholder.

REDACTED                holds REDACTED in principal amount of Claims.

*CONSENTING NOTEHOLDER:*

# REDACTED

**Exhibit A**

PLAN TERM SHEET

**GREEN FIELD ENERGY SERVICES, INC.**
**RESTRUCTURING TERM SHEET**
**DECEMBER 17, 2013**

THIS TERM SHEET (THE "TERM SHEET") DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS AND CONDITIONS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL FINANCIAL RESTRUCTURING AND IS SUBJECT TO THE NEGOTIATION AND EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE ACCEPTABLE IN ALL RESPECTS TO THE COMPANIES (AS DEFINED BELOW) AND THE CONSENTING NOTEHOLDERS (AS DEFINED BELOW).

This Term Sheet sets forth the principal terms of a proposed restructuring (the "Restructuring") of existing debt and other obligations of Green Field Energy Services, Inc. and its wholly owned subsidiaries (the "Companies") through a plan of reorganization of the Companies (a "Plan") and, the effective date thereof, the "Effective Date") containing the terms and conditions described herein and other standard and customary provisions. This Term Sheet shall be attached to, and incorporated into, a restructuring support agreement (the "Restructuring Support Agreement") entered into by and among the Companies, holders of at least 66.7% in amount of the Notes (as defined below; such holders, the "Consenting Noteholders"), Michel B. Moreno (and related trusts and other entities under his control, as applicable), Shell (as defined below), TPT (as defined below), and other parties signatories thereto. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement.

| | |
|---|---|
| **COMPANIES:** | Green Field Energy Services, Inc. ("GFES"), Hub City Tools, Inc. and Proppant One, Inc. |
| **REQUISITE NOTEHOLDERS:** | Consenting Noteholders holding a majority in dollar amount of Notes held by all Consenting Noteholders. |

**PREPETITION CAPITAL STRUCTURE**

| | |
|---|---|
| **Notes:** | Those certain 13% Senior Secured Notes Due 2016 issued in the original aggregate principal amount of $250,000,000 under that certain Indenture dated as of November 15, 2011 among Green Field Energy Services, Inc., as issuer, Hub City Tools, Inc., as guarantor, and Wilmington Trust, National Association, as trustee and collateral agent (the "Indenture Trustee," the Notes issued thereunder, the "Notes" and, the beneficial holders thereof, the "Noteholders"), as amended on October 23, 2012 and thereafter amended, modified, or supplemented from time to time (the "Indenture"). |
| | The Noteholders have four classes of claims against the Companies: (1) claims secured by Shared Collateral (as defined in that certain Amended and Restated Intercreditor Agreement dated October 24, 2012 (the "Intercreditor Agreement") by and among the Indenture Trustee, Shell and the Obligors) for any and all obligations owing under the Notes (the "Noteholder Shared Collateral Secured Claims"), |

(2) claims secured by collateral (the "Other Collateral") other than the Shared Collateral for any and all obligations owing under the Notes ("Noteholder Other Secured Claims"), (3) claims secured by all of the Companies' pre- and postpetition assets (the "Noteholder AP Collateral" and, together with the Shared Collateral and the Other Collateral, the "Noteholder Collateral") for any and all diminution since the petition date in the value of the Shared Collateral and the Other Collateral (the "Noteholder AP Secured Claims" and, together with the Noteholder Shared Collateral Secured Claims and the Noteholder Other Secured Claims, the "Noteholder Secured Claims"), and (4) any and all unsecured claims, including claims for any deficiency between the amount of any and all obligations owing under the Notes Documents (as defined in the Indenture) and the aggregate value of the Noteholder Collateral (the "Noteholder Unsecured Claims" and, together with the Noteholder Secured Claims, the "Noteholder Claims").

**Shell Credit Facility:** That certain Contract for High Pressure Fracturing Services dated as of September 2, 2011 by and between Shell Western Exploration and Production, Inc. (predecessor-in-interest to SWEPI LP; "Shell") and Hub City Industries, LLC (a.k.a. Greenfield Energy Technologies and predecessor-in-interest to GFES), as heretofore amended (the "Shell Agreement"). Shell's claims for any and all obligations under the Shell Agreement (the "Shell Claims") are secured by security interests in certain motor vehicles as the result of notations on their certificates of title (the "Shell Motor Vehicle Liens") and equipment and other assets as the result of a UCC-1 filed with the Delaware Secretary of State on October 11, 2013 (the "Shell General Liens").

**Existing Warrants:** All outstanding warrants held by existing warrant holders (the "Existing Warrant Holders") pursuant to that certain Warrant Agreement, dated as of November 15, 2011 (as amended on October 24, 2012 and thereafter amended, supplemented or modified from time to time, the "Warrant Agreement"), by and between GFES, Wilmington Trust, National Association, as warrant agent, and other parties signatory thereto.

**Existing Equity Interests:** All equity interests in the Companies and rights or options to acquire such equity interests owned by existing equity holders (the "Existing Equityholders").

**MORENO TGS INTERESTS:** MOR DOH Holdings, L.L.C. ("MOR") is a Delaware limited liability company organized and operated under that certain Amended and Restated Limited Liability Company

2

Agreement dated June 21, 2013 (the "MOR Operating Agreement").   The sole asset of MOR is all of the membership interests in Turbine Generation Services, LLC f/k/a Green Field Power Generation, L.L.C. ("TGS")

Michel B. Moreno ("Moreno") and his wife, Tiffany C. Moreno, directly or indirectly through their family and trust entities (together with Moreno and Tiffany C. Moreno, the "Moreno Entities"), own 90.40767% of the MOR Membership Interests and related Common Units (as defined in the MOR Operating Agreement) (the "MOR/TGS Interests").

**TPT:**                    Turbine Powered Technology, LLC ("TPT") is a joint venture organized and operated under that certain operating agreement, dated September 22, 2011 (as modified by amendments dated October 28, 2011 and November 9, 2011 the "TPT Operating Agreement"), that is owned 50% by MTT Properties, LLC ("MTT") and 50% owned by GFES (such 50% GFES interest, the "GFES TPT Equity").

**CHAPTER 11 CASES:**        The Companies commenced voluntary chapter 11 cases (the "Chapter 11 Cases") in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on October 27, 2013 (the "Petition Date").

**DIP FACILITY:**           The Companies have entered into a $30 million secured super priority priming debtor-in-possession facility (the "DIP Facility") with Icon/GB.  The Indenture Trustee and Shell have consented to such DIP Facility, including the priming contemplated therein, subject to the provision of adequate protection and other provisions set forth in of the final order authorizing the Debtors' entry into the DIP Facility, among other relief, entered by the Bankruptcy Court on November 26, 2013 as docket item 191 in the Chapter 11 Cases (the "Final DIP Order").

The claims of ICON/GB for amounts owing under the DIP Facility (the "DIP Claims") will be satisfied by the Companies' cash on hand and any proceeds of the Sale (as defined below).

**MORENO SETTLEMENT:**       As described below, the Moreno Entities shall transfer all of their MOR/TGS Interests, free and clear of all liens, claims, and encumbrances other than as may be set forth in the MOR Operating Agreement in exchange for (a) the contribution of the GFES TPT Equity to NewCo, (b) 30% of the Class A preferred equity, 50% of the Class B preferred equity and 70% of the common equity of NewCo, and (c) a release of all

3

of the Companies' and their estates' rights, claims and causes of action against Michael B. Moreno, Tiffany C. Moreno and the other Moreno Entities, the officers and directors of the Companies, Moreno Properties, LLC, Dynamic Industries, Inc., Marine Turbine Technology, LLC, Casafin II, LLC, Aerodynamic, LLC, Elle Investments, LLC, Alliance Consulting Group, LLC, Frac Rentals, LLC, Moody, Moreno and Rucks, LLC, TGS, MOR, TCM 2011 DOH GRAT, MBM 2011 MGH GRAT, TCM 2011 MGH GRAT, MBM 2011 DOH GRAT, Riverstone and Rucks, Dynamic Group Holdings, LLC, Shale Support Services, LLC, Dynamic Energy Services International, LLC, MOR 2013 Holdings, LLC and MOR MGH Holdings, LLC, and their respective officers, directors, representatives, shareholders, members, employees and professional advisors (collectively, the "Moreno Releasees"), which releases shall expressly exclude any defenses that may be raised by the Companies to any claims, rights or causes of action of any Moreno Releasees against the Companies.

**TPT SETTLEMENT:**

TPT shall (a) release all claims, rights and causes of action against the Companies and their estates and TGS, (b) consent, and cause MTT to consent, to the assignment of the GFES TPT Equity to NewCo and the transactions contemplated herein, (c) consent to the Companies' assumption and assignment of the license of intellectual property from TPT to GFES and the equipment purchase agreement between TPT and GFES to any purchaser of assets of the Companies without any further cure payments, and (d) deliver equipment previously ordered by TGS without further payment by TGS, all in exchange for a release of all rights, claims and causes of action of the Companies against TPT and payment of $12 million of the Sale proceeds to TPT pursuant to the Plan (the "TPT Payment"), which shall be used by TPT for working capital purposes and shall not be distributed to TPT's members.

In accordance with Article 23 of the TPT Operating Agreement, GFES shall transfer the GFES TPT Equity to NewCo and cause NewCo to be admitted as a full member of TPT (as further described below).

**NOTEHOLDER SETTLEMENT:**

On the Effective Date, in satisfaction of the Noteholder Claims, the Noteholders shall receive the following (the "Noteholder Distribution"): (i) $40 million of the proceeds from the Sale, which, pursuant to the Intercreditor Agreement and the Shell Settlement, shall be paid directly to

4

Shell (the "<u>Shell Turnover Distribution</u>"), (ii) 70% of the Class A preferred equity of NewCo, (iii) 50% of the Class B preferred equity of NewCo, and (iv) 30% of the common equity of NewCo.

**SHELL SETTLEMENT:**

On the Effective Date, in satisfaction of the Shell Claims and Shell's agreement to (i) stipulate to the avoidance of the Shell General Liens, (ii) cap its turnover rights on account of the Noteholder Shared Collateral Secured Claims at $40 million and not assert any other turnover rights under the Intercreditor Agreement or otherwise, and (iii) release the Moreno collection guaranty of the obligations under the Shell Credit Facility, Shell shall receive (a) $5 million of the Companies' cash on hand and Sale proceeds on account of their perfected liens (the "<u>Shell Perfected Distribution</u>"), (b) the Shell Turnover Distribution (together with the Shell Perfected Distribution, the "<u>Shell Distribution</u>"), and (c) a release of all claims, rights and causes of action of the Companies and their estates against Shell, its affiliates, and their respective officers and directors other than the Companies' rights, claims and causes of action under chapter 5 of the Bankruptcy Code.

**NEWCO:**

On the Effective Date, a newly formed entity ("NewCo") shall be formed and capitalized with (i) the MOR/TGS Interests, (ii) the GFES TPT Equity, and (iii) cash (the "<u>NewCo Cash Distribution</u>") in an amount equal to (a) any and all of the Companies' cash on hand and Sale proceeds in excess of the amount required to satisfy all DIP Claims, the Shell Distribution, all Other Secured Claims, the TPT Payment, and the Estate Distribution (as defined below) plus (b) any excess Estate Distribution after settlement of the Litigation Trust (as defined below); provided, however, that to the extent the aggregate value of the NewCo Cash Distribution and the Noteholder Distribution would exceed the allowed amount of the Noteholder Claims, the amount in excess shall be contributed to the Litigation Trust in cash.

**CAPITAL STOCK**

On the Effective Date, the capital stock of NewCo shall consist of (i) Class A preferred equity, which shall have a $300 million liquidation preference and not be entitled to any dividends, (ii) Class B preferred equity, which shall have a $300 million liquidation preference after payment in full in cash of the Class A preferred equity and not be entitled to any dividends, and (iii) common equity.

**BOARD OF DIRECTORS**

The initial Board of Directors of NewCo will be composed of

5

three directors, consisting of Moreno or his designee, a representative of Beach Point Capital Management, LLC or its designee, and a representative of Stonehill Capital Management LLC or its designee; provided, however, that the prior written consent of Moreno (which consent shall not be unreasonably withheld) shall be required if, at any time, (a) the representative of Beach Point Capital Management, LLC shall be any individual other than Jacob Rothman or (b) the representative of Stonehill Capital Management LLC shall be any individual other than Wayne Teetsel.

Unless previously removed for Cause (as defined below) and so long as he continues to own at least 50% of the outstanding NewCo Common Stock, Moreno shall have the ability to nominate and appoint himself or his designee as a director of NewCo.  As used herein, the term "Cause" shall mean with respect to Moreno:

(i)   an intentional act of fraud, embezzlement, theft or any conviction of a felony that occurs during or in the course of Moreno's employment with NewCo, MOR, or TGS;

(ii)  intentional engagement in (A) any transfer of all or a material portion of the real or personal property of TGS to any entity affiliated with Moreno, or (B) any other transaction involving MOR or TGS with any entity affiliated with Moreno, in each instance without the prior approval of a majority of NewCo's Board of Directors which approval shall not be unreasonably withheld, conditioned or delayed; or

TGS RELATED ACTIONS

(iii) mental or physical incapacity which precludes Moreno from rendering services to Newco and TGS in the same manner as such services were provided prior to such incapacity for a period of 90 consecutive days or 150 days in any 180 consecutive day period.

The charter, operating agreement, and/or other organizational documents of NewCo shall provide that, except for the actions described in the immediately following paragraph, Moreno may cause NewCo to take or not take any action involving TGS, MOR or the MOR/TGS Interests so long as (a) Moreno or his designee is a director of NewCo, (b) Moreno or his designee is managing the day to day affairs and operations of TGS, and (c) a Qualified Investment (as defined in the MOR Operating Agreement) has been made or

6

the time in which to make such has not yet expired.

Notwithstanding the immediately preceding paragraph, the following actions may be taken by NewCo only to the extent authorized by a unanimous vote of its Board of Directors (which vote shall not be unreasonably withheld, conditioned or delayed):

> (i) any action to amend or modify the MOR Operating Agreement in any respect that would have an adverse effect on Newco other than an amendment or modification to the definition of "Qualified Investment" that (a) extends the time period for such to a date that is on or before June 21, 2015 or (b) reduces the aggregate amount of such to an amount that is at least $50 million; and

> (ii) any transfer of all or a material portion of the real or personal property of TGS to any entity affiliated with Moreno, or causing TGS to engage in any other transaction involving MOR or TGS with any entity affiliated with Moreno.

**CONSENTS TO TRANSFER OF MOR/TGS INTERESTS:**

It shall be a condition to the occurrence of the Effective Date that the Moreno Entities first obtain consent to the free and clear transfer of the MOR/TGS Interests to NewCo and any other transactions contemplated herein and by the Plan, as applicable, from (i) the other equity holders of TGS and (ii) any and all other persons parties whose consent for any of the foregoing transactions is required (which shall include, without limitation, the existing secured lenders to TGS, the Moreno Entities, and any other members of TGS's direct parent).

**TGS GE LITIGATION PROCEEDS:**

The Consenting Noteholders and the Moreno Entities shall agree that in the event TGS receives proceeds from litigation or settlement of litigation against General Electric Corporation or any of its affiliates (collectively, the "GE Entities") on account of any claims arising on or prior to the Petition Date related to any potential investment or loan by any of the GE Entities in or to TGS, whether such proceeds are in the form of cash, securities, forgiveness of indebtedness or otherwise (the "GE Proceeds"), NewCo shall issue Class AA preferred stock with a liquidation preference senior to the Class A preferred stock and Class B preferred stock in an amount equal to the greater of (a) the product of NewCo's percentage of the total common equity of TGS at the time the GE Proceeds are received by TGS multiplied by

7

the amount of the GE Proceeds or (b) such larger amount of GE Proceeds to which the other shareholders of TGS agree NewCo is entitled, with such Class AA preferred stock not being entitled to any dividends or voting rights, and allocations thereof among Michel B. Moreno and the Noteholders to be negotiated in good faith by Michel Moreno and the Consenting Noteholders upon receipt of such parties of all necessary information regarding such litigation claims and prior to the date of the hearing on the Disclosure Statement. Notwithstanding the foregoing, TGS management, as directed by Michael Moreno, will control the litigation against the GE Entities.

**OTHER SECURED CLAIMS:**    On the Effective Date, provided that the aggregate amount of Other Secured Claims does not exceed $3 million plus the allowed amount of Other Secured Claims held by Ford Motor Credit Company, LLC and Nations Fund I Inc., the holders of such Other Secured Claims shall either (a) receive their collateral in satisfaction of their claims, or (b) be paid in full in cash.

**ESTATE DISTRIBUTION:**    On the Effective Date, $24 million of the Companies' cash on hand and Sale proceeds shall be transferred to the Companies' estates free and clear of all claims, liens and encumbrances of the Noteholders for payment of administrative, priority and unsecured claims (the "Estate Distribution"). In addition, on the Effective Date, to the extent the aggregate value of the NewCo Cash Distribution and the Noteholder Distribution would exceed the allowed amount of the Noteholder Claims, the amount in excess shall be contributed to the Litigation Trust in cash free and clear of all claims, liens and encumbrances of the Noteholders.

**GENERAL UNSECURED CLAIMS**    On the Effective Date, (i) a trust (the "Litigation Trust") shall be settled with (a) any and all chapter 5 causes of action of the Companies other than those released as part of the Moreno Settlement, (b) the first $1 million of any amount by which the Estate Distribution exceeds allowed administrative and priority claims, and (c) all amounts by which the aggregate value of the NewCo Cash Distribution and the Noteholder Distribution exceeds the allowed amount of the Noteholder Claims, and (ii) in satisfaction of all general unsecured claims, each holder of an allowed general unsecured claim shall receive its pro rata share of the interests in the Litigation Trust.

**EXISTING WARRANTS**    Existing Warrant Holders shall receive no recovery on

8

account of their warrants in the Companies.

**EXISTING EQUITY INTERESTS**          Existing Equityholders shall receive no recovery on account of their equity interests in the Companies.

**SALE PROCESS:**          The Companies shall file a motion to sell substantially all of the assets of the Companies pursuant to Section 363 of the Bankruptcy Code (the "Sale") and establish certain bidding procedures relating thereto (the "Sale Motion") and continue the existing marketing process for the Companies' assets. The Sale Process shall be conducted pursuant to the Milestones (as defined below). Unless the Restructuring Support Agreement is terminated, neither Shell nor the Noteholders shall credit bid in any Sale.

**MILESTONES:**
- No later than February 7, 2014, the Companies shall have filed the Plan, Disclosure Statement, and a motion to approve the Disclosure Statement, each in form and substance reasonably acceptable to the Requisite Noteholders and Shell.

- No later than January 24, 2014, the Companies shall have received letters of intent from any interested potential purchasers of the Companies' assets.

- No later than March 10, 2014, the Disclosure Statement shall have been approved by order of the Bankruptcy Court, which order shall be in form and substance reasonably acceptable to the Requisite Noteholders and Shell.

- No later than February 24, 2014, the Companies shall have filed the Sale Motion, which shall be in form and substance acceptable to the Requisite Noteholders and Shell.

- No later than March 21, 2014, the auction shall have been conducted.

- No later than April 11, 2014, the Companies shall have consummated the Sale.

- No later than April 30, 2014, the Plan (which Plan, documents related thereto, and corresponding confirmation order shall be in form and substance acceptable to the Requisite Noteholders and Shell) shall have been confirmed and the Effective Date shall have occurred.

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES:**          Executory contracts and unexpired leases shall be assumed or rejected pursuant to a schedule to be attached to the

9

purchase agreement in connection with a sale of substantially all of the Companies' assets.

**MOR/TGS INTERESTS/DILUTION:**  Stockholders/members of NewCo shall be afforded preemptive rights to subscribe to any additional equity investments in TGS (the "<u>TGS Subscription Rights</u>").

The MOR/TGS Interests held by NewCo shall be subject to (i) dilution by (x) any additional equity investments in TGS (subject to the TGS Subscription Rights) and (y) TGS equity awarded pursuant to any management incentive plan authorized by a majority of directors on the TGS board of directors other than Moreno or directors appointed by a Moreno Entity.

**PRIVATE COMPANY:**  NewCo will not be listed on a national securities exchange or be an SEC-reporting company, but will deliver an appropriate reporting package to stockholders or members pursuant to a stockholders' agreement or operating agreement (as applicable) in form and substance acceptable to the Requisite Noteholders, the Companies and Moreno.

**FIDUCIARY OUT:**  The Restructuring Support Agreement shall include a customary "fiduciary out" provision providing that the Companies may negotiate unsolicited additional proposals if the Companies and the independent directors of their boards of directors have made a reasonable good faith determination, after consulting with their advisors, that the failure to do so would be a violation of their fiduciary duties.

**TERMINATION RIGHTS:**  Either the Debtors or the Requisite Noteholders may terminate the Restructuring Support Agreement if the stalking horse bid set forth in the Sale Motion would not result in the Debtors' receipt at closing of the Sale of at least REDACTED of cash proceeds (net of any funds escrowed or reserved for the benefit of the Buyer).

**CRITICAL VENDORS:**  The Bankruptcy Court has entered an order permitting the Companies to pay up to $1,000,000 to pre-petition unsecured creditors that the Companies deem to be critical vendors.

**NOTEHOLDER/MORENO EXPENSES:**  The Restructuring Support Agreement shall provide for the payment by the Companies of the reasonable accrued and ongoing prepetition and postpetition fees and expenses of the attorneys and financial advisor of the Ad Hoc Noteholder Group (as defined in the Final DIP Order) on a monthly basis, subject to agreed upon budgeted amounts, and the reasonable fees and expenses of attorneys and a financial advisor for the Moreno Entities, and the reasonable fees and expenses of attorneys for each of the Indenture Trustee and

10

the proposed agent retained by certain Noteholders in connection with a postpetition financing proposal negotiated with the Companies, through consummation of the Sale and through confirmation of the Plan upon the Effective Date, subject in each case to agreed upon budgeted amounts.

**RELEASES:**

To the fullest extent allowable by law, the Plan will contain customary releases and other exculpatory provisions in favor of (i) the Companies and all affiliates of the Companies, their present directors, officers, representatives, shareholders, members, employees and professional advisors, (ii) the Moreno Releasees, (iii) Shell and its directors, officers, representatives, shareholders, members, employees and professional advisors (other than with respect to the Companies' rights, claims and causes of action under chapter 5 of the Bankruptcy Code), (iv) the Indenture Trustee and its representatives and professional advisors, (v) the Consenting Noteholders, their respective directors, officers, partners, members, representatives, employees, professional advisors, (vi) TPT and its directors, officers, representatives, shareholders, members, employees and professional advisors, and (vii) other parties to be agreed upon by the Companies, Shell, and the Requisite Noteholders.

**STRUCTURING CONSIDERATIONS:**

The parties to the Restructuring Support Agreement shall use good-faith efforts to structure the Restructuring and the transactions contemplated herein and in the Restructuring Support Agreement to the maximum extent possible in a tax-efficient and cost-effective manner for the Companies.

11

**Exhibit B**

PROVISION FOR TRANSFER AGREEMENT

  The undersigned ("Transferee") hereby acknowledges that it has read and understands the Restructuring Support Agreement between Green Field Energy Services, Inc. and [**Transferor**] ("Transferor"), *inter alia*, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound.

By: _____
    Transferee

Acknowledged by
Green Field Energy Services, Inc.
on _____, 20__

By: _____

Its: _____