IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>GREEN FIELD ENERGY SERVICES, INC., et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 13-12783 (KG)<br><br>Jointly Administered<br><br>Doc. Ref. Nos. 299 and 303 |

**DECLARATION OF THOMAS E. HILL IN SUPPORT OF DEBTORS'
(I) OBJECTION TO THE ADJOURNMENT MOTION AND
(II) RESPONSE TO THE EXAMINER MOTION**

Under 28 U.S.C. § 1746, Thomas E. Hill declares as follows under the penalty of perjury:

1. I am a Managing Director with Alvarez & Marsal North America, LLC ("**Alvarez**") and am the elected Chief Restructuring Officer ("**CRO**") for the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"). I am authorized to submit this declaration on behalf of the Debtors.

2. As CRO to the Debtors, my support staff from Alvarez and I are responsible for preparing the weekly budget and variance reports for the Debtors and have been involved in the discovery process and various productions to the Official Committee of Unsecured Creditors (the "**Committee**") under their numerous diligence and document requests. Alvarez has been a key constituent in searching for and collecting documents to produce to the Committee and has worked with all of the parties to locate and produce responsive documents, including: the Debtors; the Debtors' counsel, Latham and Watkins LLP; and the Debtors' investment banker, Carl Marks Advisory Group, LLC.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax or organizational identification number, are: Green Field Energy Services, Inc. (2539); Hub City Tools, Inc. (2827); and Proppant One, Inc. (6035). The above-captioned Debtors' mailing address is 4023 Ambassador Caffery Parkway, Suite #200, Lafayette, LA 70503.

3. I submit this declaration in support of the Debtors' (i) Objection (the "**Objection**") to the Motion (the "**Adjournment Motion**") of the Committee seeking to adjourn both the response deadline and hearing date with respect to the *Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Code Rule 9019 for an Order Authorizing the Debtors to Enter Into and Perform their Obligations Under a Restructuring Support Agreement with the Moreno Entities, Turbine Powered Technology, LLC, SWEPI, LP and Consenting Noteholders* [Docket No. 299] (the "**RSA Motion**") and (ii) Response (the "**Response**") to the *Motion of the Official Committee of Unsecured Creditors for Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code* [Docket No. 304] (the "**Examiner Motion**" and collectively with the Adjournment Motion, the "**Motions**").[2]

I. **ALVAREZ'S GOOD FAITH COOPERATION WITH THE COMMITTEE**

4. At the Committee's request, the Debtors setup a meeting with the Committee Members, legal counsel to the Committee, Brown Rudnick LLP ("**Brown Rudnick**"), the financial advisor to the Committee, Conway MacKenzie, Inc. ("**Conway**" and collectively with Brown Rudnick, the "**Committee Professionals**") and the Debtors' professionals and core management team, including the Debtors' President and the Debtors' Chief Financial Officer. The meeting took place on November 19, 2013 in Houston, Texas, and at this meeting the Committee Members and the Committee Professionals were invited to ask any questions they wished and the Debtors' professionals and management team gave as fulsome answers as possible.

5. The Committee Members and Committee Professionals requested a 2011 PowerPoint presentation used by the Debtors during their attempt to raise bonds in the sum of

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the RSA Motion or Examiner Motion, as applicable.

$250 million, which gave a detailed explanation of the Debtors' proposed business plan given then-current market conditions (attached hereto as Exhibit A). That same day, the Debtors provided the requested PowerPoint presentation, and the Debtors made clear on this date and numerous occasions thereafter to the Committee and Committee Professionals that this was the only business plan the Debtors were executing thereon. In addition, on December 5, 2013, the Debtors provided a detailed model prepared by Jefferies & Company, Inc., which was a fully integrated financial forecast of the Debtors' projected financial statements from 2011 through 2015 assuming the Debtors spent the $250 million they were attempting to raise. At that time, the Debtors had already provided the related offering memorandum for the $250 million, which was a document prepared by Jefferies & Company, Inc. used by the Debtors to actually raise the $250 million. As made clear at the meeting and repeatedly since, these documents represent the only relevant business plans of the Debtors.[3]

  6. Both Brown Rudnick and Conway each sent the Debtors various requests for documents, dated November 11, 2013, November 13, 2013, November 20, 2013, and November 21, 2013 (collectively, the "**Requests**").

## II. CONWAY'S VISIT TO DEBTORS' HEADQUARTERS

  7. Due to the limited amount of time to produce documents and the expansive nature of the Requests, which encompassed a huge volume of hard copy documents, the Debtors invited the Committee Professionals to come to their offices in Lafayette, Louisiana to examine any documents they wished. Brown Rudnick declined this invitation.

---

[3] As explained thoroughly in the Blackwell Declaration (defined below), Green Field Energy Services ("**GFES**"), the only operating Debtor, was formed in 2011. Prior to 2011, GFES's predecessor primarily focused their operations on traditional well-related services. The Debtors first started providing hydraulic fracturing services in December 2010, and GFES's primary focus has been expanding their hydraulic fracturing operations.

3

8. Conway, the Committee's financial advisor, accepted the Debtors' invitation and on December 10, 2013 and December 11, 2013, Conway had full access to the Debtors' hard copy files, equipment, and personnel. During their visit, Conway conducted extensive interviews lasting several hours with the Debtors' management, including the Chief Financial Officer, the President, Vice President of Technical Sales Marketing, and personnel from accounting and operations. Conway asked questions about a wide variety of topics, including but not limited to: (i) the Debtors' corporate history and financial performance; (ii) the fracking business and industry in general; (iii) the Debtors' business history with Shell; (iv) the Debtors' interest in two sand mines; (v) the Debtors' annual financial planning process; (vi) the Debtors' financial models available in the Committee data room; (vii) the way in which the Debtors' exercised their business judgment in response to various unexpected financial results; and certain of the Debtors' balance sheet accounts.

9. During their visit, Conway also requested information regarding all of the Debtors' bank statements. Alvarez provided a banker's box full of bank statements. Conway never asked for any additional documents of any kind during their visit. I do not believe that Conway ever finished reviewing these documents.

10. Conway also requested during their visit to see in person the equipment in the Debtors' secured yard and warehouse. Alvarez and the Debtors opened the secured yard and warehouse and set up a meeting with Donald Foley, Vice President of Projects Integration. Mr. Foley took Conway on a one-and-a-half hour tour, explaining each piece of equipment and how it was used in order to give Conway a full understanding of the equipment. In sum, the Debtors and Alvarez accommodated all of Conway's demands and answered all of Conway's questions.

Although Alvarez made it clear that if Conway desired additional information after their visit, they need only ask via email to Latham and Alvarez, Conway has not done so.

### III. ALVAREZ'S CONTINUED ASSISTANCE IN PROVIDING THE COMMITTEE DOCUMENTS AND INFORMATION

11. In addition to this one time visit, Alvarez has constantly been in contact with and provided all requested information to the Committee Professionals. Since the Committee's formation, Alvarez has received and responded to as many as four to five questions per week from the Committee, asking Alvarez to track down various pieces of information. When Alvarez has received such a request, they have consistently provided the information, either by responding to the questions immediately, or by providing the documents to the Committee electronically in the data room subsequent to Latham's review (the "**Committee Data Room**"). Alvarez also provides the Committee with weekly updates on the cash variance report, per the Committee's request, and as discussed in greater detail below.

12. To date, the Debtors have provided over 2,300 responsive documents to the Committee. In order to locate these responsive documents, Alvarez conducted an extensive search including taking such actions as: (i) meeting with certain of the Debtors' employees to interview them to find out what, if any, responsive documents might exist and where they might be stored; (ii) searching other data rooms populated and maintained by the Debtors for electronically stored information; (iii) searching employees' computers for electronically stored information; (iv) searching various filing cabinets for hard copy documents; and (v) searching employees' offices for responsive hard copy documents. Despite the Committee's assertions otherwise, such office searches included the office of Michel B. Moreno and his secretary. Alvarez alone has thus far spent nearly 300 hours searching for and providing responsive documents to the Committee.

IV. **ALVAREZ'S WORK IN CREATING THE MEMORANDUM DETAILING THE AFFILIATE TRANSACTIONS**

13. Additionally, a large amount of Alvarez's time was spent creating the memorandum detailing the Debtors' pre-petition transactions with Mr. Moreno and other related parties (the "**Memorandum**") at the direction of the Special Committee of the Debtors' Boards of Directors.

14. The Memorandum was created at the direction of the Special Committee (as defined in the Blackwell Declaration) with a purpose of summarizing, among other things,: 1) the ownership structure; 2) history and business purpose of each affiliate entity/interested party GFES has transacted with from November 2011 – October 2013 (the "**Testing Period**"); and 3) the methodology and procedures utilized by Alvarez to gain an understanding of the material transactions between GFES and its affiliated entity/interested parties and potential causes of action relating thereto. The Memorandum, among other things, was used by the Debtors to evaluate the various settlements described in the RSA.

15. Furthermore, in the Examiner Motion, the Committee attacks the Memorandum as being "cursory and/or 'ad hoc' at best." See Examiner Motion, ¶ 17. A review of the Memorandum yields, quite to the contrary, that an incredible amount of work went into the production of the Memorandum.

16. As detailed in the Memorandum, Alvarez began creating the Memorandum by: 1) obtaining a listing from GFES of the company's affiliated/interested entities and 2) obtaining an organizational chart from GFES detailing all of the entities Michel Moreno has an ownership interest in. Upon finalizing the completed list of GFES affiliate/interested parties, Alvarez obtained the GFES general ledger detail for each entity during the Testing Period and obtained an understanding of the nature of the transactions via: 1) substantive testing

procedures and 2) inquiry of GFES' core management team. Specifically, Alvarez developed individual testing techniques for each affiliated entity GFES transacted with based on its unique relationship with GFES, which included: obtaining sample invoice support; reviewing relevant agreements between GFES and the related entity; obtaining sample wire support; and performing pricing fairness analyses to determine if the prices GFES paid a given affiliate were fair relative to what they could have gotten from an unrelated third party. In total, Alvarez spent nearly 400 hours creating the Memorandum, including the review of approximately 300 documents.

17.    The only specific reason the Committee identifies as to why the Memorandum is deficient is because it does not mention the failure of Mr. Moreno's companies to buy $23.4 million in stock. First, such information was disclosed on the very first day of these Chapter 11 Cases in the *Declaration of Earl J. Blackwell, Chief Financial Officer of Green Field Energy Services, Inc., in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 2] (the "**Blackwell Declaration**") in paragraph 59:

> The Debtors' shareholders did not purchase, and the Debtors did not issue, preferred stock to the GFES' shareholders when payment for such shares of preferred stock was due on May 15, 2013 and August 13, 2013, nor did the Debtors make arrangements for another form of capital contribution.

This fact was also disclosed in the second quarter bond filing, which is posted publicly on the GFES website. Further, as clearly defined in the Memorandum, the testing population (scope) was derived from general ledger data detailing transactions between GFES and its affiliated entities. In other words, the testing was transaction based. As such, hypothetical transactions that never occurred (such as the preferred stock purchase) would not have fallen within the testing scope.

18.    The Committee began asking for the Memorandum on November 19, 2013 and continued to inquire about receiving a copy on a weekly basis, thereafter. The Debtors

informed the Committee that the Memorandum was being prepared in conjunction with the preparation of the Debtors' schedules/statements, the filing deadline for which was December 13, 2013. The Debtors' were upfront regarding the projected delivery date of the Memorandum to the Committee and delivered the Memorandum in accordance with such timeline. The Memorandum was delivered to the Committee upon its completion on December 17, 2013. Since that date, the Committee has never asked to speak with Alvarez about the Memorandum or asked for additional detail or underlying documents. In fact, it was not until January 3, 2014, the day before the Motions were filed, that the Committee asserted any deficiencies regarding the Memorandum. Moreover, it was only in the Committee's January 7, 2014 subpoena to Alvarez that the Committee first requested to see any of the supporting documentation underlying the Memorandum as opposed to utilizing the voluntary discovery the Debtors have continued to provide.

## V.   THE DEBTORS' FINANCIAL SITUATION

19. On November 26, 2013, this Court entered the *Final Order (I) Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364 and 507(B), and (II) Granting Adequate Protection to Certain Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code* [Docket No. 191] (the "**Final DIP Order**"). The Final DIP Order authorized the Debtors to borrow money up to an aggregate face amount of $30,000,000 pursuant to the terms and conditions governing the Term Facility

20. The Final DIP Order requires the Debtors to provide, every Wednesday during the term of the Final Order, (i) an updated Budget, and (ii) Budget Variance report/reconciliation report setting forth, among other things, (a) the actual cash receipts, expenditures, disbursements and the Aggregate Liquidity for the trailing four (4) weeks then

ending, and (b) the variance in dollar amounts of the actual expenditures, disbursements and Aggregate Liquidity for such trailing four-week period from those budgeted amounts for the corresponding period reflected in the Budget (the "**Variance Report**").[4]

21.    Attached hereto as Exhibit B is the most recent Variance Report for the week ending January 5, 2013. Attached hereto as Exhibit C is the most recent Budget through February 23, 2014.

22.    The Variance Report and Budget attached hereto were provided to counsel to the Committee on Wednesday, January 8, 2014.

23.    As detailed in the Exhibits attached hereto, without an infusion of additional cash, I expect the Debtors to exceed the borrowing capacity under the Term Facility by the end of February, 2014 or the beginning of March, 2014. At such time, the Debtors will not have sufficient liquidity for the continued administration of these Chapter 11 cases under current assumptions contained in the Budget.

24.    Despite the forecasts contained in the Budget, the Debtors are currently considering a number of options to increase their liquidity and I believe that the Debtors will raise enough resources to confirm a Chapter 11 plan in short order. However, I believe that liquidity will continue to remain extremely tight.

25.    For the foregoing reason, I believe it is imperative that the RSA Motion be heard on February 4, 2014 and not adjourned to a date to be determined.

26.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information, and belief, and respectfully request that all of the relief

---

[4] Capitalized terms used in this paragraph but otherwise not defined shall have the meanings ascribed to such terms in the Final DIP Order.

requested in the Objection and Response be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of January, 2014.

_____
Thomas A. Hill
Chief Restructuring Officer for the Debtors and
Debtors-in-Possession