### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                                        :    Chapter 11

                                          :

GREEN FIELD ENERGY SERVICES, INC.,    :    Case No. 13-12783 (KG)
et al.,

                                          :    Jointly Administered

            Debtors.[1]               :

                                          :

                                          :

------------------------------------------------------------ x    Related Docket Nos. 482, 513, 517, 520 and 521

### DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS TO MOTION OF THE DEBTORS FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, 365, 503, 507 AND 1146(a), FED. R. BANKR. P. 2002, 6004, 6006, 9007 and 9014 AND DEL. BANKR. L.R. 2002-1, 6004-1 AND 9006-1 AUTHORIZING AND APPROVING (A) BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF CERTAIN ASSETS OF THE DEBTORS, (B) AGENT BID PROTECTIONS, (C) THE FORM AND MANNER OF NOTICE OF THE SALE HEARING AND (D) RELATED RELIEF

The debtors and debtors-in-possession in the above-captioned-cases (collectively, the "**Debtors**") file this omnibus response (the "**Response**") to the objections, responses and reservations of rights (collectively, the "**Objections**") of (1) the United States Trustee for Region 3 (the "**UST**") [Docket No. 521], (2) Tucson Embedded Systems, Inc. ("**Tucson Embedded**") [Docket No. 513], (3) Nations Fund I, Inc. ("**Nations**") [Docket No. 517], and (4) Ford Motor Credit Company LLC ("**Ford**") [Docket No. 520] (collectively, the "**Objectors**") to the Debtors' motion to approve (i) the Bidding Procedures, (ii) the Agent Bid Protections, (iii) procedures for the assumption and assignment of executory contracts and unexpired leases, and (iv) the form

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax or organizational identification number, are: Green Field Energy Services, Inc. (2539); Hub City Tools, Inc. (2827); and Proppant One, Inc. (6035).  The above-captioned Debtors' mailing address is 4023 Ambassador Caffery Parkway, Suite #200, Lafayette, LA 70503.

and manner of notice of a hearing on the sale of substantially all of the Debtors' assets [Docket No. 482] (the "**Bid Procedures Motion**").[2]

**Preliminary Statement**

1.    What is lost in each of the Objections is that the Agency Agreement between the Debtors and GBCI will allow the Debtors to pay off their debtor-in-possession financing facility and confirm a plan. The Debtors and their advisors are cognizant that there is no guarantee that they will receive any additional bids that provide value to the Debtors' estates that exceeds $67.5 million---the value of the GBCI bid. As a result, in the event the Bidding Procedures are not approved, GBCI can terminate the Agency Agreement and the Debtors have no assurances that they will locate another purchaser for their assets at a value equal to or greater to the GBCI bid. Without anticipated sale proceeds totaling at least the $67.5 million expected under the Agency Agreement, the Debtors will not be able to confirm a plan and will have no choice but to convert these Chapter 11 Cases to chapter 7. Thus, the Debtors consider approval of the Bid Procedures Order (as previously modified to address the concerns raised by the UST informally) and ultimately the Agency Agreement itself, if it is the highest and best offer received following the Auction, imperative to the success of these Chapter 11 Cases. Recognizing the importance of the Agency Agreement and the relief sought in the Bid Procedures Motion to these Chapter 11 Cases, none of the Debtors' primary economic constituents—including the Committee, the Noteholders, Shell or the DIP Lenders, which collectively represent the vast majority of the Debtors' secured and unsecured creditors—have filed an objection to the Bid Procedures Motion.

2.    The Objections are legally and factually without merit and should be

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bid Procedures Motion.

denied.  As an initial matter, many of the Objections focus on the Debtors' planned sale of substantially all of their assets, and do not assert any objections to the relief sought in the Bid Procedures Motion currently before this Court.  Objections to the proposed sale will be addressed by the Court at the Sale Hearing to be held on March 11, 2014.  Until then, these sale objections are not ripe for consideration by this Court.

3.    While certain of the objections raised by the UST relate to the sale and will be addressed by the Debtors at a later date, the remainder of the UST's objections should be overruled on the merits.  The Debtors have made extensive efforts to address the UST's expressed concerns through revisions to the Bidding Procedures, the Bid Procedures Order and the various sale notices.[3]  As discussed in more detail below, the proposed initial overbid is $1.45 million (and not $17.5 million, as asserted by the UST).  Furthermore, Bankruptcy Code Section 327 is not applicable here because the Agency Agreement is akin to an asset purchase agreement whereby GBCI is providing guaranteed money ($50,000,000) to the Debtors upfront regardless of the ultimate sale proceeds generated.  Unlike Section 327 professionals, if GBCI is not the Successful Bidder at the Auction, it earns the Break-Up Fee and an Expense Reimbursement and walks away without further compensation.  Also, unlike Section 327 professionals, if GBCI does not sell the Debtors' assets for more than $67.5 million, it walks away without any compensation.

4.    Tucson Embedded's Objection relates to the process for assuming the Debtors' executory contracts pursuant to the Bid Procedures Motion.  The process outlined therein provides sufficient notice of the assumption process and ensures that the Debtors will provide adequate assurance of future performance of any assumed contracts as soon as

---

[3]    Comparisons of each of these documents against the versions filed with the Bid Procedures Motion are attached hereto as Exhibits A, B and C.

practicable given the sale timeline, which must be adhered to lest the Debtors risk termination of the Agency Agreement and losing the only bid that they have received that provides sufficient funding to enable confirmation of a plan.   In addition, the Debtors intend to comply with International Traffic in Arms Regulations ("**ITAR**"), to the extent applicable, and all other similar regulations and the Debtors have not requested a waiver of such regulations in the Bid Procedures Order or the Approval Order.  Any regulatory issues that arise at the Auction will be considered by the Debtors in evaluating any competing bids.

5.      Finally, the Objections filed by Ford and Nations are premature.  Nations requests permission to sell certain equipment or vehicles that were "leased"[4] to the Debtors prior to the Petition Date or, in the alternative, segregation of the proceeds of any sale of such equipment or vehicles for the benefit of Nations.  Ford also requests permission to sell certain vehicles that belong to the Debtors and in which Ford asserts a security interest.  The Debtors believe that attempting to conduct several different assets sales concurrently will not maximize the value of the Debtors' estates and will only lead to confusion in the market about the actual assets being sold.  Moreover, the Agency Agreement provides that GBCI will serve as the *exclusive* sales agent for the Debtors' assets.   Agency Agreement § 2.1.  The Debtors have begun and will continue to work with each of Ford and Nations prior to the Sale Hearing to resolve their respective Objections.

---

[4]      The Debtors reserve the right to argue that such arrangements are in fact secured financings.

**Background**

6.      On September 30, 2013, the Debtors retained Alvarez and Marsal North America, LLC ("**Alvarez**") to perform a variety of restructuring related services.  Additionally, in October 2013, the Debtors retained Carl Marks Advisory Group, LLC ("**Carl Marks**") to act as their investment banker in an advisory capacity to evaluate financial and strategic alternatives to pursue a sale process.  Prior to filing these Chapter 11 Cases, the Debtors, with the assistance of Alvarez and Carl Marks, and in consultation with Latham & Watkins LLP, pursued a range of options to address the Debtors' concerns about their ability to service their debt and fund operations going forward, including new financing, refinancing, and the sale of certain or all of the Debtors' assets or the Debtors' business.

7.      The Debtors and their advisors continued to evaluate operational changes that could result in decreased costs, while also negotiating with the lenders under their prepetition credit facilities.  These operational changes included the cessation of substantially all of the Debtors' hydraulic fracturing operations and significant reductions in force.  The Debtors also shifted largely all of their assets into storage facilities.

8.      As part of a potential sale of the Debtors' assets, Carl Marks contacted over 210 potential purchasers.  Of those contacted, 38 signed a non-disclosure agreement and received a confidential information memorandum describing the Debtors' assets, 30 potential purchasers accessed the data room and, ultimately, four potential purchasers submitted expressions of interest for different assets.

9.      On February 6, 2014 the independent special committee of the Debtors' board of directors evaluated the bids and selected GBCI's bid.  GBCI's bid was not a bid to purchase the assets immediately for a fixed price, but rather a bid to act as the Debtors' exclusive

sales agent to sell the Assets free and clear of all Encumbrances on the Debtors' behalf in exchange for guaranteed payment of at least $50 million in two installments plus sharing of proceeds in excess of $67.5 million. Thereafter, the Debtors and GBCI entered into the Agency Agreement. Until the Bid Deadline occurs, the Debtors have no assurances that any of the other three potential purchasers that previously expressed an interest in purchasing the Debtors' assets will seek to participate in the Auction.

**Response to Objections**

10.    The Objections make the following assertions: (a) the sale of assets under Bankruptcy Code Section 363(b) is improper in these Chapter 11 Cases;[5] (b) the appointment of GBCI as Agent is governed by Bankruptcy Code Section 327; (c) the bid requirements will chill bidding; (d) language in the proposed Bid Procedures Order may be prejudicial to a subsequently appointed trustee; (e) the Court should permit the piecemeal sale of certain of the Debtors' assets to proceed concurrently with the larger sale pursuant to the Bid Procedures Motion; and (f) the proposed process for assuming and assigning executory contracts and unexpired leases is flawed. For the following reasons, these assertions are invalid and the Objections should be overruled.[6]

**A.    Objection of the UST**

11.    Since filing the Bid Procedures Motion, the Debtors have made numerous changes to the Bidding Procedures Order and related exhibits to incorporate informal comments received from the UST. Indeed, to date the Debtors have accepted all but two of the UST's extensive comments.

---

[5]    As noted above, sale objections will not be addressed by the Debtors at this time and the Debtors reserve the right to do so at a later date.

[6]    The Debtors deny many of the factual and legal assertions and characterizations contained in the Objections. Nothing contained herein shall be deemed an admission or acceptance of any statement contained in the Objections.

12.     The UST raises three main objections to the Bid Procedures Motion in its Objection, one of which was not raised in the UST's prior comments. First, the UST argues that GBCI, as Agent, must satisfy the requirements of Bankruptcy Code Section 327(a), which permits the retention of professional persons, including auctioneers. However, GBCI is not acting as a true "auctioneer" in the context of these Chapter 11 Cases. Unlike a typical arrangement with an auctioneer, GBCI is required to pay to the Debtors an upfront guaranteed payment of $50,000,000 regardless of the proceeds GBCI recoups from the sale of the Debtors' assets. This remains the case even if GBCI is ultimately unable to sell any of the Debtors' assets. To the extent GBCI is able to sell the assets for any amount up to $67.5 million, the entirety of such proceeds will be paid to the Debtors. However, if GBCI is ultimately unsuccessful at the Auction and is not determined by the Debtors to be the Successful Bidder for the Debtors' assets, GBCI will walk away from the sale process with only its approved Break-Up Fee and an Expense Reimbursement. This is not how professionals retained under Bankruptcy Code Section 327 are compensated and shows that GBCI is not a "professional" under Section 327. Typically, professionals are paid a fixed or hourly fee by the estate for the services they provide. Professionals do not ordinarily provide a payment to the estate and accept down-side risk as part of their compensation package. In this regard, the Agency Agreement and the transaction contemplated thereby is, in fact, equivalent to an asset purchase agreement and a sale transaction than to the retention of an auctioneer envisioned by Section 327.

13.     Courts have generally found that the following factors should be considered when determining whether an entity or person is a "professional" within the meaning of Bankruptcy Code Section 327:

> "(1) whether the employee controls, manages, administers, invests, purchases or sells assets that are significant to the debtor's

> reorganization, (2) whether the employee is involved in negotiating the terms of a Plan of Reorganization, (3) whether the employment is directly related to the type of work carried out by the debtor or to the routine maintenance of the debtor's business operations; (4) whether the employee is given discretion or autonomy to exercise his or her own professional judgment in some part of the administration of the debtor's estate, ..., (5) the extent of the employee's involvement in the administration of the debtor's estate, ... and (6) whether the employee's services involve some degree of special knowledge or skill, such that the employee can be considered a "professional" within the ordinary meaning of the term."

In re First Merchants Acceptance Corp., 1997 WL 873551, at *3 (D.Del.1997). Ordinarily, a professional is an actor that offers knowledge and advice materially above and beyond that which the customer or client possesses. In re American Tissue, Inc., 331 B.R. 169, 174 (2005).

14.     Here, GBCI does not constitute a professional within the meaning of Bankruptcy Code Section 327. GBCI has not been and will not be involved in negotiating the terms of the Debtors chapter 11 plan. Indeed, the *Joint Plan of Liquidation of Green Field Energy Services, Inc., et al.* [Docket No. 478] was filed prior to the execution of the GBCI Agency Agreement. Further, GBCI's role as Agent in these Chapter 11 Cases is a limited one and GBCI will not be permitted to exercise its professional judgment in the administration of the Debtors' estates. GBCI is not counseling or advising the Debtors, but rather, GBCI is exercising its professional judgment and providing services for its own account, not to or for the Debtors. GBCI's role as Agent is unrelated to the routine maintenance of the Debtors' business operations or the administration of the Debtors' estates.

15.     To be sure, GBCI will serve as the exclusive sales agent of the Debtors' assets, and is a sophisticated party that according to ordinary parlance could be termed a professional. However, in these Chapter 11 Cases, GBCI has a relatively minor role to play, and its role is primarily that of a sales agent providing a critical guaranteed purchase price, not that of

a professional providing services to the Debtors within the meaning of Bankruptcy Code Section 327. Indeed, without GBCI's interest and commitment to sell the assets of the Debtors, GBCI would not have any role at all in these Chapter 11 Cases.

16.     Two months ago, Judge Walrath considered this very issue in In re EWGS Intermediary, LLC, et al., Case No. 12-12876 (MFW) (United States Bankruptcy Court District of Delaware, Dec. 5, 2013).  As in these Chapter 11 Cases, in In re EWGS Intermediary, Judge Walrath was asked to determine whether it was appropriate for the debtor to enter into an agency agreement with Hilco Merchant Resources ("**Hilco**") to act as the agent with exclusive authority to sell the debtor's assets, a transaction that mirrors the Agency Agreement into which the Debtors propose to enter into with GBCI.[7]  The UST argued that Hilco must be retained under Section 327 of the Bankruptcy.  However, Judge Walrath found that the debtor did not need to retain Hilco under Section 327 of the Bankruptcy Code and overruled the objection of the UST. Transcript at 76-97 attached hereto as Exhibit D.

17.     As in In re EWGS Intermediary, GBCI will be able to utilize the Debtors' employees[8] and to sell the assets free and clear of liens and encumbrances, which is why GBCI styled its proposal as an agency agreement.  Accordingly, GBCI is not acting as a traditional auctioneer in these Chapter 11 Cases and should not be required to adhere to the strict

---

[7]     The agency agreement at issue in In re EWGS Intermediary provided that that Hilco would be appointed as the debtor's exclusive agent for the purpose of selling or otherwise disposing of the debtor's tangible and intangible assets.  The agency agreement at issue there further provided that Hilco, with a joint venture partner, would pay a guaranteed amount to the debtor, and as compensation would receive the gross receipts from the sale of the debtor's assets, less the guaranteed amount and expenses of the sale.  Transcript at 76-81, In re EWGS Intermediary.  Thus, in In re EWGS Intermediary, Hilco, shared in the potential upside from the sale of the debtor's assets, while also taking on downside risk through the agreement to pay a guaranteed amount to the debtor, just as GBCI is doing here through the terms of the Agency Agreement.

[8]     Many of the Debtors' assets such as their turbine fracturing pumps are very unique and require the specialized knowledge of the Debtors' employees---without the benefit of this knowledge in connection with the sale of their assets significant value will be lost because a buyer will not be able to see how the equipment is maintained and operated.

requirements of Bankruptcy Code Section 327.

18.     Second, the UST argues that the bid requirements will chill bidding because the Bidding Procedures require an initial overbid of $17.5 million. However, the actual initial overbid is only $1.45 million (consisting of the $1 million Break-Up Fee, up to $250,000 in Expense Reimbursement and a $200,000 minimum overbid). Although GBCI has only guaranteed $50,000,000, because the Agency Agreement requires GBCI to pay the Debtors all amounts received from a subsequent sale of the Debtors' assets up to $67.5 million before GBCI would share in such amounts, the Debtors consider the value of GBCI's bid to equal $67.5 million.[9] It is inconceivable to the Debtors that GBCI would be willing to work for free---clearly GBCI must believe that they will sell the assets for more than $67.5 million, the threshold at which their compensation begins. Accordingly, the Debtors believe that for an alternative bid to be considered higher and better, it must exceed $67.5 million plus $1.45 million.[10]

19.     Finally, the UST argues that the language in the proposed Bid Procedures Order may be prejudicial to a subsequently appointed trustee because the proposed Bid Procedures Order requires and directs a subsequent appointed trustee:

> to operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of the Bidding Procedures Order and the Pre-Closing Obligations and GBCI and the trustee shall be and hereby are authorized to perform such Pre-Closing Obligation upon the appointment of a trustee without the need for further order of this Court.

Original Bid Procedures Order, ¶ 7, as attached as Exhibit A to the Bidding Procedures Motion.

---

[9]     After the Debtors receive $67.5 million, GBCI will receive preferred return of $7,350,000. Thereafter, all aggregate proceeds of the Sale remaining shall be paid to the Agent until the Agent has received an additional $450,000; and, thereafter, all aggregate proceeds of the Sale remaining shall be paid (i) 85% to the Debtors and (ii) 15% to the Agent.

[10]     Consisting of the $1 million Break-Up Fee, up to $250,000 in Expense Reimbursement and a $200,000 minimum overbid)

Paragraph 7 has been modified as follows such that any trustee would <u>not</u> be required to operate the business of the Debtors:

> any trustee appointed in these cases shall be and hereby is authorized and directed to comply with the terms of this Bidding Procedures Order and the Pre-Closing Obligations and GBCI and the trustee shall be and hereby are authorized to perform such Pre-Closing Obligations upon the appointment of a trustee without the need for further order of this Court.

Modified Bid Procedures Order, ¶ 7, as attached as <u>Exhibit B</u> hereto.   Although the Bid Procedures Order no longer requires a subsequently appointed trustee to operate the Debtors' business, the Agency Agreement and the Bid Procedures Order entered by this Court should be binding on any subsequent trustee.

**Objections of Nations and Ford**

20.     The Objections filed by Nations and Ford are premature and are not currently ripe for consideration by the Court.   Putting aside the sale objections raised by each of Nations and Ford regarding the segregation of proceeds of the Sale to the Successful Bidder to be used to pay the secured claims of Nations and Ford, both of these entities also request that the Court permit them to sell certain of the Debtors' assets on a piecemeal basis outside the context of the larger sale contemplated by the Bid Procedures Motion.   The Debtors do not believe it is in the best interests of the Debtors' estates to proceed with three different sale processes simultaneously as there is no indication that such multiple sale processes would lead to better results and, in fact, they are likely to lead to confusion among potential bidders.   The Debtors will endeavor to work with each of Nations and Ford and resolve their objections prior to the Sale Hearing.

**Objection of Tucson Embedded**

21.    Tucson Embedded's Objections relate to the assumption and assignment process proposed by the Debtors in the Bidding Procedures Motion. As provided therein and in accordance with Bankruptcy Rule 2002,[11] the Debtors will provide non-debtor contracting parties with 21 days' notice of the potential assumption and assignment of their executory contract or unexpired lease with the Debtors as such notice will be served on February 18, 2014 and the Sale Hearing will be held on March 11, 2014. The notice will include the amounts the Debtors believe are required to cure any defects in such contracts and leases. To the extent Tucson Embedded does not agree with the cure amount included in the notice, it will have the full amount of time proscribed by Bankruptcy Rule 2002 to file an objection to the cure amount, which will be considered by this Court at the Sale Hearing.

22.    Schedule B of the Agency Agreement details that Contracts are Excluded Assets (each as defined in the Agency Agreement) and GBCI does not intend to assume any executory contracts or unexpired leases of the Debtors. As a result, if GBCI is ultimately the Successful Bidder, Tucson Embedded's objection is moot. However, because the Debtors will not know the identity of the Successful Bidder until after the Auction, or until after the Bid Deadline if no Auction is held, they propose to serve the Notice of Assumption identifying all contracts and leases actually to be assumed and assigned to the Successful Bidder no later than one day following the conclusion of the Auction. Modified Bid Procedures Order, ¶ 14, attached as Exhibit B hereto. In addition, within one day after the conclusion of the Auction, the Debtors

---

[11]    Bankruptcy Rule 2002 provides that "[e]xcept as provided in subdivisions (h), (i), (l), (p), and (q) of this rule, the clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by mail of:... (2) a proposed use, sale, or lease of property of the estate other than in the ordinary course of business, unless the court for cause shown shortens the time or directs another method of giving notice;..."

will file a notice (a) identifying the Successful Bidder(s) and (b) providing adequate assurance materials demonstrating the ability of the Successful Bidder(s) to perform under the Assumed Contracts.    Modified Bid Procedures Order, ¶ 13, attached as <u>Exhibit B</u> hereto.    The Bid Procedures Order, as modified by the Debtors subsequent to filing the Bidding Procedures Motion, also now provides that any party may submit an objection at the Sale Hearing to the Successful Bidder's bid on the grounds that adequate assurance of future performance under an executory contract or lease has not been provided by the Successful Bidder.    Modified Bid Procedures Order, ¶ 9, attached as <u>Exhibit B</u> hereto.    These provisions of the Modified Bid Procedures Order are typical of those regularly approved in comparable chapter 11 cases within this District, if not more favorable to non-debtor counterparties.    <u>See, e.g.</u>, <u>In re: Constar International Holdings LLC</u>, Case No. 13-13281 (Bankr. D. Del. September 12, 2013) (requiring service of notice of non-stalking horse purchaser at least one day before sale hearing and requiring counterparties to object to ability of non-stalking horse purchaser to provide adequate assurance of future performance at least two hours prior to scheduled sale hearing); <u>In re: Landauer Healthcare Holdings, Inc.</u>, Case No. 13-12098 (CSS) (Bankr. D. Del. September 12, 2013) (requiring service of notice of non-stalking horse purchaser within one day of auction conclusion and requiring counterparties to object to ability of non-stalking horse purchaser to provide adequate assurance of future performance at least two hours prior to scheduled sale hearing); <u>In re: Agfeed USA, LLC</u>, Case No. 13-11761 (BLS) (Bankr. D. Del. August 1, 2013) (requiring service of notice of non-stalking horse purchaser at least one day before sale hearing and requiring counterparties to object to ability of non-stalking horse purchaser to provide adequate assurance of future performance at least two hours prior to scheduled sale hearing); <u>In re: Solar Trust of America, LLC</u>, Case No. 12-11136 (KG) (Bankr. D. Del. May 11, 2012)

(requiring service of notice of non-stalking horse purchaser within one day of auction conclusion and requiring counterparties to object to ability of non-stalking horse purchaser to provide adequate assurance of future performance at least two days prior to scheduled sale hearing).

23.    Finally, the Debtors and GBCI will comply with ITAR, to the extent applicable, and any similar regulations and the Debtors have not requested a waiver of ITAR in either the Bid Procedures Order or the Approval Order.  The Bidding Procedures explicitly note that a Qualified Bid will be evaluated based upon factors including the bidder's "ability to obtain all necessary antitrust, governmental, national security, foreign investment or other regulatory approvals for the proposed transaction."  Bidding Procedures, § VIII.  Thus, any regulatory concerns will already be considered by the Debtors in evaluating any bids.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) overruling the Objections, (b) granting the relief requested in the Bid Procedures Motion and (c) granting such other and further relief as this Court deems appropriate.

Dated: February 18, 2014
Wilmington, Delaware                    Respectfully Submitted,


                                        /s/ Kara Hammond Coyle
                                        Michael R. Nestor (No. 3526)
                                        Kara Hammond Coyle (No. 4410)
                                        Justin H. Rucki (No. 5304)
                                        YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                        Rodney Square
                                        1000 North King Street
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 571-6600
                                        Facsimile: (302) 571-1253

-and-

Josef S. Athanas
Caroline A. Reckler
Sarah E. Barr
Matthew L. Warren
LATHAM & WATKINS LLP
Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 876-7700
Facsimile:   (312) 993-9767

Counsel for Debtors and Debtors in Possession