## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>GREEN FIELD ENERGY SERVICES, INC. *et al.*, [1]<br><br>Debtors. | Chapter 11<br><br>Case No. 13-12783 (KG)<br><br>Jointly Administered<br><br>**Hearing Date:   March 11, 2014 at 2:00 p.m. (ET)**<br>**Obj. Deadline:   February 28, 2014 at 4:00 p.m. (ET)**<br><br>**Related Docket No. 514** |

### OFFICIAL COMMITTEE OF UNSECURED CREDITORS' (I) OBJECTION TO DEBTORS' MOTION FOR AN ORDER EXTENDING THEIR EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THERETO PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE; AND (II) CROSS-MOTION TO TERMINATE THE EXCLUSIVE PERIODS PURSUANT TO SECTION 1121(d)(1) OF THE BANKRUPTCY CODE

The Official Committee of Unsecured Creditors (the "Committee") of Green Field

Energy Services, Inc. and its affiliated debtors and debtors-in-possession in the above-captioned

Chapter 11 cases (collectively, the "Debtors"), by and through its undersigned counsel, hereby

(I) objects to the *Debtors' Motion for an Order Extending Their Exclusive Periods to File a*

*Chapter 11 Plan and Solicit Acceptances thereto Pursuant to Section 1121(d) of the Bankruptcy*

*Code* [D.I. 514] (the "Exclusivity Motion") and (II) cross-moves for entry of an Order,

substantially in the form attached hereto as Exhibit A, terminating the Debtors' exclusivity

periods, pursuant to Section 1121(d)(1) of Chapter 11 of Title 11 of the United States Code (the

"Bankruptcy Code"), to allow the Committee to develop, file, and prosecute an alternative

---

[1]     The affiliated Debtors in these proceedings and the last four digits of each Debtor's federal tax number are Green Field Energy Services, Inc. (2539), Hub City Tools, Inc. (2827), and Proppant One, Inc. (6035).   The Debtors' mailing address is 4023 Ambassador Caffrey Parkway, Suite 200, Lafayette, Louisiana 70503.

Chapter 11 plan.[2]  In support of this Objection and Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.        Plan exclusivity is not an unfettered right.  As reflected clearly in the legislative history and governing case law, it is a privilege that must be: (a) continually earned based on good stewardship over estate assets and good case leadership; and, separately, (b) based on a solid foundation of case circumstance.  The record of this case does not support the relief requested in the Exclusivity Motion.  Rather, by this point of case development, the creditors should be afforded a fair opportunity to present their own plan.

2.        From inception, this case had little, if any, going-concern business purpose.  The Debtors' fracking business – representing the overwhelming majority of the Debtors' historical operations and assets – was shuttered prepetition, and all related assets have since been held in storage.  For a few months post-petition, the Debtors attempted to run a very small oil services operation, but that business also has been shuttered and all related assets are also now in storage.  An asset sale process is presently underway, being run by a third-party auctioneer.  Few employees remain.

3.        Besides auction proceeds, the most valuable assets remaining are estate causes of action, many of which are now being investigated by former Chief Bankruptcy Judge Felsenthal (the "Examiner").  Prior to Judge Felsenthal's appointment, the Debtors paid little attention to such causes of action, intent on settling them without undertaking any real investigation as to their intrinsic worth.  Apparently, this cavalier attitude has not changed since Examiner

---

[2]        Capitalized terms not otherwise defined herein shall have the meanings given them in the Exclusivity Motion.

2

appointment, given that the Debtors are actively prosecuting a "settlement" plan before the Examiner has issued his report.

4.    Indeed, the Committee has long questioned the manner in which these cases were being run, but was simply unable to persuade a different approach.  From the get-go, the Debtors adopted an unusual, high-risk strategy: They purposefully excluded the Committee from all plan negotiations, choosing instead to negotiate with the primary targets of estate litigation.    It was obviously foreseeable that this approach would result in hot litigation and expensive examination.    The Debtors thereafter prosecuted a controversial "Restructuring Support Agreement" (the "RSA"), predicated on factual assumptions that were, eventually, proven to be very far off the mark.  The RSA has since been abandoned, and the estates needlessly incurred yet more in-fighting and administrative expense.  Thereafter, an Examiner was appointed but, rather than waiting to learn the Examiner's conclusions, the Debtors prepared and filed the above-mentioned "settlement" plan.  This plan: (a) lacks the support of any creditor constituency that is not a target of estate litigation; (b) is predicated on the notion that the equity sponsor may receive 70% of the reorganized company's common stock, while unsecured creditors receive a pittance; and (c) invites yet more litigation and administrative expense.

5.    Lastly, it bears reminding the Court that, whenever the Debtors sought extraordinary relief (e.g., approval of the RSA), they made alarmist proclamations of "burn rate" and pending disaster if the case was not concluded by February 2014, at the latest.  For months, the Committee noted its strong disagreement with those proclamations, showing contrary proof, and likening them to a "gun being held to the head" for strategic purpose.   Apparently, with their request for an exclusivity extension to June for plan proposal and August for plan solicitation,

the Debtors have come around to the Committee's way of thinking, but only because it furthers
their request for continued exclusivity.

6.    At this point, the Committee is unsure whether the case would not be better off
with a trustee in charge (which itself would terminate exclusivity).  Regardless, by this stage of
case development, the facts most assuredly do not support continued exclusivity.  Given that
there is no business to preserve, the Debtors are essentially interlopers, standing between the
creditors and their realizable value entitlements.  It is time to let the creditors decide their own
fate.  The Committee can produce a confirmable plan promptly and, if given the opportunity, will
do so expeditiously, affording the Court a more efficient and effective means for resolving this
case.

## **BACKGROUND**

### **A.    The Current State Of These Cases And The Debtors' Businesses**

7.    On January 14, 2014, this Court entered an Order appointing the Examiner [D.I.
383] with a primary charge of investigating and reporting to the Court regarding claims and
causes of action then proposed under the RSA to be released.  With the Debtors' abandonment of
the RSA, the Examiner's mandate was changed to investigate and report on whether the estates
hold valuable claims or causes of action against parties who would receive releases under the
Debtors' subsequently-proposed plan (the "Plan") and whether any value to be contributed by
such parties would justify the releases.  See Order, dated February 24, 2014 [D.I. 580], ¶ 1.  It is
expected that the examiner will issue his report on or about March 4, 2014.

8.    In the meantime, the Debtors have ceased all business operations, and are
proceeding with a liquidation sale of their equipment and other assets used in the conduct of their
business (the "Assets").  See D.I. 482 (the "Bidding Procedures Motion").  Substantially all of

the Debtors' employees have been terminated.  Under the now-approved Bidding Procedures, Gordon Brothers Commercial & Industrial, LLC ("GBCI") has guaranteed that a minimum of $50 million will be received for the Assets.  By the time of the hearing on the Exclusivity Motion, it is expected that the results of the sale process will be largely established.

**B.      Events Leading To Proposal Of The Debtors'
         Plan And The Requested Extension Of Exclusivity**

9.      Following the Petition Date, the Debtors, their controlling shareholder, Michel Moreno ("Moreno"), SWEPI LP ("Shell") and an *Ad Hoc* Noteholder Group (the "Noteholders" and, together with the Debtors, Moreno and Shell, the "RSA Parties") continued a restructuring dialogue that began prepetition.  The Committee was purposefully excluded from those discussions.  See *Debtor's Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order Authorizing the Debtors to Enter Into and Perform Their Obligations Under a Restructuring Support Agreement with the Moreno Entities, Turbine Powered Technology, LLC, SWEPI, LP, and the Consenting Noteholders* [Docket No. 299] (the "RSA Motion"), ¶ 14.  Those negotiations culminated in the Debtors' filing of RSA Motion on December 31, 2013 without any prior involvement by or knowledge of the Committee.

10.      The RSA would have required pursuit, and support, by the RSA Parties of a plan that would, *inter alia*:

- Provide for broad releases of claims (both estate and third party) against Moreno and his related entities;

- Provide for releases in favor of Shell of all but Chapter 5 causes of action;

- Allocate significant value to Moreno, Shell and the Noteholders, while providing for relatively disadvantageous treatment for general unsecured creditors; and

5

- Reserve for Moreno and the Noteholders the value of the "PowerGen" business the Committee believes was wrongfully taken from the Debtors prepetition by Moreno.

11.     The Committee opposed the RSA Motion.  See D.I. 435.  In early February, the Committee was informed that the Debtors would be withdrawing the RSA Motion due, at least in part, to the expected poor results of the then-nascent sale process.[3]  On February 6, 2014, the Debtors filed the Plan.  [D.I. 478]  The Plan largely advances the same restructuring agenda that has been advanced by these Debtors throughout these cases:

- Insiders would receive broad releases of estate claims against them;
- Insiders would receive broad releases of third party claims against them by creditors who vote in favor of the Plan;
- Insiders would arrogate to themselves value in excess of what would be allocated to them under a simple application of the Bankruptcy Code's distribution scheme;
- The Noteholders would receive disparately better treatment on account of their deficiency claim than would be afforded general unsecured creditors; and
- The PowerGen business would be reserved for, and split between, Moreno and the Noteholders.

As with the RSA, the Committee was not allowed to be part of the negotiations that led to the Plan.  Neither the RSA, nor the Plan, was developed with the benefit of the Examiner's conclusions as to the viability of claims that would be released thereunder.  While the RSA was supported by the Noteholders, the Plan apparently is not.  From what is known to date, the Committee believes the Plan is incapable of confirmation for numerous reasons.

12.     On February 14, 2014, the Debtors filed the Exclusivity Motion, seeking to extend: (a) the exclusive period during which the Debtors may file a Chapter 11 plan or plans of

---

[3]     On February 7, 2014, the Debtors gave formal notice of the abandonment of the RSA. See Notice of Withdrawal of Docket No. 299 [D.I. 480].

reorganization (the "Exclusive Filing Period") from February 24, 2014 to and including June 24, 2014; and (b) the exclusive period during which the Debtors may solicit acceptances to such plan or plans (the "Exclusive Solicitation Period" and, together with the Exclusive Filing Period, the "Exclusive Periods") from April 25, 2014 to and including August 25, 2014.  Prior to filing Exclusivity Motion, the Debtors had repeatedly stressed to the Court and the Committee the need to emerge from these Chapter 11 cases as quickly as possible.[4]

## JURISDICTION

13.    This Court has jurisdiction over this Objection and Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

14.    By this Objection and Motion, the Committee seeks an Order, pursuant to Section 1121(d)(1) of the Bankruptcy Code, terminating the Debtors' exclusive periods to file a Chapter 11 plan and solicit acceptances thereof under Section 1121(a).

---

[4]    See, e.g., Jan. 13 Hr'g. Tr. 67:9-12 ("The people running this case do not have an interest in how the pie is split up, only that it gets split up fairly among the parties and quickly, before we run out of money."); Debtors' Obj. to Committee's Motion to Set Status Conference [Docket No. 335] ¶ 4 ("[A]s set forth in the Hill Declaration (as defined below), the Debtors have limited liquidity and, absent a significant change in circumstances, will run out of funds to administer these Chapter 11 Cases if a plan is not confirmed very quickly."), ¶ 67 ("[T]he Debtors have extremely limited liquidity and will need to strive to reach plan confirmation.  Any delay in the process at this juncture risks administrative insolvency and conversion to chapter 7, which the Debtors believe would greatly harm creditor recoveries.") (internal citation omitted).

**ARGUMENT**

I.    **Legal Standards Governing Exclusivity Under**
       **Section 1121(d)(1) Of The Bankruptcy Code**

15.    Although Section 1121(b) grants a debtor the exclusive right to file a plan during

the first 120 days following the petition date, Section 1121(d)(1) further provides that "the court

may for cause reduce or increase" the debtor's exclusivity periods.  11 U.S.C. § 1121(d)(1).  The

Debtors bear the burden of showing that sufficient "cause" exists to extend the exclusivity

period.  See In re Gibson & Cushman Dredging Corp., 101 B.R. 405, 409 (E.D.N.Y. 1989) ("The

party seeking the change in the statutory time period bears the burden of establishing that the

requisite cause exists . . . [A] finding of cause should be premised upon some promise of

probable success . . . ."); see also In re S.W. Oil Co. of Jourdanton, 84 B.R. 448, 450 (Bankr.

W.D. Tex. 1987) (requests for extensions of exclusivity should not be "routinely grant[ed]").

16.    Congress gave the courts the power to reduce or terminate the exclusivity periods

in order to: (a) democratize the plan process; and (b) prevent a debtor from monopolizing the

plan process, as had been the case under old chapter XI, pursuant to which only a debtor could

propose a plan of arrangement.  See In re Timbers of Inwood Forest Assoc., Ltd., 808 F.2d 363,

372 (5th Cir. 1987) (en banc) (courts assessing "whether 'cause' exists should be mindful of the

legislative goal behind § 1121 . . . [it] must avoid reinstituting the imbalance between the debtor

and its creditors that characterized proceedings under the old Chapter XI," which gave the debtor

"undue bargaining leverage, because by delay he c[ould] force a settlement out of otherwise

unwilling creditors.") (internal citations and quotations omitted), aff'd, 484 U.S. 365 (1988).

17.    Congress explicitly emphasized the Bankruptcy Code's recognition of "the

legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to

8

have a say in the future of the company."  See <u>Timbers of Inwood Forest</u>, 808 F.2d at 372 n.15 (internal citation omitted).  Accordingly, courts have recognized that Section 1121 should be faithfully interpreted to limit the delay that makes creditors the hostages of Chapter 11 debtors. See <u>Official Comm. of Unsecured Creditors of Mirant Americas Generation, L.L.C. v. Mirant Corp. (In re Mirant Corp.)</u>, Nos. 4-04-CV-476-A, NO. 4-04-CV-530-A, 2004 U.S. Dist. LEXIS 19796, at *8 (N.D. Tex. Sept. 30 2004).

18.    In <u>In re Dow Corning Corp.</u> ("<u>Dow Corning</u>"),  the court observed that, although all courts do not agree on the precise formulation, most rely upon the same set of factors.  208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997).  These factors are:

(a)  the size and complexity of the case;
(b)  the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;
(c)  the existence of good faith progress toward reorganization;
(d)  the fact that the debtor is paying its bills as they become due;
(e)  whether the debtor has demonstrated reasonable prospects for filing a viable plan;
(f)  whether the debtor has made progress in negotiations with its creditors;
(g)  the amount of time which has elapsed in the case;
(h)  whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and
(i)  whether an unresolved contingency exists.

<u>See</u> <u>id.</u>  <u>See</u> <u>In re Central Jersey Airport Servs</u>, LLC, 282 B.R. 176 (Bankr. D.N.J. 2002)

19.    The <u>Dow Corning</u> court cautioned, however, that

when a court considers a laundry list of factors in the course of deciding a matter, it is not limited to the elementary task of counting the factors.  Sometimes one or more factors strongly point to a particular result while others point the other way only weakly.  And sometimes certain factors are just more relevant or important than others . . . .  A better way to look at this additional issue is to draw back from the narrow focus on individual factors and <u>scan the big picture</u> . . . .  When the Court is determining whether to terminate a debtor's exclusivity, the primary consideration should be <u>whether or not doing so would facilitate</u>

9

moving the case forward.  And that is a practical call that can
override a mere toting up of the factors.

Dow Corning, 208 B.R. at 669-70 (emphases added); see also In re Adelphia Commc'ns Corp.,

352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006) (The "test is better expressed as determining whether

terminating exclusivity would move the case forward materially, to a degree that wouldn't

otherwise be the case.  Certainly practical considerations, or other considerations in the interests

of justice, could override, in certain cases, the result after analysis of the nine factors.").

**II.     The Debtors Cannot Carry Their Burden To Show
         "Cause" Exists To Extend Their Exclusivity Periods**

20.     Given the state of these cases and the Debtors' businesses, the three primary

issues that will be addressed under a plan are: (a) allocation of value; (b) which parties will

receive Plan releases, and what, if anything, they will contribute in exchange; and (c) which

parties, if any, will be entitled to pursue estate causes of action, and who will benefit from any

recoveries realized.  This case does not present sufficient complexity to warrant an extension of

exclusivity.  Bankruptcy Code Section 1121's legislative history provides, "if an unusually large

company were to seek reorganization under chapter 11, the court would probably need to extend

the time in order to allow the debtor to reach an agreement."  See H.R. Rep. No. 95-595, at 232

(1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6191 91977).  In considering what "size and

complexity" would support an extension of exclusivity, the Adelphia court noted that the cases

before it were of:

> . . . unprecedented complexity and overwhelming size . . .
> involv[ing] 231 debtors, 6 different prepetition credit facilities,
> approximately 30 issuances of outstanding public indebtedness at
> different levels of a complex capital structure, numerous and
> exceedingly complex Intercreditor Dispute issues, SEC and DOJ
> investigations and settlements, massive ongoing litigation among
> stakeholders, the wholesale departure of [family] management,

10

> the effects of the massive prepetition fraud of [family] management, an approximately $17.6 billion sale transaction of unprecedented size and scope in a chapter 11 proceeding, and numerous other complicated matters and issues.

352 B.R. at 587 (internal citation omitted).  This case is not, at this point, particularly complex.  And, while the Committee remains hopeful the sale process will result in significant value to be allocated, the Court and parties will likely have greater clarity as to that issue by the time of the hearing on the Exclusivity Motion.

21.    In considering the request to extend the Exclusive Periods, the Court should also consider the Debtors' conduct of these cases to date.  First, the Exclusivity Motion cites to prior activity in the case as indicative of progress warranting an extension of exclusivity.  Respectfully, the Committee disagrees with that depiction.  The "first day" and "second day" relief obtained (see Exclusivity Motion ¶¶ 6-7) pertained primarily to: (a) preservation of a business since abandoned; (b) retention of professionals who continue to accrue administrative claims against the estates; and (c) administrative matters that, while useful for conduct of the case, do not materially advance this liquidation towards plan confirmation.  With respect to the KEIP and KERP programs (see id ¶ 8): (x) it is currently unknown whether the sale process will generate sale proceeds sufficient to trigger KEIP payments to management (and, given the state of the cases and the Debtors' business, the Committee would in any event have concerns with large bonuses being paid to management); and (y) with the shut-down of the Debtors' business, it is unclear whether the KERP program was well-founded or served its purpose of preserving "employee morale."

22.    Next, given the narrow scope of the issues, the Debtors have had ample time to engage with all creditors to work towards a consensual restructuring.  They have chosen to

exclude the Committee and to engage only with insiders and the Noteholders, and they have repeatedly repackaged and presented the same "plan" to the Court (first in the RSA, and now through the Plan). From their actions and statements, it is clear the Debtors will continue to pursue the same restructuring agenda they have pursued to date. Extending the time during which the Debtors have the exclusive rights to propose and solicit acceptances of a plan will not result in a consensual restructuring or, since the Debtors continue to decline to engage with the Committee, further progress in negotiations with creditors. Rather, it will only provide the Debtors and insiders with additional opportunity to pressure general unsecured creditors to accede to the same Debtor/insider demands that have pervaded these cases since their commencement.

23.     The Committee believes the Plan is fatally defective and incapable of confirmation. Given the Debtors' obvious inclination to doggedly adhere to their current course, there is no justification to allow further depletion of estate assets in pursuit of the same flawed agenda. Rather, as discussed below, exclusivity should be terminated so that, if (as the Committee expects) the Plan fails, the Court will be positioned to consider an alternative plan without significant delay.

24.     The Committee therefore respectfully submits that under the circumstances, the Debtors have failed to demonstrate the requisite "cause" that would warrant an extension of the Exclusive Periods.

III.     **There Is "Cause" Within The Meaning Of Section 1121(d) To Warrant Termination Of The Debtors' Exclusivity Period**

25.     If, as the Committee suspects, the Debtors cannot obtain confirmation of their Plan, there is no reason these cases should be subject to the delay and inefficiency attendant to starting from scratch, with the Debtors still in control of the plan process. Instead, the

Committee should be allowed to put forth its own proposal for consideration by creditors on a parallel or near-parallel path with the Plan. Accordingly, the Committee respectfully requests that this Court terminate the Exclusive Periods now so as to allow the Committee to file its own plan to provide creditors with a real choice in how these estates will be liquidated.

26. Evaluation of the relevant <u>Dow Corning</u> factors supports termination of the Debtors' exclusivity: (a) the Debtors do not need time to negotiate a plan of reorganization, as they have already filed a liquidating Plan; (b) there has been no progress towards reorganization (only towards liquidation on terms disproportionately favorable to insiders); (c) continuation of exclusivity would allow the Debtors to continue to monopolize the plan process, even though they appear unflinchingly focused on a singular restructuring agenda; (d) the Debtors continue to decline to engage with the Committee, the representative of all unsecured creditors; and (e) other than the Examiner's views on the claims proposed to be released under the Plan and the results of the sale process – both of which should be known by the time of the hearing on the Exclusivity Motion – there are no remaining contingencies to be resolved.

27. In assessing whether "cause" exists to terminate exclusivity, "the primary consideration should be whether or not doing so would facilitate moving the case forward." <u>Dow Corning</u>, 208 B.R. at 670. <u>See also</u> <u>Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l Hosp. (In re Henry Mayo Newhall Mem'l Hosp.)</u>, 282 B.R. 444, 453 (B.A.P. 9th Cir. 2002) (citation omitted) (holding that "a transcendent consideration is whether adjustment of exclusivity will facilitate moving the case forward toward a fair and equitable resolution"); <u>Adelphia</u>, 352 B.R. at 590 (explaining that in assessing exclusivity, the court should look at "whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case"). Compared to the Debtors' Plan, a conversion of these cases to

Chapter 7 would better serve creditors' interests; however, conversion would involve certain inefficiencies. Allowing the Committee to file an alternative plan for concurrent consideration with the Debtors' Plan would facilitate moving these Chapter 11 cases forward in the way envisioned by the Bankruptcy Code and by the Dow Corning court – in a manner fair and equitable to all parties in interest. See Dow Corning, 208 B.R. at 670. At a minimum, allowing creditors to choose between a straight-forward distribution scheme and the Debtors' release-laden "restructuring" scheme will allow creditors the voice intended by Congress.

28. Terminating the Exclusive Periods will not prejudice the Debtors because termination does not prevent them from continuing to seek confirmation of their current plan or proposing another Chapter 11 plan if, as the Committee expects, the current Plan is determined to be unconfirmable; instead, it simply opens up the process for competing proposals and levels the playing field. See In re R.G. Pharm., Inc., 374 B.R. 484, 488 (Bankr. D. Conn. 2007) ("The fact that the debtor no longer has the exclusive right to file a plan does not affect its concurrent right to file a plan.") (internal citation omitted).

29. Consideration of the "big picture"– as suggested by the Dow Corning court – also weighs in favor of terminating exclusivity. 208 B.R. at 669. Here, given that the Debtors are effectively liquidating their business, the balance weighs heavily in favor of creditors. The Committee is prepared to quickly develop, file, and prosecute a plan that affords creditors and this Court an alternative, and hopefully far more efficient path to exit. See In re Pub. Serv. Co. of N.H., 88 B.R. 521, 537 (Bankr. D.N.H. 1988) (assessing existence of an "alternate substantial plan being held off by debtor" in determining whether to terminate exclusivity); In re Crescent Beach Inn, Inc., 22 B.R. 155, 160-61 (Bankr. D. Me. 1982) (shortening exclusive period will permit parties "with perhaps a more objective view of the debtor's circumstances, to file a

plan"). Accordingly, the Debtors' Exclusive Periods should be terminated to allow the Committee to propose an alternative plan for the benefit of all creditors.

## NOTICE

30. Notice of this Objection and Motion has been provided to: (a) counsel for the Debtors; (b) the United States Trustee for the District of Delaware; (c) counsel to the Debtors' postpetition secured lender; (d) counsel to Shell Western Exploration and Production, Inc., the Debtors' prepetition lender; (e) counsel to the Indenture Trustee under the 2016 Senior Secured Notes (as defined in the Blackwell Declaration); (f) the Securities and Exchange Commission; (g) counsel to the Environmental Protection Agency; (h) counsel to the *ad hoc* group of holders of 2016 Senior Secured Notes; (i) the United States Attorney General for the District of Delaware; (j) the Attorneys General for the states in which the Debtors conduct business; and (k) all parties that have filed a notice of appearance and requested service in these Chapter 11 cases pursuant to Bankruptcy Rule 2002. The Committee submits that no other or further notice need be provided.

## NO PRIOR REQUEST

31. No previous motion for the relief sought herein has been made to this or any other Court.

*[Remainder of page intentionally left blank]*

## **CONCLUSION**

WHEREFORE, based on the foregoing, the Committee respectfully requests that this Court: (i) deny the relief requested in the Exclusivity Motion; (ii) terminate the Debtors' exclusive period to file and solicit votes on a plan of reorganization under Section 1121(d)(1) of the Bankruptcy Code; and (iii) grant such other and further relief as the Court deems necessary and appropriate.

Dated: February 28, 2014
      Wilmington, Delaware

WOMBLE CARLYLE SANDRIDGE & RICE, LLP

By: _/s/  Steven K. Kortanek_____
Steven K. Kortanek (Del. Bar No. 3106)
Kevin Mangan (Del. Bar No. 3810)
222 Delaware Avenue, Suite 1601
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330

- and -

BROWN RUDNICK LLP
Robert J. Stark (admitted *pro hac vice*)
Andrew Dash (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

Howard L. Siegel (admitted *pro hac vice*)
City Place I
Hartford, Connecticut 06103
Telephone: (860) 509-6500
Facsimile: (860) 509-6501

*Co-Counsel for the Official Committee of Unsecured Creditors of Green Field Energy Services, Inc.*