# EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GREEN FIELD ENERGY SERVICES, INC., <u>et</u> | : | Case No. 13-12783 (KG) |
| <u>al</u>., | : | |
| | : | Jointly Administered |
| Debtors.[1] | x | |

-------------------------------------------------------

**DISCLOSURE STATEMENT WITH RESPECT TO THE <span style="color:blue">FIRST AMENDED</span> JOINT
PLAN OF LIQUIDATION OF GREEN FIELD ENERGY SERVICES, INC., ET AL.**

| | |
|---|---|
| **LATHAM & WATKINS LLP** | **YOUNG CONAWAY STARGATT** |
| Josef S. Athanas | **& TAYLOR, LLP** |
| Caroline A. Reckler | Michael R. Nestor |
| Sarah E. Barr | Kara Hammond Coyle |
| Matthew L. Warren | 1000 North King Street |
| Suite 5800 | Wilmington, Delaware 19801 |
| 233 South Wacker Drive | (302) 571-6600 |
| Chicago, IL  60606 | |
| (312) 876-7700 | |
| | |
| *Counsel for Debtors* | *Counsel for Debtors* |

Dated:  ~~February~~<span style="color:blue">March</span> 6,
2014

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax or organizational identification number, are:  Green Field Energy Services, Inc. (2539); Hub City Tools, Inc. (2827); and Proppant One, Inc. (6035).  The above-captioned Debtors' mailing address is 4023 Ambassador Caffery Parkway, Suite #200, Lafayette, LA 70503.

3.      01:15

---

**IMPORTANT INFORMATION FOR YOU TO READ**

---

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE FIRST AMENDED JOINT PLAN OF LIQUIDATION OF GREEN FIELD ENERGY SERVICES, INC., ET AL. (THE "PLAN").  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY PERSON OR ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "BELIEVE," "PREDICTS," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, FINANCIAL PROJECTIONS, AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY.  THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO AND RECOVERIES BY HOLDERS OF ALLOWED CLAIMS, AND IF ALL ALLOWED CLAIMS ARE PAID IN FULL WITH INTEREST, ALLOWED INTERESTS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  FACTORS THAT COULD CAUSE ACTUAL RESULTS TO BE MATERIALLY DIFFERENT FROM EXPECTATIONS INCLUDE THOSE FACTORS DESCRIBED IN PART VIII HEREIN TITLED "RISK FACTORS".  THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF GREEN FIELD ENERGY SERVICES, INC. OR ANY OF THE DEBTORS IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

NO LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED DISTRIBUTIONS AND OTHER ACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR CAUSE OF ACTION OR PROJECTED OBJECTION TO A PARTICULAR CLAIM OR INTEREST IS, OR IS NOT, IDENTIFIED IN THIS DISCLOSURE STATEMENT, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN A FINAL ORDER OF THE BANKRUPTCY COURT.  THE DEBTORS, PRIOR TO THE EFFECTIVE DATE, OR THE LIQUIDATION TRUST OR LITIGATION TRUST, AFTER THE EFFECTIVE DATE, MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE ANY CAUSES OF ACTION OR OBJECTIONS TO CLAIMS AND INTERESTS, AND MAY DO SO AFTER THE CONFIRMATION DATE OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES SUCH CAUSES OF ACTION OR OBJECTIONS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED

4.      01:15 HEREIN BY REFERENCE.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE

FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.  EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.  ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE ENCOURAGED TO REVIEW THE DISCLOSURE STATEMENT AND PLAN, INCLUDING ALL EXHIBITS ATTACHED HERETO AND THERETO, IN THEIR ENTIRETY BEFORE CASTING THEIR VOTES TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE GOOD FAITH EFFORTS TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS EXPRESSLY PROVIDED HEREIN).

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE OF THE DISCLOSURE STATEMENT OR SUCH EARLIER DATE AS MAY BE SPECIFICALLY NOTED.  THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON OR ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS, THE PLAN OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN PART VIII HEREIN TITLED "RISK FACTORS."

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN.  THE DEBTORS URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE VOTING DEADLINE IS April 9, 2014, UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE.

TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE VOTING AGENT MUST ACTUALLY RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.

2.      01:15

CH\1723784.11 1723784.13

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................................................1

    A.    PURPOSE OF DISCLOSURE STATEMENT ........................................................1
    B.    OVERVIEW OF THE PLAN ....................................................................................2
    C.    THE VOTING PROCESS............................................................................................7
    D.    THE CONFIRMATION HEARING AND OBJECTIONS TO CONFIRMATION........9
    E.    ESTIMATES AND FORWARD LOOKING STATEMENTS .................................9

II. GENERAL INFORMATION CONCERNING THE DEBTORS................................................~~10~~9

    A.    DEBTORS................................................................................................................~~10~~9
    B.    THE DEBTORS' CORPORATE HISTORY ............................................................~~11~~10
    C.    OVERVIEW OF THE DEBTORS' BUSINESS........................................................~~11~~10
    D.    CORPORATE GOVERNANCE AND MANAGEMENT ........................................14
    E.    TRANSACTIONS WITH CERTAIN PARTIES RELEASED UNDER THE PLAN...................16
    F.    SUMMARY OF SIGNIFICANT PREPETITION OBLIGATIONS .........................~~23~~16
    G.    EQUITY INTERESTS ............................................................................................~~25~~18
    H.    LITIGATION ..........................................................................................................~~25~~18
    I.    HISTORICAL FINANCIAL INFORMATION; ADDITIONAL INFORMATION .................~~26~~19
    J.    KEY EVENTS LEADING TO THE FILING OF CHAPTER 11 CASES ...............~~26~~19

III. THE CHAPTER 11 CASES ......................................................................................................~~27~~19

    A.    COMMENCEMENT OF THE CHAPTER 11 CASES ...........................................~~27~~19
    B.    CONTINUATION OF BUSINESS ........................................................................~~27~~20
    C.    FIRST DAY AND OTHER INITIAL ORDERS ....................................................~~27~~20
    D.    RETAINED PROFESSIONALS..............................................................................~~27~~20
    E.    SCHEDULES AND STATEMENTS ......................................................................~~28~~20
    F.    APPOINTMENT OF OFFICIAL CREDITORS' COMMITTEE..............................~~28~~20
    G.    DEBTOR IN POSSESSION FINANCING ............................................................~~28~~21
    H.    KEY EMPLOYEE RETENTION PROGRAM AND KEY EMPLOYEE INCENTIVE PROGRAM ...............................................................................................~~29~~21
    I.    PROPOSED SALE OF ASSETS ~~29~~; FINANCING AFTER CLOSE OF ASSET SALE..........22
    ~~J.~~    ~~RESTRUCTURING SUPPORT AGREEMENT~~ ................................................~~29~~
    ~~K.~~J.    THE EXAMINER ....................................................................................................~~30~~22
    ~~L.~~K.    THE REQUEST OF THE OFFICIAL CREDITORS' COMMITTEE TO SEEK STANDING TO PURSUE CERTAIN CAUSES OF ACTION .......................................................................~~31~~23
    ~~M~~L.    BAR DATE AND PROOF OF CLAIM/REQUEST FOR PAYMENT PROCESS...................~~31~~23
    ~~N~~M.    CLAIMS OBJECTION PROCESS ........................................................................~~31~~24
    ~~O~~N.    DISPOSITION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................~~31~~24
    ~~P~~O.    PLAN EXCLUSIVITY ..........................................................................................~~32~~24
    ~~Q~~P.    LIQUIDATION TRUSTEE ....................................................................................~~32~~24
    ~~R.~~    ~~LITIGATION TRUSTEE~~ ..................................................................................~~32~~

IV. REASONS FOR THE SOLICITATION; RECOMMENDATION ..........................................~~32~~24

V. THE PLAN ..................................................................................................................................~~33~~25

    A.    OVERALL STRUCTURE OF PLAN....................................................................~~33~~25
    B.    DEEMED CONSOLIDATION ..............................................................................~~33~~25
    C.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............~~34~~26
    D.    COMPREHENSIVE SETTLEMENT OF CLAIMS AND CONTROVERSIES........~~42~~34
    ~~E.~~    ~~CREATION OF AND CONTRIBUTIONS TO NEWCO.~~ ..................................~~42~~

# TABLE OF CONTENTS
## (continued)

**Page**

F_E. THE LIQUIDATION TRUST .................................................................... 42_34
G.  THE LITIGATION TRUST ..................................................................... 45
H_F. CANCELLATION OF DOCUMENTS, TERMINATION OF OFFICIAL CREDITORS' COMMITTEE, DISSOLUTION OF DEBTORS AND CLOSING OF CHAPTER 11 CASES .......................... 48_37
I_G. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................ 50_39
J_H. DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND INTERESTS ............. 50_39
K_I. PROVISIONS GOVERNING DISTRIBUTIONS ................................................ 52_41
L_J. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF PLAN .. 55_43
M_K. EFFECTS OF CONFIRMATION ............................................................... 56_44
N_L. RETENTION OF JURISDICTION ............................................................. 59_47

VI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................... 60_48

A.   IN GENERAL .................................................................................... 60_48
B.   U.S. FEDERAL INCOME TAX CONSEQUENCES TO the DEBTORS ......................... 61_49
C.   U.S. FEDERAL INCOME TAX TREATMENT OF THE LIQUIDATION TRUST AND THE LITIGATION TRUST 62 ...................................................................... 50
D.   DISPUTED CLAIMS RESERVES .............................................................. 63_51
E.   U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS ................ 64_51
F.   BACKUP WITHHOLDING AND INFORMATION REPORTING .............................. 65_53

VII. RISK FACTORS ..................................................................................... 66_53

A.   CERTAIN BANKRUPTCY CONSIDERATIONS ............................................... 66_54
B.   DISCLOSURE STATEMENT DISCLAIMER .................................................. 68_55

VIII. CONFIRMATION AND CONSUMMATION OF THE PLAN OF LIQUIDATION ................... 70_56

A.   SOLICITATION OF VOTES .................................................................... 70_56
B.   CONFIRMATION PROCEDURES ............................................................. 70_57
C.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN .................... 70_57
D.   CONSUMMATION OF THE PLAN ........................................................... 73_60

IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................. 74_60

A.   ALTERNATIVE PLAN .......................................................................... 74_60
B.   CHAPTER 7 LIQUIDATION .................................................................... 74_61
C.   DISMISSAL ..................................................................................... 74_61

X. THE SOLICITATION; VOTING PROCEDURES ..................................................... 74_61

A.   PARTIES ENTITLED TO VOTE ................................................................ 74_61
B.   CLASSES ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ..................... 75_61
C.   WAIVERS OF DEFECTS, IRREGULARITIES, ETC. .......................................... 75_61
D.   WITHDRAWAL OF BALLOTS; REVOCATION .............................................. 75_62
E.   SPECIAL INSTRUCTIONS FOR HOLDERS OF Senior Noteholder Claims ............. 76_62
F.   VOTING RIGHTS OF DISPUTED CLAIMANTS .............................................. 77_64
G.   FURTHER INFORMATION; ADDITIONAL COPIES ........................................ 77_64

## **TABLE OF APPENDICES**

Appendix A        Plan of Liquidation

Appendix B        Organizational Chart

Appendix C        Liquidation Analysis

~~Appendix D~~        ~~Examiner Report~~

> THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH APPENDIX ATTACHED TO THIS
> DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

**DISCLOSURE STATEMENT WITH RESPECT TO THE**
**FIRST AMENDED JOINT PLAN OF LIQUIDATION OF GREEN FIELD ENERGY SERVICES, INC., ET AL.**

**I.**
**INTRODUCTION**

**A.    PURPOSE OF DISCLOSURE STATEMENT**

The Debtors submit this *Disclosure Statement with Respect to the First Amended Joint Plan of Liquidation of Green Field Energy Services, Inc., et al.* (as it may be amended, supplemented or otherwise modified from time to time, the "**Disclosure Statement**") in connection with the solicitation of votes to accept or reject the *First Amended Joint Plan of Liquidation of Green Field Energy Services, Inc., et al.* (the "**Plan**").  A copy of the Plan is attached to this Disclosure Statement as Appendix A.  **All capitalized terms used but not otherwise defined in this Disclosure Statement will have the meanings set forth in the Plan.**  To the extent of any conflict between the terms or conditions of this Disclosure Statement and the Plan, the terms and conditions of the Plan will control and govern.

The purpose of this Disclosure Statement is to provide sufficient information to enable the creditors of the Debtors entitled to vote on the Plan to make an informed decision on whether to accept or reject the Plan.  This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

- the events leading to the filing of Chapter 11 Cases;

- events that have occurred during the Chapter 11 Cases;

- a summary of the terms and provisions of the Plan;

- a summary of the core settlements and contributions underlying the Plan;

- the process for confirming the Plan;

- certain risk factors relating to the Debtors and confirmation and consummation of the Plan;

- certain tax consequences of the consummation of the Plan;

- alternatives to confirmation and consummation of the Plan; and

- the solicitation and voting procedures for the Plan.

Additional copies of this Disclosure Statement are available, free of charge, upon request made to (i) the office of the Debtors' counsel at Latham & Watkins LLP and Young Conaway Stargatt & Taylor, LLP or (ii) the Voting Agent, Prime Clerk LLC.

In addition, a ballot for voting to accept or reject the Plan (the "**Ballot**") is enclosed with this Disclosure Statement for holders of Claims who are entitled to vote to accept or reject the Plan.  If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please promptly contact Prime Clerk LLC by phone at (855) 410-7359 or in writing at 3rd Avenue, 9th Floor, New York, NY 10022.

**Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the other appendices attached hereto and the instructions accompanying the Ballots in their entirety before voting on the Plan**.  These documents contain important information concerning the classification of Claims for voting purposes and the tabulation of votes.

THIS INTRODUCTION IS BEING PROVIDED AS AN OVERVIEW OF THE MATERIAL ITEMS ADDRESSED IN THIS DISCLOSURE STATEMENT AND THE PLAN, WHICH IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN.  THIS INTRODUCTION SHOULD NOT BE RELIED UPON FOR A COMPREHENSIVE DISCUSSION OF THE DISCLOSURE STATEMENT AND/OR THE PLAN OR IN LIEU OF REVIEWING

THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.

B.    **OVERVIEW OF THE PLAN**

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Part III of this Disclosure Statement, entitled "The Plan."

The Plan, **and** Plan Documents (~~including: (i) the Release and Settlement Agreement, (ii) the Liquidation Trust Agreement and (iii) the Litigation Trust Agreement) and the NewCo Related Agreements, collectively,~~ reflect and incorporate a settlement and compromise of controversies ~~and, collectively, form the cornerstone of the Plan~~.

~~On January 21, 2014, the Debtors received bids in connection with the sale of their Assets. Absent significant additional consideration generated at an auction, the cash purchase price generated from the consummation of any of those bids would not provide sufficient recoveries for the deal contemplated by the Restructuring Support Agreement that the Debtors, SWEPI, LP, the Ad Hoc Noteholders, Michel Moreno and TPT had previously agreed upon. As a result of this development, the Debtors negotiated the revised terms of the Plan with the Debtors' key constituents. The Plan effectuates, and is premised upon a settlement reached by and among the Debtors, SWEPI LP, Michel Moreno and TPT, which centers around the contribution of the MOR/TGS Interests by the Moreno Entities to NewCo in exchange for certain interests in NewCo and the releases by Debtors set forth in Section 12.06 of this Plan and the releases by Holders of Claims set forth in Section 12.07 of this Plan. In light of the current purchase price for the Assets, the Ad Hoc Noteholders are unwilling to consent to a waiver of the Deficiency Claim of the Senior Secured Notes Indenture Trustee or of any Senior Secured Noteholder. The Plan is premised upon a waiver of Deficiency Claim of the Senior Secured Notes Indenture Trustee and Senior Secured Noteholders. The Debtors and the Ad Hoc Noteholders are continuing to negotiate the terms of the Plan.~~

~~Contemporaneous with the filing of this Disclosure Statement, the Restructuring Support Agreement has been terminated. The Moreno Entities, TPT, and Shell support the approval of the Plan. The Official Creditors' Committee and the Ad Hoc Noteholders do not.~~

~~Pursuant to Bankruptcy Code Section 363 and Bankruptcy Rule 9019 and in consideration for the classification, distributions and other benefits provided pursuant to the Plan, the Plan Documents and the NewCo Related Agreements, the provisions of the Plan relating to and effectuating this settlement will constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, Plan Documents and NewCo Related Agreements.~~

~~As detailed in Part V below, the Moreno Entities will contribute the MOR/TGS Interests to NewCo. Under the Plan, the Senior Secured Noteholders will receive equity in NewCo as a portion of their recovery on account of the Senior Noteholder Claims, and will not share in the proceeds of any Causes of Action of the Debtors under Chapter 5 of the Bankruptcy Code. The Debtors believe that this settlement substantially increases the potential return to the Debtors' creditors – particularly Holders of Class 6 General Unsecured Claims. In exchange for this contribution, the Debtors and each creditor that votes in favor of the Plan will release Mr. Moreno and certain entities owned, directly or indirectly, or controlled by Mr. Moreno from any and all Causes of Action – including any Cause of Action asserting that TGS should have been formed as a subsidiary or business line of the Debtors.~~

The Plan ~~further~~ provides for the liquidation of Assets of the Estates, including the (a) investigation and prosecution of Causes of Action by a Liquidation Trust to be formed pursuant to the Plan and a Liquidation ~~Trust Agreement and (b) investigation and prosecution of Avoidance Actions by a Litigation Trust to be formed pursuant to the Plan and a Litigation~~ Trust Agreement. The Plan defines "Assets" as (a) all assets and properties of every kind, nature, character and description (whether real, personal, or mixed, whether tangible and intangible, including contract rights, wherever situated and by whomever possessed), including the goodwill related thereto, operated, owned or leased by the Debtors as of the Effective Date and that constitute property of the Estates within the purview of Bankruptcy Code Section 541, including, without limitation, any and all Claims, Estate Causes of Action, **(including** Avoidance Actions**)** and rights of the Debtors under federal, state, or foreign law, letters of credit issued for the benefit of the Debtors and the monies deposited to secure the performance of any contract or lease by the Debtors or any Affiliate thereof; and (b) the proceeds, products, rents and profits of any of the foregoing. For the avoidance of doubt, Assets include the rights of the Debtors under the Asset Purchase ~~Agreement~~**Agreements** and the Sale Order.

The Liquidation Trust is to be managed by a Liquidation Trustee under the oversight of a Liquidation Trust Oversight Committee. The Liquidation Trust will be responsible for liquidating the Assets~~, other than Avoidance Actions,~~ **of the Estates** and making Distributions to holders of Allowed ~~Claims, other than Class 6 General Unsecured~~ Claims, and, if applicable, Allowed

7.       01:15

2

Interests, as well as all other administrative tasks necessary for ultimate resolution of the Chapter 11 Cases, pursuant to the terms of the Plan and the Liquidation Trust Agreement. ~~The Litigation Trust, on the other hand, is to be managed by a Litigation Trustee under the oversight of a Litigation Trust Oversight Committee selected by the Official Creditors' Committee. The Litigation Trust will be responsible for liquidating the Avoidance Actions and making Distributions to holders of Allowed Class 6 General Unsecured Claims.~~

In accordance with Bankruptcy Code Section 1123(a)(1), Administrative Claims, Fee Claims, DIP Claims and Priority Tax Claims have not been classified but appear in the table to summarize their respective treatment.

| | | SUMMARY OF TREATMENT AND EXPECTED RECOVERIES | |
|---|---|---|---|
| | | (All capitalized terms used but not otherwise defined below will have the meanings set forth in the Plan.) | |
| *Class* | *Claim/Interest* | *Description, Treatment and Projected Recovery for Claim/Interest* | *Estimated Percentage Recovery[2]* |
| N/A | **Administrative Claims** | An Administrative Claim is an obligation of the Debtors under Bankruptcy Code Section 503(b) entitled to priority in payment under Bankruptcy Code Section 507(a), including but not limited to: (a) a 503(b)(9) Claim; (b) the actual and necessary costs and expenses incurred after the Petition Date for preserving the Estates and/or operating the Debtors' businesses; (c) cure costs associated with the assumption or assumption and assignment of executory contracts and unexpired leases pursuant to Bankruptcy Code Section 365 (other than to the extent assumed by a third party under an asset purchase agreement and sale approved by the Bankruptcy Court); and (d) all Statutory Fees. As used in the Plan, the term "Administrative Claim" excludes Fee Claims.<br><br>The Plan provides that, to be eligible to receive Distributions under the Plan on account of an Administrative Claim (other than a 503(b)(9) Claim) that is not otherwise Allowed by the Plan, a Request for Payment of Administrative Claim must have been or be filed with the Bankruptcy Court on or before the applicable Administrative Claims Bar Date. To be eligible to receive Distributions under the Plan on account of a 503(b)(9) Claim that is not otherwise Allowed by the Plan, a Request for Payment of a 503(b)(9) Claim must have been filed with the Claims Agent on or before the 503(b)(9) Claims Bar Date. Any Administrative Claim that is not asserted in accordance with Section 4.01(a) of the Plan will be deemed disallowed under the Plan and will be forever barred against any of the Estates, the Liquidation Trust~~, the Litigation Trust~~ or any of their Assets or property, and the holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.<br><br>Under the Plan, and unless the holder of an Allowed Administrative Claim agrees to receive other less favorable treatment, each holder of an Allowed Administrative Claim will be paid 100% of the unpaid amount of such Claim in Cash on the date that is the later of (i) the Initial Distribution Date for First Tier Claims or (ii) as soon as reasonably practicable after the date such Claim becomes an Allowed Claim; provided, however, that Allowed Administrative Claims of the United States Trustee for Statutory Fees will be paid on the Effective Date and thereafter, as such fees may thereafter accrue and be due and payable, by the Liquidation Trustee pursuant to Section 7.03 of the Plan in accordance with the applicable schedule for payment of such fees.<br><br>Administrative Claims are not classified and are treated as required by the Bankruptcy Code. The holders of such Claims are not entitled to vote on the Plan. | 100% |
| N/A | **Fee Claims** | A Fee Claims is a Claim: (a) of a Professional person retained by order of the Bankruptcy Court for compensation and/or reimbursement of expenses pursuant to Bankruptcy Code Sections 327, 328, 330, or 331 (other than ordinary course professionals of the Debtors); and (b) of any Professional or other party-in-interest seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code Section 503(b).<br><br>The Plan provides that all Final Fee Applications for payment of Fee Claims must be filed with the Bankruptcy Court on or before the Fee Claims Bar Date. Any Fee Claim that is not asserted in accordance with Section 4.02(a) of the Plan will be deemed disallowed under the Plan and will be forever barred against any of the Estates, the Liquidation Trust~~, the Litigation Trust~~ or any of their Assets or property, and the holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.<br><br>The Plan further provides that all Final Fee Applications will be subject to the requirements and | 100% |

---

7.        01:15    **[2] The percentages set forth below are based on the "medium" scenario in the Liquidation Analysis.**

| | | **SUMMARY OF TREATMENT AND EXPECTED RECOVERIES** | |
|---|---|---|---|
| | | (All capitalized terms used but not otherwise defined below will have the meanings set forth in the Plan.) | |
| _Class_ | _Claim/Interest_ | _Description, Treatment and Projected Recovery for Claim/Interest_ | _Estimated Percentage Recovery_ |
| | | procedures set forth in Section 4.02 of the Plan.<br><br>The Plan provides that, unless the holder of an Allowed Fee Claim agrees to receive other less favorable treatment, each holder of an Allowed Fee Claim will be paid 100% of the unpaid amount of such Claim in Cash no later than five (5) Business Days after the date that such Claim is Allowed by order of the Bankruptcy Court.  Immediately prior to the Effective Date, the Debtors will pay all outstanding amounts on account of Fee Claims relating to prior periods and for the period ending on the Effective Date to the respective Professional holding such Fee Claim.  The Professionals will estimate Fee Claims due for periods that have not been billed as of the Effective Date.  Within ten (10) days after entry of a Final Order with respect to its Final Fee Application, each Professional will remit any overpayment to the Liquidation or the Liquidation Trustee will pay any outstanding amounts owed to the Professional.<br><br>Fee Claims are not classified and are treated as required by the Bankruptcy Code.  The holders of such Claims are not entitled to vote on the Plan. | |
| N/A | **Priority Tax Claims** | A Priority Tax Claim is a Claim or a portion of a Claim for which priority is asserted under Bankruptcy Code Section 507(a)(8).<br><br>To be eligible to receive Distributions under the Plan on account of a Priority Tax Claim, a Proof of Claim must be filed with the Claims Agent so as to be received on or before the Governmental Unit Bar Date.  Any Priority Tax Claim that is not asserted in accordance with Section 4.03(a) of the Plan will be deemed disallowed under the Plan and will be forever barred against any of the Estates, the Liquidation Trust~~, the Litigation Trust,~~ or any of their Assets or property and the holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.<br><br>Subject to the terms of the Plan, with respect to each Allowed Priority Tax Claim, at the sole option of the Debtors, the holder of an Allowed Priority Tax Claim will be entitled to receive on account of such Allowed Priority Tax Claim, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (x) payments in Cash on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim, or (y) such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Debtors.<br><br>Priority Tax Claims are not classified and are treated as required by the Bankruptcy Code.  The holders of such Claims are not entitled to vote on the Plan. | 100% |
| N/A | **DIP Claims** | The Plan provides that on the Effective Date, each holder of an Allowed DIP Claim, in full and complete settlement, release and discharge of such Claim, will be paid in full in Cash all outstanding principal and accrued but unpaid interest, costs, fees and expenses owing as of the Effective Date, and any other amounts due and owing under the DIP Loan Documents.<br><br>DIP Claims are not classified and are Unimpaired.  The holders of such Claims are deemed to accept the Plan will not vote. | 100% |

7.        01:15

CH\~~1723784.11~~1723784.13

| | | | Estimated |
|---|---|---|---|

**SUMMARY OF TREATMENT AND EXPECTED RECOVERIES**

(All capitalized terms used but not otherwise defined below will have the meanings set forth in the Plan.)

| _Class_ | _Claim/Interest_ | _Description, Treatment and Projected Recovery for Claim/Interest_ | _Estimated Percentage Recovery_* |
|---|---|---|---|
| 1 | **Other Secured Claims** | An Other Secured Claim is a Secured Claim arising prior to the Petition Date against any of the Debtors, other than a Senior Noteholders' Claim, the Shell Secured Claim or any Secured Claim satisfied pursuant to the Sale Order or any other order of the Bankruptcy Court.

Under the Plan a Secured Claim is a Claim (a) that is secured by a valid, perfected and enforceable Lien that is not subject to an Avoidance Action, in or upon any right, title or interest of any of the Debtors in and to property of the Estates, to the extent of the value of the holder's interest in such property as of the relevant determination date or (b) that is subject to an offset right pursuant to Bankruptcy Code Section 553, to the extent of the amount subject to a valid setoff as of the Effective Date; which Claim ~~shall~~will be in an amount, including postpetition interest and any reasonable fees, costs or charges to the extent permitted under Bankruptcy Code Section 506(b), that is agreed to in writing by the holder and the Debtors or the Liquidation Trustee or is determined by the Bankruptcy Court pursuant to Bankruptcy Code Section 506(a).

Other Secured Claims are First Tier Claims under the Plan. Class 1 consists of separate sub-Classes, one for each Other Secured Claim. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code. Class 1 is Unimpaired by the Plan and the holders of Other Secured Claims are deemed to accept the Plan and, therefore, are not entitled to vote on the Plan.

The Plan provides that, unless a holder of an Allowed Other Secured Claim agrees to receive other less favorable treatment, each holder of an Allowed Claim in this Class will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, (x) 100% of the unpaid amount of such Claim in Cash or (y) the collateral securing any such Allowed Other Secured Claim (to the extent such collateral does not constitute collateral securing the Senior Noteholder Claims or, if such collateral does secure the Senior Noteholder Claims, to the extent that the Lien securing such Allowed Other Secured Claim is senior to the Lien securing the Senior Noteholder Claims) on the date that is the later of (i) the Initial Distribution Date for First Tier Claims or (ii) as soon as is reasonably practicable after the date such Claim becomes an Allowed Claim; provided, however, that if the holder of an Allowed Other Secured Claim holds Cash with a right of setoff, such holder will be entitled to effect the setoff and thereby satisfy the Claim in lieu of receiving payment.

In addition, the Plan requires that certain conditions be met before a holder of an Other Secured Claim is entitled to receive the foregoing treatment. First, except as otherwise specifically provided in the Plan or in any agreement, instrument or document created in connection with the Plan: (a) each holder of an Other Secured Claim, regardless of whether such Claim has been listed in the Schedules or asserted in a Proof of Claim: (1) to the extent Cash is distributed in accordance with Section 5.01(b) of the Plan, will turn over and release to the Estates and the Liquidation Trust any and all property of the Estates that secures or purportedly secures such Claim and any such Lien arguably securing such Claim will automatically, and without further action by the Estates or the Liquidation Trust, be deemed released; provided, however, that if such property is Cash, in lieu of payment, the holder will be deemed to have setoff the Cash to the extent of the Allowed amount of the Claim, and will be obligated to turn over and release the balance of Cash and any other property that was held to secure the Claim; and (2) execute such documents and instruments as the Liquidation Trust require(s) to evidence such holder's release of such property or Lien, and if such holder violates the Confirmation Order and the Plan by refusing to execute appropriate documents or instruments, the Liquidation Trust may, in its discretion, file a copy of the Confirmation Order which will serve to release any holder's rights in such property; and (b) on the Effective Date, all right, title and interest in such property will revert, vest or revest in accordance with the Plan, free and clear of all Claims and Interests, including, without limitation, Liens, escrows, charges, pledges, or other encumbrances of any kind; provided, however, that the physical turnover of property described in (a)(1) above, is necessary and required only to the extent the holder is in possession or control of the property that secures or purportedly secures such Claim.

Without limiting the automatic release provisions of the immediately preceding Paragraph, the Plan provides that: (a) no distribution thereunder will be made to or on behalf of any holder unless and until such holder executes and delivers to the Estates or the Liquidation Trust such release of Liens or otherwise turns over and releases any property in such holder's possession; (b) any holder that fails to execute and deliver such release of Liens within ninety (90) days after the Effective Date (or such other date as may be agreed by the Liquidation Trust and such holder) will be subject to whatever sanction is deemed appropriate by the Bankruptcy Court; and (c) the Liquidation Trust, which will be deemed to be appointed as attorney-in-fact for all such holders of Other Secured Claims for the purpose of releasing such Liens, will be authorized to use, and all authorities will be required to accept, the Confirmation Order and the notice of Effective Date as | 100% |

7.        01:15

| | | **SUMMARY OF TREATMENT AND EXPECTED RECOVERIES** | |
| | | (All capitalized terms used but not otherwise defined below will have the meanings set forth in the Plan.) | |
| ***Class*** | ***Claim/Interest*** | ***Description, Treatment and Projected Recovery for Claim/Interest*** | ***Estimated Percentage Recovery[4]*** |
|---|---|---|---|
| | | satisfaction of all Liens.<br><br>Other Secured Claims are Unimpaired.  The holders of such Claims are deemed to accept the Plan will not vote. | |
| 2 | **Priority Non-Tax Claims** | A Priority Non-Tax Claim as a Claim or portion of a Claim for which priority is asserted under Bankruptcy Code Sections 507(a)(3), (4), (5), (6) or (7).<br><br>The Plan provides that, unless the holder of an Allowed Priority Non-Tax Claim agrees to receive other less favorable treatment, each holder of an Allowed Priority Non-Tax Claim will be paid 100% of the unpaid amount of such Claim in Cash on the date that is the later of (i) Initial Distribution Date for First Tier Claims or (ii) as soon as is reasonably practicable after the date such Claim becomes an Allowed Claim.<br><br>Priority Non-Tax Claims are Unimpaired.  The holders of such Claims are deemed to accept the Plan and will not vote. | 100% |
| 3 | **Shell Secured Claim** | The Shell Secured Claim is the Shell Claim to the extent such Claim is secured by security interests in certain of the Debtors' motor vehicles as the result of notations on certificates of title of such motor vehicles.<br><br>The Shell Secured Claim is a First Tier Claim under the Plan and, accordingly, will be paid in Cash under the Plan on the Effective Date.<br><br>The Shell Secured Claim is Impaired.  The holder of such Claim is entitled to vote to accept or reject the Plan. | 100% |
| 4 | **Senior Noteholder Claims** | A Senior Noteholder Claim is the Claim of the Senior Secured Notes Indenture Trustee or any Senior Secured Noteholder under the Senior Secured Notes Indenture, including (a) any Secured Claim, (b) the Senior Noteholders' Adequate Protection Claims, and (c) any Deficiency Claim of the Senior Secured Notes Indenture Trustee or any Senior Secured Noteholder.<br><br>**Class 4 will consist of all Senior Noteholder Claims.  Class 4 consists of separate sub-Classes, one for the Secured Claim of the Senior Secured Noteholders, one for the Senior Noteholder Adequate Protection Claims and one for the Deficiency Claim of the Senior Secured Noteholders.  Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code.  Class 4 is Impaired by the Plan and the holders of Senior Noteholder Claims are entitled to vote on the Plan.**<br><br>Subject to the terms of **Senior Noteholder Claims are Second Tier Claims under the Plan. Under** the Plan, in full satisfaction, settlement and release of and in exchange for all such Allowed Senior Noteholder Claims, commencing on the Initial Distribution Date for Second Tier Claims, (a) each holder of a Senior Noteholder Claim will be entitled to receive a Pro Rata portion of (i) 70% of the Class A preferred equity of NewCo, (ii) 50% of the Class B preferred equity of NewCo, and (iii) 30% of the common equity of NewCo, (b) the GFES TPT Interest will be transferred to NewCo on the Effective Date and (c) **the Senior Noteholder Distribution until such time as the Senior Noteholder Claim Allowed Amount is paid in full; provided that the first $1,000,000 of the Senior Noteholder Distribution will be made directly to the TPT Acquisition Entity and the remaining Senior Noteholder Distribution will be made to each holder of a Senior Noteholder Claim through** the Senior Secured Notes Indenture Trustee will receive, for the benefit of the Senior Secured Noteholders, distributions of the Senior Noteholder Cash Distribution from the Liquidation Trust until such time as (i) the aggregate value contributed to NewCo by the Debtors and the Liquidation Trustee *plus* (ii) the aggregate value distributed to the Senior Secured Notes Indenture Trustee, is equal to the Senior Noteholder Claim Allowed Amount.<br><br>It is not expected that the Senior Noteholder Claims will be paid in full.  As a result, the Senior Noteholder Claims are Impaired.  The holders of such Claims are entitled to vote to accept or reject the Plan. | 2629% |

| | | | Estimated Percentage Recovery[4] |
|---|---|---|---|
| | | **SUMMARY OF TREATMENT AND EXPECTED RECOVERIES** | |
| | | (All capitalized terms used but not otherwise defined below will have the meanings set forth in the Plan.) | |
| _Class_ | _Claim/Interest_ | _Description, Treatment and Projected Recovery for Claim/Interest_ | |
| 5 | **Shell Other Claim** | The Shell Other Claim is the Claim of Shell in excess of the Distributions received by Shell on account of the Shell Secured Claim, including any Deficiency Claim of Shell or any Claim under or related to the Intercreditor Agreement. | N/A |
| | | The Shell Other Claim will be an Allowed Claim.  Under the Plan, in full satisfaction, settlement and release of and in exchange for the Shell Other Claim, Shell will receive the release set forth in Section 12.07 of the Plan. ~~Solely to effectuate the foregoing and the provisions of the Plan, on the Effective Date the Shell Other Claim, and all rights relating thereto, will be transferred to the Debtors.~~ | |
| | | The Shell Other Claim is Impaired.  The holder of such Claim is entitled to vote to accept or reject the Plan. | |
| 6 | **General Unsecured Claims** | A General Unsecured Claim is a Claim that is not an Administrative Claim, a Fee Claim, a Priority Tax Claim, an Other Secured Claim, a Priority Non-Tax Claim, a Shell Secured Claim, a Senior Noteholder Claim, a Shell Other Claim, a Subordinated Other Claim, or a Subordinated Stock Claim, whether Allowed or Disputed.  Any Deficiency Claim of the Senior Secured Notes Indenture Trustee or any Senior Secured Noteholder is deemed waived and is not a General Unsecured Claim. | ~~22~~14% |
| | | The Plan provides that **each holder of an Allowed General Unsecured Claim, in full satisfaction, settlement and release of and in exchange for all such Allowed Claims, unless such holder agrees to less favorable treatment,** each holder of an Allowed General Unsecured Claim, in full satisfaction, settlement and release of and in exchange for all such Allowed Claims, unless such holder agrees to less favorable treatment, will be entitled to receive, commencing on the Initial Distribution Date for Third Tier Claims, a Pro Rata share of the ~~interests in the Litigation  Trust.~~**Available Cash remaining after the payment of, or establishment of adequate reserves for, all First Tier Claims and the Senior Noteholder Distribution, until such time as all Allowed General Unsecured Claims are paid in full.** | |
| | | General Unsecured Claims are Impaired.  The holders of such Claims are entitled to vote to accept or reject the Plan. | |
| 7 | **Subordinated Other Claims** | A Subordinated Other Claim is (a) any Claim, other than a Subordinated Stock Claim, asserted against any of the Debtors that is subordinated pursuant to either Bankruptcy Code Section 510(b) or Bankruptcy Code Section 510(c); or (b) any Claim for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the holder of such Claim, including, without limitation, any such Claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, willful intellectual property infringement, fraud, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise), and any such Claim asserted by a Governmental Unit in connection with a tax or other obligation owing to such unit. | 0% |
| | | The Plan provides that, subject to Section 5.11 of the Plan, no holder of a Subordinated Other Claim will receive or retain any property under the Plan**, or the** Liquidation ~~Trust Agreement or the Litigation~~ Trust Agreement on account of such holder's Claim. | |
| | | Subordinated Other Claims are Impaired.  The holders of such Claims are deemed to have rejected the Plan and will not vote. | |
| 8 | **Subordinated Stock Claims** | A Subordinated Stock Claim is any Claim against any of the Debtors that is subordinated pursuant to Bankruptcy Code Section 510(b) arising from the rescission of a purchase or sale of any Interest, any Claim for damages arising from the purchase or sale of any Interest, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim. | 0% |
| | | The Plan provides that, subject to Section 5.11 of the Plan, no holder of a Subordinated Stock Claim will receive or retain any property under the Plan**, or the** Liquidation ~~Trust Agreement or the Litigation~~ Trust Agreement on account of such holder's Claim. | |
| | | Subordinated Stock Claims are Impaired.  The holders of such Claims are deemed to have rejected the Plan and will not vote. | |

7.            01:15

7

| | | SUMMARY OF TREATMENT AND EXPECTED RECOVERIES | |
|---|---|---|---|
| | | (All capitalized terms used but not otherwise defined below will have the meanings set forth in the Plan.) | |
| _Class_ | _Claim/Interest_ | _Description, Treatment and Projected Recovery for Claim/Interest_ | _Estimated Percentage Recovery[1]_ |
| 9 | **GFES Interests** | A GFES Interest is any equity security, within the meaning of Bankruptcy Code Section 101(16), issued by GFES and outstanding prior to the Effective Date including, without limitation, any preferred stock, common stock, stock unit, stock options or other right to purchase the stock of GFES, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights to acquire or receive any stock or other equity ownership interests in GFES prior to the Effective Date including, for the avoidance of doubt, all outstanding warrants held by existing warrant holders pursuant to that certain Warrant Agreement, dated as of November 15, 2011, by and between GFES, Wilmington Trust, National Association, as warrant agent, and other parties signatory thereto. The Plan provides that all GFES Interests will be cancelled as of the Effective Date.  Subject to the provisions of Section 5.11 of the Plan, no holder of a GFES Interest will receive or retain any property under the Plan, **or** the Liquidation ~~Trust Agreement or the Litigation~~ Trust Agreement on account of such holder's Interest. GFES Interests are Impaired.  The holders of such Interests are deemed to have rejected the Plan and will not vote. | 0% |
| 10 | **Subsidiary Interests** | Subsidiary Interests means, collectively, all of the issued and outstanding shares of stock or membership interests of Hub City and Proppant One. The Plan provides that holders of Subsidiary Interests will not receive or retain any property under the Plan on account of such Interests. Subsidiary Interests are Impaired.  The holders of such Interests are deemed to have rejected the Plan and will not vote. | 0% |

## C.    THE VOTING PROCESS

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a plan of reorganization are entitled to vote to accept or reject a proposed plan.  Generally, a claim or equity interest is impaired under a plan if the holder's legal, equitable or contractual rights are altered under such plan.  Classes of claims or equity interests under a chapter 11 plan in which such claims or equity interests are unimpaired are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.  In addition, classes of claims or equity interests under a chapter 11 plan in which such claims or equity interests will not receive or retain any property are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.  In connection with the Plan, therefore:

- Claims in Classes 3, 4, 5 and 6 (together, the "**Voting Classes**") are Impaired.  As a result, the votes of the holders of Claims in such Classes will be solicited.

- Claims in Classes 1 and 2 are Unimpaired. As a result, the votes of the holders of Claims in such Classes will not be solicited.

- Claims in Classes 7 and 8 and Interests in Classes 9 and 10 are Impaired and the holders of such Claims and Interests are not expected to receive any Distribution on account of such Claims or Interests.  As a result, the holders of Claims and Interests in those Classes are deemed to have rejected the Plan and the votes of holders of such Claims and Interests will not be solicited.

The Debtors established  March 11, 2014 (the "**Voting Record Date**") as the time and date for determining which holders of Claims are entitled to receive a copy of this Disclosure Statement and to vote to accept or reject the Plan.  Accordingly, only holders of record that are otherwise entitled to vote on the Plan will receive a Ballot or master Ballot and may vote on the Plan.

The Debtors have retained Prime Clerk LLC to, among other things, act as their voting agent (the "**Voting Agent**").  Specifically, the Voting Agent will assist the Debtors with:  (a) mailing this Disclosure Statement and the applicable Ballots (including beneficial owner Ballots and master Ballots in the case of the Senior Noteholder Claims in Class 4), (b) soliciting votes on the Plan, (c) receiving, tabulating, and reporting on Ballots cast for or against the Plan, (d) responding to inquiries from creditors

7.        01:15

and stakeholders relating to the Plan, the Disclosure Statement, the Ballots and matters related thereto including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan, (e) if necessary, contacting creditors regarding the Plan and their Ballots and (f) mailing notices required by the Bankruptcy Code, the Bankruptcy Rules or order of the Bankruptcy Court.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that actually vote for acceptance or rejection of the plan.  **YOUR VOTE ON THE PLAN IS IMPORTANT.**

If one of the Voting Classes rejects the Plan, the Debtors reserve the right to seek confirmation of the Plan over any such rejection by one or more Voting Classes pursuant to Bankruptcy Code Section 1129(b).  Section 1129(b) permits the confirmation of a plan of liquidation notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims votes to accept such plan.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.  The Debtors reserve the right to alter, amend, or modify the Plan or any exhibit, in accordance with the provisions of the Plan including, without limitation, Section 14.01 of the Plan, if determined necessary to satisfy the requirements of Bankruptcy Code Section 1129(b).

With respect to holders of Class 3, Shell Secured Claims, Class 5 Shell Other Claims and Class 6 General Unsecured Claims, a Ballot is enclosed for the purpose of voting on the Plan.  This Disclosure Statement, the appendices attached hereto and the related documents are the only materials the Debtors are providing to creditors for their use in determining whether to vote to accept or reject the Plan, and such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.

With respect to holders of Class 4 Senior Noteholder Claims, this Disclosure Statement and the related materials will be furnished to holders of Senior Secured Notes whose names (or the names of whose nominees) appear as of the Voting Record Date on the security holder lists maintained by the Senior Secured Notes Indenture Trustee pursuant to the Senior Secured Notes Indenture or, if applicable, who are listed as participants in a clearing agency's security position listing.  IF SUCH ENTITIES DO NOT HOLD FOR THEIR OWN ACCOUNT, THEY SHOULD PROVIDE COPIES OF THE DISCLOSURE STATEMENT, THE PLAN AND, IF APPLICABLE, BENEFICIAL OWNER BALLOTS OR MASTER BALLOTS, TO THE BENEFICIAL OWNERS.  With respect to Senior Noteholder Claims, special voting instructions apply to beneficial owners, nominees of beneficial owners and securities clearing agencies.  Those special instructions will accompany the beneficial owner Ballot or master Ballot provided to holders of Senior Noteholder Claims.  Those instructions may be different from the general instructions contained herein.  In the event of an inconsistency, the special instructions that accompany the beneficial owner Ballot or master Ballot should be followed.  A summary of such instructions is set forth in more detail in Section X below.

The Ballots, beneficial owner Ballots and master Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Voting Classes with respect thereto.  All votes to accept or reject the Plan must be cast by using the Ballot or beneficial owner Ballot enclosed with the Disclosure Statement or, in the case of a bank, brokerage firm or other nominee holding Senior Secured Notes in its own name on behalf of a beneficial owner, or any agent thereof (each, a "**Nominee**") the master Ballot provided to such Nominee under separate cover (or manually executed facsimiles thereof).

All Ballots must be returned to the Voting Agent at the following address:

<div align="center">

Green Field Energy Services, Inc. (13-12783)
c/o Prime Clerk LLC
830 3rd Avenue, 9th Floor
New York, NY  10022
Telephone: (855) 410-7359

</div>

Original executed Ballots must be returned to the Voting Agent.  The Voting Agent will reject any Ballot, other than a master Ballot, that is sent via facsimile or electronic mail transmission.

---

Please refer to the instructions accompanying the Ballots, beneficial owner Ballots or master Ballots for more information regarding voting requirements to ensure that your Ballot, beneficial owner Ballot or master Ballot is properly and timely submitted such that your vote may be counted.

---

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT, BENEFICIAL OWNER BALLOT OR MASTER BALLOT MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED SUCH THAT IT IS **ACTUALLY RECEIVED**

ON OR BEFORE THE VOTING DEADLINE (April 9, 2014) BY THE VOTING AGENT.

       All properly completed Ballots or master Ballots received by the Voting Agent prior to the Voting Deadline from holders of Allowed Claims in the Voting Classes will be counted for purposes of determining whether each Class has accepted the Plan.  The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting by each of Classes 3, 4, 5 and 6.

       If a Ballot, beneficial owner Ballot or master Ballot is received by the Voting Agent <u>after</u> the Voting Deadline, it will not be counted, unless the Debtors have granted, in their sole discretion, an extension of the Voting Deadline in writing with respect to such Ballot or master Ballot.  Additionally, the following Ballots, beneficial owner Ballots and master Ballots will **<u>NOT</u>** be counted:

- any Ballot, beneficial owner Ballot or master Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

- any Ballot, beneficial owner Ballot or master Ballot cast by or on behalf of a Person or Entity that does not hold a Claim in one of the Voting Classes;

- any Ballot, beneficial owner Ballot or master Ballot cast by or on behalf of a Disputed Claimant who has not timely filed a motion under Bankruptcy Rule 3018(a), or who has timely filed such a motion that was not granted by the Bankruptcy Court;

- any Ballot, beneficial owner Ballot or master Ballot that is properly completed, executed and timely submitted, but (a) does not indicate an acceptance or rejection of the Plan, (b) indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan; and/or

- any unsigned Ballot, beneficial owner Ballot or master Ballot or any Ballot that has a non-original signature (excluding master Ballots transmitted by facsimile).

       THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF ALL HOLDERS OF CLAIMS AND RECOMMEND THAT ALL HOLDERS OF CLAIMS IN VOTING CLASSES VOTE TO ACCEPT THE PLAN.

## D.      THE CONFIRMATION HEARING AND OBJECTIONS TO CONFIRMATION

       Bankruptcy Code Section 1128 requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "**Confirmation Hearing**").  The Confirmation Hearing is set to commence on April 16, 2014.  At the Confirmation Hearing, the Debtors will request confirmation of the Plan, as may be modified from time to time.  The Debtors may modify the Plan to the extent permitted by Bankruptcy Code Section 1127(a) and Bankruptcy Rule 3019, as necessary to confirm the Plan.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequently adjourned Confirmation Hearing. Notice of the Confirmation Hearing will be provided to holders of Claims and Interests or their representatives (the "**Confirmation Hearing Notice**") pursuant to an order of the Bankruptcy Court.  Objections to Confirmation must be filed with the Bankruptcy Court by April 9, 2014 and are governed by Bankruptcy Rules 3020(b) and 9014.  Objections to Confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount and Class of the Claim.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## E.      ESTIMATES AND FORWARD LOOKING STATEMENTS

       This Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof.  Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein.  Consequently, actual events, circumstances, effects and results may vary significantly from those included in or contemplated by such projected financial information and such other forward-looking statements.  The projected financial information contained herein and in the appendices annexed hereto is therefore not necessarily indicative of the future financial condition of the Debtors, which may vary significantly from that set forth in such projected financial information.  Consequently, the projected financial information and other forward-looking statements contained herein should not be regarded as representations by any of the Debtors, their advisors, or any Person that the projected financial condition or results of

operations can or will be achieved.  FACTORS THAT COULD CAUSE ACTUAL RESULTS TO BE MATERIALLY DIFFERENT FROM EXPECTATIONS INCLUDE THOSE FACTORS DESCRIBED IN PART VIII HEREIN TITLED "RISK FACTORS."

## II.
## GENERAL INFORMATION CONCERNING THE DEBTORS

### A.    DEBTORS

The Debtors include Green Field Energy Services, Inc. ("**GFES**"), the parent company, and two of its subsidiaries:  Hub City Tools, Inc. ("**Hub City**") and Proppant One, Inc. ("**Proppant One**").  Basic information about each of the Debtors is set forth below.

| Name of Entity | Ownership | Business Purpose/Status |
|---|---|---|
| Green Field Energy Services, Inc. | Privately owned | Main operating company; active but with reduced operations |
| Hub City Tools, Inc. | Green Field Energy Services, Inc. | Non-operating legacy entity from GFES' earlier operations |
| Proppant One, Inc. | Green Field Energy Services, Inc. | Non-operating entity formed primarily to market GFES' sand operations |

GFES is the main operating entity in the Debtors' corporate structure.  In addition to being the direct parent and 100% equity owner of each of Hub City and Proppant One, GFES also holds a 50% equity interest in TPT.  TPT is a joint venture between GFES and MTT Properties, LLC ("**MTT**").

GFES is currently owned by three parties, MOR MGH Holdings, LLC ("**MORMGH**"), Moody Moreno & Rucks, LLC ("**MMR**") and Enrique Fontova, ("**Mr. Fontova**") President of GFES.  The Debtors' Chief Executive Officer, Michel B. Moreno ("**Mr. Moreno**"), owns or controls 33.3% of MMR and 100% of MORMGH.

In May 2011, the Debtors entered into agreements with certain of the Debtors' members to repurchase all of their equity interests in GFES for cash and contingent consideration in the form of an earnout.  These redemption agreements required upfront payments to be made to certain parties as well as earnout payments to be made to all parties over time based on the gross revenues of certain of the Debtors' turbine driven equipment ("**TDEs**").

In November 2011, GFES amended its certificate of incorporation to, among other things, effect a stock split on a 1,400 for 1 basis.  The stock split was effected simultaneously for all of the Debtors' then-issued and outstanding common stock and the exchange ratio was the same for each share of issued and outstanding common stock.  The stock split affected all of the Debtors' stockholders uniformly and did not affect any stockholder's percentage ownership interest.  Shares of common stock issued pursuant to the stock split are fully paid and nonassessable.

On November 15, 2011, as part of the 2016 Senior Secured Note Indenture (as defined below), GFES issued 250,000 warrants for the purchase of GFES common stock.  Each warrant entitles the registered holder to receive from GFES 0.988235 fully paid and nonassessable shares of common stock at the initial exercise price of $0.01 per share, subject to adjustment upon the occurrence of certain events set forth in the Warrant Agreement.  As of the date hereof, no warrants have been exercised.

In April 2013, 124,446 shares of common stock were awarded to GFES President, Enrique Fontova, as part of a management incentive plan.  Following this award, and as of the date hereof, the ownership of GFES, on an undiluted basis, is as follows:

| Name of Entity | Common Shares Held | Ownership Percentage |
|---|---|---|
| MOR MGH Holdings, LLC | 1,244,460 | 81.63% |
| Moody, Moreno & Rucks, LLC | 155,540 | 10.20% |
| Enrique Fontova | 124,446 | 8.16% |

The chart attached as Appendix B depicts the Debtors' current corporate structure.

**B.      THE DEBTORS' CORPORATE HISTORY**

The Debtors were an independent oilfield services company that has historically provided a wide range of services to oil and natural gas exploration and production companies to help develop and enhance the production of hydrocarbons.  GFES was formed in 1969 as a Louisiana limited liability company called Hub City Industries, LLC.  In September 2011, Hub City Industries, LLC changed its name to Green Field Energy Services, LLC, and, in October 2011, Green Field Energy Services, LLC converted into a Delaware corporation.[23]

The Debtors primarily focused their operations on traditional well-related services from 1969 to 2010.  In December 2010, the Debtors first began providing hydraulic fracturing services in addition to well-related services.  From 2010 until the Petition Date, the Debtors provided both hydraulic fracturing services and well services to oil and natural gas exploration and production companies. In 2011, the Debtors entered into long-term lease arrangements for two sand mines with the expectation that they could secure access to sand to use in their own hydraulic fracturing operations, as well as to market and sell to other providers of hydraulic fracturing services.

**C.      OVERVIEW OF THE DEBTORS' BUSINESS**

The Debtors provided a wide range of services to oil and natural gas drilling and production companies to help develop and enhance the production of hydrocarbons.  The Debtors' services include hydraulic fracturing, cementing, coiled tubing, pressure pumping, acidizing, as well as nitrogen and other pumping services.  The Debtors also assemble their own turbine-powered hydraulic fracturing units.

1.      **Operational Locations**

The Debtors are headquartered in Lafayette, Louisiana.  As of October 18, 2013, the Debtors had offices, facilities and mines in fourteen locations across the United States.

| Location | Business Use | Owned/Leased |
|---|---|---|
| Lafayette, LA | Corporate headquarters | Leased |
| Lafayette, LA | Storing and repairing equipment; general office purposes | Leased |
| Lafayette, LA | Storage unit | Leased |
| Abbeville, LA | Warehouse | Leased |
| Carencro, LA | District office; storing and repairing equipment; general office purposes | Leased |
| Pearl River, LA | Sand mine | Leased (with limited option to purchase) |
| Denver, CO | Sales office | Leased |
| Nicholson, MS | Sand mine | Leased (with limited option to purchase) |
| Carrizo Springs, TX | Man camp – field lodging | Owned |
| Fort Worth, TX | Office space (vacant) | Leased |
| Houston, TX | Sales office | Leased |
| Marshall, TX | District office; storing and repairing equipment; general office purposes | Owned |
| Midland, TX | District office | Leased |
| Pleasanton, TX | District office | Leased |

The Debtors have terminated the Marshall district operations and transferred equipment at that facility to other locations in Louisiana.  The Debtors still own the Marshall facility, but are currently marketing it for sale.

---

[23]      GFES has also previously been named Green Field Energy Services, LLC and Green Field Energy Services, Inc., a Louisiana corporation.  Hub City is a legacy entity from GFES' earlier operations, but is no longer operating.  Proppant One was formed in 2011 primarily to market the Debtors' potential sand operations, but such sand operations were ultimately abandoned.

7.      01:15

12

The Debtors have rejected the leases for each of the Midland, Pleasanton and Fort Worth, Texas locations pursuant to the Bankruptcy Court's November 25, 2013, order granting the Debtors the authority to reject each of the leases pursuant to Bankruptcy Code Section 365 [Docket No. 165].

2.    **Business Segments**

As noted above, prior to the Petition Date, The Debtors operated through three primary business segments:  (i) the hydraulic fracturing services segment; (ii) the well services segment and (iii) the sand operations segment.

(a)    Well Services Segment

The Debtors began providing well services in 1969 and, as of the Petition Date, possessed an established customer base for these services.  The Debtors' well services, sometimes referred to as "well stimulation services," were services performed on an oil or natural gas well to enhance production by improving the flow of hydrocarbons from the drainage area into the well bore.  The Debtors' well services included (i) cementing, (ii) coiled tubing, (iii) pressure pumping, (iv) acidizing, and (v) nitrogen and other pumping services.

Cementing involves the use of pressure pumping equipment to pump a slurry of liquid cement down a well between the casing and the borehole.  Cementing helps to isolate fluid zones, minimize potential damage to hydrocarbon bearing and surrounding formations, and provides structural integrity for the casing by securing it to the earth.  Cementing is also used when recompleting wells, where one zone is plugged and another is opened.

Coiled tubing services involve the insertion of a flexible steel pipe into wells to perform various well servicing operations.  The coiled tubing itself typically has a diameter of less than three inches, and is manufactured in continuous lengths of thousands of feet.  Due to its small diameter, coiled tubing can be inserted into existing production tubing and used to perform a variety of services to enhance the flow of oil or natural gas without using a larger, more costly workover rig.  Coiled tubing offers several advantages over workover rigs, including the ability to (i) continue production from the well without interruption, (ii) move continuous coiled tubing in and out of a well significantly faster than conventional pipe, (iii) direct fluids into a wellbore with greater precision, (iv) provide a source of energy to power a down-hole motor or manipulate down-hole tools, and (v) enhance access to remote fields due to the smaller size and mobility of a coiled tubing unit.

Pressure pumping involves the use of pressure pumping equipment for well injection, cased-hole testing, workover pumping, mud displacement and wireline pumpdowns.

Acidizing involves the injection of highly reactive, low pH solutions (such as hydrochloric acid) into the area where hydrocarbons enter the wellbore.  Acidizing is the most common means of reducing near-wellbore damage, as it dissolves and dilutes contaminants that have accumulated and may restrict the flow of hydrocarbons from a reservoir toward the wellbore.  By dissolving contaminants, acidizing may improve the flow of hydrocarbons towards the wellbore, thus increasing well productivity.

Nitrogen and other pumping services typically involve the use of nitrogen, an inert gas, in various pressure pumping operations.  When provided as a stand-alone service, nitrogen pumping is used to displace fluids in various oilfield applications.

In February 2012, the Debtors discontinued their pump down services line of business for external third parties.  This decision arose out of the Debtors' need for pump down services to support the Debtors' hydraulic fracturing operations.  Hydraulic fracturing requires the use of pump downs services, and with an expanding hydraulic fracturing fleet the Debtors were forced to pay third parties to provide these services to support their hydraulic fracturing segment when the Debtors' own pump down service equipment was being used to serve other customers.

(b)    Hydraulic Fracturing Services Segment

The Debtors' senior management expected the hydraulic fracturing business segment to provide significant growth opportunities for the company.  As a result, in 2010, the Debtors began shifting their focus to the hydraulic fracturing services segment.

The Debtors' hydraulic fracturing services enhanced the production of oil and natural gas from formations with restricted natural flow of hydrocarbons.  The fracturing process consists of pumping a fluid into a perforated well casing or tubing at a sufficient pressure and rate to cause the underground formation to fracture, thereby allowing the oil or natural gas to flow more freely.  Sand, bauxite, resin-coated sand, or ceramic particles, each referred to as a proppant or propping agent, are suspended in the

7.        01:15

13

fracturing fluid and prop open the cracks created by the hydraulic fracturing process in the underground formation. Part of the hydraulic fracturing services the Debtors provided included designing optimum well completion, which included determining the proper fluid, proppant and injection specifications to maximize production. The Debtors also provided technical evaluation, job design and fluid recommendations to their customers.

The Debtors' hydraulic fracturing operations utilized turbine-powered hydraulic fracturing pumping equipment that provided several advantages over the diesel-powered pumping equipment typically used by others in the hydraulic fracturing industry. These advantages included lower emissions, a smaller operating footprint, lower operating costs when burning natural gas, and greater fuel flexibility (including the ability to operate on natural gas provided at a well head).

Each of the Debtors' turbine-powered hydraulic fracturing units consisted primarily of a high pressure hydraulic pump, a turbine engine, a gear box, electrical and hydraulic assemblies, and skids (collectively, a "**TFP**") and various hoses, valves, tanks, and other supporting equipment that were typically mounted to a flat-bed trailer. The group of hydraulic fracturing units, other equipment and vehicles necessary to perform a typical fracturing job is referred to as a hydraulic fracturing "spread" and the Debtors' spreads were collectively referred to as the Debtors' hydraulic fracturing "fleet." The Debtors assembled their own turbine-powered hydraulic fracturing units and then generally used trailers to haul the units to their customers' well locations.

The Debtors' TFPs were powered by remanufactured turbine engines previously used in United States military applications. These turbine engines have a reputation for reliability and durability. The Debtors' TFPs were more cost effective to operate and maintain on natural gas than conventional diesel-powered equipment. Prior field tests regarding operation of the Debtors' TFPs demonstrated compliance with respect to emissions of nitrogen oxides and carbon monoxide under the United States Environmental Protection Agency ("**EPA**") Clean Air Nonroad Diesel Tier 4 ("**Tier 4**") standards.

The following table compares the Debtors' turbine-powered pressure pumping equipment against conventional diesel-powered pressure pumping equipment.

| | TURBINE-POWERED | CONVENTIONAL DIESEL-POWERED |
|---|---|---|
| **Multi-fuel Capability**………………… | Natural gas, diesel or biofuel | Diesel or biofuel |
| **Emissions (including diesel)**………… | Lower than typical diesel emissions; Have met Tier 4 standards for $NO_x$ and carbon monoxide | Requires catalytic converter to meet Tier 4 standards (catalytic converter reduces HP, adds additional costs) |
| **HP (per trailer)**……………………… | 4,500 HP (2 pumps) | 2,250 HP (1 pump) |
| **Major Engine Repair**……………….. | Generally onsite repair or exchange | Generally requires trip to repair shop |

Given the comparative advantages the Debtors' turbine-powered hydraulic fracturing pumping equipment offered over the traditional diesel-powered pumping equipment typically used in the industry, senior management expected that the demand for these services would continue to grow. Thus, beginning in 2010 the Debtors focused senior management's time and energy, along with increased capital, on expanding the Debtors' hydraulic fracturing fleet. Following senior management's increased focus on the launch and implementation of the hydraulic fracturing business, the well services segment provided 9.9% of the Debtors' 2013 year to date revenue,[34] after providing 40% of the Debtors' revenue in 2010. The following table summarizes the Debtors' hydraulic fracturing and well services units in service as of December 31, 2011 and 2012.

| SERVICE UNITS | 2011 | 2012 |
|---|---|---|
| Hydraulic fracturing units (TFPs)………………………………........................ | 8 | 55 |
| Cementing units……………………….......................................................... | 3 | 3 |
| Coiled tubing units…………………….......................................................... | 4 | 5 |

---

[34]    2013 YTD includes results through October 2013.

| | | |
|---|---|---|
| Pressure pumping units…………………………….................................................... | 5 | 4 |
| Acidizing units……………………………................................................................ | 10 | 8 |
| Nitrogen & other pumping units………………………….......................... | 8 | 8 |

       (c)      Sand Operations Segment

Raw manufacturing sand is an essential element of the proppant used in the hydraulic fracturing process. In 2011, the Debtors entered into long-term lease arrangements for two sand mines in Mississippi and Louisiana to secure access to sand for use in the Debtors' hydraulic fracturing operations as well as to market and sell to other providers of hydraulic fracturing services. The Debtors also made arrangements to acquire 300,000 tons of sand annually for three years to partially meet their needs associated with their hydraulic fracturing service obligations.

The Debtors engaged Westward Environmental, Inc. ("**Westward**") to complete a subsurface exploration report that included (i) analysis of 16 borings at the sand mine consisting of 406 acres in Mississippi (the "**Nicholson Mine**") and (ii) analysis and modeling of 9 borings at a portion of the sand mine consisting of 300 acres in Louisiana (the "**Hickory Mine**" and the long-term lease arrangements relating to the Nicholson Mine and Hickory Mine, together, the "**Sand Lease**").

The Debtors are in the process of marketing the Sand Lease in connection with the Sale detailed in Section III.I below.

      3.      **Customers**

Prior to the Petition Date, the Debtors' customers were primarily independent oil and natural gas exploration and production companies. The Debtors provided hydraulic fracturing and other services through three different types of customer arrangements. These arrangements included (i) per stage payments for the committed hydraulic fracturing spreads under long-term agreements; (ii) contracts providing minimum monthly service fees; and (iii) spot market arrangements to provide hydraulic fracturing services at prevailing market rates.

During the year ended December 31, 2010, the Debtors' top five customers accounted for approximately 38% of total revenues, with EXCO Resources and Chesapeake Operating, Inc. each accounting for approximately 11% of total revenues. During the year ended December 31, 2011, the Debtors' top five customers accounted for approximately 52% of total revenues, with EXCO Resources, Navidad Resources, LLC and SWEPI, LP (together with its affiliates and subsidiaries "**Shell**"), accounting for approximately 17%, 12% and 11% of total revenues, respectively. During the year ended December 31, 2012, the Debtors' top five customers accounted for approximately 88% of total revenues, with Shell accounting for approximately 79% of total revenues.

      4.      **Employees**

The Debtors have largely ceased operations and have been materially reducing the number of employees over the past several months (all such reductions in force are herein referred to as the "**RIF**"). Due to the RIF, which is ongoing, and employee departures, the Debtors' workforce has decreased significantly since the Petition Date.

As of the pay period ending February 2, 2014, the Debtors' workforce consisted of approximately 81 active employees. Approximately 30 were employed by GFES in its corporate headquarters located in Lafayette, Louisiana. In addition, the Debtors had approximately 2 salaried employees working at the coil tubing and nitrogen facility in Lafayette, Louisiana, and 38 employees at the stimulation and cementing facility in Carencro, Louisiana. Finally, the Debtors maintained approximately 11 employees for security and maintenance purposes at the former fracturing facilities in Monessen, Pennsylvania and Abbeville, LA.

**D.**      **CORPORATE GOVERNANCE AND MANAGEMENT**

      1.      **Current Board Of Directors**

      (a)      Members of the Board

The Debtors' respective boards of directors (collectively, the "**Boards**") each consist of the following three members:

- **Michael B. Moreno** has been a beneficial equity holder and an advisor to the Debtors since June 2006. Upon GFES' corporate reorganization in October 2011, Mr. Moreno became the Chairman of GFES' Board and GFES'

CH\~~1723784.11~~1723784.13

Chief Executive Officer.  Mr. Moreno beneficially owns 85.7% of the common stock of GFES.  He is also the founder and former Chief Executive Officer of Moreno Group, LLC, a global, full-service construction company serving the upstream and downstream oil and gas sectors, co-founder of Dynamic Offshore Resources, LLC, an oil and gas company focused on acquiring and developing producing properties in the Gulf of Mexico, and former Chief Executive Officer of Dynamic Industries, LLC, a leading fabricator and related field services provider serving the upstream and downstream oil and gas sectors.  He also founded and grew several companies until their sale including:  Moreno and Associates, a safety consulting company for the offshore oil and gas industry, Pure Water Solutions, an equipment rental company for the offshore oil and gas industry, and Dynamic Cranes, an offshore crane rental company.

- **Enrique "Rick" Fontova** was the Chief Executive Officer of GFES from May 2011 until GFES' corporate reorganization in October 2011, at which time Mr. Fontova became a Director and President of GFES.  Mr. Fontova has over 32 years of oil and natural gas experience, the last nine of which have been spent in the oilfield services industry following 2 years with Shell Oil Company.  Mr. Fontova joined Moreno Group, LLC as president of Dynamic Power, LLC in February of 2009, and previously served as Senior Vice President of International Sales and Operations of Eventure Global Technology, which provides solid expandable casing services.

- **Brent Kugman** was appointed as an independent director of each of the Debtors' Boards and serves as the sole member of the Special Committee (as defined below).  Mr. Kugman and the Special Committee are discussed in more detail below.

    (b)     Former Members of the Board of GFES

- **Charlie A. Kilgore** resigned from the Board on October 16, 2013.  Mr. Kilgore originally became a Director following GFES' corporate reorganization in October 2011.  Mr. Kilgore founded and currently serves as Chief Executive Officer of Kilgore marine Services, an industrial marine transportation company servicing the Gulf of Mexico.  He has 26 years of experience in operating marine transportation companies, and previously worked as a Drilling Engineer for Conoco, Inc.

- **Mark Knight** resigned as a member of the Board on October 21, 2013.  Mr. Knight originally became a Director following GFES' corporate reorganization in October 2011.  He currently serves as President and Chief Executive Officer of Knight Oil Tools, Inc., which provides rental tools, fishing services, well services, saw services, and manufacturing packages to the oil and gas industry.  Mr. Knight is also a board member for the Boys and Girls Club of Acadiana, Acadiana Symphony, Evangeline Area Council of Boys Scouts of America, Our Lady of Fatima School Board, and currently serves on the St. Thomas More Foundation Board.

- **Charles Goodson resigned as a member of the Board on May 19, 2012.  Mr. Goodson originally became a Director following GFES' corporate reorganization in October 2011.  Mr. Goodson serves as Chairman, Chief Executive Officer, and President of PetroQuest Energy Inc., an independent energy company engaged in the exploration, development, acquisition and production of oil and natural gas reserves, and a small customer of the Debtors.  He co-founded American Explorer, Inc., an oil exploration company in the Gulf of Mexico and served as its President.  American Explorer, Inc. became American Explorer LLC and Mr. Goodson continued with the company as a partner until it merged with PetroQuest, Inc. in 1998.  He is a member of the Lafayette Association of Petroleum Landmen, the American Association of Petroleum Landmen, the Board of Directors of Our Lady of Lourdes Regional Medical Center, the IberiaBank's Lafayette Advisory Board, the Federal Reserve Bank of Atlanta Energy Council and a past member of the Governor's Energy Policy Advisory Commission.**

    2.     **Special Committee**

    The Boards of each of the Debtors determined that in connection with the filing of the bankruptcy it was advisable and in the best interests of the Debtors for their respective Boards to designate a special committee (the "**Special Committee**") in connection with the evaluation and implementation of Possible Restructuring Alternatives (as defined below).  The Boards determined that the Special Committee has the power and authority (1) to review and evaluate a possible bankruptcy, sale, restructuring, financing or equity transaction, liquidation, or other strategic alternative involving the Debtors (the "**Possible Restructuring Alternatives**"), including the terms, conditions and advisability thereof, (2) to discuss and negotiate the terms and conditions of Possible Restructuring Alternatives with any party the Special Committee deems appropriate, including, without limitation, the Debtors' creditors and equity holders and their respective agents and advisors, (3) to determine whether any Possible Restructuring Alternative is

advisable and in the best interests of the Debtors and their stockholders and creditors and, if appropriate, approve a Possible Restructuring Alternative, (4) to assist with, review and evaluate, and make determinations with respect to, any other matter which presents an actual or potential conflict between the interests of the Debtors and any of their affiliates as determined in the reasonable judgment of the Board, and (5) to engage (and terminate the engagement of) a Chief Restructuring Officer, a Deputy Chief Restructuring Officer, and such Assistant Chief Restructuring Officers as the Special Committee may determine are necessary or appropriate in connection with the Possible Restructuring Alternatives (collectively, the "**Restructuring Officers**") who report solely to the Special Committee.

Accordingly, effective as of the Petition Date, Brent Kugman was appointed as an independent director of each of the Boards of the Debtors and was designated the sole member of each of the Special Committees.  The Special Committee subsequently engaged Alvarez & Marsal North America, LLC ("**Alvarez**") to provide the Debtors a Chief Restructuring Officer and certain additional personnel.  Alvarez thereby designated Thomas E. Hill to serve as Chief Restructuring Officer (the "**CRO**") for the Debtors.

3.    **Executive Management**

(a)    Senior Management Team

Set forth below is information regarding the GFES' current senior management team (the "**Executives**") serving as of the Petition Date.

- **Michael B. Moreno** has been a beneficial equity holder and an advisor to the Debtors since June 2006.  Upon GFES' corporate reorganization in October 2011, Mr. Moreno became the Chairman of GFES' Board and GFES' Chief Executive Officer.  Mr. Moreno ~~served as the Debtors' Chief Executive Officer until February 4, 2014.  Mr. Moreno~~ is discussed more fully above.

- **Enrique "Rick" Fontova** was the Chief Executive Officer of GFES from May 2011 until GFES' corporate reorganization in October 2011, at which time Mr. Fontova became a Director and the President of GFES.  Mr. Fontova is discussed more fully above.

- **Earl J. Blackwell** has been the Chief Financial Officer of GFES since 2009.  He was previously involved with GFES through his position as Managing Director of Moody Moreno & Rucks, LLC, a private equity firm that invests in companies in the environmental, energy, communications, and oil and gas industries and which invested in a predecessor of GFES in 2005.  Mr. Blackwell has extensive experience as a Certified Public Accountant for 15 years, including as a Senior Partner at Broadhurst, Blackwell & Gardes, a Certified Public Accounting Firm.  He also has 25 years of experience as Chief Financial Officer or Chief Operating Officer in several industrial waste and property development companies.

E.    **TRANSACTIONS WITH CERTAIN PARTIES RELEASED UNDER THE PLAN**

~~Under the Plan, any causes of action against Mr. Moreno are released in exchange for the contributions of the MOR/TGS Interests to NewCo by the Moreno Entities.  Mr. Moreno had numerous relationships with the Debtors through various trusts and businesses he controlled.  In exchange for the contributions of the MOR/TGS Interests to NewCo, the trusts and businesses Mr. Moreno controls that had relationships with the Debtors will also receive releases.~~

~~Specifically, under the Plan, the Debtors will release Mr. Moreno, Tiffany C. Moreno, the officers and directors of the Debtors, Moreno Properties, LLC, Dynamic Industries, Inc., Casafin II, LLC, Aerodynamic, LLC, Elle Investments, LLC ("Elle"), Alliance Consulting Group, LLC ("Alliance"), Frac Rentals, LLC, Moody, Moreno and Rucks, LLC ("MMR"), Turbine Generation Services, LLC ("TGS"), MOR DOH Holdings, LLC ("MORDOH"), TCM 2011 DOH GRAT, MBM 2011 MGH GRAT, TCM 2011 MGH GRAT, MBM 2011 DOH GRAT, Riverstone and Rucks, Dynamic Group Holdings, LLC, Shale Support Services, LLC, Dynamic Energy Services International, LLC, MOR 2013 Holdings, LLC and MOR MGH Holdings, LLC ("MORMGH"), and their respective officers, directors, representatives, shareholders, members, employees and professional advisors.  The Debtors' relationships with such parties are summarized below.~~

~~Turbine Powered Technology, LLC ("TPT") is a 50% owned non-Debtor subsidiary of the Debtors that supplies and maintains the Debtors' turbine frac pumps, and licenses to the Debtors the intellectual property associated with such turbine frac pumps.  The other 50% of TPT is controlled by Ted McIntyre.  Marine Turbine Technologies, Inc. ("MTT") is another company controlled by Ted McIntyre that did business with the Debtors.~~

CH\~~1723784.11~~1723784.13

Under the Plan, the Debtors will release TPT and MTT in exchange for (i) the release of all TPT Claims, (ii) the consent of TPT to the transfer of the GFES TPT Interest to NewCo and admission of NewCo as a member of TPT and (iii) TPT's consent to the assumption and assignment of the TPT License by the Debtors under the Sale Order.

A summary of the facts relating to the history of such parties' interactions with the Debtors, and thus potential causes of action against such parties, is set forth below.

1. Michel B. Moreno

As noted above, Mr. Moreno is the Chairman, CEO and majority owner of GFES. Mr. Moreno has been a beneficial equity holder and an advisor to the Debtors since June 2006. Upon the corporate reorganization of the Debtors in October 2011, in conjunction with the Senior Secured Notes Indenture, Mr. Moreno became the Chairman of the Board of GFES and the Debtors' Chief Executive Officer.

During 2012, GFES made three disbursements to Mr. Moreno, all of which were interest free and made without any executed loan agreement.  In total GFES disbursed a total of $2.9 million to Mr. Moreno in 2012, 100% of which was repaid to GFES by Mr. Moreno prior to December 31, 2012.  See summary below for relevant details regarding the disbursements.

| Amount | Disbursement Date | Repayment Date |
|---|---|---|
| $2,229,670.94 | 04/02/12 | 04/24/12 |
| $400,000.00 | 01/05/12 | 01/16/12 |
| $250,000.00 | 01/25/12 | 08/17/12 |

Mr. Moreno had numerous relationships with the Debtors through various trusts and businesses he controlled.  Under the Plan, any causes of action against Mr. Moreno or such various trusts and businesses are preserved and may be pursued by the Liquidation Trust following the Effective Date.

GFES paid Mr. Moreno a total of $995,000 ($475,000 salary, $410,000 bonus, and $16,000 auto allowance) in 2012, and $436,000 ($420,000 salary and $16,000 auto allowance in 2013). GFES also reimbursed Mr. Moreno for expenses he incurred on behalf of GFES including $75,000 in 2012 and $64,000 between January and March of 2013.  As of November 2013, Mr. Moreno claims $112,000 in outstanding expense reimbursement requests.  During the one year period prior to the Petition Date Mr. Moreno received approximately $571,897 in payments on account of salary, bonus and expense reimbursements.

In late 2012 Mr. Moreno began to believe that a potential business line existed whereby the turbine engines developed by TPT could be used for power generation and sold or rented to customers for that purpose (the "Power Generation Business").  Initially, it was contemplated that GFES would develop the Power Generation Business as an addition to the Debtors' existing well services and hydraulic fracturing services.  GFES and employees worked to develop potential models for development of the Power Generation Business and sought financing for the business from numerous sources, including the Noteholders, General Electric Corporation and many others.  Ultimately, however, the Debtors were unable to obtain adequate financing to pursue development of the Power Generation Business within GFES.  However, certain potential investors, including General Electric Corporation, indicated that they would invest in the Power Generation Business but only if it was legally distinct from the Debtors' hydraulic fracturing and well services operations.

As a result, on March 7, 2013, TGS was formed by its sole member, MORDOH, to pursue the Power Generation Business.  At the time, MORDOH was 100% owned by two trusts (MBM 2011 DOH GRAT and TCM 2011 DOH GRAT) owned and controlled by Mr. Moreno or his family members, which provided initial capital funding for TGS.  Subsequently, in June 2013, Powermeister, LLC, an entity unrelated to the Debtors or their equity holders, purchased a 9.6% equity interest in MORDOH for $20 million.

Pursuant to the Written Consent of the Shareholders and Directors of Green Field Energy Services, Inc. dated May 13, 2013 (the "Opportunity Waiver"), the GFES Board of Directors, including two independent directors, Charles Kilgore and Mark Knight, determined to waive the opportunity for GFES to pursue the Power Generation Business and agreed that Mr. Moreno, TGS and TPT could pursue the Power Generation Business outside of GFES.

In order to provide additional funding for the Power Generation Business, on May 13, 2013, TGS entered into a Senior Secured Promissory Note, pursuant to which GE Oil & Gas, Inc. ("GE") provided a $25 million loan to

CH\1723784.11 1723784.13

TGS secured by substantially all of the TGS assets.  On June 21, 2013, TGS entered into a Turbine Driven Power Generation Equipment License Agreement with TPT, pursuant to which TPT licensed to TGS the right to use TPT's turbine engine technology in the Power Generation Business.  TPT had previously licensed the same technology to GFES but limited to use in the fracking business.

On June 21, 2013, GFES, TGS and TPT entered into the "Agreement for the Manufacture and Sale of Turbine Powered Generators" (the "Tri-Party Agreement"), pursuant to which (a) TPT agreed to provide turbine generators to TGS, (b) GFES agreed to act as contract manager, overseeing the production of the turbine generators for TGS, and (c) TGS agreed to remit funds to GFES as deposits, which would, in turn, be remitted by GFES to TPT upon fulfillment of orders

In March 2013, GFES began collecting deposits from TGS to purchase components for the manufacture of power generation equipment for TGS.  In total, TGS deposited approximately $27.9 million with GFES from March 2013 to September 2013 (the majority of which was to be paid to TPT on behalf of TGS per the Tri-Party Agreement).  Ultimately, $18.1 million of the $27.9 million in deposits was:  (1) paid to TPT on behalf of TGS; (2) reimbursed to TGS; or (3) delivered in inventory to TGS

Additionally, starting in March 2013, TGS purchased turbine engines from GFES.  TGS paid GFES $23,091,245 for such engines, resulting in a profit margin of approximately 50% for GFES on such sales.  These transactions were separate and distinct from the deposits noted in the paragraph above, which called for GFES to provide full power generators to TGS (as opposed to turbine engines only).  In August 2013, the Debtors repurchased two such engines from TGS.  The price was $766,000, but the Debtors never paid such amount to TGS.

Finally, GFES and TGS entered into an "Agreement Between Green Field Energy Services, Inc. and Turbine Generation Services, LLC for the Period of November 2012 Through June 2013" (the "TGS Reimbursement Agreement") which acknowledged that GFES provided vital support to TGS during its formation, development, financing, marketing and production of its product lines. As compensation, the TGS Reimbursement Agreement obligated TGS to pay GFES $1,042,786 – an amount calculated to reflect the time that GFES employees had spent working on tasks that ultimately benefitted TGS rather than GFES.  TGS subsequently reimbursed an additional $19,097.16 to GFES for travel expenses related to work that benefited TGS.

The Debtors believe that a potential cause of action exists against Mr. Moreno for usurpation or misappropriation of the Debtors' corporate opportunity with respect to the Power Generation Business.  However, the Debtors also believe that Mr. Moreno may have certain defenses to such cause of action.  Under the Plan, Mr. Moreno is contributing his entire ownership interest in the TGS to NewCo, which will then essentially be owned 30% by Mr. Moreno and 70% by the Senior Secured Noteholders.  Thus, valuing TGS is relevant for purposes of analyzing the recoveries under the Plan.

On a balance sheet basis, utilizing book values of assets, the TGS equity was worth $13.6 million as of November 30, 2013.[4]  The Moreno Entities have a 90% interest in MORDOH, the parent of TGS.  Accordingly, based on the book value, the Moreno Entities' interests in TGS are worth $12.2 million ($13.6 million x 90%).

TGS does not appear to have actually ever generated any meaningful EBITDA or earnings from operations, so there is no way for the Debtors to determine the value of TGS based on a multiplier of historical EBITDA or earnings.  The Debtors have obtained projections from TGS.  The projections assume TGS obtained $125 million of additional equity investment in 2013, which TGS did not.  Moreover, if TGS did receive such investment, it would materially dilute the Moreno Entities' interests in TGS.  Nonetheless, were TGS to obtain $125 million of additional equity investment and the projections to prove accurate, the value of the Moreno Entities' diluted interests TGS would be much higher than 90% of book value.  The projections indicate a projected EBITDA in 2014 of $24,025,482, in 2015 of $70,695,154 and in 2016 of $106,852,068.  Perhaps relying on the projections, it is the Debtors' understanding that Powermeister, LLC, an independent third party, invested $20 million for approximately 10% of the equity of MORDOH, TGS's parent.  Based on that investment, TGS would be worth approximately $200 million and the equity interests of the Moreno Entities in TGS would be worth approximately $180 million ($200 million x 90%).

---

[4]      The $13.6 million book value of TGS based on its November 30, 2013 balance sheet may be substantially overstated.  The $766,000 account receivable and $12,719,800.84 of deposits listed as assets in the TGS November 30, 2013 balance sheet are both due from the Debtors and therefore have a value far lower than listed.  Moreover, the $25,069,338.94 of inventory listed as an asset in the TGS November 30, 2013 balance sheet consists of turbines that the Debtors sold to TGS at a markup of 50% over market.

7.        01:15

19

Based on these data points, the value of TGS appears to be between $13.6 million and $200 million and the value of the Moreno Entities' interests in TGS appears to be between $12.2 million and $180 million, with a midpoint of approximately $96 million. The Debtors realize that the data points on which this valuation is based are highly speculative and the Moreno Entities' interests in TGS may be worth substantially less than this estimate. However, the Debtors believe that a $96 million valuation of the Mr. Moreno's interests in TGS may be appropriate. The Debtors doubt that the such interests in TGS would be worth anywhere near $96 million were Mr. Moreno not involved in TGS.

2. Moreno Properties, LLC and Aerodynamic, LLC

Moreno Properties, LLC ("Moreno Properties") and Aerodynamic, LLC ("Aerodynamic") are entities owned by Mr. Moreno and Tiffany Moreno through which the Morenos maintained and leased an airplane to the Debtors.

Aerodynamic owns a Learjet 40 aircraft (FAA Tail #N404EL) and has certain debt associated with the aircraft. Aerodynamic has no employees and is wholly owned by Mr. Moreno. Prior to the Petition Date, Aerodynamic leased the Learjet to GFES via a "dry" lease agreement which required GFES to pay Aerodynamic $55,000 per month (the promissory note requires monthly payments of $55,397.88) and allowed GFES to use the aircraft at its discretion. When the aircraft was not in use by GFES, Aerodynamic leased the aircraft to a number of other entities at an hourly rate of $2,900 per hour.

GFES used the aircraft to transport its employees and customers to business functions outside of the Lafayette, LA region. GFES logged 243 flight hours during 2012 and 229 flight hours thru September 2013. Mr. Fontova, the President of GFES, was permitted to use the aircraft for personal trips, without payment.

Moreno Properties is the designated "operator" of the Learjet and is wholly owned by Mr. Moreno. FAA regulations require the operator of a registered aircraft to perform regular repairs and maintenance to the aircraft based on the number of flight hours the aircraft has flown. Because GFES had the right to use the aircraft at its discretion (without flight hour limits), Moreno Properties re-invoices the expenses it incurs from the required maintenance and repairs to GFES at cost.

Moreno Properties also leases a number of commercial real estate properties throughout the United States; however, GFES does not lease any commercial space from Moreno Properties. Two employees of Moreno Properties have offices at GFES headquarters in Lafayette, LA. Moreno Properties uses this space at no cost to Moreno Properties

In 2012, GFES paid Aerodynamic and Moreno Properties approximately $1.18 million (rate per flight hour of $5,507) and $842,000 in 2013 (rate per flight hour of $4,160) for use of the Learjet. Prior to the Petition Date, GFES ceased use of the Learjet and promptly terminated the respective contracts with Aerodynamic and Moreno Properties.

3. Casafin II, LLC

Casafin II, LLC ("Casafin") owns a Bombardier Challenger aircraft (FAA Tail#N300GM) and has certain debt associated with the aircraft. Casafin has no employees and is wholly owned by Mr. Moreno. Prior to the Petition Date, GFES has a non-exclusive aircraft lease agreement with Casafin which allowed GFES to use the aircraft at an hourly rate of $4,500 per flight hour.

GFES used the aircraft to transport its employees and customers to business functions outside of the Lafayette, LA region. GFES logged 337 flight hours during 2012 and 206 flight hours thru September 2013. Casafin invoiced GFES approximately $1.6 million for 337 flight hours in 2012 and approximately $950,000 for 206 flight hours (through September 2013).

4. Alliance Consulting Group, LLC

Alliance Consulting Group, LLC ("Alliance") is a sand supplier in which Elle (defined below) (a Moreno owned entity) holds a 50% equity interest and a 40% senior debt interest. In January 2012, GFES entered an agreement with Alliance, which called for Alliance to build and operate a wet and dry processing plant that would perform the mining, processing and transportation of raw fracturing sand from two mines being leased by GFES from Blackwell Aggregates, Inc. At the time of the agreement, the practice of pre-paying sand mine operators was commonplace because frac sand was in high demand. GFES entered the agreement with Alliance under the belief that such agreement would allow GFES to 1) obtain frac sand at a discounted rate relative to market; and 2) secure a long term supply of frac sand at a time when supply was low.

Ultimately, Alliance began to experience working capital shortfalls in 2012 that made Alliance unable to produce any

7.        01:15

CH\1723784.111723784.13

~~meaningful amount of fracturing sand for GFES. In July 2013, the holders of the secured debt of Alliance, including Moreno affiliate Elle, which controls 40% of such secured debt, began foreclosure proceedings on the sand refining assets of Alliance with the intent to transfer such assets to Moreno affiliate Shale Support Services, LLC. On October 3, 2013, before conclusion of the foreclosure proceedings, an involuntary petition for relief under Chapter 11 was filed against Alliance. It is the Debtors understanding from the publicly available documents in the Alliance bankruptcy proceedings that Shale Support Services, LLC is continuing to pursue acquisition of the sand refining assets of Alliance through the Alliance bankruptcy proceedings. On January 27, 2014, the Debtors filed a proof of claim in the Alliance bankruptcy case.~~

~~**5. Dynamic Group Holdings, LLC**~~

~~Dynamic Group Holdings, LLC and its predecessor Dynamic Industries, Inc. ("Dynamic") comprise an entity in which MORMGH (a Moreno-controlled entity) holds 13.74% of the preferred shares and 97.46% of the common shares and Riverstone and Rucks (an entity not controlled by Mr. Moreno) owns 86.26% of the preferred shares and 2.54% of the common shares. Dynamic was a supplier that sold skids to the Debtors. Dynamic Energy Services International, LLC is a subsidiary of Dynamic.~~

~~In April 2011, the GFES entered into an agreement with Dynamic to provide the material and labor for producing skids according to GFES's design and specifications. Mr. Moreno was the majority owner of Dynamic (97%) and was in control of Dynamic at that time. The agreement stipulated that Dynamic would be paid hourly labor rates ($44 per hour) and markups for materials (8%) and subcontracted services (12%) relating to the skid production.~~

~~Dynamic provided GFES $5.2 million in skids for the year ended December 31, 2012 at an average cost of approximately $72,000 for each skid produced (Dynamic delivered a total of 72 skids). The decision to enter into a contract with Dynamic was primarily driven by the fact that in 2011, GFES was still developing skid designs and specifications suitable for their production environment. As such, GFES needed a partner with whom they were familiar to collaboratively develop skids that suited GFES needs. GFES' familiarity with Dynamic (due to Mr. Moreno's ownership in Dynamic) made Dynamic a suitable candidate to develop the skids. The skids produced by Dynamic went through a number of iterations before the ideal skid design specification was finalized. Once GFES was able to produce a skid blue print and specification (January 2013), GFES went to market to determine whether it could procure similar skids from a third party at a lower cost. Ultimately GFES determined that CMC of Georgia, Inc. was able to produce the same skid at a significantly lower cost of approximately $39,000 per skid. Accordingly, GFES began procuring skids from CMC in January 2013.~~

~~**6. Elle Investments, LLC**~~

~~Elle is owned by Mr. Moreno (99%) and Tiffany Moreno (1%) and serves as a shell entity through which Mr. Moreno owns 33% of MMR and 50% of Alliance's equity and 40% of its senior debt. GFES had no transactions with Elle between September 2011 and November 2013. Additionally, Elle did not receive any payment from the Debtors during the one year period prior to the Petition Date. The Debtors are unaware of any transactions directly between the Debtors and Elle.~~

~~**7. Frac Rentals, LLC**~~

~~Frac Rentals, LLC ("Frac Rentals") is wholly owned by MOR 2013 Holdings, LLC and previously owned by MORDOH (both Moreno-controlled entities). The President of Frac Rentals is Jesus Moreno, Mr. Moreno's brother. Frac Rentals was a supplier that provided the Debtors safety equipment specific to the natural gas fracking industry. As noted above, Frac Rentals rented safety equipment to GFES, beginning in approximately January 2013. Prior to renting such equipment from Frac Rentals, GFES rented such equipment from third-party rental providers. GFES is the only customer that Frac Rentals has ever serviced.~~

~~Frac Rentals was established in late 2012 and became operational in January 2013. Frac Rentals owns safety equipment (flow iron restraints, duck ponds and cooling trailers) specific to the natural gas fracking industry. Frac Rentals began renting equipment to GFES in January 2013. Prior to using Frac Rentals, GFES used unrelated third party rental providers to service part of their safety equipment needs.~~

~~**8. Moody, Moreno and Rucks, LLC and MOR MGH Holdings, LLC**~~

~~**(a) Background Regarding MMR**~~

~~Mr. Moreno and his wife Tiffany Moreno own Elle, which owns 33.3% of MMR, which in turn owns 10.203% of the~~

common stock and 11.11% of the preferred stock of GFES. In May 2011, the equity owners of Hub City Industries, LLC (predecessor entity to GFES) agreed to redeem all of their equity interest in the Company other than those held by MORDOH. The redemption agreement called for an "initial" payment to each member in July 2011 and subsequent "earn out" payments to each member pursuant to GFES achieving various performance metrics. The redemption agreement stipulated that MMR would receive an initial payment of $21.1 million. According to GFES's management, this initial payment was never made due to liquidity issues at GFES. In October 2011, MMR and GFES executed an Rescission of Act of Redemption Agreement whereby MMR accepted a 11.1% equity stake in GFES in lieu of receiving the initial payment.

MMR has received approximately $46,000 in earn out payments to date. Additionally, MMR has contributed capital to GFES in exchange for preferred stock consistent with the schedule below. These payments were requirements of the Bond Indenture agreements minimum capital requirements.

| Shareholder Name | Date | Monies Received |
|---|---|---|
| MMR, LLC | 09/30/12 | $370,333 |
| MMR, LLC | 10/31/12 | $740,667 |
| MMR, LLC | 02/19/13 | $58,011 |
| MMR, LLC | 03/12/13 | $58,011 |
| MMR, LLC | 03/29/13 | $58,011 |

Moreover, MMR previously held a 50% ownership interest in EnerSciences Holdings, LLC ("EnerSciences") and ChemRock Technologies, LLC ("ChemRock"), a substantial vendor of the Debtors, which interest was divested prior to the Petition Date. It is the Debtors' understanding that, pursuant to the agreement governing this divestiture, ChemRock agreed to (a) cancel $14,500,000 of payables owed by GFES to ChemRock for chemicals and services supplied to GFES under a Preferred Supplier Agreement between GFES and ChemRock dated February 10, 2012, (b) obtain the cancellation, termination, and release of a $3,000,000 line of credit from Iberia Bank, which was guaranteed, in part, by Mr. Moreno, William Rucks, IV, and Kevin Moody (the indirect principals of MMR) and (c) pay MMR certain amounts based on sales of ChemRock products to GFES going forward. It is also the Debtors' understanding that a condition precedent to the effectiveness of the redemption agreement was that GFES would (a) execute a Master Purchase Order Agreement pursuant to which GFES agreed to purchase a minimum of $40,000,000 of products from ChemRock and (b) make an immediate payment to ChemRock of $1,000,000.

(b) Background Regarding MORMGH

Two trusts controlled by Mr. Moreno, MBM 2011 MGH GRAT and TCM 2011 MGH GRAT, each own 50% of MORMGH, which in turn owns 81.634% of the common stock and 88.89% of the preferred stock of GFES. Mr. Moreno is the sole operator of MORMGH which exists as a shell company through which Mr. Moreno has part of his ownership interest in GFES. It is the Debtors' understanding that MORMGH owns 70% of Shale Support Services, LLC and 13.74% of Dynamic. The predecessor of Dynamic was Dynamic Industries, Inc., an entity which sold certain skids to the Debtors as described above, and the parent company of Dynamic Energy Services International, LLC.

On February 19, 2013 MORMGH wired approximately $1.4 million to GFES as was required by the minimum capital requirements of the Bond Indenture Agreement. MORMGH received preferred equity in GFES for the same amount.
On April 1, 2013, GFES wired $2.2 million to MORMGH at the request of Mr. Moreno. No loan agreement was entered into and no debt was documented. This amount was repaid in full on April 3rd, 2013. The disbursement was not disclosed in the Debtors' quarterly financial statement for June 2013.

(c) Share Purchase Agreements with MORMGH and MMR

MORMGH and MMR are parties to the 2012 SPA and the 2013 SPA. The 2012 SPA required MORMGH and MMR to purchase certain amounts of preferred equity from GFES, which the Debtors believe MORMGH and MMR failed to do. Similarly, the 2013 SPA required MORMGH to purchase certain additional preferred equity, which the Debtors believe MORMGH failed to do.

CH\1723784.111723784.13

Under the 2012 SPA, entered into in connection with the Supplemental Indenture, MORMGH and MMR were required to purchase $10 million divided by the percentage of such party's equity interest in GFES. Thus, MORMGH was required to purchase $8,889,000 of preferred equity and MMR was required to purchase the remaining $1,111,000. These payments were made during 2012.

Based on the Debtors' records, at the close of the fourth quarter of 2012 the required payment was $1,566,461, of which MORMGH would be liable for $1,392,428 and MMR was liable for $174,033. These amounts were paid and purchased in the first quarter of 2013. Based on the Debtors' records, (a) at the close of the first quarter of 2013 the required payment was $4,464,626, of which MORMGH would be liable for $3,968,606 and MMR was liable for $496,020, (b) at the close of the second quarter of 2013 the required payment was $2,242,455, of which MORMGH would be liable for $1,993,318 and MMR was liable for $249,137 and (c) at the close of the third quarter of 2013 the required payment was $4,086,369, of which MORMGH would be liable for $3,632,373 and MMR was liable for $453,996. Thus, in total, MORMGH was obligated to purchase $9,594,298 on account of these three quarters, and MMR was obligated to purchase $1,199,152. These amounts were not paid and no preferred equity was issued.

**9. MOR DOH Holdings, LLC**

MORDOH was previously the sole owner of Frac Rentals, which was created to supply safety rental equipment to companies in the hydraulic fracturing industry, namely GFES. In an attempt to increase GFES' liquidity position, GFES agreed to enter into a sale/lease back transaction with Frac Rentals in which GFES agreed to sell certain frac safety equipment to Frac Rentals for $4,614,310. MORDOH (on behalf of Frac Rentals) wired GFES $4,614,310 in various installments between July 2012 and September 2012. In October 2012, GFES became aware of the fact that the Senior Secured Notes Indenture prohibited this type of transaction. GFES and Frac Rentals then unwound this transaction by returning the $4,614,310 to MORDOH on November 1, 2012.

**10. Shale Support Services, LLC**

Shale Support Services, LLC ("S3") is 70% owned by MORMGH (a Moreno-controlled entity). The remaining 30% is owned by Rowan Group, LLC (10%) and BBR Holdings, LLC (20%) both of which are owned by unrelated third parties. S3 was established by Mr. Moreno when Alliance began experiencing working capital issues. S3 began mining and processing frac sand at the DK Pit once it became clear that Alliance lacked the liquidity to continue as the operator of the mine. S3 appears to be pursuing the acquisition of certain assets within Alliance's bankruptcy proceedings, including the dry processing facility Alliance was constructing.

S3 mines raw frac sand for use by companies in the fracking industry. In January 2013, the Company began procuring raw frac sand from S3 on an open account basis from the DK pit.

**11. Turbine Generation Services, LLC**

In March 2013, the Debtors began collecting deposits from TGS for use by the Debtors in purchasing components for the manufacture of power generation equipment for TGS. In total TGS deposited $27,994,107 with GFES from March 2013 to September 2013, the large majority of which was deposited pursuant to the Tri-Party Agreement (as defined below). Ultimately, $12,011,017 of this amount was distributed to TPT on behalf of TGS for goods and services provided by TPT. Additionally, $3,884,083 of this amount was eliminated by delivery of inventory from GFES to TGS. Finally, $2,210,883.76 was reimbursed to TGS. The Debtors believe that this $2,210,883.76 may be recovered as a preferential payment pursuant to Bankruptcy Code Section 547.

Beginning in March 2012, TGS purchased approximately $23 million of turbine engines from GFES, which engines originally cost GFES approximately $10 million. In August 2013, GFES repurchased two of these turbine engines from TGS for $766,000, which amount remained unpaid as of the Petition Date. However, these engines were repurchased by the Debtors prior to the reimbursement of $2,210,883.76.

**12. Turbine-Powered Technology, LLC**

As noted above, TPT is a joint venture owned 50% by MTT Properties, LLC and 50% owned by GFES. The Debtors' involvement with TPT centers around three separate types of business relationships with TPT.

First, GFES is the 50% owner of TPT. TPT was formed on September 22, 2011 for the purpose of holding certain

intellectual property and other rights associated with turbine-powered hydraulic fracturing pumps, to assemble turbine-powered hydraulic fracturing pumps to be used by the Debtors and to provide maintenance of turbine-powered equipment being used by or sold by the Debtors. The Debtors initially contributed $250,000 to the joint venture in 2011. From the period of November 2011 through December 2012, the Debtors contributed approximately $950,000 in additional equity to TPT over 17 installments, for a total equity contribution of approximately $1.2 million.

Second, TPT assembles and maintains turbine engines for the Debtors pursuant to a series of agreements. TPT maintains the Debtors' turbine engines pursuant to the Turbine Driven Maintenance Agreement dated September 22, 2011 (the "Maintenance Agreement"), which, among other things, provides that the Debtors pay TPT the actual costs and expenses of the maintenance services plus 25% and a 50% markup on certain de minimis materials purchased by TPT in connection with such maintenance services. TPT also assembles and installs the Debtors' turbine engines onto trailers and skids, along with other equipment, to create the Debtors' TFPs, at cost with no markup, pursuant to the Turbine Driven Equipment Installation Agreement dated September 22, 2011 (the "Installation Agreement"). TPT is also party through assignment to an Equipment Purchase Agreement dated July 8, 2011 (as amended and assigned to TPT on September 22, 2011, the "Purchase Agreement"). Finally, TPT licenses certain patent rights, copyrights, trademarks and trade secrets to the Debtors pursuant to that certain Turbine Driven Equipment License Agreement dated September 22, 2011 (the "License Agreement" and, collectively with the Maintenance Agreement, Installation Agreement and Purchase Agreement, the "TPT-GFES Agreements").

Third, the Debtors serve as contract manager under the Tri-Party Agreement with TGS and TPT, pursuant to which (a) TPT provides turbine generators to TGS, (b) GFES acts as contract manager, overseeing the production of the turbine generators for TGS, and (c) TGS remits funds to GFES as deposits which would, in turn, be remitted by GFES to TPT upon fulfillment of orders. In March 2013, GFES began collecting deposits from TGS to purchase components for the manufacture of power generation equipment for TGS. From March 2013 through September 2013, TGS deposited approximately $27.9 million with GFES (the majority of which was required to be paid to TPT on behalf of TGS per the Tri-Party Agreement). Ultimately, $18.1 million of those deposits was: (1) paid to TPT on behalf of GFES, (2) reimbursed to TGS or (3) delivered in inventory to TGS. On January 21 and 22, 2014, TPT filed four proofs of claim against the Debtors asserting $12,504,172.96 in the aggregate of liquidated claims, in addition to unliquidated damages for breach of the Installation Agreement and Maintenance Agreement.

13. Marine Turbine Technology, Inc.

Marine Turbine Technologies, Inc. ("MTT") is controlled by Ted McIntyre, who also controls TPT. MTT manufactures and sells turbine engines for use across a number of different industries, including hydraulic fracturing. MTT is party to contracts with certain government agencies which permit MTT to purchase engines from military vehicles and retrofit them for various purposes.

In March 2013, GFES purchased 33 T55 turbine engines from Honeywell for a total purchase price of approximately $4.34 million (or approximately $131,000 per turbine engine). Pursuant to that purchase contract, GFES and MTT each paid for half of the purchase price of the T55 turbine engines. MTT later invoiced GFES for its half of the purchase price, in the amount of approximately $2.17 million, which GFES paid to MTT on May 24, 2013. Shortly after purchasing these turbine engines from Honeywell, GFES sold them for approximately $383,000 per turbine engine, thus making a substantial profit.

On May 28, 2013, GFES purchased 15 T53 turbine engines from MTT for approximately $104,000 each (or $1.56 million in the aggregate). GFES did not pay MTT for these engines. GFES then sold each of the 15 T53 engines to TGS on May 31, 2013 for approximately $249,000 each (or $3,735,000 in the aggregate), for a total profit to GFES of about $2,175,000

## F.    SUMMARY OF SIGNIFICANT PREPETITION OBLIGATIONS

Prior to the Petition Date, the Debtors entered into various financing arrangements. Each of the financing facilities and the amounts owed thereunder is described below.

| Type of Prepetition Indebtedness | Approximate Amount of Outstanding Debt as of the Petition Date[5] |
|---|---|

---

[5]    These amounts exclude interest, fees, expenses and other additional potential liabilities.

7.    01:15

CH\1723784.111723784.13

| | |
|---|---|
| Shell Credit Facility | $80,000,000.00 |
| Senior Secured Notes | $~~255,900,000.00~~255,948,000.00 |
| Trade Debt | $78,800,000.00 |

1.     **Amended and Restated Shell Credit Facility**

Prior to the Petition Date, GFES entered into that certain Contract for High Pressure Fracturing Services dated as of September 2, 2011 (as amended and restated, the "**Shell Contract**") with Shell, which included a credit facility (as amended and restated the "**Shell Credit Facility**").  Pursuant to the Shell Contract the Debtors agreed to provide and operate fracking spreads at Shell drilling sites, and Shell agreed to provide up to an $100 million of senior secured term loans, which loans could not be reborrowed once repaid.  As of the Petition Date, there was approximately $80 million in aggregate principal amount of term loans outstanding under the Shell Credit Facility.  Shell has further asserted that the Debtors are obligated to Shell for at least an additional $31,000,000 on account of liens that have been asserted against Shell's property by the Debtors' vendors. The Shell Contract and Shell Credit Facility changed several times throughout the course of the parties' relationship, and were amended eight (8) times in all during the two years between initial execution and the Petition Date.

In September 2011, the Debtors signed the initial version of the Shell Contract, which provided for Shell to make a prepayment of $100 million to the Debtors in three installments. In November 2011, the Debtors entered into the Senior Secured Notes Indenture and were required to repay the initial repayment from Shell, and in fact did so. On April 26, 2012, the Debtors and Shell entered into a third amendment to the Shell Contract, which replaced the prepayment with a $30 million revolving senior credit facility.

On October 22, 2012, the Debtors and Shell again amended the Shell Contract. In the fourth amendment to the Shell Contract (the "**Fourth Amendment**"), Shell agreed to advance an additional $70 million term loan to the Debtors on October 24, 2012.  At the time of the Fourth Amendment, $24 million remained outstanding from the revolving facility provided under the third amendment, and this $24 million was added to the $70 million term loan in the Fourth Amendment, for a total loan of $94 million.  According to the terms of the Fourth Amendment, the Debtors were required to make monthly principal repayments, with all indebtedness expected to be repaid in or before November 2014, approximately  two years after the execution of the Fourth Amendment.

The Debtors' obligations under the Shell Credit Facility were intended to be secured by first priority lien security interests on certain of the Debtors' motor vehicles and equipment designated by Shell.  Certificates of title of certain of the Debtors' motor vehicles identify Shell as a lienholder (the "**Shell Titled Assets**").

In connection with the Shell Contract, Shell and the Senior Secured Notes Indenture Trustee entered into the Intercreditor Agreement, which set forth the relative priority and interests with respect to the Debtors' motor vehicles and equipment as between Shell and the Senior Secured Notes Indenture Trustee, on behalf of the Senior Secured Noteholders.  The Intercreditor Agreement includes a "payment over" provision requiring that the Indenture Trustee remit certain recoveries related to Shared Collateral (as defined in the Intercreditor Agreement) to Shell in certain circumstances.

On May 10, 2012, Shell filed an insufficient UCC financing statement (the "**Insufficient Financing Statement**"). Instead of specifically listing or identifying the specific collateral in which it was claiming an interest, Shell noted "(See Attached Sheets)," but failed to attach any documents, thus failing to perfect any security interest in the Debtors' assets.  Shell failed to file a valid UCC-1 financing statement in the jurisdiction in which the Debtors are incorporated and, as a result, Shell does not have a properly perfected lien on the Debtors' equipment under the Insufficient Financing Statement.

On October 8, 2013, Shell delivered a notice of default to GFES stating that the Debtors had (i) failed to pay outstanding indebtedness within 10 days after such indebtedness became due; and (ii) had defaulted on any credit, loan, prepayment, or other financial obligation, and thus had defaulted on the Shell Contract. The notice of default formally demanded full payment of all indebtedness in arrears and procurement of the release of any liens attached to the assets falling under the purview of the Shell Contract.  However, the notice of default did not indicate that Shell was terminating, or intended to terminate, the Shell Contract.

On October 11, 2013, Shell filed a new UCC Financing Statement (the "**Preference Period Financing Statement**"), attaching a list of the Debtors' assets in which Shell asserted a security interest and seemingly perfecting Shell's interest in the collateral (the "**October 2013 Preferential Transfer**").  The list of collateral in the Preference Period Financing Statement includes:

All of debtor's equipment, tools, trucks, blenders, sanders, pumps, Frac Spreads (namely, a complement or spread of equipment required to perform hydraulic fracturing), and motor vehicles, including but not limited to those described on Appendix A [to the October 13 Preference Period Financing Statement].

2.    **Senior Secured Notes**

On November 15, 2011, GFES, Hub City Tools, Inc., as guarantor, and the Senior Secured Notes Indenture Trustee entered into that certain Senior Secured Notes Indenture pursuant to which GFES issued 250,000 units, each unit consisting of:  (i) $1,000 principal amount, totaling $250 million aggregate principal amount, of Senior Secured Notes; and (ii) one warrant to purchase 0.988235 shares of common stock ("**Warrants**").  The holders of the units informed the trustee of the decision to separate the units on November 15, 2011, so that the Notes and the Warrants would be traded independently.

The Senior Secured Notes mature on November 15, 2016 and bear interest at a fixed annual rate of 13%, to be payable semiannually on May 15 and November 15 of each year.  The Senior Secured Notes are secured by security interests in substantially all of the Debtors' tangible and intangible assets subject to certain exceptions. The covenants under the Senior Secured Note Indenture allow the Debtors to enter into a senior credit facility in addition to the Shell Credit Facility in an aggregate principal amount not exceeding the greater of $30 million and a specified percentage of the Debtors' tangible assets.

If the Debtors experience certain kinds of changes in control, the Debtors must offer to repurchase the Senior Secured Notes at a price equal to 101% of the principal amount plus accrued and unpaid interest.  Upon the sale of certain assets, the Debtors may be required to offer to use the net proceeds of the sale to repurchase some of the Senior Secured Notes at 100% of the principal amount plus accrued and unpaid interest.  Additionally, the Debtors must offer to repurchase some of the Senior Secured Notes at 108% of the principal amount after each of June 30 and December 31 of each year, commencing with June 30, 2013.  Upon such time as certain conditions are met, the repurchase price of the Senior Secured Notes in connection with the semi-annual repurchase will decrease to 103%.  The portion of the carrying value related to the June 30, 2013 offer, net of discount, is classified as current.

Under the terms of the Senior Secured Notes Indenture, the Debtors were required to prepare and file a registration statement with the SEC with respect to (a) an offer to exchange the unregistered Senior Secured Notes in a registered offering for new notes that would be identical in all material respects to the Senior Secured Notes, and (b) the resale of common stock issuable under exercise of the Warrants.  Pursuant to this agreement, the Debtors filed:  (i) a registration statement on Form S-4 on May 11, 2012 with respect to the Senior Secured Notes; and (ii) a registration statement on Form S-1 on June 13, 2013 with respect to the underlying shares of common stock issuable under exercise of the Warrants.  Both filings contained an amendment staying the effective date of the filing until the Debtors filed an amendment specifically stating that the filings will thereafter become effective.  The Debtors filed amended S-4 and S-1 registration statements on June 14, 2013, updating and supplementing the earlier filings to keep the information therein current and to respond to certain comments from the SEC, but did not make the filing effective at such time.  The Debtors did not resolve all of the SEC's comments to the registration statements and therefore never requested the effectiveness of the registration statements.

On October 14, 2013, the Senior Secured Notes Indenture Trustee delivered a notice of default to GFES stating that the Debtors had failed to (i) make a payment on the Notes; and (ii) make a semi-annual offer to repurchase, and thus had defaulted on the Senior Secured Notes Indenture. The notice provided that the Senior Secured Notes Indenture Trustee was continuing to forbear, on a day-to-day basis, from exercising its rights and remedies as a result of this default, but reserves all of the rights and remedies available to it under the Senior Secured Notes Indenture.

3.    **Trade and Other Unsecured Debt**

The Debtors have certain trade debt due and owing to vendors, suppliers and other pre-petition creditors.  According to the Debtors' Schedules and Statements, as of the Petition Date, the total outstanding obligations due and owing to vendors, suppliers and other general unsecured creditors (other than the lenders under the financings discussed above) was approximately $78.8 million. Certain of the trade debt could potentially give rise to liens under applicable state law against either the property of the Debtors or the Debtors' customers, although it is unclear at this time whether any such liens would be valid.

**G.    EQUITY INTERESTS**

GFES is presently owned by MORMGH (81.63%), MMR (0.20%) and GFES' President, Enrique Fontova (8.16%).  The Debtors' historical and current equity structure is set forth in more detail in Section A above.

## H.    LITIGATION

### 1.    Moreno and Moreno Affiliated Entities

The Debtors may have certain causes of action against Mr. Moreno and the Moreno Affiliated Entities under theories of, among others, piercing the corporate veil, usurping corporate opportunities, breach of fiduciary duty, fraudulent conveyance, preferential transfers, and breach of contract in connection with the related party transactions described in Section II.E above.  ~~In the aggregate, the Debtors believe that they could recover up to $20.8 million on breach of contract actions (which recovery would be subject to the Liens of the Senior Secured Noteholders), between $64.9 and $67.2 on the usurping corporate opportunities claim, $6.1 to $8.4 of which would not be subject to the Liens of the Senior Secured Noteholders, and between $8.3 million and $16.2 in the aggregate on account of other such causes of action, in each case not taking into account the costs of litigation or the collectability of any judgment.~~  Such causes of action are ~~being released pursuant to~~<u>preserved under</u> the Plan.

**<u>Moreno and the Moreno Affiliated Entities vigorously refute the viability of these causes of action, and any creditor claims that might exist, and the Debtors believe that they intend to defend any claims brought against them.</u>**

### 2.    Shell

The Debtors may have certain causes of action against Shell under theories of, among others, lender liability, aiding and abetting breach of fiduciary duty, fraudulent conveyance, preferential transfers, and breach of contract in connection with the transactions and agreements between the Debtors and Shell.  Such causes of action are being released pursuant to the Plan.  ~~The Debtors do not believe these causes of action have any material value and certainly do not believe that the value of these causes of action could exceed the setoff rights of Shell on account of its Claims.~~

### ~~3. TPT and MTT~~

~~The Debtors may have certain causes of action against TPT and MTT under theories of, among others, fraudulent conveyance and preferential transfers in connection with the transactions described in Section II.E above.  In the aggregate, the Debtors believe that they could recover up to $1.8 million in the aggregate on account of such causes of action not taking into account the costs of litigation or the collectability of any judgment.  Such causes of action are being released pursuant to the Plan.~~

### <u>3.</u>    ~~4.~~ Litigation Against the Debtors

Prior to the Petition Date, breach of contract claims were filed against the Debtors in Texas, Louisiana and Colorado arising from alleged failures to pay for materials and services rendered.

Prior to the Petition Date, the Debtors were also party to a handful of wrongful termination, negligence and personal injury actions.

### <u>4.</u>    ~~5.~~ ChemRock Technologies, LLC

The Debtors may have valuable causes of action against ChemRock for, among other things, breach of contract, fraudulent conveyance and preferential transfers.  ~~In the aggregate, the Debtors believe that they could recover up to $15 million on account of such causes of action not taking into account the costs of litigation or the collectability of any judgment.~~ Such causes of action are preserved, and are not released, under the Plan.

### <u>5.</u>    ~~6.~~ Great Northern Sand LLC

The Debtors may have valuable causes of action against Great Northern Sand, LLC for, among other things, breach of contract and fraudulent conveyance.  ~~In the aggregate, the Debtors believe that they could recover up to $15 million on account of such causes of action not taking into account the costs of litigation or the collectability of any judgment.~~ Such causes of action are preserved, and are not released, under the Plan

### <u>6.</u>    ~~7.~~ Other Litigation

The Debtors may hold valuable Causes of Action against third parties and such Causes of Action, including Avoidance Actions, are expressly preserved under the Plan unless expressly released.  From and after the Effective Date, the

7.        01:15

~~Litigation~~**Liquidation** Trust will have exclusive rights, powers and interests of the Debtors to pursue, settle or abandon any ~~and all Avoidance Actions, while the Liquidation Trust will exclusive rights, powers and interests of the Debtors to pursue, settle or abandon any~~ other preserved **Estate** Causes of Action**, including Avoidance Actions**.

As set forth in the Debtors' Statement of Financial Affairs Question 3(b) and the Debtors' Statement of Financial Affairs Question 3(c), significant transfers to certain creditors were made during the 90-day preference period under Section 547 of the Bankruptcy Code and, except to the extent released under the Plan, such transfers may potentially be subject to recovery. In the aggregate, payments to non-insider creditors not released in the Plan during the 90 days prior to the Petition Date were approximately $26.9 million and payments to insider creditors not released in the Plan during the one year prior to the Petition Date were approximately $27.7 million.

## I.    HISTORICAL FINANCIAL INFORMATION; ADDITIONAL INFORMATION

The Debtors' fiscal year ends on December 31. Consolidated financial information regarding the GFES and Hub City Tool, Inc. for the fiscal year ended December 31, 2012 is available in the Annual Report of Green Field Energy Services, Inc. The report may be accessed on the Debtors' website, under the "Investor Relations" tab at  www.gfes.com/about-green-field.

## J.    KEY EVENTS LEADING TO THE FILING OF CHAPTER 11 CASES

Due to the competitive advantages of the turbine-powered hydraulic fracturing technology utilized by the Debtors, the Debtors greatly expanded their hydraulic fracturing operations and capabilities, increasing the number of TFPs in their fleet from eight (8) in 2011 to sixty-five (65) as of the Petition Date. Unfortunately, market conditions changed for the worse shortly after the Debtors made this shift in focus.

As a result, the Debtors' customer base became more and more concentrated. In the last three years the Debtors' top five (5) customers accounted for 38% of revenues (2010), 52% of revenues (2011), and 88% of revenues (2012). Additionally, in August 2013, Shell, by far the Debtors' largest customer, accounting for 79% of total revenues in 2012, informed GFES that Shell would scale back its operations in the primary locations where the Debtors were providing services and, as a result, would not continue to utilize the Debtors' services in such areas.

As a result of the foregoing, the Debtors began to explore operational modifications to save operating costs, as well as financing options. On September 30, 2013, the Debtors retained Alvarez to perform a variety of restructuring related services. Additionally, in October 2013, the Debtors retained Carl Marks Advisory Group, LLC ("**Carl Marks**") to provide investment banking related services. The Debtors and their advisors continued to evaluate operational changes that could result in decreased cost, while also negotiating with Shell and certain Senior Secured Noteholders. These operational changes include the cessation of substantially all of the Debtors' hydraulic fracturing operations and significant reductions in force. Moreover, the Debtors largely shifted all of their assets into storage facilities during these Chapter 11 Cases.

Prior to filing these Chapter 11 Cases, the Debtors, with the assistance of Alvarez and Carl Marks, and in consultation with Latham & Watkins LLP, pursued a range of options to address the Debtors' concerns about their ability to service their debt and fund operations going forward, including new financing, refinancing, and the sale of certain or all of the Debtors' assets or business.

### III.
### THE CHAPTER 11 CASES

## A.    COMMENCEMENT OF THE CHAPTER 11 CASES

On October 27, 2013 (the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases are pending in the Bankruptcy Court, located at 824 N. Market Street, 3rd Floor, Wilmington, DE 19801.

## B.    CONTINUATION OF BUSINESS

Since the Petition Date, the Debtors have continued to operate as debtors-in-possession subject to the supervision of the Bankruptcy Court in accordance with the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by

7.        01:15

CH\~~1723784.11~~1723784.13

creditors, the enforcement of Liens against property of the Debtors, and the continuation of litigation against the Debtors. The relief provides the Debtors with the "breathing room" necessary to assess and reorganize their businesses and prevents creditors from obtaining an unfair recovery advantage while the Chapter 11 Cases are pending. Although the automatic stay may be lifted for cause, and several parties have sought and been granted limited stay relief, there has been no modification of the automatic stay that has adversely affected the Debtors or their Estates.

## C.    FIRST DAY AND OTHER INITIAL ORDERS

On the Petition Date, the Debtors filed a number of motions seeking approval of certain so-called "first day orders." The first day orders facilitated the transition between the Debtors' pre-petition and post-petition business operations by authorizing the Debtors to continue with certain regular business practices that may not be specifically authorized under the Bankruptcy Code, or for which the Bankruptcy Code requires prior court approval. The first day orders entered in the Chapter 11 Cases authorized, among other things, the following: (i) the joint administration of the Chapter 11 Cases; (ii) the payment and honoring of pre-petition wages, salaries, and benefits for employees; (iii) the payment of pre-petition property, excise, and franchise taxes; (iv) the continued use of the Debtors' existing cash management system, bank accounts and business forms; (v) the payment of prepetition claims of certain critical vendors; (vi) the retention of Prime Clerk, LLC as the Claims Agent; and (vi) the entry by the Debtors into an agreement to obtain post-petition secured financing on an interim basis.

Additional orders were obtained by the Debtors during the initial stage of the Chapter 11 Cases (i) to retain chapter 11 Professionals; (ii) to retain and pay ordinary course professionals without separate retention and fee applications; (iii) to establish procedures by which court-approved chapter 11 Professionals may obtain interim compensation and reimbursement pending the filing of interim and final fee applications; (iv) to provide adequate assurance of future payment to utility companies and establish procedures under which utilities may challenge or seek additional adequate assurance; (v) to extend the time by which the Debtors were required to file their Schedules and Statements (as defined below); (vi) to reject certain executory contracts; and (vii) to enter into an agreement to obtain post-petition secured financing on a final basis.

## D.    RETAINED PROFESSIONALS

Following the Petition Date, the Bankruptcy Court authorized the Debtors to retain certain Professionals to represent them and assist them in connection with the Chapter 11 Cases. Specifically, the Debtors retained, and the Bankruptcy Court approved the retention of, the following Professionals: (a) Latham & Watkins LLP, as co-counsel, (b) Young Conaway Stargatt & Taylor, LLP, as co-counsel, (c) Carl Marks, as investment banker, (d) Prime Clerk, LLC, as administrative advisor (as an adjunct to serving as the claims and noticing agent), (collectively, the "**Debtors' Professionals**"), and Alvarez to provide the Debtors with a CRO and certain additional personnel. Alvarez thereby designated Thomas E. Hill to serve as CRO for the Debtors. In addition, the Bankruptcy Court authorized the Debtors to retain, employ, compensate and reimburse the expenses of certain attorneys who have rendered services to the Debtors unrelated to the Chapter 11 Cases to assist with the operation of the Debtors' businesses in the ordinary course.

## E.    SCHEDULES AND STATEMENTS

On December 13, 2013, the each of the Debtors filed their respective (i) Schedules of Assets and Liabilities and Schedule of Executory Contracts and Unexpired Leases and (ii) Statements of Financial Affairs (collectively and as amended, the "**Schedules and Statements**") [Docket Nos. 248-253, 265-266, 271]. These documents contain basic information including schedules of creditors holding unsecured priority and non-priority claims for the benefit of creditors and parties in interest. Copies of the Schedules and Statements and the amendments thereto are available for inspection on the Bankruptcy Court's website at www.deb.uscourts.gov. In addition, copies are also available free of charge on the Voting Agent's website at http://cases.primeclerk.com/gfes.

## F.    APPOINTMENT OF OFFICIAL CREDITORS' COMMITTEE

On November 7, 2013, the United States Trustee for Region 3 appointed the Official Creditors' Committee pursuant to Bankruptcy Code Section 1102(a)(1). The Official Creditors' Committee's members are: (i) ChemRock Technologies, LLC; (ii) National Oilwell Varco LP; (iii) Martin Energy Services LLC; (iv) Pel-State Bulk Plant, LLC; (v) Preferred Quality Chemicals, LLC; (vi) Preferred Resin Holding Company, LLC; and (vii) S.P.M. Flow Control, Inc. The Official Creditors' Committee has retained the following Professionals: Brown Rudnick LLP, as co-counsel; Womble Carlyle Sandridge & Rice, LLP, as co-counsel; and Conway MacKenzie, Inc., as financial advisor.

## G.    DEBTOR IN POSSESSION FINANCING

On October 29, 2013, each of the Debtors, as borrowers, executed a Bridge Note in the amount of $15 million (the "**Bridge**

7.          01:15

29

**Note**") in favor of ICON Capital, LLC ("**ICON Capital**") and GB Credit Partners, LLC ("**GB**"), in their capacities as co-administrative agents under the Bridge Note, due December 11, 2013.  On October 29, 2013, the Bankruptcy Court approved the Bridge Note and authorized the Debtors to borrow up to $15 million in the aggregate on an interim basis (the "**Interim DIP Order**") [Docket No. 62].

Following entry of the Interim DIP Order, the Debtors reached an agreement with GB and ICON Capital on the documentation of a term loan facility and, on November 26, 2013, each of the Debtors, as borrowers, entered into the DIP Credit Agreement providing for up to $30 million as a DIP Facility with the DIP Agents, and each lender party thereto. On November 26, 2013, the Court entered the Final DIP Order (the "**Final DIP Order**") [Docket No. 191], permitting the Debtors to obtain credit and incur debt to a maximum amount of $30 million.  Proceeds of the DIP Credit Facility were used to pay all outstanding amounts owing under the Bridge Note.

In conjunction with the Final DIP Order, the Debtors granted the DIP Agents Superpriority Claims (as defined in the Final DIP Order) and DIP Liens (as defined in the Final DIP Order) consisting of (i) first priority liens on all assets of the Debtors not subject to Pre-Petition Permitted Encumbrances (as defined in the Final DIP Order), (ii) junior liens on the Debtors' assets that are subject to Pre-Petition Permitted Encumbrances, (iii) first priority priming liens on the Debtors' assets that are subject to the Pre-Petition Lender Primed Liens (as defined in the Final DIP Order), and (iv) priming liens on any assets subject to the liens of Junior Lienholders (as defined in the Final DIP Order) that received notice of the Final DIP Order.

In consideration for the use of Indenture Collateral (as defined in the Final DIP Order) and the priming of the Indenture Liens (as defined in the Final DIP Order), the Final DIP Order provided for the adequate protection of the Senior Secured Note Indenture Trustee including (i) replacement liens on the Collateral to the extent of the diminution in the value of the Indenture Collateral, subject to certain restrictions, (ii) a weekly accounting of the Pre-Petition Segregated Funds (as defined in the Final DIP Order), and (iii) reimbursement for the reasonable fees and expenses of restructuring and Delaware counsel to the certain Senior Secured Noteholders up to $400,000 in the aggregate.

The Final DIP Order did not grant either the DIP Agents, the Senior Secured Notes Indenture Trustee or anyone else liens or super-priority claims on Avoidance Actions.

The Final DIP Order requires the Debtors to segregate proceeds from postpetition services and business activities into a separate bank account (the "**Post-Petition Segregated Funds**") and permits the Post-Petition Segregated Funds to be used to pay, among other things, fees and expenses incurred in the Chapter 11 Cases in accordance with the Budget (as defined in the Final DIP Order).  The DIP Final Order also requires the proceeds from any sale of prepetition unencumbered assets to be placed into a segregated bank account subject only to the DIP Liens and the Noteholder Adequate Protection Liens (as defined in the Final DIP Order).

Until all DIP Obligations (as defined in the DIP Order) are indefeasibly paid in full, no claims may be charged against the Collateral (as defined in the DIP Order) pursuant to Bankruptcy Code Section 506(c).  In anticipation of the repayment of the DIP Obligations upon consummation of a sale of substantially all of their assets, on February 18, 2014, the Debtors filed the Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364, and 552, Fed. R. Bankr. 4001(b) and Del. Bankr. L.R. 4001-2 (A) Authorizing Use of Cash Collateral and (B) Granting Adequate Protection [Docket No. 554] (the "Cash Collateral Motion"), seeking an order permitting the Debtors to, among other things, use the "cash collateral" of the Senior Secured Notes Indenture Trustee and Shell and contribute $1.5 million in cash to Turbine Power Technology, LLC as a capital contribution.  On [March 11], 2014, the Bankruptcy Court entered an order approving the Cash Collateral Motion and permitting such use and providing or confirming adequate protection liens of Shell and the Senior Secured Notes Indenture Trustee.

**H.      KEY EMPLOYEE RETENTION PROGRAM AND KEY EMPLOYEE INCENTIVE PROGRAM**

On December 17, 2014, the Debtors filed a motion for an order approving the Debtors' Key Employee Incentive Plan (the "**KEIP**") for certain senior management employees and the Key Employee Retention Plan (the "**KERP**") for certain non-insider employees.  On December 31, 2013 the United States Trustee Filed an objection to the KEIP and KERP.  In response to the United States Trustee's objection and extensive negotiations with the other parties in interest, the Debtors filed an amendment to the KEIP and the KERP on January 8, 2014 [Docket No. 321]. The purpose of such plans was to incentivize the Debtors' employees to maximize the value of the Debtors' assets and combat the negative employee morale that typically result from the uncertainties and increased burdens of an employer's debtor-in-possession status.  The payment of KEIP bonuses was conditioned on the achievement of certain metrics relating to financial performance and net sale proceeds.  The payment of KERP bonuses was conditioned on the employee's continuing employment through two separate benchmark periods. The payment of the KEIP and KERP bonuses was also

7.      01:15

CH\1723784.11 1723784.13

conditioned on the employees waiving their rights to severance payments. Oral argument where heard before the Bankruptcy Court on January 13, 2014, and the Bankruptcy Court entered an order approving the KEIP and KERP as amended [Docket No. 374].

I.    **PROPOSED SALE OF ASSETS: FINANCING AFTER CLOSE OF ASSET SALE**

On October 14, 2013, the Debtors engaged Carl Marks to act as investment banker in an advisory capacity to evaluate financial and strategic alternatives to pursue a sale process. As part of the engagement, Carl Marks and the Debtors pursued a potential sale of the Debtors' Assets.

Carl Marks contacted over 210 potential purchasers with respect to the sale of the Debtors' Assets.  Of those, 38 signed a non-disclosure agreement and received a confidential information memorandum describing the Debtors' Assets.  Thirty potential purchasers accessed an electronic data room and, ultimately four (4) expressions of interest were submitted for different portions of the Debtors' Assets.

~~Concurrent with the filling of this Disclosure Statement or shortly thereafter~~On February 7, 2014, the Debtors ~~expect to file~~filed (i) a stalking horse ~~purchase~~agency agreement that they had negotiated with Gordon Brothers Commercial & Industrial LLC (the "Agency Agreement") and (ii) a motion seeking approval of, among other things, bid procedures, bid protections and authority to sell substantially all of their assets after an auction and a sale hearing. (the "Sale Motion").  The bid of Gordon Brothers Commercial & Industrial LLC ("GBCI") pursuant to the Agency Agreement is not a bid to purchase the assets immediately from the Debtors for a fixed price, but rather a bid to sell the Assets free and clear of all encumbrances on the Debtors' behalf in exchange for guaranteed payment of at least $50 million in two installments plus sharing of proceeds in excess of $67.5 million.  At a hearing on February 19, 2014, the Bankruptcy Court entered an order authorizing the Debtors to enter into the stalking horse agency agreement subject to higher and better bids at an auction that was scheduled for March 7, 2014.

No higher or better bids were received on the assets included in the GBCI bid.  Accordingly, the Debtors cancelled the auction.  The Debtors did, however, receive a bid from the Ad Hoc Noteholders for the Debtors' membership interests in Turbine Power Technology, LLC (the "GFES TPT Interest").  As more fully set forth in the Membership Interests Purchase Agreement submitted therewith (the "MIPA") the purchase price for the GFES TPT Interest will be in the form of a credit bid in the amount of $17,750,000 in principal amount of the Senior Secured Notes and will be consummated by either the Indenture Trustee or a newly formed entity as buyer.  [Pursuant to the Sale Order, the Court approved the GBCI Agency Agreement, the MIPA and the Sale Motion on March 11, 2014.]

~~J. RESTRUCTURING SUPPORT AGREEMENT~~

~~As noted above, the Restructuring Support Agreement reflected the culmination of lengthy negotiations, both prior to and following the Petition Date, between the Debtors, Mr. Moreno and the Moreno Entities, TPT, Shell, and the Ad Hoc Noteholders.~~

~~As noted above, the Restructuring Support Agreement established the original framework for the Plan.  Namely, pursuant to the Restructuring Support Agreement, the (a) Moreno Entities agreed to contribute their equity interests in TGS to a NewCo in exchange for a release of the Moreno Entities, (b) Shell agreed to limit its recovery on account of its secured claim to $5 million, release the personal guaranty of Mr. Moreno in favor of Shell and to limit its recovery on account of its turnover rights under the Intercreditor Agreement to $40 million in exchange for a release of Causes of Action against Shell other than Avoidance Actions, (c) TPT agreed to consent to the admission of NewCo as a full member of TPT and to the assignment of certain contracts and intellectual property licenses in exchange for $12 million and a release of Causes of Action against TPT and (d) the Consenting Senior Secured Noteholders agreed to not recover from the proceeds of Avoidance Actions on account of their Senior Noteholder Claims in exchange for receipt of equity in NewCo.~~

~~The Debtors determined not to continue to seek approval of the Restructuring Support Agreement, and the Restructuring Support Agreement was terminated because it was determined that the Cash proceeds generated from the sale of the Debtors' assets would likely not be sufficient to effectuate the Restructuring Support Agreement.  As a result, the Debtors and the other parties to the Restructuring Support Agreement, as well as the Unsecured Creditors' Committee, negotiated a potential settlement that permits effectuation of certain aspects of the Restructuring Support Agreement and maximizes the recovery to the Debtors' estates.  The Debtors, SWEPI LP, successor in interest to Shell Western Exploration and Production, Inc., Michel Moreno and Turbine Powered Technology, LLC, have agreed in principal to the settlement which centers around the contribution of the MOR/TGS Interests by the Moreno Entities to NewCo in exchange for certain interests in NewCo and the releases by Debtors set forth in Section 12.06 of this Plan and the releases by Holders of Claims set~~

7.        01:15

CH\~~1723784.11~~1723784.13

forth in Section 12.07 of this Plan.  In light of the current purchase price for the Assets, the Ad Hoc Noteholders are unwilling to consent to a waiver of the Deficiency Claim of the Senior Secured Notes Indenture Trustee or of any Senior Secured Noteholder.  The Plan is premised upon a waiver of the Deficiency Claim of the Senior Secured Notes Indenture Trustee and the Senior Secured Noteholders.  In light of the foregoing, the Debtors and the Ad Hoc Noteholders are continuing to negotiate the terms of the Plan.

The chart below summarizes certain of the differences between the Plan, premised on the settlement referenced above, and the plan contemplated by the Restructuring Support Agreement

|  | RSA | Plan |
|---|---|---|
| Shell's recovery on account of its turnover rights under the Intercreditor Agreement | Limited to $40 million | No recovery |
| Shell's personal guaranty from Mr. Moreno in favor of Shell | Mr. Moreno to receive a full release from Shell | Mr. Moreno will not receive a release from Shell |
| Release of Claims against Shell | Release of Causes of Action against Shell other than Avoidance Actions | Release of Causes of Action against Shell including Avoidance Actions |
| Consideration Received by TPT in exchange for TPT's agreement to consent to the admission of NewCo as a full member of TPT and to the assignment of a certain intellectual property license | $12 million and a release of Causes of Action against TPT | No cash consideration and release of Causes of Action against TPT |

The Debtors believe that the Plan maximizes value for all of the Debtors' creditors, including General Unsecured Creditors.  Moreover, as detailed below, the Debtors believe that the consideration provided by each of Shell, the Moreno Entities, TPT and the Senior Secured Noteholders justifies the releases set forth in Article XII of the Plan.

**J.**  ~~K.~~ THE EXAMINER

On January 5, 2014, the Official Creditors' Committee filed a motion seeking the appointment of an examiner (the "**Examiner Motion**") [Docket No. 304]. Although the Debtors do not believe that an examiner was required in these Chapter 11 Cases, the Debtors did not object to the appointment of an examiner under certain parameters.  On January 14, 2014, the Court entered an order authorizing the appointment of an examiner (the "**Examiner Order**") [Docket No. 421]. Retired United States Bankruptcy Judge for the Northern District of Texas Steven A. Felsenthal was appointed as the examiner (the "**Examiner**").

Pursuant to the Examiner Order, the scope of the examiner's report is limited to a review of the Released Causes of Action:

The examiner shall investigate and prepare a report providing his/her factual and legal conclusions respecting whether the estates hold valuable claims or causes of action against any of the parties that would receive a release if the Chapter 11 Plan described in the RSA is confirmed and whether the value being contributed by the parties to the RSA (the "RSA Parties") justifies granting such releases.

This direction was appropriate at the time the Examiner Order was entered, because at such time the Debtors intended to proceed with a plan that incorporated the terms of the Restructuring Support Agreement.  However, on February 7, 2014, the Debtors terminated the Restructuring Support Agreement.  See *Notice of Withdrawal of Docket No. 299* [Docket No. 480].  Moreover, one day earlier on February 6, 2014, the Debtors filed the Plan with terms varying from those contemplated by the Restructuring Support Agreement prior to its termination [Docket No. 478].

As a result of the foregoing, the Debtors and the other RSA Parties (as defined in the Examiner Order), the Official Creditors' Committee, the Office of the United States Trustee, and the Examiner each believed the direction to the Examiner

set forth in Paragraph 3 of the Examiner Order should be modified to the following:

> The examiner shall investigate and prepare a report providing his/her factual and legal conclusions respecting whether the estates hold valuable claims or causes of action against any of the parties that would receive a release if the Chapter 11 Plan that was filed by the Debtors on February 6, 2014 [Docket No. 478], including any plan revisions that represent a consensual resolution of matters that would have otherwise been covered in the examiner's report, is confirmed and whether the value being contributed by the parties to the RSA (the "RSA Parties") justifies granting such releases.  The examiner shall take into account the submissions of the Committee and the RSA Parties in issuing his/her report.

On February 24, 2014, the Bankruptcy Court entered an order modifying the Examiner Order to reflect the foregoing.  [Docket No. 580]

The Examiner Order provided a briefing schedule.  As contemplated thereby:

- On January 24, 2014, the Official Creditors' Committee made its *Preliminary Submission to the Examiner Concerning Relevant Facts and Potential Causes of Action Identified by the Official Committee of Unsecured Creditors as of January 24, 2014* (the "**Committee Preliminary Submission**").

- On January 31, 2014, the Debtors, Shell, the Ad Hoc Noteholders and the Moreno Entities each made their own respective preliminary submissions to the Examiner.

- On February 4, 2014, the Debtors made a supplemental submission to the Examiner.

- On February [10], 2014, the Official Creditors' Committee made a supplemental submission to the Examiner.

- On February [13]14, 2014, the Debtors, Shell the Ad Hoc Noteholders and the Moreno Entities made supplemental submissions to the Examiner.

Prior to issuing his report, the Examiner spoke on ~~at least one occasion~~multiple occasions to each of the Official Creditors' Committee, Shell, the Debtors, the Ad Hoc Noteholders and Mr. Moreno.  On March [—]4, 2014, the Examiner issued his report~~, a copy of which is attached hereto as Appendix D~~.

**K.**    ~~L.~~THE REQUEST OF THE OFFICIAL CREDITORS' COMMITTEE TO SEEK STANDING TO PURSUE CERTAIN CAUSES OF ACTION

On January 5, 2014, the Official Creditors' Committee filed a motion (the "**Standing Motion**") [Docket No. 305] requesting that the Bankruptcy Court grant it standing  to immediately prosecute and, if appropriate, settle, (i) the avoidance of liens perfected by Shell days before the chapter 11 filings (the "**Lien Avoidance Cause of Action**") and (ii) a declaratory judgment that, as a consequence of avoiding the Liens subject to the Lien Avoidance Cause of Action, the Estates have priority entitlement to the first $80 million of the proceeds of any sale of the collateral underlying Shell's Liens, pursuant to the express terms of the Intercreditor Agreement and/or Bankruptcy Code Section 551 (the "**Section 551 Cause of Action**").   The Standing Motion ~~was originally scheduled to be heard on February 4, 2014.  The Official Creditors' Committee and the Debtors agreed to adjourn it until February 27, 2014.~~is pending.

~~The Debtors plan to file an objection to the Standing Motion.~~

**L.**    ~~M.~~BAR DATE AND PROOF OF CLAIM/REQUEST FOR PAYMENT PROCESS

On December 13, 2013, the Bankruptcy Court entered an order (the "**Bar Date Order**") [Docket No. 185] establishing (i) January 24, 2014 as the General Bar Date and the 503(b)(9) Claims Bar Date, (ii) April 25, 2014 as the Governmental Unit Bar Date; (iii) the first Business Day that is at least thirty (30) days after the Effective Date as the Administrative Claims Bar Date and Fee Claims Bar Date; and (iv) the date that is twenty-five (25) days after the entry of any order authorizing the rejection of an executory contract or unexpired lease as the Rejection Bar Date.

In light of a technical issue that occurred in connection with the service of the Bar Date Order, on January 2, 2014, the

Bankruptcy Court entered an order authorizing the Debtors to establish a supplemental bar date for certain creditors. Accordingly, the Debtors established January 31, 2014, for those creditors who did not receive proper notice of the original bar date (the "**Supplemental Bar Date Order**").

**M.** ~~N.~~ CLAIMS OBJECTION PROCESS

Approximately 415 Proofs of Claim and 503(b)(9) Claims have been filed against the Debtors aggregating approximately $1.43 billion (this is a consolidated figure that includes numerous duplicates as well as claims asserted against more than one of the Debtors for the same liability, but excludes amounts for unliquidated and contingent Claims). The Debtors have initiated a process by which, prior to the Effective Date, they will evaluate the Proofs of Claim and 503(b)(9) Claims to determine whether objections seeking the disallowance of certain asserted Claims should be filed. After the Effective Date, the Liquidation Trust will have the exclusive responsibility for reviewing and objecting to the Allowance of any Claim or Interests filed in the Chapter 11 Cases ~~other than the Allowance of any Claim in Class 6 General Unsecured Claims. After the Effective Date, the Litigation Trust will have the exclusive responsibility for reviewing and objecting to the Allowance of any Claim in Class 6 General Unsecured Claims~~. As an alternative, the Debtors, or the Liquidation Trustee ~~or Litigation Trustee, as the case may be,~~ may seek to negotiate and settle disputes as to asserted Claims as an alternative to filing objections to the Proofs of Claim or 503(b)(9) Claims.

Completion of the Claims objection process and other objections to Claims that may be filed after the date hereof, may take significant time and could result in significant delays in distributions to creditors under the Plan. The Debtors believe that the completion of the Claims objection process would take at least as long, if not longer, if these Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code. Moreover, as set forth in Section IX.B below, the Debtors do not believe that creditor recoveries would be greater in a chapter 7 than recoveries will be under the Plan.

**N.** ~~O.~~ DISPOSITION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Plan provides that, to the extent an executory contract or unexpired lease of the Debtors that has not expired by its own terms prior to the Effective Date (a) has not been assumed, assumed and assigned or rejected pursuant to such process or by order of the Bankruptcy Court during the Chapter 11 Cases prior to the Effective Date or (b) is not the subject of a motion to assume or a motion or permitted notice to assume and assign in each case filed as of the Effective Date, such executory contract or unexpired lease will be deemed rejected pursuant to Bankruptcy Code Section 365 as of the Effective Date.

**O.** ~~P.~~ PLAN EXCLUSIVITY

Bankruptcy Code Section 1121(b) provides for an initial period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to propose a plan (the "**Exclusive Period**"). In addition, Bankruptcy Code Section 1121(c)(3) provides that if a debtor proposes a plan within the Exclusive Period, it has the remaining balance of 180 days after the commencement of the chapter 11 case to solicit acceptances of such plan (the "**Exclusive Solicitation Period**"). During the Exclusive Period and the Exclusive Solicitation Period, plans may not be proposed by any party in interest other than the debtor. Under Bankruptcy Code Section 1121(d), the Exclusive Period and the Exclusive Solicitation Period may be extended for cause.

The Disclosure Statement and Plan were filed within the Exclusive Period.

**P.** ~~Q.~~ LIQUIDATION TRUSTEE

Pursuant to Section 7.03 of the Plan, and effective as of the Effective Date of the Plan, the Liquidation Trust Beneficiaries and the Debtors, under the Liquidation Trust Agreement, will create the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries. A summary of certain significant terms of the Liquidation Trust Agreement are set forth below. The Liquidation Trust Agreement will be attached to the Plan as Exhibit ~~C~~B and will be filed with the Plan Supplement. The Plan Supplement will also identify the initial Liquidation Trustee and include a curriculum vitae of such individual.

~~R. LITIGATION TRUSTEE~~

~~Pursuant to Section 7.04 of the Plan, and effective as of the Effective Date of the Plan, the Litigation Trust Beneficiaries and the Debtors, under the Litigation Trust Agreement, will create the Litigation Trust for the benefit of the Litigation Trust Beneficiaries. A summary of certain significant terms of the Litigation Trust Agreement are set forth below. The Litigation Trust Agreement will be attached to the Plan as Exhibit D and will be filed as part of the Plan Supplement. The Plan Supplement will also identify the initial Litigation Trustee and include a curriculum vitae of such individual.~~

## IV.
## REASONS FOR THE SOLICITATION; RECOMMENDATION

Chapter 11 of the Bankruptcy Code provides that, in order for the Bankruptcy Court to confirm the Plan, at least one Class of Impaired Claims must accept the Plan, provided that the Plan satisfies the requirements of Bankruptcy Code Section 1129(b) as to any rejecting Classes of Impaired Claims. An Impaired Class of Claims will have accepted the Plan if requisite acceptances are obtained, meaning: (i) the holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims in such Impaired Class of Claims actually voting have voted to accept the Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims in such Impaired Class actually voting on the Plan have voted to accept the Plan, not counting the vote of any holder designated under Bankruptcy Code Section 1126(e). Thus, the Debtors are seeking the acceptances from Classes 3, 4, 5 and 6.

In light of the benefits to be attained by the Debtors' creditors pursuant to the Plan, the Debtors' Board (or other governing bodies) recommend that all holders of Claims in the Voting Classes vote to accept the Plan. The Special Committee has reached this decision after considering the available alternatives to the Plan and their likely effect on the Debtors' creditors and stakeholders. These alternatives include: liquidation of the Debtors under chapter 7 of the Bankruptcy Code, an alternate plan filed by the Debtors or another party in interest or dismissal of the Chapter 11 Cases. The Debtors' Boards (or other governing bodies) determined, after consulting with financial and legal advisors, that the Plan would result in a distribution of greater values to creditors than would a liquidation under chapter 7 or any other chapter 11 liquidation or reorganization. For a comparison of estimated distributions under chapter 7 of the Bankruptcy Code and under the Plan, please see Part VIII.C.2 of this Disclosure Statement.

FOR ALL OF THESE REASONS, THE DEBTORS' BOARDS (OR OTHER GOVERNING BODIES) SUPPORT THE PLAN AND URGE ALL HOLDERS OF CLAIMS IN VOTING CLASSES VOTE TO ACCEPT AND SUPPORT THE PLAN.

## V.
## THE PLAN

> **THIS PART V IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS PART V AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN WILL CONTROL AND GOVERN.**

## A.    OVERALL STRUCTURE OF PLAN

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business bankruptcies. The fundamental purpose of a chapter 11 case is to formulate a plan to restructure a debtor's finances so as to maximize recoveries to its creditors. With this purpose in mind, businesses sometimes use chapter 11 as a means to conduct asset sales and other forms of liquidation. Whether the aim is reorganization or liquidation, a chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and stockholders with respect to their claims against and equity interests in a debtor's bankruptcy estate.

The Plan divides the Claims against and Interests in the Debtors into Classes according to their relative seniority and other criteria. Certain Classes – in particular, Administrative Claims, Fee Claims, Priority Tax Claims and DIP Claims remain unclassified in accordance with Bankruptcy Code Section 1123(a)(1). The Plan assigns all other Claims and Interests to the following Classes: Class 1 – Other Secured Claims, Class 2 – Priority Non-Tax Claims, Class 3 – Shell Secured Claim, Class 4 – Senior Noteholder Claims, Class 5 – Shell Other Claims, Class 6 – General Unsecured Claims, Class 7 – Subordinated Other Claims, Class 8 – Subordinated Stock Claims, Class 9 – GFES Interests, Class 10 – Subsidiary Interests.

The Bankruptcy Code entitles only holders of impaired claims or interests who receive some distribution under a proposed plan to vote to accept or reject that plan. Holders of claims or equity interests that are unimpaired under a proposed plan are conclusively presumed to have accepted that plan and are not entitled to vote on it. Holders of claims or equity interests that will receive no distributions under a proposed plan are conclusively presumed to reject that plan and, therefore, are also not entitled to vote on it.

## B.    DEEMED CONSOLIDATION

On the Effective Date, the Estates will be deemed consolidated for all purposes related to the Plan. As a result of the deemed consolidation of the liabilities and properties of all the Debtors, except as otherwise provided in the Plan, (a) the Chapter 11 Cases of

7.        01:15

CH\~~1723784.11~~1723784.13

GFES, Hub City and Proppant One will be deemed consolidated into the case of GFES as a single consolidated case; (b) the Estate of each of the Debtors will be deemed to be one consolidated Estate; (c) all property of the Estate of each Debtor will be deemed to be property of the consolidated Estates; (d) all Claims against each Estate will be deemed to be Claims against the consolidated Estates; (e) all Claims based upon prepetition unsecured guarantees by one Debtor in favor of any other of the Debtors (other than guarantees existing under any assumed executory contracts or unexpired leases) will be eliminated, and no distributions under the Plan will be made on account of Claims based upon such guarantees; (f) for purposes of determining the availability of the right of setoff under Bankruptcy Code Section 553, the Debtors will be treated as one consolidated entity so that, subject to the other provisions of Bankruptcy Code Section 553, prepetition debts due to any of the Debtors may be set off against the prepetition debts of any other of the Debtors; (g) no distributions under the Plan will be made on account of any Subsidiary Interests; and (h) the GFES Interests will be subject and subordinate to the Claims against the consolidated Estate.

Deemed consolidation will not merge or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under the Plan; deemed consolidation will have no effect on valid, enforceable and unavoidable Liens, except for Liens that secure a Claim that is eliminated by virtue of deemed consolidation and Liens against collateral that are extinguished by virtue of deemed consolidation; and deemed consolidation will not have the effect of creating a Claim in a class different from the class in which a Claim would have been placed in the absence of deemed consolidation.

Deemed consolidation will not affect the obligation of each of the Debtors to pay Statutory Fees to the Office of the United States Trustee until such time as a particular chapter 11 Case is closed, dismissed or converted. Further, the deemed consolidation provided for in the Plan will not, other than for purposes related to the Plan and distributions to be made hereunder, affect the legal and corporate structures of the Debtors or the rights and defenses of the Liquidation Trust pertaining to the Estate Causes of Action, or the rights and defenses of Litigation Trust with respect to Avoidance Actions.

The Plan constitutes a motion for deemed consolidation of the liabilities and properties of all the Debtors for purposes of distribution. The confirmation of the Plan will constitute approval of the motion by the Bankruptcy Court, and the Confirmation Order will contain findings supporting and conclusions providing for deemed consolidation on the terms set forth in Section 2.01 of the Plan.

Although the Debtors seek deemed consolidation rather than full substantive consolidation of the Estates, the Estates would likely satisfy the criteria for substantive consolidation. The United States Court of Appeals for the Third Circuit has adopted a standard for granting a request for substantive consolidation similar to the standards adopted by other Circuits authorizing substantive consolidation. See In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005); Reider v. F.D.I.C. (In re Reider), 31 F.3d 1102, 1107-1108 (11th Cir. 1994); Woburn Assoc. v. Kahn (In re Hemingway Transport Inc.), 954 F.2d 1, 11-12 (1st Cir. 1992); First Nat'l Bank of El Dorado v. Giller (In re Giller), 962 F.2d 796, 798-99 (8th Cir. 1992); Union Sav. Bank. v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 518 (2d Cir. 1988); Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), 810 F.2d 270, 276 (D.C. Cir. 1987).

In the Third Circuit, debtors seeking substantive consolidation must show either "(i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." Owens Corning, 419 F.3d at 211 (emphasis added). "A prima facie case for [the first rationale] typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity." Id. at 212.

There is ample evidence that prior to the Petition Date the creditors of the Debtors treated them as one legal entity. The Debtors prepared and disseminated consolidated financial reports to the public, including customers, suppliers, landlords, lenders, and credit rating agencies. Because the Debtors disseminated financial information to the public on a consolidated basis, it is highly unlikely that the Debtors' creditors relied on the separate identity of any Debtor in extending credit to such Debtor.

Rather, because financial information disseminated to customers, suppliers, landlords, lenders, and credit rating agencies, has been prepared and presented on a consolidated basis, it is clear that creditors treated the Debtors as one legal entity when deciding whether to extend credit. Thus, substantive consolidation would be warranted in this case under the test set forth by the Third Circuit.

Several courts within the Third Circuit have acknowledged the existence and application of substantive consolidation of separate bankruptcy estates in appropriate circumstances. See In re Molnar Bros., 200 B.R. 555 (Bankr. D.N.J. 1996) (recognizing the application of substantive consolidation of two or more bankruptcy estates); In re PWS Holding Corp., Case No. 98-212-223 (SLR) (D. Del. 1998) (approving substantive consolidation of debtors pursuant to a plan of reorganization); Bracaglia v. Manzo (In re United Stairs Corp.), 176 B.R. 359, 368 (Bankr. D.N.J. 1995) (stating that it is "well established that in the appropriate circumstances the

court may substantively consolidate corporate entities"); In re Buckhead Am. Corp., 1992 Bankr. LEXIS 2506 (Bankr. D. Del. Aug. 13, 1992) (substantively consolidating debtors); In re Cooper, 147 B.R. 678, 682 (Bankr. D.N.J. 1992).

For the reasons set forth above, the Debtors believe that the requirements for substantive consolidation of the Debtors with respect to voting and treatment of all Claims and Interests except for Other Secured Claims are satisfied.

## C.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

As discussed above, Bankruptcy Code Section 1122 provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with Bankruptcy Code Section 1122, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims, Fee Claims, Priority Tax Claims and DIP Claims, which, pursuant to Bankruptcy Code Section 1123(a)(1), need not be classified). The Debtors also are required, under Bankruptcy Code Section 1122, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class. The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of Bankruptcy Code Section 1122 and applicable case law.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the expected amount of liquidation proceeds. In view of the deemed rejection by Classes 7, 8, 9 and 10, however, as set forth below, the Debtors will seek confirmation of the Plan pursuant to the "cram down" provisions of the Bankruptcy Code. Specifically, Bankruptcy Code Section 1129(b) permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired classes of claims and interests. Although the Debtors believe that the Plan can be confirmed under Bankruptcy Code Section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

### 1.    Treatment Of Unclassified Claims Under The Plan

(a)    Administrative Claims

An Administrative Claim is defined in the Plan as an obligation of the Debtors under Bankruptcy Code Section 503(b) entitled to priority in payment under Bankruptcy Code Section 507(a), including but not limited to: (a) a 503(b)(9) Claim; (b) the actual and necessary costs and expenses incurred after the Petition Date for preserving the Estates and/or operating the Debtors' businesses; (c) cure costs associated with the assumption or assumption and assignment of executory contracts and unexpired leases pursuant to Bankruptcy Code Section 365 (other than to the extent assumed by a third party under an asset purchase agreement and sale approved by the Bankruptcy Court); and (d) all Statutory Fees. As used in the Plan, the term "Administrative Claim" excludes Fee Claims. Administrative Claims are First Tier Claims under the Plan and, accordingly, will be paid in full, or adequately reserved for, prior to any Distribution to holders of Second Tier Claims, Third Tier Claims, Fourth Tier Claims, Fifth Tier Claims or Sixth Tier Claims.

The Plan provides that, to be eligible to receive Distributions under the Plan on account of an Administrative Claim (other than a 503(b)(9) Claim) that is not otherwise Allowed by the Plan, a Request for Payment of Administrative Claim must have been or be filed with the Bankruptcy Court on or before the applicable Administrative Claims Bar Date. To be eligible to receive Distributions under the Plan on account of a 503(b)(9) Claim that is not otherwise Allowed by the Plan, a Request for Payment of a 503(b)(9) Claim must have been filed with the Claims Agent on or before the 503(b)(9) Claims Bar Date. Any Administrative Claim that is not asserted in accordance with Section 4.01(a) of the Plan will be deemed disallowed under the Plan and will be forever barred against any of the Estates, the Liquidation Trust, the Litigation Trust or any of their Assets or property, and the holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

Administrative Claims are First Tier Claims under the Plan. Under the Plan, and unless the holder of an Allowed Administrative Claim agrees to receive other less favorable treatment, each holder of an Allowed Administrative Claim will be paid 100% of the unpaid amount of such Claim in Cash on the date that is the later of (i) the Initial Distribution Date for First Tier Claims or (ii) as soon as reasonably practicable after the date such Claim becomes an Allowed Claim; provided, however, that Allowed Administrative Claims of the United States Trustee for Statutory Fees will be paid on the Effective Date and thereafter, as such fees may thereafter accrue and be due and payable, by the Liquidation Trustee pursuant to Section 7.03 of the Plan in accordance with the applicable schedule for payment of such fees.

ADMINISTRATIVE CLAIMS ARE NOT CLASSIFIED AND ARE TREATED AS REQUIRED BY THE BANKRUPTCY

CH\1723784.111723784.13

CODE. THE HOLDERS OF SUCH CLAIMS ARE NOT ENTITLED TO VOTE ON THE PLAN.

(b)      Fee Claims

The Plan defines Fee Claims as Claims: (a) of a Professional person retained by order of the Bankruptcy Court for compensation and/or reimbursement of expenses pursuant to Bankruptcy Code Sections 327, 328, 330, or 331 (other than ordinary course professionals of the Debtors); and (b) of any Professional or other party-in-interest seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code Section 503(b). Fee Claims are First Tier Claims under the Plan and, accordingly, will be paid in full, or adequately reserved for, prior to any Distribution to holders of Second Tier Claims, Third Tier Claims, Fourth Tier Claims, Fifth Tier Claims or Sixth Tier Claims.

The Plan provides that all Final Fee Applications for payment of Fee Claims will be filed with the Bankruptcy Court on or before the Fee Claims Bar Date. Any Fee Claim that is not asserted in accordance with Section 4.02(a) of the Plan will be deemed disallowed under the Plan and will be forever barred against any of the Estates, the Liquidation Trust, the Litigation Trust or any of their Assets or property, and the holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

The Plan further provides that all Final Fee Applications will be subject to the following requirements and procedures:

- All Final Fee Applications will comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, applicable orders of the Bankruptcy Court and applicable Third Circuit law.

- All Final Fee Applications will be served via first class mail upon the United States Trustee and the Liquidation Trustee. Notice of the Final Fee Applications, including the amount of final allowance of fees and expenses sought, the objection deadline and the hearing date, will be served in accordance with Local Rule 2002-1(b).

- The deadline to object to a Final Fee Application will be not less than twenty-one (21) days (or the next Business Day if such day is not a Business Day) following service of the Final Fee Application.

- The hearing to consider all Final Fee Applications will be set at a date and time that is at least sixty (60) days after the Effective Date and will be set forth in the Confirmation Order. Each Professional that files a Final Fee Application will include such hearing date in their respective notice of hearing.

- To object to a Professional's Final Fee Application, the objecting party must (x) file a written objection on or before the objection deadline and (y) serve the objection on the Professional who filed the Final Fee Application and each of the notice parties designated in Section 4.02(b)(ii) of the Plan, such that each party receives the objection on or before the established objection deadline.

- A Fee Claim asserted in a Final Fee Application will be an Allowed Fee Claim to the extent provided in the order of the Bankruptcy Court entered pursuant to the Final Fee Application.

The Plan provides that, unless the holder of an Allowed Fee Claim agrees to receive other less favorable treatment, each holder of an Allowed Fee Claim will be paid 100% of the unpaid amount of such Claim in Cash no later than five (5) Business Days after the date that such Claim is Allowed by order of the Bankruptcy Court. Immediately prior to the Effective Date, the Debtors will pay all outstanding amounts on account of Fee Claims relating to prior periods and for the period ending on the Effective Date to the respective Professional holding such Fee Claim. The Professionals will estimate Fee Claims due for periods that have not been billed as of the Effective Date. Within ten (10) days after entry of a Final Order with respect to its Final Fee Application, each Professional will remit any overpayment to the Liquidation or the Liquidation Trustee will pay any outstanding amounts owed to the Professional.

FEE CLAIMS ARE NOT CLASSIFIED AND ARE TREATED AS REQUIRED BY THE BANKRUPTCY CODE. THE HOLDERS OF SUCH CLAIMS ARE NOT ENTITLED TO VOTE ON THE PLAN.

(c)      Priority Tax Claims

The Plan defines a Priority Tax Claim as a Claim or a portion of a Claim for which priority is asserted under Bankruptcy Code Section 507(a)(8). The taxes entitled to priority are (i) taxes on or measured by income or gross receipts that meet the requirements set forth in Bankruptcy Code Section 507(a)(8)(A), (ii) property taxes meeting the requirements of Bankruptcy Code

Section 507(a)(8)(B), (iii) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in Bankruptcy Code Section 507(a)(8)(C), (iv) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to Bankruptcy Code Section 507(a)(4), to the extent that such taxes also meet the requirements of Section 507(a)(8)(D), (v) excise taxes of the kind specified in Bankruptcy Code Section 507(a)(8)(E), (vi) customs duties arising out of the importation of merchandise that meet the requirements of Bankruptcy Code Section 507(a)(8)(F), and (vii) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in Bankruptcy Code Section 507(a)(8)(G).  Priority Tax Claims are First Tier Claims under the Plan and, accordingly, will be paid in full, or adequately reserved for, prior to any Distribution to holders of Second Tier Claims, Third Tier Claims, Fourth Tier Claims, Fifth Tier Claims or Sixth Tier Claims.

To be eligible to receive Distributions under the Plan on account of a Priority Tax Claim, a Proof of Claim must be filed with the Claims Agent so as to be received on or before the Governmental Unit Bar Date.  Any Priority Tax Claim that is not asserted in accordance with Section 4.03(a) of the Plan will be deemed disallowed under the Plan and will be forever barred against any of the Estates, the Liquidation Trust, ~~the Litigation Trust,~~ or any of their Assets or property and the holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

Subject to the terms of the Plan, with respect to each Allowed Priority Tax Claim, at the sole option of the Debtors, the holder of an Allowed Priority Tax Claim will be entitled to receive on account of such Allowed Priority Tax Claim, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (x) payments in Cash on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim, or (y) such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Debtors.

PRIORITY TAX CLAIMS ARE NOT CLASSIFIED AND ARE TREATED AS REQUIRED BY THE BANKRUPTCY CODE.  THE HOLDERS OF SUCH CLAIMS ARE NOT ENTITLED TO VOTE ON THE PLAN.

(d)     DIP Claims

The Plan defines DIP Claims as all Claims of the DIP Agents or the DIP Lenders under or relating to the DIP Credit Agreement, the DIP Facility or the DIP Order.

The Plan provides that on the Effective Date, each holder of an Allowed DIP Claim, in full and complete settlement, release and discharge of such Claim, will be paid in full in Cash all outstanding principal and accrued but unpaid interest, costs, fees and expenses owing as of the Effective Date, and any other amounts due and owing under the DIP Loan Documents.

DIP CLAIMS ARE NOT CLASSIFIED AND ARE TREATED AS REQUIRED BY THE BANKRUPTCY CODE.  THE HOLDERS OF SUCH CLAIMS ARE NOT ENTITLED TO VOTE ON THE PLAN.

2.     **Treatment Of Classified Claims And Interests Under Plan**

(a)     Class 1:  Other Secured Claims

The Plan defines Other Secured Claims as a Secured Claim arising prior to the Petition Date against any of the Debtors, other than a Senior Noteholders' Claim, the Shell Secured Claim or any Secured Claim satisfied pursuant to the Sale Order or any other order of the Bankruptcy Court.

Other Secured Claims are First Tier Claims under the Plan and, accordingly, will be paid in full, or adequately reserved for, prior to any Distribution to holders of Second Tier Claims, Third Tier Claims, Fourth Tier Claims, Fifth Tier Claims or Sixth Tier Claims.  Class 1 consists of separate sub-Classes, one for each Other Secured Claim.  Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code.  Class 1 is Unimpaired by the Plan and the holders of Other Secured Claims are deemed to accept the Plan and, therefore, are not entitled to vote on the Plan.

The Plan provides that, unless a holder of an Allowed Other Secured Claim agrees to receive other less favorable treatment, each holder of an Allowed Claim in this Class will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, (x) 100% of the unpaid amount of such Claim in Cash or (y) the collateral securing any such Allowed Other Secured Claim (to the extent such collateral does not constitute collateral securing the Senior Noteholder Claims or, if such collateral does secure the Senior Noteholder Claims, to the extent that the Lien securing such Allowed Other Secured Claim is senior to the Lien securing the Senior Noteholder Claims) on the date that is the later of (i) the Initial Distribution Date for First Tier Claims or (ii) as

7.     01:15

CH\\~~1723784.11~~1723784.13

soon as is reasonably practicable after the date such Claim becomes an Allowed Claim; provided, however, that if the holder of an Allowed Other Secured Claim holds Cash with a right of setoff, such holder will be entitled to effect the setoff and thereby satisfy the Claim in lieu of receiving payment.

In addition, the Plan requires that certain conditions be met before a holder of an Other Secured Claim is entitled to receive the foregoing treatment.  First, except as otherwise specifically provided in the Plan or in any agreement, instrument or document created in connection with the Plan:  (a) each holder of an Other Secured Claim, regardless of whether such Claim has been listed in the Schedules or asserted in a Proof of Claim:  (1) to the extent Cash is distributed in accordance with Section 5.01(b) of the Plan, will turn over and release to the Estates and the Liquidation Trust any and all property of the Estates that secures or purportedly secures such Claim and any such Lien arguably securing such Claim will automatically, and without further action by the Estates or the Liquidation Trust, be deemed released; provided, however, that if such property is Cash, in lieu of payment, the holder will be deemed to have setoff the Cash to the extent of the Allowed amount of the Claim, and will be obligated to turn over and release the balance of Cash and any other property that was held to secure the Claim; and (2) execute such documents and instruments as the Liquidation Trust require(s) to evidence such holder's release of such property or Lien, and if such holder violates the Confirmation Order and the Plan by refusing to execute appropriate documents or instruments, the Liquidation Trust may, in its discretion, file a copy of the Confirmation Order which will serve to release any holder's rights in such property; and (b) on the Effective Date, all right, title and interest in such property will revert, vest or revest in accordance with the Plan, free and clear of all Claims and Interests, including, without limitation, Liens, escrows, charges, pledges, or other encumbrances of any kind; provided, however, that the physical turnover of property described in (a)(1) above, is necessary and required only to the extent the holder is in possession or control of the property that secures or purportedly secures such Claim.

Without limiting the automatic release provisions of the immediately preceding Paragraph, the Plan provides that:  (a) no distribution thereunder will be made to or on behalf of any holder unless and until such holder executes and delivers to the Estates or the Liquidation Trust such release of Liens or otherwise turns over and releases any property in such holder's possession; (b) any holder that fails to execute and deliver such release of Liens within ninety (90) days after the Effective Date (or such other date as may be agreed by the Liquidation Trust and such holder) will be subject to whatever sanction is deemed appropriate by the Bankruptcy Court; and (c) the Liquidation Trust, which will be deemed to be appointed as attorney-in-fact for all such holders of Other Secured Claims for the purpose of releasing such Liens, will be authorized to use, and all authorities will be required to accept, the Confirmation Order and the notice of Effective Date as satisfaction of all Liens.

OTHER SECURED CLAIMS ARE UNIMPAIRED.  THE HOLDERS OF SUCH CLAIMS ARE DEEMED TO HAVE ACCEPTED THE PLAN AND WILL NOT VOTE.

      (b)      Class 2:  Priority Non-Tax Claims

The Plan defines a Priority Non-Tax Claim as a Claim or portion of a Claim for which priority is asserted under Bankruptcy Code Sections 507(a)(3), (4), (5), (6) or (7).

Priority Non-Tax Claims are First Tier Claims under the Plan and, accordingly, will be paid in full, or adequately reserved for, prior to any Distribution to holders of Second Tier Claims, Third Tier Claims, Fourth Tier Claims, Fifth Tier Claims or Sixth Tier Claims.

The Plan provides that, unless the holder of an Allowed Priority Non-Tax Claim agrees to receive other less favorable treatment, each holder of an Allowed Priority Non-Tax Claim will be paid 100% of the unpaid amount of such Claim in Cash on the date that is the later of (i) Initial Distribution Date for First Tier Claims or (ii) as soon as is reasonably practicable after the date such Claim becomes an Allowed Claim.

PRIORITY NON-TAX CLAIMS ARE UNIMPAIRED.  THE HOLDERS OF SUCH CLAIMS ARE DEEMED TO HAVE ACCEPTED THE PLAN AND WILL NOT VOTE.

      (c)      Class 3:  Shell Secured Claim

The Plan defines the Shell Secured Claim as the Shell Claim to the extent such Claim is secured by security interests in certain of the Debtors' motor vehicles as the result of notations on certificates of title of such motor vehicles.

The Shell Secured Claim is a First Tier Claim under the Plan ~~and, accordingly,~~  **In full satisfaction, settlement and release of the Shell Secured Claim, the holder of the Shell Secured Claim** will be paid **$5,000,000** in Cash ~~under the Plan~~ on the

Effective Date.

THE SHELL SECURED CLAIM IS IMPAIRED.  **THE HOLDER OF SUCH CLAIM IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

(d)    Class 4:  Senior Noteholder Claims

The Plan defines the Senior Noteholder Claims as the ~~Claim~~Claims of the Senior Secured Notes Indenture Trustee ~~or~~and any Senior Secured Noteholder under the Senior Secured Notes Indenture, including (a) any Secured Claim, (b) the Senior ~~Noteholders'~~Noteholder Adequate Protection Claims, and (c) any Deficiency Claim ~~of the Senior Secured Notes Indenture Trustee or any Senior Secured Noteholder~~.

Senior Noteholder Claims are Second Tier Claims under the Plan and, accordingly, will be paid in full, or adequately reserved for, prior to any Distribution to holders of Third Tier Claims, Fourth Tier Claims, Fifth Tier Claims or Sixth Tier Claims.

Subject to the terms of the Plan, in full satisfaction, settlement and release of and in exchange for all such Allowed Senior Noteholder Claims, commencing on the Initial Distribution Date for Second Tier Claims, ~~(a)~~each holder of a Senior Noteholder Claim will be entitled to receive a Pro Rata portion of ~~(i) 70% of the Class A preferred equity of NewCo, (ii) 50% of the Class B preferred equity of NewCo, and (iii) 30% of the common equity of NewCo, (b) the GFES TPT Interest will be transferred to NewCo on the Effective Date and (c)~~the Senior Noteholder Distribution until such time as the Senior Noteholder Claim Allowed Amount is paid in full; provided that the first $1,000,000 of the Senior Noteholder Distribution will be made directly to the TPT Acquisition Entity and the remaining Senior Noteholder Distribution will be made to each holder of a Senior Noteholder Claim through the Senior Secured Notes Indenture Trustee ~~will receive, for the benefit of the Senior Secured Noteholders, distributions of the Senior Noteholder Cash Distribution from the Liquidation Trust until such time as (i) the aggregate value contributed to NewCo by the Debtors and the Liquidation Trustee plus (ii) the aggregate value distributed to the Senior Secured Notes Indenture Trustee, is equal to the Senior Noteholder Claim Allowed Amount~~.

Class 4 consists of separate sub-Classes, one for the Secured Claim of the Senior Secured Noteholders, one for the Senior Noteholder Adequate Protection Claims and one for the Deficiency Claim of the Senior Secured Noteholders.  Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code.

SENIOR NOTEHOLDER CLAIMS ARE IMPAIRED.  **THE HOLDERS OF SUCH CLAIMS ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

(e)    Class 5:  Shell Other Claim

The Plan defines the Shell Other Claim as the Claim of Shell in excess of the Distributions received by Shell on account of the Shell Secured Claim, including any Deficiency Claim of Shell or any Claim under or related to the Intercreditor Agreement.

The Shell Other Claim will be an Allowed Claim.  Under the Plan, in full satisfaction, settlement and release of and in exchange for the Shell Other Claim, Shell will receive the release set forth in Section 12.07 of the Plan. ~~Solely to effectuate the foregoing and the provisions of the Plan, on the Effective Date the Shell Other Claim, and all rights relating thereto, will be transferred to the Debtors.~~

THE SHELL OTHER CLAIM IS IMPAIRED.  **THE HOLDER OF SUCH CLAIM IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

(f)    Class 6:  General Unsecured Claims

The Plan defines a General Unsecured Claim as a Claim that is not an Administrative Claim, a Fee Claim, a Priority Tax Claim, an Other Secured Claim, a Priority Non-Tax Claim, a Shell Secured Claim, a Senior Noteholder Claim, a Shell Other Claim, a Subordinated Other Claim, or a Subordinated Stock Claim, whether Allowed or Disputed.  Any Deficiency Claim of the Senior Secured Notes Indenture Trustee or any Senior Secured Noteholder is deemed waived and is not a General Unsecured Claim.  General Unsecured Claims are Third Tier Claims under the Plan and, accordingly, will be paid in full, or adequately reserved for, prior to any Distribution to holders of Fourth Tier Claims, Fifth Tier Claims or Sixth Tier Claims.

The Plan provides that each holder of an Allowed General Unsecured Claim, in full satisfaction, settlement and release of and in exchange for all such Allowed Claims, unless such holder agrees to less favorable treatment, will be entitled to

7.        01:15

CH\\~~1723784.11~~1723784.13

receive, commencing on the Initial Distribution Date for Third Tier Claims, a Pro Rata share of the ~~interests in the Litigation Trust.~~**Available Cash remaining after the payment of, or establishment of adequate reserves for, all First Tier Claims and the Senior Noteholder Distribution, until such time as all Allowed General Unsecured Claims are paid in full.**

        GENERAL UNSECURED CLAIMS ARE IMPAIRED.  **THE HOLDERS OF SUCH CLAIMS ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

        (g)      Class 7:  Subordinated Other Claims

        The Plan defines a Subordinated Other Claim as (a) any Claim, other than a Subordinated Stock Claim, asserted against any of the Debtors that is subordinated pursuant to either Bankruptcy Code Section 510(b) or Bankruptcy Code Section 510(c); or (b) any Claim for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the holder of such Claim, including, without limitation, any such Claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, willful intellectual property infringement, fraud, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise), and any such Claim asserted by a Governmental Unit in connection with a tax or other obligation owing to such unit.  Subordinated Other Claims are Fourth Tier Claims under the Plan, and accordingly, will not receive any Distribution until payment in full of, or adequate reserve for, all First Tier Claims, Second Tier Claims and Third Tier Claims.

        The Plan provides that, subject to Section 5.11 of the Plan, no holder of a Subordinated Other Claim will receive or retain any property under the Plan**, or** the Liquidation ~~Trust Agreement or the Litigation~~ Trust Agreement on account of such holder's Claim.

        SUBORDINATED OTHER CLAIMS ARE IMPAIRED.  THE HOLDERS OF SUCH CLAIMS ARE DEEMED TO HAVE REJECTED THE PLAN AND WILL NOT VOTE.

        (h)      Class 8:  Subordinated Stock Claims

        The Plan defines a Subordinated Stock Claim as any Claim against any of the Debtors that is subordinated pursuant to Bankruptcy Code Section 510(b) arising from the rescission of a purchase or sale of any Interest, any Claim for damages arising from the purchase or sale of any Interest, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim. Subordinated Stock Claims are Sixth Tier Claims/Interests under the Plan, and accordingly, will not receive any Distribution until payment in full of, or adequate reserve for, all First Tier Claims, Second Tier Claims, Third Tier Claims, Fourth Tier Claims and Fifth Tier Claims.

        The Plan provides that, subject to Section 5.11 of the Plan, no holder of a Subordinated Stock Claim will receive or retain any property under the Plan**, or** the Liquidation ~~Trust Agreement or the Litigation~~ Trust Agreement on account of such holder's Claim.

        SUBORDINATED STOCK CLAIMS ARE IMPAIRED.  THE HOLDERS OF SUCH CLAIMS ARE DEEMED TO HAVE REJECTED THE PLAN AND WILL NOT VOTE.

        (i)      Class 9:  GFES Interests

        The Plan defines GFES Interest as any equity security, within the meaning of Bankruptcy Code Section 101(16), issued by GFES and outstanding prior to the Effective Date including, without limitation, any preferred stock, common stock, stock unit, stock options or other right to purchase the stock of GFES, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights to acquire or receive any stock or other equity ownership interests in GFES prior to the Effective Date including, for the avoidance of doubt, all outstanding warrants held by existing warrant holders pursuant to that certain Warrant Agreement, dated as of November 15, 2011, by and between GFES, Wilmington Trust,  National Association, as warrant agent, and other parties signatory thereto.  GFES Interests are Sixth Tier Claims/Interests under the Plan, and accordingly, will not receive any Distribution until payment in full of, or adequate reserve for, all First Tier Claims, Second Tier Claims, Third Tier Claims, Fourth Tier Claims and Fifth Tier Claims.

        The Plan provides that all GFES Interests will be cancelled as of the Effective Date.  Subject to the provisions of Section 5.11 of the Plan, no holder of a GFES Interest will receive or retain any property under the Plan**, or** the Liquidation ~~Trust Agreement or the Litigation~~ Trust Agreement on account of such holder's Interest.

        GFES INTERESTS ARE IMPAIRED.  THE HOLDERS OF SUCH INTERESTS ARE DEEMED TO HAVE REJECTED

7.        01:15

THE PLAN AND WILL NOT VOTE.

(j)        Class 10:  Subsidiary Interests

The Plan defines Subsidiary Interests as, collectively, all of the issued and outstanding shares of stock or membership interests of Hub City and Proppant One.

The holders of Subsidiary Interests will not receive or retain any property under the Plan on account of such Interests.

SUBSIDIARY INTERESTS ARE IMPAIRED.  THE HOLDERS OF SUCH INTERESTS ARE DEEMED TO HAVE REJECTED THE PLAN AND WILL NOT VOTE.

3.        **Supplemental Treatment in Event of Surplus of Available Cash**

The treatment provisions of the Plan assume sufficient Available Cash to permit payment in full of First Tier Claims and partial payment of Second Tier Claims and Third Tier Claims.  If, however, Available Cash exceeds expectations and a surplus of Available Cash remains in the Liquidation Trust Distribution Account after all First Tier Claims, Second Tier Claims and Third Tier Claims are paid in full or adequately reserved for, then such surplus Available Cash will be distributed as follows:

- Fourth Tier Claims:  Each holder of an Allowed Subordinated Other Claim, in full satisfaction, settlement and release of and in exchange for all such Allowed Claims, will be entitled to receive, commencing on the Initial Distribution Date for Fourth Tier Claims, one or more Distributions of Available Cash in an amount equal to its Pro Rata share of such Available Cash remaining in the Liquidation Trust Distribution Account.

- Fifth Tier Claims:  If all Fourth Tier Claims are paid in full or adequately reserved for and a surplus of Available Cash still remains in the Liquidation Trust Distribution Account, each eligible holder of an Allowed Priority Tax Claim, Allowed Priority Non-Tax Claim, Allowed General Unsecured Claim, and Allowed Subordinated Other Claim will be entitled to receive Available Cash in an amount equal to its Pro Rata share of the Unsecured Interest Allocation on account of postpetition interest accrued through the Effective Date at the applicable Postpetition Interest Rate; provided, however, that holders of Subordinated Other Claims will not be entitled to receive payments of postpetition interest unless and until all other holders of Allowed Fourth Tier Claims receive payment in full on account of all postpetition interest they are owed in accordance with this subsection.

- Sixth Tier Claims/Interests:  If all Fourth and Fifth Tier Claims are paid in full or adequately reserved for and a surplus of Available Cash still remains in the Liquidation Trust Distribution Account, each holder of an Allowed Subordinated Stock Claim and each holder of an Allowed GFES Interest will be entitled to receive one or more Distributions of Available Cash in an amount equal to its allocated share of such remaining Available Cash as such allocated share will be determined by the Bankruptcy Court upon motion of the Liquidation Trustee.

4.        **Claims Subject to Insurance Coverage**

Notwithstanding anything to the contrary in the Plan, if any Allowed Claim is covered by insurance, such Claim will first be paid from such insurance with the balance, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

5.        **Requirement For Allowance of Claims**

Under the Plan, a Claim otherwise entitled to be paid or to receive a Distribution under the Plan must be an Allowed Claim. As defined by the Plan, Allowed means:

- when used with respect to an Administrative Claim, all or any portion of an Administrative Claim (A) that has been allowed by a Final Order or adjudicated in favor of the holder by estimation or liquidation by a Final Order, or (B) for which a Request for Payment in a liquidated amount has been filed by the applicable Bar Date and as to which either (x) no objection to the allowance thereof has been filed by the applicable Claims/Interest Objection Deadline, or (y) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order;

- when used with respect to any Claim, a Claim that is not otherwise a Disputed Claim; or

- when used with respect to an Interest, an Interest held in the name, kind and amount set forth on the records retained by the applicable Debtor.

As defined by the Plan, Disputed means:

- with respect to any Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order, a Claim (i) as to which no Request for Payment or Proof of Claim has been filed by the applicable Bar Date and which is listed in the Schedules as unliquidated, contingent, or disputed; (ii) as to which a Request for Payment or Proof of Claim has been filed by the applicable Bar Date and as to which an objection or request for estimation has been filed by the applicable Claims/Interest Objection Deadline, or which is otherwise disputed in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (iii) as to which a Request for Payment or Proof of Claim was required to be filed by the Bar Date, but as to which a Request for Payment or Proof of Claim was not timely or properly filed; (iv) that is disputed in accordance with the provisions of the Plan; or (v) if not otherwise Allowed, as to which the applicable Claims/Interest Objection Deadline has not expired; and

- with respect to any Interest, an Interest held in name, kind, or amount different from the name, kind and amount set forth on the records retained by the applicable Debtor.

6. **Special Provisions Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Liquidation Trust's~~, the Litigation Trust's,~~ or the Debtors' rights and defenses in respect of any Claim or Interest that is Unimpaired under the Plan, including, without limitation, all rights in respect of (1) legal and equitable defenses to, (2) setoff or recoupment against, or (3) counter-claims with respect to, any such Unimpaired Claims and Interests.

7. ~~Transfer of GFES TPT Interest and~~ **TPT Settlement** ~~Payment~~

On the Effective Date ~~(a) the GFES TPT Interest will be transferred to NewCo free and clear of all Liens, Claims and Interests on account of the Senior Noteholder Claims and (b)~~ TPT will receive the releases by the Debtors set forth in Section ~~12.06 of the Plan and the releases by Holders of Claims set forth in Section~~ 12.07 of the Plan ~~in exchange~~ for (i) the release of all TPT Claims~~,~~ **and** (ii) the consent of TPT ~~to the transfer of the GFES TPT Interest to NewCo and admission of NewCo as a member of TPT and (iii) TPT's consent~~ to the assumption and assignment of the TPT License by the Debtors under the Sale Order.

D. **COMPREHENSIVE SETTLEMENT OF CLAIMS AND CONTROVERSIES**

The Plan~~, and~~ Plan Documents (including**, without limitation,** the Settlement and Release Agreement) ~~and the NewCo Related Agreements,~~ collectively, reflect and incorporate a settlement and compromise of controversies ~~and, collectively, form the cornerstone of the Plan. Each of the Debtor Releasees and Creditor Releasees have, through contributions or concessions, made substantial contributions to the Estates in exchange for the benefits provided hereunder. The contribution of the MOR/TGS Interests to NewCo entitles the Moreno Affiliated Entities to the releases and protections provided under the terms of the Plan, including Sections 12.06, 12.07, 12.08 and 12.09 of the Plan.~~

**.** Pursuant to **section 363 of the** Bankruptcy Code ~~Section 363~~ and Bankruptcy Rule 9019 and in consideration for the classification, distributions and other benefits provided pursuant to the Plan~~,~~ **and** the Plan Documents ~~and the NewCo Related Agreements~~, the provisions of the Plan relating to and effectuating this settlement will constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan~~,~~ Plan Documents ~~and NewCo Related Agreements~~**.** The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the settlements and compromises contained in the Plan~~,~~ **and** Plan ~~Documents (including, without limitation, the Release and Settlement Agreement) and the NewCo~~ Documents, as well as a finding by the Bankruptcy Court that such settlements are in the best interests of the Debtors, their Estates and holders of Claims and Interests and are fair, equitable and reasonable.

~~E. CREATION OF AND CONTRIBUTIONS TO NEWCO.~~

~~The contributions to NewCo of (a) the MOR/TGS Interests by the Moreno Entities and (b) the GFES TPT Interest by~~

CH\~~1723784.11~~1723784.13

the Debtors are fundamental elements of the Plan and the settlement and compromise of controversies contained in the Plan, the Plan Documents and the NewCo Documents.

On or prior to the Effective Date, NewCo will have been created and the MOR/TGS Interests will have been contributed to NewCo. On the Effective Date, the GFES-TPT Interest will be transferred by the Debtors to NewCo free and clear of all Liens, Claims and Interests. On the Initial Distribution Date for Second Tier Claims, which is anticipated to be the Effective Date, the holders of Allowed Senior Noteholder Claims will receive equity in NewCo as set forth in Section 5.04(b) of the Plan.

## E.    F. THE LIQUIDATION TRUST

### 1.    Creation of the Liquidation Trust and Vesting of Assets

The Liquidation Trust will be managed by a Liquidation Trustee as well as by a Liquidation Trust Oversight Committee. The Plan provides that the Liquidation Trustee will be the successor to all of the privileges of the Estates and the Debtors, including, but not limited to, the attorney/client privilege, except to the extent related to Avoidance Actions.

On the Effective Date, the Liquidation Trustee will sign the Liquidation Trust Agreement and accept the Initial Liquidation Trust Funding and all Assets of the Estates (other than Avoidance Actions) on behalf of the beneficiaries thereof, and be authorized to obtain, liquidate, and collect all of the Assets of the Estates not in its possession and pursue all of the Estate Causes of Action. The Liquidation Trust will be deemed created and effective without any further action by the Bankruptcy Court or any party. The Plan specifies that the Liquidation Trust will be established for the primary purpose of liquidating its Assets and for making Distributions in accordance with the Plan and the Liquidation Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.

The Liquidation Trust Beneficiaries will be beneficiaries of the Liquidation Trust. The Plan defines the Liquidation Trust Beneficiaries as the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims, Allowed Non-Priority Tax Claims, Allowed DIP Claims and Allowed Claims and, if applicable, Allowed Interests, in Class 1, Class 2, Class 3, Class 4, Class 5 and Class 6, and to the extend provided in Section 5.11 of the Plan, Class 7, Class 8 and Class 9 entitled to Distributions. The Liquidation Trust Beneficiaries will be bound by the Liquidation Trust Agreement. The Liquidation Trust Beneficiaries will be bound by the Liquidation Trust Agreement. The interests of the Liquidation Trust Beneficiaries in the Liquidation Trust will be uncertificated and will be nontransferable except upon death of the interest holder or by operation of law.

Pursuant to Bankruptcy Code Section 1141(b), the Plan provides that the Initial Liquidation Trust Funding and the other applicableall Assets of the Estates (other than Avoidance Actions) will vest in the Liquidation Trust; provided, however, that the Liquidation Trust, with the consent of the Liquidation Trustee, may abandon or otherwise not accept any Assets that the Liquidation Trust believes, in good faith, have no value to the Liquidation Trust. Any Assets the Liquidation Trust so abandons or otherwise does not accept will not vest in the Liquidation Trust. As of the Effective Date, all Assets vested in the Liquidation Trust and all Assets dealt with in the Plan, will be free and clear of all Liens, Claims and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.

The Plan sets forth a reasonable limit on the term of the Liquidation Trust and the Debtors believe that the Liquidation Trust will be able to achieve the goals set forth in the Plan and the Liquidation Trust Agreement during this term. Under the Plan, the Liquidation Trustee will be discharged and the Liquidation Trust will be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Liquidation Trust Assets have been liquidated, (iii) all duties and obligations of the Liquidation Trustee under the Liquidation Trust Agreement have been fulfilled, (iv) all Distributions required to be made by the Liquidation Trust under the Plan and the Liquidation Trust Agreement have been made, and (v) each of the Chapter 11 Cases of the Debtors has been closed; provided, however, that in no event will the Liquidation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets.

### 2.    Certain Powers and Duties of the Liquidation Trust and Liquidation Trustee

The Plan provides that Thethe Liquidation Trustee will be the exclusive trustee of the Liquidation Trust Assets for purposes

of 31 U.S.C. Section 3713(b) and 26 U.S.C. Section 6012(b)(3). The powers, rights, and responsibilities of the Liquidation Trustee will be specified in the Liquidation Trust Agreement and, under the supervision of the Liquidation Trust Oversight Committee, and, subject to Section 7.03(b) of the Plan, will include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect trust Assets; (b) pay taxes or other obligations incurred by the Liquidation Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, Professionals and consultants to advise and assist in the administration, prosecution and distribution of trust Assets; (d) calculate and implement distributions of trust Assets; (e) prosecute, compromise, and settle, in accordance with the specific terms of the Liquidation Trust Agreement, Estate Causes of Action vested in the Liquidation Trust; (f) resolve issues involving Claims and Interests, other than General Unsecured Claims, pursuant to Article IX of the Plan; and (g) undertake all administrative functions of the Chapter 11 Cases, including the ultimate closing of the Chapter 11 Cases.

In addition, the Liquidation Trust is the successor to the Debtors, the Estates, and the Debtors' rights to books and records. Under the Plan, on the Effective Date, the Liquidation Trust will: (i) take possession of all books, records, and files of the Debtors and their Estates; and (ii) provide for the retention and storage of such books, records, and files until such time as the Liquidation Trust determines, in accordance with the Liquidation Trust Agreement, that retention of same is no longer necessary or required.

The Liquidation Trust has the authority under the Plan to invest Cash (including any earnings thereon or proceeds therefrom) as permitted by Bankruptcy Code Section 345 or, subject to the terms of the Liquidation Trust Agreement, in other prudent investments, to the extent permitted to be made by a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

The Plan specified that all Liquidation Trust Operating Expenses will be the responsibility of and paid by the Liquidation Trust in accordance with the Liquidation Trust Agreement.

The Plan requires that in no event later than thirty (30) Business Days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidation Trust Operational Reserve and any Disputed Claims Reserve has been released or paid out in accordance with the Plan, the Liquidation Trustee will file with the Bankruptcy Court a report setting forth the amounts, recipients and dates of all Distributions made by the Liquidation Trustee under the Plan through each applicable reporting period.

3.    **Federal Income Tax Treatment of the Liquidation Trust for the Liquidation Trust Assets; Tax Reporting and Tax Payment Obligations**

For U.S. federal income tax purposes, it is intended that the Liquidation Trust (except with respect to the Disputed Claims Reserve) be classified as a liquidating trust under Treasury Regulation Section 301.7701-4. Accordingly, for U.S. federal income tax purposes, it is intended that the Liquidation Trust Beneficiaries be treated as if they had received a Distribution from the Estates of an undivided interest in each of the Liquidation Trust Assets (to the extent of the value of their respective therein) and then contributed such interests to the Liquidation Trust.

(a)    Liquidation Trust Assets

The Plan provides that for all U.S. federal income tax purposes, all parties will treat the transfer of Assets (net of any applicable liabilities) to the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries as (a) a transfer by the Debtors of the Liquidation Trust Assets (net of any applicable liabilities) directly to the Liquidation Trust Beneficiaries (to the extent of the value of their respective share in the applicable Liquidation Trust Assets), followed by (b) the transfer of the Liquidation Trust Assets (net of any applicable liabilities) by the Liquidation Trust Beneficiaries (to the extent of the value of their respective share in the Liquidation Trust Assets) to the Liquidation Trust in exchange for the beneficial interests in the Liquidation Trust. Accordingly, for U.S. federal income tax purposes, the ~~Liquidating~~Liquidation Trust (except with respect to the Disputed Claims Reserve associated therewith) will be treated as a grantor trust, and the Liquidation Trust Beneficiaries will be treated as the grantors of the Liquidation Trust and the owners of the Liquidation Trust Assets.

(b)    Tax Reporting

Under the Plan, the Liquidation Trust will be responsible for filing all federal, state, local and foreign tax returns, including, but not limited to, any documentation related thereto for current or former employees, vendors or contractors of the Debtors, for the Debtors and the Liquidation Trust, including with respect to the Disputed Claims Reserve associated therewith. The Liquidation Trust will file tax returns for the Liquidation Trust, except with respect to the Disputed Claims Reserve associated therewith, as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with Section 7.03 of the Plan. Within a reasonable time following the end of the taxable year, the Liquidation Trustee will send to each holder of a beneficial interest appearing on its record

7.        01:15

CH\ ~~1723784.11~~1723784.13

during such year, a separate statement setting forth such holder's share of items of income, gain, loss, deduction or credit and each such holder will report such items on their federal income tax returns; provided, however, that no such statement need be sent to any beneficiaries that are not expected to receive any Distribution from the Liquidation Trust.  The Liquidation Trustee may provide each such holder of a beneficial interest with a copy of the Form 1041 for the Liquidation Trust (without attaching any other holder's Schedule K-1 or other applicable information form) along with such holder's Schedule K-1 or other applicable information form in order to satisfy the foregoing requirement.  The Liquidation Trustee will allocate the taxable income, gain, loss, deduction or credit of the Liquidation Trust with respect to each holder of a beneficial interest to the extent required by the Tax Code and applicable law.

The Plan provides that, as soon as possible after the Effective Date, the Liquidation Trust will make a good faith valuation of the Liquidation Trust Assets, and such valuation will be used consistently by all parties for all federal income tax purposes.  The Liquidation Trust also will file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidation Trust that are required by any Governmental Unit for taxing purposes.

The Liquidation Trust will file all income tax returns with respect to any income attributable to the Disputed Claims Reserve and will, subject to Section 7.03(f)(iii) of the Plan, pay the federal, state and local income taxes attributable to the Disputed Claims Reserve, based on the items of income, deduction, credit or loss allocable thereto.

The Plan provides that the Liquidation Trust may request an expedited determination of the tax obligations of the Debtors or of the Liquidation Trust, including the Disputed Claims Reserve, under Bankruptcy Code Section 505(b) for all returns filed for, or on behalf of, the Debtors and the Liquidation Trust for all taxable periods through the dissolution of the Liquidation Trust.

Under the Plan, the Liquidation Trust will comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions made by the Liquidation Trust will be subject to any such withholding and reporting requirements.

(c)    Payment of Taxes

The Plan provides that the Liquidation Trust will be responsible for payments of all Allowed tax obligations of the Debtors including Priority Tax Claims and Administrative Claims, in addition to any taxes imposed on the Liquidation Trust or the Liquidation Trust Assets, including the Disputed Claims Reserve associated therewith.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve associated with the Liquidation Trust is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the Liquidation Trust Assets allocable to, or retained on account of, Disputed Claims, such taxes will be (a) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (b) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Liquidation Trust as a result of the resolutions of such Disputed Claims.

Pursuant to Bankruptcy Code Section 1146(a), the issuance, transfer or exchange of any security or the making or delivery of any instrument of transfer by the Liquidation Trust may not be taxed under any law imposing a stamp tax, use tax, sale tax or similar tax.

4.    **Term of Liquidation Trust**

The Plan sets forth a reasonable limit on the term of the Liquidation Trust and the Debtors believe that the Liquidation Trust will be able to achieve the goals set forth in the Plan and the Liquidation Trust Agreement during this term.  Under the Plan, the Liquidation Trustee will be discharged and the Liquidation Trust will be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the ~~Assets of the~~ Liquidation Trust **Assets** have been liquidated, (iii) all duties and obligations of the Liquidation Trustee under the Liquidation Trust Agreement have been fulfilled, (iv) all Distributions required to be made by the Liquidation Trust under the Plan and the Liquidation Trust Agreement have been made, and (v) each of the Chapter 11 Cases of the Debtors has been closed; provided, however, that in no event will the Liquidation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the ~~Assets of the~~ Liquidation Trust **Assets**.

5.    **The Liquidation Trust Oversight Committee**

The Plan provides that on the Effective Date, the Liquidation Trust Oversight Committee will be formed pursuant to the

7.        01:15

47

Liquidation Trust Agreement.  The Liquidation Trust Oversight Committee will be comprised of no more than three (3) members, two of whom will be selected by the Senior Secured Notes Indenture Trustee at the direction of the majority of the Senior Secured Noteholders and one of whom will be selected by the Official Creditors' Committee, until such time, if any, as the Senior Noteholder Claim Allowed Amount is paid in full, at which time the member selected by the Official Creditors' Committee will select two members to replace the two members selected by the Senior Secured Notes Indenture Trustee.

The Liquidation Trust Oversight Committee will have the rights and responsibilities provided for in the Liquidation Trust Agreement.  The Liquidation Trustee will report all material matters (as described in the Liquidation Trust Agreement) to and seek approval for all material decisions (as described in the Liquidation Trust Agreement) from the Liquidation Trust Oversight Committee.

## G. THE LITIGATION TRUST

### 1. Creation of the Litigation Trust and Vesting of Assets

The Litigation Trust will be managed by a Litigation Trustee as well as by a Litigation Trust Oversight Committee. The Plan provides that the Litigation Trustee will be the successor to all of the privileges of the Estates and the Debtors, including, but not limited to, the attorney/client privilege, solely to the extent related to Avoidance Actions.

On the Effective Date, the Litigation Trustee will sign the Litigation Trust Agreement and accept the Initial Litigation Trust Funding and the Avoidance Actions on behalf of the beneficiaries thereof, and be authorized to pursue, obtain, liquidate, collect and recover all Assets of the Estates solely relating to the Avoidance Actions.  The Litigation Trust will be deemed created and effective without any further action by the Bankruptcy Court or any party.  The Litigation Trust will be established for the primary purpose of pursuing the Avoidance Actions and for making Distributions to Allowed General Unsecured Claims in accordance with the Plan and the Litigation Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust.

The Litigation Trust Beneficiaries will be beneficiaries of the Litigation Trust. The Litigation Trust Beneficiaries will be bound by the Litigation Trust Agreement. The interests of the Litigation Trust Beneficiaries in the Litigation Trust will be uncertificated and will be nontransferable except upon death of the interest holder or by operation of law.

Pursuant to Bankruptcy Code Section 1141(b), the Initial Litigation Trust Funding and the Avoidance Actions will vest in the Litigation Trust; provided, however, that the Litigation Trust, with the consent of the Litigation Trustee, may abandon or otherwise not accept any such Assets that the Litigation Trust believes, in good faith, have no value to the Litigation Trust.  Any Assets the Litigation Trust so abandons or otherwise does not accept will not vest in the Litigation Trust.  As of the Effective Date, all Assets vested in the Litigation Trust and all Assets dealt with in the Plan, will be free and clear of all Liens, Claims and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.

### 2. Certain Powers and Duties of the Litigation Trust and Litigation Trustee

The Plan provides that the Litigation Trustee will be the exclusive trustee of the Litigation Trust Assets for purposes of 31 U.S.C. Section 3713(b) and 26 U.S.C. Section 6012(b)(3). The powers, rights, and responsibilities of the Litigation Trustee will be specified in the Litigation Trust Agreement and, under the supervision of the Litigation Trust Oversight Committee, and, subject to Section 7.04(b) of the Plan, will include the authority and responsibility to:  (a) receive, manage, invest, supervise, and protect trust Assets; (b) pay taxes or other obligations incurred by the Litigation Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, Professionals and consultants to advise and assist in the administration, prosecution and distribution of trust Assets; (d) calculate and implement distributions of trust Assets; (e) prosecute, compromise, and settle, in accordance with the specific terms of the Litigation Trust Agreement, the Avoidance Actions vested in the Litigation Trust; and (f) resolve issues involving General Unsecured Claims pursuant to Article IX of the Plan.

The Litigation Trust has the authority under the Plan to invest Cash (including any earnings thereon or proceeds therefrom) as permitted by Bankruptcy Code Section 345 or in other prudent investments to the extent permitted to be made by a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

The Plan specifies that all Litigation Trust Operating Expenses will be the responsibility of and paid by the Litigation

7.          01:15

48

Trust in accordance with the Litigation Trust Agreement.

The Plan requires that in no event later than thirty (30) Business Days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Litigation Trust Operational Reserve and any Disputed Claims Reserve has been released or paid out in accordance with the Plan, the Litigation Trustee will file with the Bankruptcy Court a report setting forth the amounts, recipients and dates of all Distributions made by the Litigation Trustee under the Plan through each applicable reporting period.

### 3. Federal Income Tax Treatment of the Litigation Trust for the Litigation Trust Assets; Tax Reporting and Tax Payment Obligations

For U.S. federal income tax purposes, it is intended that the Litigation Trust (except with respect to the Disputed Claims Reserve) will be classified as a liquidating trust under Treasury Regulation Section 301.7701-4. Accordingly, for U.S. federal income tax purposes, it is intended that the Litigation Trust Beneficiaries will be treated as if they had received a Distribution from the Estates of an undivided interest in each of the Litigation Trust Assets of the (to the extent of the value of their respective share therein) and then contributed such interests to the Litigation Trust.

#### (a) Litigation Trust Assets

The Plan provides that for all U.S. federal income tax purposes, all parties will treat the transfer of Assets (net of applicable liabilities) to the Litigation Trust for the benefit of the Litigation Trust Beneficiaries as (a) a transfer by the Debtors of the Litigation Trust Assets directly to the Litigation Trust Beneficiaries (to the extent of the value of their respective share in the applicable Litigation Trust Assets), followed by (b) the transfer of the Litigation Trust Assets (net of any applicable liabilities) by the Litigation Trust Beneficiaries (to the extent of the value of their respective share in the applicable Litigation Trust Assets) to the Litigation Trust in exchange for the beneficial interests in the Litigation Trust. Accordingly, for U.S. federal income tax purposes, the Litigation Trust (except with respect to the Disputed Claims Reserve associated therewith) will be treated as a grantor trust, and the Litigation Trust Beneficiaries will be treated as the grantors and the owners of the Litigation Trust Assets.

#### (b) Tax Reporting

Under the Plan the Litigation Trust is responsible for filing all federal, state, local and foreign tax returns, including, but not limited to, any documentation related thereto for current or former employees, vendors or contractors of the Debtors, for the Litigation Trust, including with respect to the Disputed Claims Reserve associated therewith. The Litigation Trust will file tax returns for the Litigation Trust, except with respect to the Disputed Claims Reserve associated therewith, as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with Section 7.04 of the Plan. Within a reasonable time following the end of the taxable year, the Litigation Trustee will send to each holder of a beneficial interest appearing on its record during such year, a separate statement setting forth such holder's share of items of income, gain, loss, deduction or credit and each such holder will report such items on their federal income tax returns; provided, however, that no such statement need be sent to any beneficiaries that are not expected to receive any Distribution from the Litigation Trust. The Litigation Trustee may provide each such holder of a beneficial interest with a copy of the Form 1041 for the Litigation Trust (without attaching any other holder's Schedule K-1 or other applicable information form) along with such holder's Schedule K-1 or other applicable information form in order to satisfy the foregoing requirement. The Litigation Trustee will allocate the taxable income, gain, loss, deduction or credit of the Litigation Trust with respect to each holder of a beneficial interest to the extent required by the Tax Code and applicable law.

The Plan provides that, as soon as possible after the Effective Date, the Litigation Trust will make a good faith valuation of Assets of the Litigation Trust, and such valuation will be used consistently by all parties for all federal income tax purposes. The Litigation Trust will also file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidation Trust that are required by any Governmental Unit for taxing purposes.

The Litigation Trust will file all income tax returns with respect to any income attributable to the Disputed Claims Reserve and will, subject to Section 7.04(f)(iii) of the Plan, pay the federal, state and local income taxes attributable to the Disputed Claims Reserve, based on the items of income, deduction, credit or loss allocable thereto.

The Litigation Trust will comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions made by the Litigation Trust will be subject to any such withholding and

reporting requirements.

(c) Payment of Taxes

Under the Plan, the Litigation Trust is responsible for payment of any taxes imposed on the Litigation Trust or the Litigation Trust Assets, including the Disputed Claims Reserve associated therewith.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve associated with the Litigation Trust is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the Litigation Trust Assets allocable to, or retained on account of, Disputed Claims, such taxes will be (a) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (b) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Liquidation Trust as a result of the resolutions of such Disputed Claims.

4. Term of Litigation Trust

The Plan sets forth a reasonable limit on the term of the Litigation Trust and the Debtors believe that the Litigation Trust will be able to achieve the goals set forth in the Plan and the Litigation Trust Agreement during this term.  Under the Plan, the Litigation Trustee will be discharged and the Litigation Trust will be terminated upon the earlier of (a) such time as (i) all Disputed General Unsecured Claims have been resolved, (ii) all of the Assets of the Litigation Trust have been liquidated, (iii) all duties and obligations of the Litigation Trustee under the Litigation Trust Agreement have been fulfilled, and (iv) all Distributions to holders of Allowed General Unsecured Claims required to be made by the Litigation Trust under the Plan and the Litigation Trust Agreement have been made or (b) such time as (i) all Allowed General Unsecured Claims have been paid in full and (ii) all amounts have been deposited into the Disputed Claims Reserve for any remaining Disputed General Unsecured Claims; provided, however, that in no event will the Litigation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and Litigation of the Assets of the Litigation Trust.  Upon the discharge of the Litigation Trustee and termination of the Litigation Trust, any remaining Assets of the Litigation Trust will be distributed to the Liquidation Trust for Distribution under the Plan and Liquidation Trust Agreement.

5. The Litigation Trust Oversight Committee

On the Effective Date, the Litigation Trust Oversight Committee will be formed pursuant to the Litigation Trust Agreement.  The Litigation Trust Oversight Committee will be comprised of no more than three (3) members, all of whom will be selected by the Official Creditors' Committee.

The Litigation Trust Oversight Committee will have the rights and responsibilities provided for in the Litigation Trust Agreement.  The Litigation Trustee will report all material matters (as described in the Litigation Trust Agreement) to and seek approval for all material decisions (as described in the Litigation Trust Agreement) from the Litigation Trust Oversight Committee.

6.    **Investigations Aiding Administration of the Estates**

The Plan is predicated on the understanding, and constitutes an acknowledgment by all parties-in-interest, that the preservation for the Liquidation Trust and Litigation Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the Chapter 11 Cases. Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtors prior to the Effective Date will vest with the Liquidation Trust and Litigation Trust and will continue until dissolution of the Liquidation Trust and/or Litigation Trust, as if neither the Confirmation Date nor the Effective Date had occurred.

7.    **Prosecution and Resolution of Causes of Action**

From and after the Effective Date, prosecution and settlement of all Estate Causes of Action will be the sole responsibility of the Liquidation Trust pursuant to the Plan and the Confirmation Order.  From and after the Effective Date, the Liquidation Trust will have exclusive rights, powers, and interests of the Estates to pursue, settle or abandon such Estate Causes of Action as the sole representative of the Estates pursuant to Bankruptcy Code Section 1123(b)(3).  All Estate Causes of Action are reserved and preserved to the extent set forth in the Plan and will not be impacted or affected in any way by deemed consolidation of the Estates as provided

7.        01:15

CH\1723784.11 1723784.13

in Article II of the Plan.

Settlement by the Liquidation Trust of any Estate Cause of Action will require: (i) approval only of the Liquidation Trustee, if the amount claimed by the Liquidation Trust against a defendant is less than **or equal to** two million ~~five hundred thousand~~ dollars ($~~2,500,000~~**2,000,000**); **and** (ii) approval only of the Liquidation Trustee and **a majority of** the Liquidation Trust Oversight Committee, if the amount claimed by the Liquidation Trust against a defendant is more than two million ~~five hundred thousand~~ dollars ($~~2,500,000) but less than five million dollars ($5,000,000); and (iii)~~**2,000,000**); **_provided_ that, as set forth in the Liquidation Trust Agreement, any settlement of any Estate Cause of Action that presents a conflict of interest between TPT and the Estates will require unanimous** approval of the Liquidation ~~Trustee, the Liquidation~~ Trust Oversight Committee**,** ~~and~~ **or approval by** the Bankruptcy Court**,** ~~if the amount claimed by the Liquidation Trust against a defendant is unliquidated or equals to or exceeds five million dollars ($5,000,000)~~ **after notice and a hearing**.

~~The Plan provides that from and after the Effective Date, prosecution and settlement of all Avoidance Actions will be the sole responsibility of the Litigation Trust pursuant to the Plan and the Confirmation Order. From and after the Effective Date, the Litigation Trust will have exclusive rights, powers, and interests of the Estates to pursue, settle or abandon such Avoidance Actions as the sole representative of the Estates pursuant to Bankruptcy Code Section 1123(b)(3). All Avoidance Actions are reserved and preserved to the extent set forth in the Plan and will not be impacted or affected in any way by deemed consolidation of the Estates as provided in Article II of the Plan.~~

~~The Plan requires that settlement by the Litigation Trust of any Avoidance Action will require: (i) approval only of the Litigation Trustee, if the amount claimed by the Litigation Trust against a defendant is less than two million five hundred thousand dollars ($2,500,000); (ii) approval only of the Litigation Trustee and the Litigation Trust Oversight Committee, if the amount claimed by the Litigation Trust against a defendant is more than two million five hundred thousand dollars ($2,500,000) but less than five million dollars ($5,000,000); and (iii) approval of the Litigation Trustee, the Litigation Trust Oversight Committee, and the Bankruptcy Court, if the amount claimed by the Litigation Trust against a defendant is unliquidated or equals to or exceeds five million dollars ($5,000,000)~~

## **F.** ~~H.~~ CANCELLATION OF DOCUMENTS, TERMINATION OF OFFICIAL CREDITORS' COMMITTEE, DISSOLUTION OF DEBTORS AND CLOSING OF CHAPTER 11 CASES

The Plan provides that, on the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, debentures, certificates and other documents evidencing Claims and Interests in a Debtor or the Debtors including, without limitation, the Senior Secured Notes and the GFES Interests, will, with respect to the Debtors, be canceled and deemed rejected and terminated.

Notwithstanding the foregoing and anything else contained in the Plan, the Senior Secured Notes Indenture will continue in effect for purposes of permitting (i) Distributions to be made pursuant to the Senior Secured Notes Indenture in accordance with the Plan, Confirmation Order, and Liquidation Trust Agreement, and for the Senior Secured Notes Indenture Trustee to perform such necessary functions with respect thereto, (ii) the Senior Secured Notes Indenture Trustee to enforce its rights and those of the Senior Secured Noteholders under the Plan, Confirmation Order, and Liquidation Trust Agreement in the Chapter 11 Cases and any appeals.

The Plan further provides that, once the Senior Secured Notes Indenture Trustee has completed performance of all of its duties set forth in the Plan or in connection with any Distributions to be made under the Plan, if any, the Senior Secured Notes Indenture Trustee, and its successors and assigns, will be relieved of all obligations under the Senior Secured Notes Indenture.

Additionally, under the Plan, except with respect to the filing or review of Final Fee Applications, the appointment of the Official Creditors' Committee will terminate on the Effective Date, and the members of the Official Creditors' Committee (solely in their capacities as such) will be released and discharged from all further rights and duties arising from or related to such roles in the Chapter 11 Cases.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports will be the responsibility of the Liquidation Trustee. All Statutory Fees with respect to the period prior to the Effective Date will be paid by the Debtors in Cash on the Effective Date or other required payment date. With respect to the period after the Effective Date, the Liquidation Trustee will be obligated to pay quarterly Statutory Fees to the Office of the United States Trustee and such obligation will continue until such time as a particular Chapter 11 Case is closed, dismissed or converted.

The Plan provides that, notwithstanding anything to the contrary in the Plan, on and after the Effective Date, the respective Boards of GFES, Hub City and Proppant One will be terminated and all of the officers and directors of GFES, Hub City and Proppant One, to the extent they have not already done so, will be deemed to have resigned from their respective positions with GFES, Hub

City or Proppant One, as applicable.  Following the Confirmation Date and prior to the occurrence of the Effective Date, the then-current officers and directors of each of the Debtors will continue in their respective capacities and the Debtors will execute such documents and take such other action as is necessary to effectuate the actions provided for in the Plan.

The Plan further provides that, as soon as practicable after the Effective Date, Hub City and Proppant One will be dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith.  Pursuant to Bankruptcy Code Section 1142(b), the Liquidation Trustee will be authorized to file and will file with the official public office for keeping corporate records in Hub City's and Proppant One's state of incorporation a certificate of dissolution or equivalent document, and may take any other action before any state governmental body or court that the Liquidation Trustee deems to be necessary or appropriate to complete the dissolution and winding-up including, but not limited to, any actions contemplated in Sections 275-283 of the DGCL.  For purposes of the preceding sentence, the Plan will constitute a plan of distribution as contemplated in the DGCL.  The certificate of dissolution or equivalent document may be executed by the Liquidation Trustee without need for any action or approval by the shareholders or Board of any Debtor.  From and after the Effective Date, Hub City and Proppant One (a) for all purposes will be deemed to have withdrawn their business operations from any state in which they were previously conducting, or are registered or licensed to conduct, their business operations, and will not be required to file any document, pay any sum or take any other action in order to effectuate such withdrawal, (b) will be deemed to have cancelled pursuant to the Plan all Interests, and (c) will not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.  For the avoidance of doubt, the dissolution of Hub City and Proppant One will not have any effect, in any manner, on the Estate Causes of Action that the Liquidation Trustee may assert in accordance with the Plan and the Liquidation Trust Agreement ~~or the Avoidance Actions that the Litigation Trustee may assert in accordance with the Plan and the Litigation Trust Agreement~~.

The Plan provides that, at the Confirmation Hearing, the Debtors will seek entry of separate orders providing that the Chapter 11 Cases of Hub City and Proppant One will be closed for all purposes as of the filing of the notice of Effective Date.  For the avoidance of doubt, the closing of such cases will not have any effect, in any manner, on the Estate Causes of Action that the Liquidation Trustee may assert in accordance with the Plan and the Liquidation Trust Agreement ~~or the Avoidance Actions that the Litigation Trustee may assert in accordance with the Plan and Litigation Trust Agreement~~.  The Main Case will remain open and subject to the provisions of Section 7.12 of the Plan. Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Main Case, when all Assets contributed to the Liquidation Trust in accordance with Section 7.03(d) ~~and to the Litigation Trust in accordance with Section 7.04(d) of the Plan~~ have been liquidated and converted into Cash (other than those Assets abandoned by the Liquidation Trust), and such Cash has been distributed in accordance with the Liquidation Trust Agreement and the Plan, the Liquidation Trustee will seek authority from the Bankruptcy Court to close the Main Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders, directors, members or managers of one or more of the Debtors will be deemed to have occurred and will be in effect from and after the Effective Date pursuant to Section 303 of the DGCL or other applicable law of the states in which the Debtors are organized, without any requirement of further action by the stockholders, directors, members, or managers of the Debtors.  After the Effective Date, to the extent necessary, the Liquidation Trustee will have all authority to address any and all matters that would have required the approval of, and to act on behalf of, the stockholders, directors, members or managers of one or more of the Debtors.

Prior to the Effective Date, the Debtors will be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably necessary to effectuate and further evidence the terms and conditions of the Plan.  After the Effective Date, the Liquidation Trust will be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably necessary to effectuate and further evidence the terms and conditions of the Plan.

## G. ~~I.~~ EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Subject to Sections 8.03 and 8.04 of the Plan, each executory contract or unexpired lease of the Debtors that has not expired by its own terms prior to the Effective Date, and that (a) has not been assumed, assumed and assigned, or rejected pursuant to such process or by order of the Bankruptcy Court during the Chapter 11 Cases prior to the Effective Date, (b) is not the subject of a motion to assume or a motion or permitted notice to assume and assign in each case filed as of the Effective Date, will be deemed rejected pursuant to Bankruptcy Code Section 365 as of the Effective Date.  The Confirmation Order will constitute a Final Order of the Bankruptcy Court approving the rejection of such executory contract or unexpired lease.  Any executory contract or unexpired lease that has been assumed by the Debtors but not assigned to any other party will be transferred to the Liquidation Trust on the Effective Date unless expressly provided for otherwise in an order of the Bankruptcy Court, and the Liquidation Trust will thereafter have all

rights and obligations of the Debtors under such assumed contract or lease.

The Plan provides that, if the rejection of any executory contract or unexpired lease under the Plan gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim will be forever barred and will not be enforceable against the Estates, the Liquidation Trust, ~~the Litigation Trust,~~ their successors or properties, unless a Proof of Claim filed with the Claims Agent and served on the Liquidation ~~Trust and the Litigation~~ Trust within thirty (30) days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the executory contract or unexpired lease, which may include, if applicable, the Confirmation Order.  Any such timely filed Claim will be classified in Class 6.

Notwithstanding any of the foregoing, the Plan specifies that continuing obligations of third parties to the Debtors under insurance policies, contracts, or leases that have otherwise ceased to be executory or have otherwise expired on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, to provide indemnification, contribution or reimbursement, to grant rights of first refusal, to maintain confidentiality, or to honor releases, will continue and will be binding on such third parties notwithstanding any provision to the contrary in the Plan, unless otherwise specifically terminated by the Debtors or by order of Bankruptcy Court. The deemed rejection provided by Section 8.01 of the Plan will not apply to any such continuing obligations.

Nothing in the Plan, including any releases, will diminish or impair the enforceability of any policies of insurance that cover claims against the Debtors or any other Person, and all such policies will vest in the Liquidation Trust as of and subject to the occurrence of the Effective Date.  For the avoidance of doubt, to the extent such policies of insurance are executory contracts subject to assumption pursuant to section 365 of the Bankruptcy Code, such policies of insurance will not be deemed assumed by the Liquidation Trust, and (i) the self-insured portion of Claims arising under any insurance policies held by the Debtors prior to the Petition Date will, as to the Debtors, be treated as Class 6 General Unsecured Claims and (ii) the Debtors will not be obligated to pay any deductibles or self-insured retentions or take other actions with respect thereto.~~.~~

## **H.** ~~J.~~ DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND INTERESTS

1.    **Objections to Claims and Interests**

The Plan provides that the Claims/Interest Objection Deadline will be the first Business Day that is one hundred twenty (120) days after the Effective Date unless such date is extended one or more times by the Bankruptcy Court upon motion of ~~(a)~~ the Liquidation Trustee with respect to all Claims and Interests ~~other than the Class 6 General Unsecured Claims and (b) the Litigation Trustee with respect to the Class 6 General Unsecured Claims~~; provided, however, that the last date for filing Avoidance Actions against a holder of a Claim or Interest will be the date established by Bankruptcy Code Section 546(a) and the last day for asserting any other Estate Cause of Action will be the last day of the applicable statute of limitations therefor provided under applicable non-bankruptcy law, as such period may have been extended by Bankruptcy Code Section 108 or any other section of the Bankruptcy Code or other applicable law; provided further, however, that no Entity or Person (including the Liquidation Trust, any holder of Claims, or any holder of Interests) may file an objection to any Claim deemed Allowed by the Plan, and any such objection will be deemed null and void.

The Plan further provides that, with the exception of objections filed by the Debtors or the Official Creditors' Committee before the Effective Date, ~~(a)~~ the Liquidation Trust will have the exclusive responsibility for reviewing and objecting to the Allowance of any Claim or Interest filed in the Chapter 11 Cases ~~other than the Class 6 General Unsecured Claims and (b) the Litigation Trust will have the exclusive responsibility for reviewing and objecting to the Allowance of any Class 6 General Unsecured Claim~~. In the event that any objection filed by the Debtors or the Official Creditors' Committee remains pending as of the Effective Date, the Liquidation Trustee ~~or Litigation Trustee, as applicable,~~ will be deemed substituted for the Debtors or the Official Creditors' Committee, as applicable, as the objecting party.   All objections will be litigated to a Final Order; provided, however, that ~~(a)~~ the Liquidation Trust may compromise and settle any objections to Claims or Interests ~~other than the Class 6 General Unsecured Claims and (b) the Litigation Trust may compromise and settle any objections to the Class 6 General Unsecured Claims, in each case~~ subject to the provisions of Article IX of the Plan without further order of the Bankruptcy Court; provided further, however, that Distributions may be made to a holder of a Claim or Interest prior to the expiration of the Claims/Interests Objection Deadline if the Liquidation Trustee ~~or Litigation Trustee, as applicable,~~ reasonably believes that no basis exists for objection to such holder's Claim or Interest.  Notwithstanding the foregoing, nothing in the Plan will be interpreted to operate as a waiver or release of (i) any right that any party-in-interest may have to object to (a) any Claim or Interest through the Effective Date or (b) any Fee Claim after the Effective Date; or (ii) any objection to Claims or Interests pending as of the Effective Date but before the Fee Claims Bar Date, regardless of whether such objection was brought by the Debtors or any other party-in-interest.

Objections to Claims or Interests will not be subject to any defense, including, without limitation, res judicata, estoppel or any other defense because of the Confirmation of the Plan.  Additionally, the rights of the Liquidation Trust ~~or Litigation Trust, as applicable,~~ to amend, modify or supplement any objection to a particular Claim or Interest to include relief pursuant to Bankruptcy Code Section 502(d) are hereby preserved.

2.     **Estimation of Claims or Interests**

Pursuant to the Plan, through the Claims/Interests Objection Deadline, ~~(a)~~ the Liquidation Trust may request that the Bankruptcy Court enter an Estimation Order fixing the value of, pursuant to Bankruptcy Code Section 502(c), any contingent or unliquidated Claim or Interest or Equitable Right to Payment ~~other than a Class 6 General Unsecured Claim and (b) the Litigation Trust may request that the Bankruptcy Court enter an Estimation Order fixing the value of, pursuant to Bankruptcy Code Section 502(c), any contingent or unliquidated Class 6 General Unsecured Claim or Equitable Right to Payment that constitutes a Class 6 General Unsecured Claim,~~ regardless ~~in the case of either clause (a) or (b)~~ of whether a Debtor has previously objected to such Claim, Interest or Equitable Right to Payment, provided that a Final Order or unstayed order has not previously been entered by the Bankruptcy Court with respect to such Claim, Interest or Equitable Right to Payment or any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Claim or Interest or Equitable Right to Payment at any time during litigation concerning any objection to any contingent or unliquidated Claim or Interest or Equitable Right to Payment, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court enters an Estimation Order estimating any contingent or unliquidated Claim or Interest or Equitable Right to Payment, the amount of such estimation will constitute either the Allowed amount of such Claim, Interest or Equitable Right to Payment or a maximum limitation on such Claim, Interest or Equitable Right to Payment, as determined by the Bankruptcy Court in the absence of a stay of such order pending appeal.  If a Claim has been estimated for an amount less than the Face Amount and the Claim holder has obtained a stay pending appeal, the Liquidation Trust ~~or Litigation Trust, as applicable,~~ must reserve for the Face Amount of such Claim pending resolution of such appeal.  If the estimated amount constitutes a maximum limitation on such Claim, Interest or Equitable Right to Payment, the Liquidation Trust ~~or Litigation Trust, as applicable,~~ may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim, Interest or Equitable Right to Payment.  All of the aforementioned Claims, Interests and Equitable Right to Payment objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims, Interests and Equitable Rights to Payment may be estimated and thereafter resolved by any mechanism permitted under the Bankruptcy Code or the Plan.

The Plan provides that, after the Confirmation Date, a Claim or Interest may not be filed or amended without the authorization of the Bankruptcy Court and, even with such Bankruptcy Court authorization, may be amended by the holder of such Claim or Interest solely to decrease, but not to increase, the amount, number or priority of such Claim or Interest unless otherwise provided by the Bankruptcy Court,.

From and after the Effective Date, ~~(a)~~ the Liquidation Trust will be authorized with respect to those Claims or Interests~~, other than Class 6 General Unsecured Claims,~~ that are not Allowed pursuant to the terms ~~of the Plan~~ herein or by Final Order, pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 105(a), **without approval of the Bankruptcy Court, (a)** to compromise and settle Disputed Claims with ~~a~~ **a**pproval of only the Liquidation Trustee if the Disputed amount ~~in excess of~~ **is less than or equal to** two million ~~five hundred~~ dollars ($~~2,500,000), upon Bankruptcy Court approval of such settlement~~**2,000,000)**, and (b) ~~the Litigation Trust will be authorized with respect to the Class 6 General Unsecured Claims that are not Allowed pursuant to the terms of the Plan or by Final Order, pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 105(a),~~ to compromise and settle Disputed Claims with ~~a~~ **a**pproval only of the Liquidation Trust Oversight Committee if the Disputed amount ~~in excess of~~ **is more than** two million ~~five hundred thousand~~ dollars ($~~2,500,000), upon Bankruptcy Court approval of such settlement.  Notwithstanding any prior order of~~**2,000,000); *provided* that, as set forth in the Liquidation Trust Agreement, any settlement of any Disputed Claim that presents a conflict of interest between TPT and the Estates will require unanimous approval of the Liquidation Trust Oversight Committee or approval by** the Bankruptcy Court ~~or the provisions of Bankruptcy Rule 9019, (x) the Liquidation Trust may settle or compromise any Disputed Claim, other than a Class 6 General Unsecured Claim, with a Disputed amount of two million five hundred thousand dollars ($2,500,000) or less without approval of the Bankruptcy Court and (y) the Litigation Trust may settle or compromise any Disputed Class 6 General Unsecured Claim, with a Disputed amount of two million five hundred thousand dollars ($2,500,000) or less without approval of the Bankruptcy Court.~~**after notice and a hearing.**

3.     **No Recourse**

The Plan provides that, notwithstanding that the Allowed amount of any particular Disputed Claim or number of Disputed Interests is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount or number for which there is insufficient value in the relevant fund or reserve to provide a recovery equal to that received by other

holders of Allowed Claims or Interests in the relevant Class, with respect to such Claim or Interest no holder will have recourse to the Liquidation ~~Trust, the Litigation~~ Trust, the Estates, the Debtors, any member thereof, any of their Professionals, the holder of any other Claim or Interest, or any of their respective property.  However, nothing in the Plan will modify any right of a holder of a Claim or Interest under Bankruptcy Code Section 502(j).  **Thus, the Bankruptcy Court's entry of an Estimation Order may limit the Distribution to be made on individual Disputed Claims or Interests, regardless of the amount or number finally Allowed on account of such Disputed Claims or Interests.**

## **I.** ~~K.~~ PROVISIONS GOVERNING DISTRIBUTIONS

### 1.    **Delivery of Distributions Generally**

The Plan provides that distributions to holders of Allowed Claims (other than holders of Allowed Senior Noteholder Claims) will be made by the Disbursing Agents, assuming the availability of funds and the economic feasibility of Distributions, at such time as required by the Plan: (a) at the addresses set forth in the Proofs of Claim or Requests for Payment by such holders; (b) at the addresses set forth in any written notices of address change filed or delivered after the date on which any related Proof of Claim or Request for Payment was filed to (i) if such notice is filed or delivered on or prior to the Effective Date, the Debtors and the Claims Agent or (ii) if such notice is filed or delivered after the Effective Date, the Liquidation Trustee~~, Litigation Trustee~~ and the Claims Agent; or (c) at the addresses reflected in the Schedules relating to the applicable Allowed Claim if no Proof of Claim has been filed and none of the Debtors or the Liquidation Trustee~~, Litigation Trustee~~ and the Claims Agent have received a written notice of a change of address.

### 2.    **Distributions by the Senior Secured Notes Indenture Trustee**

Under the Plan, Distributions for the benefit of the holders of Allowed Claims in Class 4 will be made to the Senior Secured Notes Indenture Trustee in accordance with such instructions as the Senior Secured Notes Indenture Trustee will provide to the Debtors or the Liquidation Trustee, as appropriate.  The Senior Secured Notes Indenture Trustee will, in turn, promptly administer the Distributions to the beneficial holders of Allowed Claims in Class 4 in accordance with the Plan and the Senior Secured Notes Indenture.  The Liquidation Trustee will pay in the ordinary course upon the presentation of invoices by the Senior Secured Notes Indenture Trustee the reasonable fees and expenses incurred by the Senior Secured Notes Indenture Trustee in making such Distributions.

### 3.    **Provisions Concerning Disputed Claims Reserve**

Under the Plan, on the Initial Distribution Date for any particular Class of Claims, and in connection with making all Distributions required to be made under the Plan, the Liquidation Trustee~~, or the Litigation Trustee with respect to Distributions to Class 6 General Unsecured Claims,~~ will establish a reserve fund or funds solely from Assets allocable to, or retained on account of, such Disputed Claims (each such reserve fund, collectively, the "**Disputed Claims Reserve**") for Cash Distributions pertaining to each Disputed Claim in each relevant Class, as necessary pursuant to the Plan. All Cash distributed into the Disputed Claims Reserve will be maintained in one or more interest-bearing accounts at a qualified institution, consistent with the Liquidation Trust Agreement ~~or Litigation Trust Agreement, as applicable~~.

On the Initial Distribution Date and on any subsequent interim Distribution Date, the Liquidation Trustee with respect to any Distribution Date for any Claim or Interest ~~other than Class 6 General Unsecured Claims, or the Litigation Trustee with respect to any Distribution Date for Class 6 General Unsecured Claims,~~ will reserve (i) with respect to each Disputed Claim that is liquidated, the Ratable proportion of all Cash allocated for Distribution on account of such Disputed Claim based upon the Face Amount of each such Disputed Claim, or such lesser amount as may be agreed to in writing by the holder of the Claim and the Liquidation Trustee ~~or Litigation Trustee, as applicable, or~~ as may be determined by the Bankruptcy Court, as applicable, or (ii) with respect to each Disputed Claim that is unliquidated (including any unliquidated fees, penalties, charges or other similar amounts), such amount as will be sufficient, as either (a) determined by order of the Bankruptcy Court upon motion of the Liquidation Trustee ~~or Litigation Trustee, as applicable,~~ seeking a determination as to the appropriate amount to reserve, or (b) agreed to in writing by the holder of the Claim and the Liquidation Trustee ~~or Litigation Trustee, as applicable,~~ as the maximum amount that could be owed in the event the Claim were ultimately Allowed.  All Cash allocable to the Disputed Claims in the relevant Class hereunder will be distributed by the Liquidation Trustee ~~or Litigation Trustee, as applicable,~~ to the relevant Disputed Claims Reserve on the Initial Distribution Date (or such other date on which Distributions for any particular Class of Claims are made pursuant to the Plan).

The Plan specifies that, unless otherwise required by the applicable treatment provisions of the Plan (including with respect to Administrative Claims, Fee Claims, Priority Tax Claims, Other Secured Claims, Priority Non-Tax Claims, and DIP Claims) payments on any Disputed Claim or, if applicable Disputed Interest, that becomes an Allowed Claim or Allowed Interest will be

distributed on the first Interim Distribution Date after the Claim or, if applicable Interest, is Allowed.  Distributions will be made only to the extent of the aggregate Distributions that the holder of any such Allowed Claim or Allowed Interest would have received had such Claim or Interest been Allowed as of the Effective Date less any taxes paid with respect to amounts held in the Disputed Claims Reserve.

The Plan requires that each Disputed Claims Reserve be closed and extinguished by the Liquidation Trustee ~~or Litigation Trustee, as applicable,~~ when all Distributions and other dispositions of Cash or other property required to be made therefrom under the Plan and the Liquidation Trust Agreement ~~or Litigation Trust Agreement, as applicable,~~ have been made.  Upon closure of a Disputed Claims Reserve, all Cash and other property held in that Disputed Claims Reserve will revest in the Liquidation Trust ~~or Litigation Trust, as applicable,~~ and such Cash and property will first be Ratably distributed to the other holders of Allowed Claims in the Class in respect of which such Disputed Claims Reserve was created, except as otherwise provided in Article V of the Plan, and once the Claims in such Class are paid in full, will be distributed to holders of Allowed Claims in the order of the priority established by the Plan.

4.    **Transmittal of Distributions and Notices**

Any property or notice that an Entity or Person is or becomes entitled to receive pursuant to the Plan may be delivered by regular mail, postage prepaid, in an envelope addressed to that Entity or Person's Distribution Address (or, in the case of the Senior Secured Notes to the Senior Secured Notes Indenture Trustee).  Property distributed in accordance with Section 10.04 of the Plan will be deemed delivered to such Entity or Person regardless of whether such property is actually received by that Entity or Person.  A holder of a Claim or Interest may designate a different Distribution Address by notifying, after the Effective Date, the Liquidation Trustee~~, the Litigation Trustee~~ and the Claims Agent of that address in writing.  Such notification will be effective only upon receipt.  The address of the Liquidation Trust will be identified in the Liquidation Trust Agreement and may be changed by the Liquidation Trust upon filing a notice of such address change with the Bankruptcy Court, which notice will be delivered to all parties entitled to notice under Bankruptcy Rule 2002.  ~~The address of the Litigation Trust will be identified in the Litigation Trust Agreement and may be changed by the Litigation Trust upon filing a notice of such address change with the Bankruptcy Court, which notice will be delivered to all parties entitled to notice under Bankruptcy Rule 2002.~~  Notwithstanding the foregoing, Distributions to the Senior Secured Notes Indenture Trustee will be made in accordance with the provisions of Section 10.02 of the Plan.

5.    **Setoffs**

Under the Plan, the Liquidation Trust ~~or Litigation Trust, as applicable,~~ may, but will not be required to, setoff against any Claim (for purposes of determining the Allowed amount of such Claim on which Distribution will be made), any claims of any nature whatsoever that the Estates or the Liquidation Trust ~~or Litigation Trust~~ may have against the Claim holder, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Liquidation ~~Trust or Litigation~~ Trust of any such claim it may have against such Claim holder.  Holders of Allowed Claims retain whatever rights to setoff they are otherwise entitled to assert under Bankruptcy Code Section 553.

6.    **Withholding and Reporting Requirements**

In connection with the Plan and all Distributions hereunder, the Liquidation ~~Trustee and Litigation~~ Trustee will, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions hereunder will be subject to any such withholding and reporting requirements.  The Liquidation Trustee ~~and Litigation Trustee~~ will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

7.    **Postpetition Interest on Claims**

The Plan provides that, unless otherwise specifically provided for in the Plan or the Confirmation Order, postpetition interest will not accrue or be paid on Claims or, if applicable, Interests, and no holder of a Claim or Interest will be entitled to interest accruing on or after the Petition Date on any Claim.  Interest will not accrue or be paid upon any Claim or, if applicable, Interest in respect of the period from the Effective Date to the date a final Distribution is made thereon if and after such Claim becomes an Allowed Claim.  No holder of a Claim will be entitled to receive interest earned on a Disputed Claims Reserve.

8.    **Undeliverable Distributions**

No Distributions will be made with respect to Unclaimed Property.  Any Distribution that is determined to be Unclaimed Property will be transferred to or retained in the Liquidation Trust Distribution Account for further disposition in accordance with the

Plan.  Nothing contained in the Plan will require the Liquidation Trustee ~~or the Litigation Trustee~~ to attempt to locate any holder of an Allowed Claim.

9.    **Allocation of Plan Distributions between Principal and Interest**

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution will be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

10.    **Disputed Identity of Holder**

If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any Distribution, the Liquidation Trust ~~or Litigation Trust, as applicable,~~ may, in lieu of making such Distribution to such Entity or Person, make such Distribution into an escrow account until the disposition thereof will be determined by the Bankruptcy Court or by written agreement among the interested parties to such dispute; provided, however, that if the dispute remains unresolved by Final Order for an unreasonable period of time, the Liquidation Trust ~~or Litigation Trust, as applicable,~~ may request that the Bankruptcy Court order that the property that is the subject of the dispute will irrevocably become Unclaimed Property.

11.    **Transfers of Claims and Interests/Distribution Record Date**

The Plan specifies that, as of the Effective Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their agents, will be deemed closed, and there will be no further changes in the holders of record of any of the Claims or Interests.  No party, including but not limited to the Liquidation Trust ~~and Litigation Trust~~, will have any obligation to recognize any transfer of the Claims or Interests occurring after the Effective Date unless notice of the transfer of such Claim or Interest, in form and substance satisfactory to the Liquidation Trust ~~or Litigation Trust, as applicable,~~ will have been received by the Liquidation Trust ~~or Litigation Trust, as appropriate,~~ prior to the Effective Date.  Subject to the immediately preceding sentence, only those holders of record stated on the transfer ledgers as of the close of business on the Effective Date, to the extent applicable, will be entitled to be recognized for all purposes hereunder.

12.    **Method of Cash Distributions**

Any Cash payment to be made by the Liquidation ~~Trust or the Litigation~~ Trust pursuant to the Plan may be made, at the sole discretion of the Liquidation Trust ~~or Litigation Trust,~~ by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law.  Any payment or Distribution due on a day other than a Business Day will be made, without interest, on the next Business Day.

13.    **De Minimis Distributions**

No Cash payment in an amount less than fifty dollars ($50.00) will be made by the Liquidation ~~Trust or the Litigation~~ Trust to any holder of a Claim or Interest.  Cash that otherwise would be payable  to holders of Claims or Interests, other than the Class 6 General Unsecured Claims, under the Plan but for Section 10.13 of the Plan will be available for use by the Liquidation Trustee to pay Liquidation Trust Operating Expenses and make Distributions.  ~~Cash that otherwise would be payable  to holders of Class 6 General Unsecured Claims under the Plan but for Section 10.13 of the Plan will be available for use by the Litigation Trustee to pay Litigation Trust Operating Expenses and make Distributions.~~

14.    **Treatment of Unclaimed Property; Remaining Available Cash**

Unclaimed Property will be considered Available Cash and may be used to pay Liquidation Trust Operating Expenses or to fund Distributions by the Liquidation Trustee under the Plan; provided, however, that the Liquidation Trust will not be obligated to make Distributions to a Class of Claims or Interests if the amount of the Available Cash is de minimis and is not sufficient to warrant the incurrence of costs in making the Distribution.  In the event the Liquidation Trustee holds Available Cash after all Liquidation Trust Operating Expenses and Distributions are made~~, including Distributions to the holders of Class 6 General Unsecured Claims by the Litigation Trustee,~~ such remaining Available Cash will be distributed to ~~[_____]~~**A Better Chicago**, a charitable organization.  Neither Available Cash nor any Claim or any Unclaimed Property attributable to such Claim, will escheat to any federal, state or local government or other entity.

15.    **No Distribution in Excess of Allowed Amount of Claim**

7.          01:15

CH\\~~1723784.11~~1723784.13

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim will receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim, plus postpetition interest thereon to the extent allowed by the Bankruptcy Code and the Plan.  Upon a holder of an Allowed Claim recovering the full amount of its Allowed Claim from another source, it thereafter will no longer have any entitlement to receive Distributions under the Plan.

## **J.** ~~L.~~ CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF PLAN

1.      **Conditions To Confirmation**

The Plan specifies certain conditions precedent to the occurrence of the Confirmation Date, each of which must be satisfied or waived in accordance with Section 11.03 of the Plan:

a) the Confirmation Order will be in form and substance reasonably acceptable to the Debtors and the Requisite Settlement Parties and will, among other things:

i. provide that the Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the agreements or documents created under or in connection with the Plan; and

ii. provide that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order will be immediately effective, subject to the terms and conditions of the Plan; and

b) the Confirmation Order will have been entered by the Bankruptcy Court.

2.      **Conditions to the Effective Date**

The Plan specifies that the Plan may not be consummated, and the Effective Date will not occur, unless and until each of the conditions set forth below is satisfied or waived (if and to the extent permitted by Section 11.03 of the Plan):

a) the Confirmation Order will not then be stayed, vacated, or reversed or will not have been amended without the agreement of the Debtors and the Requisite Settlement Parties;

b) the Confirmation Order will not then be subject to a pending appeal, and the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending;

c) the Liquidation Trust will have been established and ~~the Initial Liquidation Trust Funding and~~ all Assets of the Estates ~~(other than the Avoidance Actions)~~, including but not limited to the Estate Causes of Action, will have been transferred to and vested in the Liquidation Trust free and clear of all Claims and Interests, except as specifically provided in the Plan and the Liquidation Trust Agreement;

~~d) the Litigation Trust will have been established and the Initial Litigation Trust Funding and all Avoidance Actions will have been transferred to and vested in the Litigation Trust free and clear of all Claims and Interests, except as specifically provided in the Plan and the Litigation Trust Agreement~~

**d)** ~~e)~~ the Liquidation Trustee and the Liquidation Trust Oversight Committee will have been appointed and assumed their rights and responsibilities under the Plan and the Liquidation Trust Agreement; **and**

~~f) the Litigation Trustee and the Litigation Trust Oversight Committee will have been appointed and assumed their rights and responsibilities under the Plan and the Litigation Trust Agreement;~~

**e)** ~~g)~~ all Plan Documents and any other actions, documents, and agreements necessary to implement the provisions of the Plan to be effectuated on or prior to the Effective Date will be reasonably satisfactory to the Debtors and the Requisite Settlement Parties, and such actions, documents, and agreements will have been effected or executed and delivered.  The Liquidation Trust Agreement ~~and the Litigation Trust Agreement~~ will be completed and in final form and executed by the parties thereto and all conditions precedent contained in any of the foregoing will have been satisfied or waived;

7.      01:15

CH\~~1723784.11~~1723784.13

~~h) the Moreno Entities will have obtained all necessary consents to the free and clear transfer of the MOR/TGS Interests to NewCo and any other transactions contemplated in the Plan, as applicable, from (i) the other equity holders of TGS and (ii) any and all other persons parties whose consent for any of the foregoing transactions is required;~~

~~i) NewCo will have been formed in accordance with the terms of the Plan and the NewCo Contribution will have occurred; and~~

~~j) Each of the NewCo Related Agreements will have been executed by each party thereto.~~

3.    **Waiver of Certain Conditions**

With the exception of the conditions contained in Sections 11.01(b) and 11.02(a) of the Plan, each of the conditions set forth in Section 11.01 and Section 11.02 of the Plan may be waived in whole or in part by the Debtors without any notice to parties in interest or the Bankruptcy Court and without a hearing, provided, however, that any such waiver will not be effective without the consent of the Requisite Settlement Parties, which consent will not be unreasonably withheld.

4.    **Effect of Nonoccurrence of the Conditions to the Effective Date**

If each of the conditions to the occurrence of the Effective Date has not been satisfied or duly waived in accordance with the Plan on or before the first Business Day that is more than sixty (60) days after the Confirmation Date, or such later date as will be agreed to by the Debtors and the Requisite Settlement Parties, the Debtors may schedule a status hearing with the Bankruptcy Court. If the Confirmation Order is ultimately vacated, the Plan will be null and void in all respects, and nothing contained in the Plan will constitute an admission, a waiver, or release of any Claims against or Interests in any of the Estates.

**K.** ~~M.~~ **EFFECTS OF CONFIRMATION**

1.    **Retention of Causes of Action/Reservation of Rights**

Under the Plan, except as expressly provided for in the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order will be deemed to (a) be res judicata or the basis for estoppel of, (b) create any other defense to the prosecution to judgment on the merits of, (c) be a waiver of or (d) be a relinquishment of any Causes of Action, including Avoidance Actions or Estate Causes of Action, that are left unaltered or Unimpaired by the Plan.  On and after the Effective Date, except for Causes of Action released by the Debtors under the Plan ~~(i)~~ the Liquidation Trust will have, retain, reserve and be entitled to assert, prosecute, settle or abandon all Estate Causes of Action ~~and (ii) the Litigation Trust will have, retain, reserve and be entitled to assert, prosecute, settle or abandon all Avoidance Actions~~.

2.    **Third-Party Causes of Action**

The Plan specifies that ~~other than as set forth in Section 12.08 of the Plan,~~ nothing in the Plan is intended to, nor will be interpreted as, impairing, waiving or otherwise affecting in any way Causes of Action that do not belong to the Estates, including assessments of damages.  Moreover, it is intended that any and all such rights, Claims and defenses with respect to any Cause of Action that ~~does~~**do** not belong to the Estates are reserved expressly, and nothing in the Plan will constitute a waiver or release with respect to same ~~other than as set forth in Section 12.08 of the Plan~~.

3.    **Compromise of Controversies**

The Plan provides that, pursuant to Bankruptcy Rule 9019, and in consideration for the classification, Distribution and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against the Debtors, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtors.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings will constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  The provisions of the Plan, including, without limitation, its injunction, exculpation, release and compromise provisions, are mutually dependent and non-severable.

4.      **Preservation of Insurance**

Notwithstanding anything to the contrary under the Plan, the Plan will not diminish or impair the enforceability of insurance policies that may cover Claims against the Debtors, the Estates, the Assets or any other Person or Entity.  In no event will the Liquidation Trust ~~or Litigation Trust~~ have the right to cancel or limit the coverage available under any insurance policy in existence as of the Effective Date under which the Debtors' directors, officers, or employees are insured parties.

5.      **Term of Injunctions or Stays**

Under the Plan, until the Effective Date, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code Sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect.  After the Effective Date, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code Sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect only to the extent provided in the Plan and in the Confirmation Order.

6.      **Exculpation**

**The Plan specifies that, except as otherwise specifically provided in the Plan, none of the Debtors, the Liquidation Trustee, the ~~Litigation Trustee, the~~ Senior Secured Notes Indenture Trustee, the Senior Secured Noteholders in their capacity as such, Shell, ~~the Moreno Entities, the Moreno Affiliated Entities,~~ TPT~~, NewCo, TGS~~, the Official Creditors' Committee (solely with respect to its conduct as a committee and not with respect to the actions of its members as individual creditors), nor any of such parties' respective present members (with respect to members of the Official Creditors' Committee, solely with respect to each member's conduct in furtherance of its, his, or her duties as a member of the Official Creditors' Committee, and not with respect to the actions of such members as individual creditors), officers, directors, shareholders, employees, representatives, advisors, attorneys, financial advisors, investment bankers, agents or Affiliates, or any of such parties' successors and assigns, will have or incur, and each such Person is hereby released from, any Claim, obligation, Cause of Action in any form whatsoever or liability to one another or to any holder of a Claim or an Interest, or any other party in interest, or any of their respective officers, directors, shareholders, members and/or enrollees, employees, representatives, advisors, attorneys, financial advisors, investment bankers, agents, related Professionals or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the negotiation and execution of the Plan, the Disclosure Statement, the Asset Purchase ~~Agreement~~Agreements, the solicitation of votes for and the pursuit of Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the Asset Purchase ~~Agreement~~Agreements, and the property to be distributed under the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and Confirmation of the Plan except fraud, willful misconduct or gross negligence as determined by a Final Order. Nothing in Section 12.06 of the Plan will be construed as a release of any entity's fraud, gross negligence or willful misconduct with respect to matters set forth in Section 12.06 of the Plan.  Any of the foregoing parties in all respects will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (if any) under the Plan.**

**Notwithstanding any other provision of the Plan, neither any holder of a Claim or Interest, nor other party in interest, nor any of their respective officers, directors, shareholders, members and/or enrollees, employees, representatives, advisors, attorneys, financial advisors, investment bankers, related Professionals, agents or Affiliates, and no successors or assigns of the foregoing, will have any right of action against any Debtor, the Liquidation Trustee, ~~the Litigation Trustee~~TPT, the Senior Secured Notes Indenture Trustee, the Senior Secured Noteholders in their capacity as such, Shell~~, the Moreno Entities, the Moreno Affiliated Entities, TPT~~, the Official Creditors' Committee (solely with respect to its conduct as a committee and not with respect to the actions of its members as individual creditors), or any of such parties' respective present members (with respect to members of the Official Creditors' Committee, solely with respect to each member's conduct in furtherance of its, his, or her duties as a member of the Official Creditors' Committee, and not with respect to the actions of such members as individual creditors), officers, directors, shareholders, employees, representatives, advisors, attorneys, financial advisors, investment bankers, related Professionals, agents or Affiliates, or any of such parties' successors and assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the negotiation and execution of the Plan, the Disclosure Statement, the Asset Purchase ~~Agreement~~Agreements, the solicitation of votes for and the pursuit of Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the Asset Purchase ~~Agreement~~Agreements, and the property to be distributed under the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and Confirmation of the Plan except fraud, willful misconduct or gross negligence as determined by a Final Order.**

7.      01:15

CH\\~~1723784.11~~1723784.13

7.    **Releases by Debtors**

Except as expressly provided in the Plan, upon the Effective Date, each of the Debtors hereby (i) remises, acquits, waives, releases and forever discharges each of the Debtor Releasees from, and (ii) covenants and agrees never to institute or cause to be instituted any suit or other form of action or proceeding of any kind or nature whatsoever against any of the Debtor Releasees based upon, any claims, demands, indebtedness, agreements, promises, Causes of Action (including Avoidance Actions), obligations, damages or liabilities of any nature whatsoever (other than rights to enforce obligations of the Debtor Releasees under any Order of the Bankruptcy Court, the Plan and all contracts, instruments, releases and other agreements delivered in connection therewith), in law or in equity, whether or not known, suspected or claimed, that the Debtors or the Estates ever had, claimed to have, has, or may have or Claim to have against the Debtor Releasees, or any of them, by reason of any matter, cause, thing, act or omission of the Debtor Releasees, or any of them, in each case related to the Debtors, the Chapter 11 Cases, the Asset Purchase ~~Agreement~~Agreements or the negotiations relating thereto, or the Plan or negotiations relating thereto, except fraud, willful misconduct or gross negligence as determined by a Final Order.

~~8. Releases by Holders of Claims~~

~~The Plan provides that, as of the Effective Date, to the fullest extent permitted under applicable law, in consideration for the obligations under the Plan and the Cash, securities, contracts, instruments, releases and other agreements or documents to be delivered in connection with the Plan, including, but not limited to, the NewCo Contribution, each present and former holder of a Claim that has voted in favor of the Plan will be deemed to release forever, waive and discharge any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights to enforce the Debtors' obligations under any Final Order of the Bankruptcy Court, the Asset Purchase Agreement, the Plan and the securities, contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Asset Purchase Agreement, or the Plan against any Creditor Releasee, except fraud, willful misconduct or gross negligence as determined by a Final Order.~~

**8.**    ~~9.~~ **Injunction**

The Plan specifies that Confirmation of the Plan will have the effect of, among other things, permanently enjoining all Entities or Persons that have held, hold or may hold or have asserted, assert or may assert Claims against or Interests in the Estates, or Claims released under the Plan, with respect to any such Claim or Interest, from and after the Effective Date, from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan):  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Estates, the Liquidation Trust, the ~~Litigation Trust, the Debtor Releasees or the Creditor~~Debtor Releasees or any of their property; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Estates, the Liquidation Trust, the ~~Litigation Trust, the Debtor Releasees or the Creditor~~Debtor Releasees or any of their property; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Estates, the Liquidation Trust, the ~~Litigation Trust, the Debtor Releasees or the Creditor~~Debtor Releasees or any of their property; (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Estates, the Liquidation Trust, the ~~Litigation Trust, the Debtor Releasees or the Creditor~~Debtor Releasees or any of their property, except with respect to any right of setoff asserted prior to the entry of the Confirmation Order, whether asserted in a Proof of Claim or otherwise, or as otherwise contemplated or Allowed by the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) prosecuting or otherwise asserting any Claim or Interest, including any right, claim or Cause of Action, including Avoidance Actions, released pursuant to the Plan.

**L.**    ~~N.~~ **RETENTION OF JURISDICTION**

The Plan provides for continuing jurisdiction by the Bankruptcy Court after the Effective Date.  Specifically, as set forth in the Plan, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of and related to the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

a)    to the extent not otherwise determined by the Plan, to determine (i) the allowance, classification, or priority of Claims upon objection by any party-in-interest entitled to file an objection, or (ii) the validity, extent, priority and

7.    01:15

CH\\~~1723784.11~~1723784.13

nonavoidability of consensual and nonconsensual Liens and other encumbrances against Assets, Estate Causes of Action, or property of the Estates, ~~the Litigation Trust~~ or the Liquidation Trust;

b)      to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Entity or Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to in the Plan, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Entity or Person;

c)      to protect the Assets or property of the Estates, ~~the Litigation Trust~~ and/or the Liquidation Trust, including Estate Causes of Action and Avoidance Actions, from Claims against, or interference with, such Assets or property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens or other encumbrances on any Assets of the Estates;

d)      to determine any and all applications for allowance of Fee Claims;

e)      to determine any Priority Tax Claims, Priority Non-Tax Claims, Administrative Claims, DIP Claims or any Request for Payment of Claims, including both fees and expenses, entitled to priority under Bankruptcy Code Section 507(a);

f)      to resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan, ~~the Plan Documents~~ and/or the ~~NewCo Related Agreements~~**Plan Documents**, and the making of Distributions hereunder;

g)      to determine any and all motions related to the rejection, assumption or assignment of executory contracts or unexpired leases or determine any issues arising from the deemed rejection of executory contracts and unexpired leases set forth in Article VIII of the Plan;

h)      except as otherwise provided in the Plan, to determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases, including any remands;

i)      to enter a Final Order closing the Chapter 11 Case of GFES and the other Debtors to the extent not closed on the Effective Date;

j)      to modify the Plan under Bankruptcy Code Section 1127, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

k)      to issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity or Person, to the full extent authorized by the Bankruptcy Code;

l)      to determine any tax liability pursuant to Bankruptcy Code Section 505;

m)      to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

n)      to resolve any disputes concerning whether an Entity or Person had sufficient notice of the Chapter 11 Cases, the applicable Bar Date, the hearing to consider approval of the Disclosure Statement or the Confirmation Hearing or for any other purpose;

o)      to resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in the Chapter 11 Cases;

p)      to authorize, as may be necessary or appropriate, sales of Assets as necessary or desirable and resolve objections, if any, to such sales;

q)      to resolve any disputes concerning any release, injunction, exculpation or other waiver or protection provided in the Plan;

r)      to approve, if necessary, any Distributions, or objections thereto, under the Plan;

s)      to approve, as may be necessary or appropriate, any Claims settlement entered into or offset exercised by the Liquidation Trust ~~or the Litigation Trust~~;

t)      to resolve any dispute or matter arising under or in connection with the Liquidation Trust ~~or Litigation Trust~~;

u)      to order the production of documents, disclosures, or information, or to appear for deposition demanded pursuant to Bankruptcy Rule 2004; and

v)      to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

The Plan further provides that, notwithstanding anything else in the Plan, the Bankruptcy Court will retain non-exclusive jurisdiction over all Estate Causes of Action prosecuted by the Liquidation Trust ~~or Avoidance Actions prosecuted by the Litigation Trust~~.

Under the Plan, if the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Section 13.01 of the Plan, the provisions of Article XIII of the Plan will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

**THE FOREGOING SUMMARY OF THE PLAN IS INTENDED TO HIGHLIGHT ONLY CERTAIN PROVISIONS OF THE PLAN. IT IS NOT INTENDED TO COVER EVERY PROVISION OF THE PLAN AND IT IS NOT A SUBSTITUTE FOR A COMPLETE REVIEW OF THE PLAN ITSELF.  THE SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PROVISIONS OF THE PLAN ITSELF, WHICH PROVISIONS CONTROL IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARY.**

**VI.**
**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**A.      IN GENERAL**

The following discussion summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan.  This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "**Service**").  There can be no assurance that the Service will not take a contrary view or that such a contrary view would not be sustained by a court.  No ruling from the Service has been or will be sought, nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein.  Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to the beneficial owners of Claims (each a "**Holder**" and collectively, the "**Holders**"), the ~~Liquidating~~Liquidation Trust~~, the Litigation Trust,~~ **or** the Debtors ~~or any entity the ownership of which is transferred to the Liquidating Trust~~.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only.  The tax treatment of a Holder may vary depending upon such Holder's particular situation.  This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a Holder that has made an agreement to resolve its Claim in a manner not explicitly provided for in the Plan.  This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities,  Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction, Holders that have a "functional

7.        01:15

63

currency" other than the United States dollar and Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount"" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**B.      U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS**

GFES, Hub City and Proppant One are the members of a U.S. federal consolidated tax group (the "**GFES Tax Group**") and file a consolidated U.S. federal income tax return. In this discussion, references to the Debtors and/or a Debtor generally means the GFES U.S. Tax Group and/or a member of such Group, respectively.

If there is a discharge of a debt obligation by a debtor (in the case of indebtedness with multiple obligors, indebtedness that is allocable to such debtor) for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), such discharge generally would give rise to cancellation of debt ("COD") income, which may have to be included in the debtor's income. However, the Debtors should be able to utilize special tax provisions which exclude from income debts discharged in a chapter 11 case or debts discharged when a debtor is insolvent, with the insolvency exception only applying to the extent of the debtor's insolvency (the "**COD Exceptions**").

Under Section 108(b) of the IRC and Treasury Regulations that apply to members of a consolidated group, each Debtor that excludes COD income from gross income under the COD Exceptions will be required to reduce certain tax attributes, including consolidated attributes, such as consolidated net operating losses and net operating loss carryforwards ("**NOLs**") and certain other losses, credits and carryforwards, if any, attributable to such Debtor, attributes that arose in separate return limitation years of such Debtor (if any), and the Debtor's tax basis in its assets (but not below the amount of its liabilities remaining immediately after the discharge of indebtedness), in an amount generally equal to the amount of such Debtor's COD income excluded from income under the COD Exceptions. A "look-through rule" applies when asset basis reduction reduces the basis of stock of another member of the consolidated group and requires corresponding adjustments to be made to the attributes attributable to the lower-tier member.

As a result of the required attribute reduction resulting from the discharge of indebtedness, the Debtors believe that a

7.         01:15

significant portion of NOLs (and alternative minimum tax NOLs) of the Debtors will be eliminated after consummation of the Plan. Because the Debtors are liquidating rather than continuing to operate in reorganized form, and because substantially all of the Debtors' Assets will be transferred to the ~~Liquidating Trust and the Litigation~~ Liquidation Trust, any remaining NOLs allocable to the Debtors are not expected to have material value.

The sale~~, the deemed receipt of the GFES MOR/TGS Interest by the Debtors, the deemed transfer of the GFES TPT Interests by the Debtors to the Holders of Allowed Class 4 Claims~~, the transfer of the ~~Debtors' assets to the Liquidating Trust and the Litigation~~ Assets to the Liquidation Trust and the liquidation of the Debtors may trigger income or gain recognition by the Debtors. However, the Debtors' existing NOLs (prior to being reduced as a result of any attribute reduction) should generally first be available to offset any such income or gain. The Debtors currently do not anticipate owing any material amount of regular U.S. federal income taxes with respect to taxable years ending after the Petition Date. If, however, the Service were to prevail in assessing U.S. federal income tax for any of these years or for tax years ending prior to the Petition Date, payments of such taxes could reduce the amounts otherwise available for distribution under the Plan.

A corporation or a consolidated group of corporations may incur alternative minimum tax ("**AMT**") liability even where a NOL is generated for regular corporate U.S federal income tax purposes or where NOL carryovers and certain other tax attributes are sufficient to eliminate taxable income as computed under the regular corporate U.S. federal income tax. In general, the AMT is imposed on a corporation's alternative minimum taxable income at a twenty percent (20%) rate to the extent such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances allowed in computing a corporation's regular U.S. federal income tax are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular U.S. federal income tax purposes by available NOL carryforwards, a portion of a corporation's taxable income for AMT purposes may not be offset by available NOL carryforwards (as computed for AMT purposes). Although it is possible that the Debtors could be liable for the AMT, at this time the Debtors do not expect to incur a material amount of AMT.

**C.     U.S. FEDERAL INCOME TAX TREATMENT OF THE LIQUIDATION TRUST ~~AND THE LITIGATION TRUST~~**

Except with respect to the respective Disputed Claims Reserves, it is intended that the ~~Liquidating~~ Liquidation Trust ~~and the Litigation Trust each~~ will be classified as a "liquidating trust" under Treasury Regulation Section 301.7701-4 and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684. Accordingly, it is intended that the Liquidation Trust ~~and the Litigation Trust each~~ will be treated as one or more "grantor trusts" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The Service, in Revenue Procedure 94-45, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Consistent with the requirements of Revenue Procedure 94-45, the Liquidation Trust Agreement requires all relevant parties to treat, for U.S. federal income tax purposes, the transfer of the ~~Liquidating~~ Liquidation Trust Assets to the ~~Liquidating~~ Liquidation Trust as (i) a transfer of such assets (net of any applicable liabilities) to the ~~Liquidating~~ Liquidation Trust Beneficiaries (to the extent of the value of their respective interests in the applicable ~~Liquidating~~ Liquidation Trust Assets) followed by (ii) a transfer of such assets (net of any applicable liabilities) by the ~~Liquidating~~ Liquidation Trust Beneficiaries to the ~~Liquidating~~ Liquidation Trust (to the extent of the value of their respective interests in the applicable ~~Liquidating~~ Liquidation Trust Assets), with the ~~Liquidating~~ Liquidation Trust Beneficiaries being treated as the grantors and owners of the ~~Liquidating Trust. Similarly consistent with the requirements of Revenue Procedure 94-45, the Litigation Trust Agreement requires all relevant parties to treat, for U.S. federal income tax purposes, the transfer of the Litigation Trust Assets to the Litigation Trust as (i) a transfer of such assets (net of any applicable liabilities) to the Litigation Trust Beneficiaries (to the extent of the value of their respective interests in the applicable Litigation Trust Assets) followed by (ii) a transfer of such assets (net of any applicable liabilities) by the Litigation Trust Beneficiaries to the Litigation Trust (to the extent of the value of their respective interests in the applicable Litigation Trust Assets), with the Litigation Trust Beneficiaries being treated as the grantors and owners of the Litigation Trust.~~ Liquidation Trust.

Each Liquidation ~~Trust Beneficiary and Litigation~~ Trust Beneficiary (each a "**Beneficiary**") will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim. The amount realized for this purpose should generally equal the amount of Cash and the fair market value of any other assets (net of any applicable liabilities) received or deemed received for U.S. federal income tax purposes under the Plan in respect of such Holder's Claim. A Holder that is deemed to receive for U.S. federal income tax purposes a non-Cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its deemed receipt.

The Plan and the ~~Liquidating~~ Liquidation Trust Agreement generally provide that the ~~Liquidating~~ Liquidation Trust must value the ~~Liquidating~~ Liquidation Trust Assets consistently with the values determined by the ~~Liquidating~~ Liquidation Trustee for ~~U.S. federal income tax purposes. Similarly, the Plan and the Litigation Trust Agreement generally provide that the Litigation~~

7.        01:15                                        65

~~Trust must value the Litigation Trust Assets consistently with the values determined by the Litigation Trustee for all~~ U.S. federal income tax purposes.  As soon as possible after the Effective Date, the ~~Liquidating~~Liquidation Trustee ~~and the Litigation Trustee shall~~will make a good faith valuation of the ~~Liquidating~~Liquidation Trust Assets ~~and the Litigation Trust Assets, respectively~~.

Consistent with the treatment of each of the ~~Liquidating Trust and the Litigation~~Liquidation Trust (except with respect to the respective Disputed Claims Reserves) as one or more grantor trusts, the ~~Liquidating Trust Agreement and the Litigation~~Liquidation Trust Agreement will require each Beneficiary to report on its U.S. federal income tax return its allocable share of the ~~Liquidating Trust or Litigation~~Liquidation Trust's income~~, as applicable~~.  Therefore, a Beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of the income of the ~~Liquidating Trust or Litigation Trust, as applicable,~~Liquidation Trust whether or not the ~~Liquidating Trust or the Litigation~~Liquidation Trust has made any distributions to such Beneficiary.  The character of items of income, gain, deduction, and credit to any Beneficiary and the ability of such Beneficiary to benefit from any deduction or losses will depend on the particular situation of such Beneficiary.

A distribution of underlying assets from the ~~Liquidating Trust or the Litigation~~Liquidation Trust to a Beneficiary (other than in respect of distributions attributable to a reduction in the applicable Disputed Claims Reserve) will generally not be taxable to such Beneficiary because such Beneficiary is already regarded for U.S. federal income tax purposes as owning such assets.  Beneficiaries are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the ~~Liquidating Trust or the Litigation~~Liquidation Trust.

Except with respect to the applicable Disputed Claims Reserve, the ~~Liquidating Trustee and the Litigation~~Liquidation Trustee will file with the Service tax returns for the ~~Liquidating Trust and the Litigation Trust, respectively,~~Liquidation Trust as one or more grantor trusts pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each applicable Beneficiary a separate statement setting forth such Beneficiary's share of items of Trust income, gain, loss, deduction, or credit.  Each such Beneficiary will be required to report such items on its U.S. federal income tax return.  The ~~Liquidating~~Liquidation Trustee ~~and the Litigation Trustee shall each~~will determine for tax reporting purposes whether to treat the applicable Beneficiaries as grantors in a single grantor trust or as grantors in more than one grantor trust with respect to each of the ~~Liquidating Trust and the Litigation~~Liquidation Trust.  It is anticipated that such reporting will not have a material effect on the income, gain and loss recognition, for U.S. federal income tax purposes, of the Beneficiaries.

The discussion above assumes that, except with respect to the respective Disputed Claims Reserves, the ~~Liquidating~~Liquidation Trust ~~and the Litigation Trust each~~will be respected as one or more grantor trusts for U.S. federal income tax purposes.  If the Service were to challenge successfully such classification, the U.S. federal income tax consequences to the ~~Liquidating Trust, the Litigation~~Liquidation Trust and the ~~respective~~Beneficiaries thereof could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the ~~Liquidating Trust or the Litigation~~Liquidation Trust).

**D.      DISPUTED CLAIMS RESERVES**

Until such time as all of the beneficial interests in the ~~Liquidating Trust and the Litigation~~Liquidation Trust can be distributed to the Holders in accordance with the terms of the Plan, the Disputed Claims Reserve associated with each of the ~~Liquidating Trust and the Litigation~~Liquidation Trust should be treated as owning a portion of the assets of the ~~Liquidating~~Liquidation Trust ~~or the Litigation Trust, respectively~~.  Distributions from the Disputed Claims Reserves associated with the Liquidation Trust ~~and the Litigation Trust, respectively,~~ will be made to the Holders of Disputed Claims with respect to such trusts, as applicable, after such Claims are subsequently Allowed and to other Beneficiaries when Disputed Claims are subsequently disallowed.  The ~~Liquidating Trust and the Litigation Trust shall each~~Liquidation Trust will  file all income tax returns with respect to any income attributable to the Disputed Claims Reserve associated with it and ~~shall~~will pay the federal, state and local income taxes attributable to the Disputed Claims Reserve associated with it, based on the items of income, deduction, credit or loss allocable thereto.

Holders should note the tax treatment of the respective Disputed Claims Reserves is unclear and should consult their tax advisors as to the tax consequences to them of the establishment of, the income on, and distributions from, the Disputed Claims Reserve applicable to such Holders.

**E.      U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS**

1.      **Holder of Shell Claim**

7.      01:15

66

The Holder of the Shell Claim should generally recognize gain or loss in an amount equal to the Cash received with respect to the Shell Secured Claim plus the value of any other consideration less its tax basis in the Shell Claim. The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Shell Claim; (ii) the tax status of the Holder of such Claim; (iii) whether such Claim has been held for more than one year; (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to such Claim; and (v) whether such Claim was acquired at a market discount.

2.  **Holders of Allowed Claims in Class 4.**

As described in Section V, pursuant to the Plan ~~and in connection with the satisfaction of Allowed Class 4 Claims, (i) the Moreno Entities shall contribute the MOR/TGS Interests to NewCo on or prior to the Effective Date, (ii) the Debtors shall contribute the GFES TPT Interest to NewCo on the Effective Date, (iii) each Holder of an Allowed Class 4 Claim shall receive its pro rata share of (a) 70% of the Class A preferred equity of NewCo, (b) 50% of the Class B preferred equity of NewCo and (c) 30% of the common equity of NewCo (the property described in this clause (iii), collectively, the "NewCo Equity Interests") and (iv)~~each holder of a Senior Noteholder Claim will be entitled to receive, through the Senior Secured Notes Indenture Trustee ~~will receive, for the benefit of the Senior Secured Noteholders, distributions,~~ a Pro Rata portion of the Senior Noteholder ~~Cash~~ Distribution ~~from the Liquidation Trust until such time as (x) the aggregate value contributed to NewCo by the Debtors and the Liquidation Trustee plus (y) the aggregate value distributed to the Senior Noteholder Claim Allowed Amount (the "Senior Noteholder Liquidation Trust Distribution Rights"). Solely for tax purposes, the Debtors intend to treat the foregoing transactions in the following manner: (A) the Debtors shall receive a portion of the MOR/TGS Interests in exchange for a release of certain claims by the Debtors against the Moreno Entities (the "GFES MOR/TGS Interest"); (B) each Holder of an Allowed Class 4 Claim shall receive its pro rata share of (i) the GFES MOR/TGS Interest, (ii) the GFES TPT Interest, and (iii)~~, provided that the first $1,000,000 of the Senior Noteholder ~~Liquidation Trust~~ Distribution ~~Rights; and (C) each Holder of an Allowed Class 4 Claim shall contribute its pro rata share of the property described in the foregoing clauses (B)(i) and (B)(ii) to NewCo in exchange for its pro rata share of the NewCo Equity Interests.~~shall be made directly to the TPT Acquisition Entity.

Although not free from doubt, Holders of Allowed Claims in Class 4 as of the Effective Date should be treated as receiving from the Debtors their respective shares of the applicable Liquidation Trust Assets (net of any applicable liabilities) ~~representing the Senior Noteholder Liquidation Trust Distribution Rights~~, other than any such assets allocated to the Disputed Claims Reserve associated with the Liquidation Trust, and simultaneously transferring such assets (net of any applicable liabilities) to the Liquidation Trust. Accordingly, a Holder of ~~an Allowed~~such Claim ~~in Class 4~~ should generally recognize gain or loss in an amount equal to the ~~difference between (i) the fair market value, as of~~amount deemed realized on the Effective Date ~~of its pro rata share of (a) the GFES MOR/TGS Interest, (b) the GFES TPT Interest, and (c) the Liquidation Trust Assets and (ii) such Holder's~~ (as described above), less its adjusted tax basis in its Claim. Additionally, such Holder should generally recognize its allocable share of income, gain, loss and deductions recognized by the Liquidation Trust on an annual basis.

Because a Holder's ultimate share of the Liquidation Trust Assets based on its Allowed Class 4 Claim will not be determinable on the Effective Date due to, among other things, the existence of Disputed Claims and the value of the Liquidation Trust Assets not being ascertainable at the time of actual receipt on the Effective Date, such Holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of cash and fair market value of the Liquidation Trust Assets ultimately received by such Holder is greater than or less than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph. It is unclear when a Holder of an Allowed Class 4 Claim should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Class 4 Claim; (ii) the tax status of the Holder of such Claim; (iii) whether such Claim has been held for more than one year; (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to such Claim; and (v) whether such Claim was acquired at a market discount. A Holder that purchased its Class 4 Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a de minimis exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

It is possible that the Service may assert that any loss should not be recognizable until the Liquidation Trustee makes its final distribution of the Liquidation Trust Assets. Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the Liquidation Trust Assets.

7.        01:15                                      67

CH\ ~~1723784.11~~1723784.13

3.    **Holders of Allowed Claims in Class 6.**

Although not free from doubt, Holders of Allowed Claims in Class 6 as of the Effective Date should be treated as receiving from the Debtors ~~their respective shares of the applicable Litigation Trust Assets (net of any applicable liabilities)~~a Pro Rata share of the Available Cash remaining after the payment of, or establishment of adequate resrves for, all First Tier Claims and the Senior Noteholder Distribution, other than any such assets allocated to the Disputed Claims Reserve associated therewith, and simultaneously transferring such assets (net of any applicable liabilities) to the ~~Litigation~~Liquidation Trust.  Accordingly, a Holder of such Claim should generally recognize gain or loss in an amount equal to the amount deemed realized on the Effective Date (as described above), less its adjusted tax basis in its Claim.  Additionally, such Holder should generally recognize its allocable share of income, gain, loss and deductions recognized by the ~~Litigation~~Liquidation Trust on an annual basis.

Because a Holder's ultimate share of the ~~Litigation~~Liquidation Trust Assets based on its Allowed Class 6 Claim will not be determinable on the Effective Date due to, among other things, the existence of Disputed Claims and the value of the ~~Litigation~~Liquidation Trust Assets not being ascertainable at the time of actual receipt on the Effective Date, such Holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of cash and fair market value of the ~~Litigation~~Liquidation Trust Assets ultimately received by such Holder is greater than or less than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph.  It is unclear when a Holder of an Allowed Class 6 Claim should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including:  (i) the nature and origin of the Class 6 Claim; (ii) the tax status of the Holder of such Claim; (iii) whether such Claim has been held for more than one year; (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to such Claim; and (v) whether such Claim was acquired at a market discount.  A Holder that purchased its Class 6 Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC.  Under those rules (subject to a de minimis exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

It is possible that the Service may assert that any loss should not be recognizable until the ~~Litigation~~Liquidation Trustee makes its final distribution of the ~~Litigation~~Liquidation Trust Assets.  Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the ~~Litigation~~Liquidation Trust Assets.

4.    **Holders of Disputed Claims.**

Although not free from doubt, Holders of Disputed Claims should generally recognize gain or loss in an amount equal to the amount deemed realized on the date such Claim becomes an Allowed Claim, less the adjusted tax basis of its Claim.  Additionally, after such Claims become Allowed Claims, such Holders should generally recognize their allocable share of income, gain, loss and deductions recognized by the ~~Liquidating~~Liquidation Trust ~~or the Litigation Trust, as applicable,~~on an annual basis.  However, it is possible that such Holders may be required to recognize the fair market value of such Holder's allocable share of the ~~Liquidating~~Liquidation Trust Assets ~~or the Litigation Trust Assets, as applicable,~~ as an amount received for purposes of computing gain or loss on the Effective Date.

5.    **Interest Income with respect to Allowed Claims.**

Holders of Allowed Claims will be treated as receiving a payment of interest (includible in income in accordance with the Holder's method of accounting for tax purposes) to the extent that any cash or other property received (or deemed received) pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims.  The extent to which the receipt of cash or other property should be attributable to accrued but unpaid interest is unclear.  The Debtors, the ~~Liquidating~~Liquidation Trust ~~and the Litigation Trust~~a intend to take the position, and the Plan provides, that such cash or property distributed pursuant to the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon.  Each Holder should consult its tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any).  A Holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

F.    **BACKUP WITHHOLDING AND INFORMATION REPORTING**

A Holder of an Allowed Claim may be subject to backup withholding (currently at a rate of 28%) with respect to any

7.        01:15

CH\~~1723784.11~~1723784.13

"reportable" payments received pursuant to the Plan unless (i) such Holder falls within certain exempt categories and, when required, demonstrates it eligibility for such exemption or (ii) provides a correct taxpayer identification number, certifies as to no loss of exemption from backup withholding and otherwise complies with the applicable requirements of the backup withholding rules.  A Holder who does not provide a correct taxpayer identification number may be subject to penalties imposed by the Service.  Amounts withheld under the backup withholding rules may be credited against a Holder's tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup holding rules by timely filing the appropriate claim for refund with the Service.

The ~~Liquidating~~Liquidation Trustee will report annually to each ~~Liquidating~~Liquidation Trust Beneficiary and to the Service such Beneficiary's share of any income, gains and losses of the ~~Liquidating~~Liquidation Trust during the calendar year to the extent required by law. ~~The Litigation Trustee will report annually to each Litigation Trust Beneficiary and to the Service such Beneficiary's share of any income, gains and losses of the Litigation Trust during the calendar year to the extent required by law.~~

Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including certain transactions that result in the taxpayer recognizing a loss in excess of specified thresholds. Each Holder should consult its tax advisors regarding these regulations and whether the transactions contemplated by the Plan with respect to such Holder would be subject to these regulations.

**THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS. NEITHER THE DEBTORS NOR THEIR PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

**VII.
RISK FACTORS**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD <u>NOT</u> BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**A.    CERTAIN BANKRUPTCY CONSIDERATIONS**

1.    **The Debtors May Amend, And Other Parties In Interest May Object To, The Amount, Classification And Treatment Of A Claim**

Except as otherwise provided in the Plan the Debtors reserve the right to object to the amount and classification, and to amend or modify the treatment, of any Claim or Interest under the Plan.  In certain circumstances before the Effective Date, other parties in interest may also object to the amount, classification and treatment of any Claim or Interest under the Plan.  Any holder of a Claim that is or may become subject to an objection may not receive its expected share of the estimated Distributions described in this Disclosure Statement or the Plan.

2.    **The Debtors May Not Be Able To Secure Confirmation Of The Plan**

Even if all holders of Claims in the Voting Classes vote to accept the Plan, the Plan might not be confirmed by the Bankruptcy Court.  Bankruptcy Code Section 1129 sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization unless, as here, such liquidation or reorganization is proposed in the plan, and that the value of Distributions to dissenting creditors and stockholders not be less than the value of Distributions such creditors and stockholders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies all the requirements for confirmation of a plan under the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for confirmation of the Plan have been satisfied.

CH\~~1723784.11~~1723784.13

Confirmation of the Plan is also subject to certain conditions as described in Article XI of the Plan. If the conditions are not satisfied, the Plan cannot be confirmed.

3.  **The Debtors May Fail To Meet All Conditions Precedent To Effectiveness Of The Plan**

Although the Debtors believe that the Effective Date may occur very shortly after the Confirmation Date, there can be no assurance as to such timing (or that the Effective Date even occurs). Moreover, if the conditions precedent to the Effective Date, including the entry of a Confirmation Order, execution and delivery of certain documents, and receipt of all necessary authorizations, have not occurred within a reasonable period of time, the Plan may be vacated by the Bankruptcy Court.

4.  **Distributions May Be Delayed or May Be Less Than Anticipated**

A substantial amount of time may elapse between the Effective Date and the receipt of Distributions under the Plan for holders of certain Claims and, if applicable, Interests, because of the time required to achieve recovery of certain assets. While sufficient funds are available to make certain initial Distributions, to the extent that Distributions under the Plan are derived, in whole or in part, from recoveries on the Estate Causes of Action, including Avoidance Actions, prosecuted by the Liquidation Trustee ~~and Litigation Trustee~~, there can be no assurance that any such Estate Causes of Action will produce recoveries that will provide sufficient funds for such Distributions to be made by the Liquidation Trust ~~and Litigation Trust~~.

Actual recoveries under the Plan depend upon the final Allowed amount of Claims. Actual recoveries may be substantially different from the estimates in this Disclosure Statement as a result of disallowances in whole or part of the Face Amounts of Proofs of Claim or the allowance of amounts for Proofs of Claim filed as unliquidated and/or contingent, including in either case the disallowance or allowance of Proofs of Claim that may be subject to a later Bar Date.

~~5. An Asset Purchase Agreement Has Not Been Executed~~

~~The Debtors have not yet executed a stalking horse purchase agreement. If the Debtors do not receive $67.5 million pursuant to the sale of their Assets, there may be insufficient funding to effectuate the Plan and the settlements set forth therein.~~

**5.** ~~6.~~ Certain Risks Arise In Connection With The Liquidation Trust

There are tax and security risks associated with the use of a Liquidation Trust. Although the Liquidation Trust is being organized and structured in a manner intended to be compliant with applicable tax laws and regulations, there is no assurance that the taxing authorities will agree with the assumptions being made in this regard as to the structure, organization and status of the Liquidation Trust.

In addition, although the Liquidation Trust is intended to be established in a manner that does not constitute the interests in the Liquidation Trust as securities or require registration under or compliance with security laws and regulations, regulators could disagree with or dispute the applicability of security laws. The potential consequences could include challenges to the validity of the Liquidation Trust or, at a minimum, increased compliance cost and greater expense to the operation of the Liquidation Trust.

There is a risk that the assignment or transfer of the Estate Causes of Action, claims and privileges to the Liquidation Trust as contemplated by the Plan could be subject to challenge that, if successful, could nullify the transfer of the Estate Causes of Action, in whole or in part, and result in the Liquidation Trust being unable to pursue those Estate Causes of Action or assert claims or privileges in connection therewith.

The Plan includes provisions that nothing in its provisions or the establishment of the Liquidation Trust and the transfer of Estate Causes of Action to the Liquidation Trust is intended to create or give rise to any claim of preclusion or estoppel in defense of any Estate Causes of Action. Nevertheless, there is a risk that despite such intention and such provisions, there could be a determination that some act or event occurring in connection with the Plan, its implementation and the establishment and operation of the Liquidation Trust will be deemed to create such defenses.

There is a risk that the term of the Liquidation Trust will be inadequate to complete the full pursuit and resolution of the Estate Causes of Action.

The Plan and provisions regarding the establishment and operation of the Liquidation Trust require the selection of a Liquidation Trustee that is a Person designated by the Official Creditors' Committee and subject to reasonable approval

7.       01:15

CH\~~1723784.11~~1723784.13

by the Debtors.  There is a risk, despite every effort to select a Person who is qualified to perform the tasks of the Liquidation Trustee, that the Person selected will be less effective than what might have been achieved by continued proceeding in the Chapter 11 Cases.

### 7. Certain Risks Arise In Connection With The Litigation Trust

There are tax and security risks associated with the use of a Litigation Trust.  Although the Litigation Trust is being organized and structured in a manner intended to be compliant with applicable tax laws and regulations, there is no assurance that the taxing authorities will agree with the assumptions being made in this regard as to the structure, organization and status of the Litigation Trust.

In addition, although the Litigation Trust is intended to be established in a manner that does not constitute the interests in the Litigation Trust as securities or require registration under or compliance with security laws and regulations, regulators could disagree with or dispute the applicability of security laws.  The potential consequences could include challenges to the validity of the Litigation Trust or, at a minimum, increased compliance cost and greater expense to the operation of the Litigation Trust.

There is a risk that the assignment or transfer of the Avoidance Actions, claims and privileges to the Litigation Trust as contemplated by the Plan could be subject to challenge that, if successful, could nullify the transfer of the Estate Causes of Action, in whole or in part, and result in the Litigation Trust being unable to pursue those Estate Causes of Action or assert claims or privileges in connection therewith.

The Plan includes provisions that nothing in its provisions or the establishment of the Litigation Trust and the transfer of Avoidance Actions to the Litigation Trust is intended to create or give rise to any claim of preclusion or estoppel in defense of any Avoidance Actions.  Nevertheless, there is a risk that despite such intention and such provisions, there could be a determination that some act or event occurring in connection with the Plan, its implementation and the establishment and operation of the Litigation Trust will be deemed to create such defenses.

There is a risk that the term of the Litigation Trust will be inadequate to complete the full pursuit and resolution of the Avoidance Actions.

The Plan and provisions regarding the establishment and operation of the Litigation Trust require the selection of a Litigation Trustee that is a Person designated by the Official Creditors' Committee and subject to reasonable approval by the Debtors.  There is a risk, despite every effort to select a Person who is qualified to perform the tasks of the Litigation Trustee, that the Person selected will be less effective than what might have been achieved by continued proceeding in the Chapter 11 Cases.

**B.    DISCLOSURE STATEMENT DISCLAIMER**

1.    **The Information Contained Herein Is For Soliciting Votes Only**

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purposes.

2.    **This Disclosure Statement Was Not Approved By The SEC**

This Disclosure Statement has not been filed with the SEC or any state regulatory authority.  Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.    **The Financial Information Contained In This Disclosure Statement Is Not Audited**

**The financial information contained in this Disclosure Statement has not been audited.**  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable good faith efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without material inaccuracies.

7.        01:15

CH\~~1723784.11~~1723784.13

4.    **This Disclosure Statement Contains Forward Looking Statements**

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "believe," "predicts," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analysis, Distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual Distributions to holders of Allowed Claims and Interests may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

5.    **No Legal Or Tax Advice Is Provided To You By This Disclosure Statement**

**This Disclosure Statement is not legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

6.    **No Admissions Are Made By This Disclosure Statement**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the holders of Claims or Interests or any other parties in interest.

7.    **No Reliance Should Be Placed On Any Failure To Identify Causes of Action Or Projected Objections**

No reliance should be placed on the fact that a particular Cause of Action or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  Except as otherwise provided in the Plan, the Confirmation Order or a Final Order, the Debtors before the Effective Date or the Liquidation Trust after the Effective Date may seek to investigate, file and prosecute any Estate Causes of Action or objections to Claims and Interests irrespective of whether the Disclosure Statement identifies such Estate Causes of Action or objections.

8.    **Nothing Herein Constitutes A Waiver Of Any Right To Object To Claims Or Recover Transfers And Assets**

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors, the Liquidation Trust or any party in interest, as the case may be, to object to that holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets made to such holder, regardless of whether any objections or Causes of Action are specifically or generally identified herein.

9.    **The Information Used Herein Was Provided By The Debtors And Was Relied Upon By The Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10.    **The Potential Exists For Material Inaccuracies, And The Debtors Have No Duty To Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable good faith efforts to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

7.        01:15

CH\~~1723784.11~~1723784.13

11.    **No Representations Made Outside The Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Debtors, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors.

**VIII.**
**CONFIRMATION AND CONSUMMATION OF THE PLAN OF LIQUIDATION**

A.    **SOLICITATION OF VOTES**

This Disclosure Statement, including all appendices hereto, together with the related materials included herewith, are being furnished to the holders of Shell Secured Claims in Class 3, Senior Noteholder Claims in Class 4, Shell Other Claims in Class 5 and General Unsecured Claims in Class 6, which Classes are the only Classes entitled to vote on the Plan.  The process by which the Debtors will solicit votes on the Plan is summarized in Parts I and X of this Disclosure Statement.  **All parties who are entitled to vote should read Parts I and X carefully to ensure that votes are properly and timely submitted such that they are counted as votes to accept or reject the Plan.**

B.    **CONFIRMATION PROCEDURES**

Bankruptcy Code Section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of liquidation.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Bankruptcy Code Section 1128(b) provides that any party in interest may object to confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objecting party, the nature and amount of Claims or Interests held or asserted by the objecting party against the Debtors' Estates, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon (i) the Office of the United States Trustee for the District of Delaware, attn: Tiiara Patton, J. Caleb Boggs Federal Building, 844 North King Street, Suite 2207, Lock Box 35, Wilmington, DE 19801 (ii) Latham & Watkins LLP, attn: Josef Athanas, Caroline Reckler and Matthew Warren, 233 S. Wacker Drive, Suite 5800, Chicago, IL 60606, (iii) Young Conaway Stargatt & Taylor, LLP, attn: Michael Nestor and Kara Hammond Coyle, 1000 North King Street, Wilmington, DE 19801, (iv) Greenburg Traurig, LLP, attn: David Kurzweil, 3333 Piedmont Road, NE, Suite 2500, Atlanta, GA 30305, (v) Brown Rudnick LLP, attn: Robert Stark, Seven Times Square, New York, New York 10036, (vi) Jones Day, attn: Paul D. Leake, Richard H. Engman and Michael J. Cohen, 222 East 41st Street, New York, NY 10017, (vii) Richards, Layton & Finger, P.A., attn: William A. Romanowicz, One Rodney Square, 920 North King Street, Wilmington, DE 19801, (viii) Liskow & Lewis, attn: Michael D. Rubenstein, First City Tower, 1001 Fannin Street, Suite 1800, Houston, TX  77002, (ix) Potter Anderson & Corroon LLP, attn: Laurie Selber Silverstein, 1313 North Market Street, 6th Floor, Wilmington, DE 19801, (x) Cole, Schotz, Meisel, Forman & Leonard, P.A., attn: Norman L. Pernick, 500 Delaware Avenue, Suite 1410, Wilmington, DE 19801, (xi) TPT, attn: Craig Ryan, 298 Louisiana Road, Franklin, LA, 70538, (xii) Katten Muchin Rosenman LLP, attn: Craig A. Barbarosh, 575 Madison Avenue, New York, NY 10022-2585, (xiii) Cousins Chipman & Brown, LLP, attn: Scott Cousins and Ann Kashishian, 1007 North Orange Street, Suite 1110, Wilmington, DE 19801, and (xiv) such other parties as the Bankruptcy Court may order, so as to be actually received no later than the date and time designated in the notice of the Confirmation Hearing.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan.  **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

C.    **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

1.    **General Requirements**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Bankruptcy Code Section 1129(a) have been satisfied with respect to the Plan.  The Debtors believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the requirements

of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

    2.    **Best Interests Test**

Often called the "best interests" test, Bankruptcy Code Section 1129(a)(7) requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor is liquidated under chapter 7 of the Bankruptcy Code as of the effective date of the plan.  To make these findings with respect to the Plan, the Bankruptcy Court must: (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if the Debtors' Chapter 11 Cases were converted to chapter 7 cases on the Effective Date of the Plan and the assets of the Debtors' estate were liquidated; (b) determine the liquidation Distribution that each holder of a Claim or an Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation Distribution to the Distribution that such holder would receive under the Plan if the Plan were confirmed.

In chapter 7 cases, creditors and equity interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid in full: (a) holders of secured claims (to the extent of the value of their collateral); (b) administrative creditors of the chapter 7 case, (c) administrative creditors of the chapter 11 case, (d) holders of priority claims; (e) holders of unsecured claims; (f) holders of debt expressly subordinated by its terms, by order of the bankruptcy court or by law; and (g) holders of equity interests.

Accordingly, the cash amount that would be available for satisfaction of claims (other than secured claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the debtors, augmented by the unencumbered cash held by the debtors at the time of the commencement of the liquidation.  Such cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the use of chapter 7 for purposes of a liquidation.

As described in more detail in the Liquidation Analysis attached as <u>Appendix C</u> to this Disclosure Statement, except with respect to Shell, which has consented to its treatment in the Plan, the Debtors believe that confirmation of the Plan will provide each holder of an Allowed Claim or Allowed Interest in each Impaired Class with a recovery greater than or equal to the value of any Distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code because, among other reasons, the liquidation under the Plan will be conducted with the continuing involvement of parties who have been involved in the Chapter 11 Cases and have historical knowledge that will result in efficiencies and economies not available with a new chapter 7 trustee.  In addition, distributions in a chapter 7 case may not occur for a longer period of time than Distributions under the Plan, thereby reducing the present value of such distributions.  In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors.

A table that compares the estimated recovery under the Plan to a chapter 7 liquidation for each Impaired Class is provided below.  The estimated recovery set forth in this table is for Shell Secured Claims in Class 3, Senior Noteholder Claims in Class 4, and General Unsecured Claims in Class 6.  The Class 5 Shell Other Claims are not included because Shell has consented to receiving a release of all Causes of Action in exchange for such Claims.  The aggregate amount of Allowed Claims finally entitled to receive Distributions under the Plan may be higher or lower than the assumed aggregate amounts as a result of disallowances in whole or part of the face amounts of Proofs of Claim or the allowance of amounts for Proofs of Claim filed as unliquidated and/or contingent, including in either case the disallowance or allowance of Proofs of Claim that may be subject to a later Bar Date.  It should also be noted that certain Claims entitled to be paid in full ahead of Classes 5 and 6, including Priority Tax Claims subject to the later Governmental Unit Bar Date, Administrative Claims subject to the Administrative Claims Bar Date, and postpetition Claims for taxes that are not subject to any Bar Date, may be asserted and Allowed in amounts that significantly diminish the amount of Available Cash.  Thus, the final recovery for such Classes may be lower or higher than the estimated recovery set forth below.

| *Claim/Interest* | *Projected Recovery Under the Plan "Medium" Scenario* | *Projected Recovery from Chapter 7 Liquidation* | | |
|---|---|---|---|---|
| | | **Low** | **Medium** | **High** |
| Class 3:  Shell Secured Claim | 100% | 100% | 100% | 100% |
| Class 4:  Senior Noteholder Claims | ~~26~~29% | ~~11~~14% | ~~24~~26% | ~~38~~37% |

| Claim/Interest | Projected Recovery Under the Plan "Medium" Scenario | Projected Recovery from Chapter 7 Liquidation | | |
|---|---|---|---|---|
| Class 6:  General Unsecured Claims | ~~32~~14% | 0% | ~~3~~5% | ~~7~~11% |
| Class 7:  Subordinated Other Claims | 0% | 0% | 0% | 0% |
| Class 8:  Subordinated Stock Claims | 0% | 0% | 0% | 0% |
| Class 9:  GFES Interests | 0% | 0% | 0% | 0% |
| Class 10:  Subsidiary Interests | 0% | 0% | 0% | 0% |

3.      **Feasibility**

Bankruptcy Code Section 1129(a)(11) requires that the Plan is able to achieve its objectives, in that it is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor, unless such liquidation or reorganization is proposed in the plan. Since the Plan proposes liquidation, there are no impediments to achieving a liquidation and the Liquidation Trust will have sufficient Assets to make the Distributions required by the Plan, the Plan is feasible.  For purposes of determining whether the Plan meets this requirement, the Debtors analyzed their ability to meet their obligations under the Plan. The Debtors believe they will receive sufficient proceeds from the sale of their vehicles and equipment to meet their obligations under the Plan.

4.      **Acceptance By Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan either (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation and otherwise leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest.

Bankruptcy Code Section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those creditors who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

Claims in Classes 1 and 2 are Unimpaired under the Plan, and the holders of Claims in such Classes are deemed to accept the Plan.  Claims in Classes 3, 4, 5 and 6 are Impaired under the Plan, and the holders of Claims in such Classes are entitled to vote on the Plan.  Claims in Classes 7 and 8 and Interests in Classes 9 and 10 are Impaired under the Plan, and the holders of Claims and Interests in such Classes are not expected to receive any recovery under the Plan and are, thus, deemed to reject the Plan.

Pursuant to Bankruptcy Code Section 1129, all Classes of Claims or Interests must either have accepted the Plan or not be Impaired by the Plan for the Plan to be confirmed without application of the "fair and equitable test" to their Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein.

The Debtors will request confirmation of the Plan, as it may be modified from time to time, under Bankruptcy Code Section 1129(b) as more fully described below with respect to Classes 7, 8, 9 and 10, which are deemed to reject the Plan, and any of Classes 3, 4, 5 or 6 that vote against the Plan.

5.      **Confirmation Without Acceptance By All Impaired Classes**

Bankruptcy Code Section 1129(b) allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, provided that the plan has been accepted by at least one impaired class of claims.  Pursuant to Bankruptcy Code Section 1129(b), notwithstanding an impaired class's rejection or deemed rejection of the Plan, the Plan can be confirmed, at the debtors' request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" (as discussed below) and is "fair and equitable" (as discussed below) with respect to each class of claims or equity interests that is impaired under, and has not accepted, the Plan.

(a)      No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that such treatment not be

7.      01:15                                        75

"unfair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors in a materially different manner without unfairly discriminating against either class. This test only applies to classes that reject or that are deemed to have rejected a plan.

(b)      Fair And Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. This test only applies to classes that reject or that are deemed to have rejected the Plan. As to the rejecting class, the test sets different standards depending on the type of claims or equity interests in such class:

- <u>Secured Claims</u>. The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the following requirement that either:

  - (I) the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

  - (ii) the plan provides for the sale, subject to Bankruptcy Code Section 363(k), of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds as described herein; or

  - (iii) the plan provides for the realization by such holders of the indubitable equivalent of such claims.

- <u>Unsecured Claims</u>. The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either:

  - the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

  - the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

- <u>Equity Interests</u>. The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

  - the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

  - the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

The treatment of Secured Claims, Unsecured Claims and Interests under the Plan satisfies the "fair and equitable" test.

## D.      CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date. If the Bankruptcy Court agrees to waive the stay under Bankruptcy Rule 3020(e), the Debtors expect consummation of the Plan to occur within several days after Confirmation of the Plan. If the stay is not waived, consummation should occur within several days after the fourteen-day stay terminates. For a more detailed discussion of the conditions precedent to the consummation of the Plan, see Article XI of the Plan.

# IX.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan provides holders of Claims with the greatest possible value and earliest possible returns that can be realized on their respective Claims. The Debtors also believe that the Plan is fair and reasonable in its treatment of all constituencies. The alternatives to Confirmation of the Plan are (i) confirmation of an alternative plan submitted by a party in interest in the Chapter 11 Cases; (ii) liquidation of the Assets, if necessary, and distribution under chapter 7 of the Bankruptcy Code; and (iii) dismissal of the Chapter 11 Cases. As discussed below, the Debtors believe that the alternatives will be less beneficial to holders of Claims than if the Plan is consummated.

### A.    ALTERNATIVE PLAN

If the Plan is not confirmed, the Debtors or another party in interest in the Chapter 11 Cases will have an opportunity to file another plan, but it does not appear that alternative plans are likely to succeed. The Debtors believe that no other plan would provide holders of Claims and Interests with a greater value or earlier recovery than they would be entitled to receive under the Plan. The Debtors have engaged in extensive negotiations with the Official Creditors' Committee, and the Plan provides for Distributions to holders of Claims and Interests in a "waterfall" based on the relative seniority and legal priorities of the Classes. The Debtors have no reason to believe that any further negotiations regarding a plan of liquidation would lead to any alternative plan that would provide greater recoveries that could be confirmed within a reasonable period of time and without protracted litigation and additional administrative expense.

### B.    CHAPTER 7 LIQUIDATION

A chapter 7 liquidation of the Debtors could be carried out with the anticipated results described above. For the reasons set forth above, the Debtors believe that the Distributions to holders of Claims under the Plan will be greater and earlier than the distributions that might result after conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.

### C.    DISMISSAL

Upon dismissal of the Chapter 11 Cases, the protections of the Bankruptcy Code would disappear, thereby resulting in costly, uncontrolled and protracted litigation in various jurisdictions among and between the parties in interest. Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a viable alternative to Confirmation of the Plan.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES. THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

# X.
## THE SOLICITATION; VOTING PROCEDURES

### A.    PARTIES ENTITLED TO VOTE

In general, a holder of a claim or interest may vote to accept or to reject a plan if (a) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest and (b) the claim or interest is "impaired" by the plan and entitled to receive a recovery under the Plan.

Under Bankruptcy Code Section 1124, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of

such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

**B.**     **CLASSES ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN**

Holders of Claims in Classes 3, 4, 5 and 6 are entitled to vote to accept or reject the Plan.  By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and each Impaired Class of Claims or Interests that will receive nothing under the Plan is deemed to have rejected the Plan and, therefore, the holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan.  Consequently, Classes 1 and 2 are deemed to have accepted the Plan and Classes 7, 8, 9 and 10 are deemed to have rejected the Plan and, therefore, none of the holder of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

**C.**     **WAIVERS OF DEFECTS, IRREGULARITIES, ETC.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Voting Agent and the Debtors in their sole discretion, which determination will be final and binding. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of Ballots must be delivered to the Voting Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal.  The Debtors also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.  The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the Voting Agent and the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

**D.**     **WITHDRAWAL OF BALLOTS; REVOCATION**

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be received by the Voting Agent in a timely manner at Prime Clerk, LLC, Attention: Green Field Energy Services, 830 Third Avenue, 9th Floor, New York, NY 10022.  The Debtors intend to consult with the Voting Agent to determine whether any withdrawals of Ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast Ballot.  Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change his or its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

**E.**     **SPECIAL INSTRUCTIONS FOR HOLDERS OF SENIOR NOTEHOLDER CLAIMS**

If you are the holder of any Senior Noteholder Claim, or if you are acting on behalf of the holder of any of such Claims, please carefully review the special instructions that accompany your Ballot.  The special instructions may not be consistent with the general instructions contained in this Disclosure Statement.  In the event of an inconsistency, you should follow the special instructions that accompany your Ballot.

The Voting Record Date for determining which holders of Senior Secured Notes are entitled to vote on the Plan is March 11, 2014.

CH\~~1723784.11~~1723784.13

1.    **Beneficial Owners**

A beneficial owner holding Senior Secured Notes as record holder in its own name may vote using either a master Ballot or a beneficial owner Ballot.  The Ballot must be completed, signed and returned to the Voting Agent on or before the Voting Deadline using the self-addressed envelope provided.

A beneficial owner holding Senior Secured Notes in "street name" through a Nominee may vote on the Plan by one of the following two methods (as selected by such beneficial owner's Nominee):

- Complete and sign the beneficial owner Ballot provided by the Nominee.  Return the Ballot to the Nominee as promptly as possible and in sufficient time to allow such Nominee to process the Ballot and return it to the Voting Agent by the Voting Deadline.  If no self-addressed envelope was provided by the Nominee, contact the Voting Agent for instructions; or

- If the Nominee provides a pre-validated beneficial owner Ballot (as described below), complete and sign the pre-validated Ballot and return it to the Voting Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

Any beneficial owner Ballot returned to a Nominee by a beneficial owner will not be counted for purposes of acceptance or rejection of the Plan unless such Nominee properly completes and delivers to the Voting Agent either the beneficial owner Ballot or a master Ballot that reflects the vote of such beneficial owner.

If any beneficial owner owns Senior Secured Notes through more than one Nominee, such beneficial owner may receive multiple mailings containing beneficial owner Ballots.  The beneficial owner should execute a separate Ballot for each block of Senior Secured Notes that it holds through any particular Nominee and return each Ballot to the respective Nominee in the envelope provided therewith.  Beneficial owners who execute multiple Ballots with respect to Senior Secured Notes held through more than one Nominee must indicate on each Ballot the names of ALL such other Nominees and the additional amounts of such Senior Secured Notes so held and voted.  If a beneficial owner holds a portion of the Senior Secured Notes through a Nominee and another portion as a record holder, the beneficial owner should follow the procedures described in subparagraph (a) above to vote the portion held of record and the procedures described in subparagraph (b) above to vote the portion held through a Nominee.

2.    **Nominees**

A Nominee that on the Voting Record Date is the registered holder of Senior Secured Notes for a beneficial owner can obtain the votes of the beneficial owners of such Senior Secured Notes, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

- The Nominee may "pre-validate" a beneficial owner Ballot by (i) signing the Ballot; (ii) indicating on the Ballot the name of the registered holder, the amount of Senior Secured Notes held by the Nominee for the beneficial owner, and the account numbers for the accounts in which such Subordinated are held by the Nominee; and (iii) forwarding such Ballot, together with the Disclosure Statement, return envelope and other materials requested to be forwarded, to the beneficial owner for voting.  The beneficial owner must then complete the information requested in the Ballot, review the certifications contained in the Ballot, and return the Ballot directly to the Voting Agent in the pre-addressed envelope so that it is RECEIVED by the Voting Agent before the Voting Deadline.  A list of the beneficial owners to whom "pre-validated" beneficial owner Ballots were delivered should be maintained by Nominees for inspection for at least one year form the Voting Deadline; or

- If the Nominee elects not to pre-validate the beneficial owner Ballot, the Nominee may obtain the votes of beneficial owners by forwarding to the beneficial owners the unsigned beneficial owner Ballot, together with the Disclosure Statement, a return envelope provided by, and addressed to, the Nominee, and other materials requested to be forward.  Each such beneficial owner must then indicate his/her or its vote on the Ballot, complete the information requested in the Ballot, review the certifications contained in the Ballot, execute the Ballot, and return the Ballot to the Nominee.  After collecting the beneficial owner Ballot, the Nominee should, in turn, complete a master Ballot compiling the votes and other information from the beneficial owner Ballot, execute the master Ballot, and deliver the master Ballot to the Voting Agent so that it is RECEIVED by the Voting Agent before the Voting Deadline.  All beneficial owner Ballots returned by beneficial owners should either be forwarded to the Voting Agent (along with the master Ballot) or retained by Nominees for inspection for at least one year from the Voting Deadline.  EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL OWNERS TO RETURN THEIR BENEFICIAL OWNER

BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT OT THE VOTING AGENT SO THAT IT IS RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE

UNLESS THE BENEFICIAL OWNER BALLOT OR MASTER BALLOT BEING FURNISHED IS TIMELY SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST OF THE BANKRUPTCY COURT THAT ANY SUCH BENEFICIAL OWNER BALLOT OR MASTER BALLOT BE COUNTED. IN NO CASE SHOULD A BENEFICIAL OWNER BALLOT OR MASTER BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE NOMINEE OR THE VOTING AGENT.

3.      **Delivery of Senior Secured Notes**

The Debtors are not at this time requesting the delivery of, and neither the Debtors nor the Voting Agent will accept, certificates representing any Senior Secured Notes.

## F.      VOTING RIGHTS OF DISPUTED CLAIMANTS

Holders of Disputed Claims in Classes 3, 4, 5 and 6 whose Claims are (i) asserted as wholly unliquidated or wholly contingent in a timely Proof of Claim or (ii) asserted in a Proof of Claim as to which an objection to the entirety of the claim is pending as of the Voting Record Date (collectively, the "**Disputed Claimants**") are not permitted to vote on the Plan except as provided in the order approving the Debtors' solicitation procedures (the "**Solicitation Order**"). Pursuant to the procedures outlined in the Solicitation Order, Disputed Claimants may obtain a Ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their Claims temporarily allowed for voting purposes only (a "**Rule 3018 Motion**"). Any such Rule 3018 Motion must be filed with the Bankruptcy Court and served upon the Debtors' counsel, Official Creditors' Committee's counsel, and the Voting Agent by the later of (i) March 26, 2014 and (ii) five (5) business days after an objection to a claimant's Proof of Claim is filed by the Debtors (the "**Rule 3018 Motion Deadline**"). Any party timely filing and serving a Rule 3018 Motion will be provided a Ballot and be permitted to cast a provisional vote to accept or reject the Plan. If and to the extent that the Debtors and such party are unable to resolve the issues raised by the Rule 3018 Motion prior to the Voting Deadline established by the Bankruptcy Court, then at the Confirmation Hearing the Bankruptcy Court will determine whether the provisional Ballot should be counted as a vote on the Plan. Nothing herein affects any party's right to object to any Proof of Claim after the Voting Record Date. With respect to any such objection, the Debtors may request that any vote cast by the holder of the Claim subject to the objection be disallowed and not counted in determining whether the requirements of Bankruptcy Code Section 1126(c) have been met.

## G.      FURTHER INFORMATION; ADDITIONAL COPIES

If you have any questions or require further information about the voting procedures for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact the Voting Agent at:

<div align="center">

Prime Clerk LLC
Attention: Green Field Energy Services
830 Third Avenue, 9th Floor
New York, New York 10022
Email:  gfes@primeclerk.com

</div>

**RECOMMENDATION**

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger or equal distribution to the Debtors' creditors than would otherwise result in liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to holders of Allowed Claims than that which is proposed under the Plan. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan cast their Ballots to accept the Plan and support confirmation of the Plan.


Dated:  ~~February~~**March** 6, 2014

> GREEN FIELD ENERGY SERVICES, INC.
> HUB CITY TOOLS, INC.
> PROPPANT ONE, INC.
>
>
> By:_____
>
> Name:  ~~Earl Blackwell~~**Thomas Hill**
> Title:  Chief ~~Financial~~**Restructuring** Officer

**LATHAM & WATKINS LLP**
Josef S. Athanas
Caroline A. Reckler
Matthew L. Warren
Sarah E. Barr
Suite 5800
233 South Wacker Drive
Chicago, IL  60606
(312) 876-7700

**YOUNG CONAWAY STARGATT
& TAYLOR, LLP**
Michael R. Nestor
Kara Hammond Coyle
1000 North King Street
Wilmington, DE 19801
(302) 571-6600

Counsel for Debtors

7.          01:15

CH\~~1723784.11~~1723784.13

**APPENDIX A**

Plan

**<u>APPENDIX B</u>**

Organizational Chart

**APPENDIX C**

Liquidation Analysis

**APPENDIX D**


**Examiner's Report**

| Summary report: Litéra® Change-Pro TDC 7.5.0.50 Document comparison done on 3/6/2014 7:29:43 PM | |
|---|---|
| **Style name:** L&W without Moves | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** CH-1723784-v11 GFES  Disclosure Statement [AS FILED ON FEBRUARY 6].docx | |
| **Modified DMS:** iw://US-DOCS/CH/1723784/13 | |
| **Changes:** | |
| Add | 302 |
| Delete | 611 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 3 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format Changes | 0 |
| **Total Changes:** | 916 |